3

## I. JURISDICTION AND GENERAL PROVISIONS

1. This Administrative Order on Consent ("Order") is entered into voluntarily by the United States Environmental Protection Agency ("EPA") and PacifiCorp, d/b/a Utah Power ("Respondent"). This Order provides for the performance of a removal action by Respondent and the reimbursement of certain response costs incurred by the United States at or in connection with the property on or near 333 West 100 South in Salt Lake City, Utah, the "Vermiculite Intermountain Site" or the "Site."

2. This Order is issued under the authority vested in the President of the United States by Sections 104, 106(a), 107 and 122 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9604, 9606(a), 9607 and 9622, as amended ("CERCLA").

3. EPA has notified the State of Utah (the "State") of this action pursuant to Section 106(a) of CERCLA, 42 U.S.C. § 9606(a).

4. EPA and Respondent recognize that this Order has been negotiated in good faith and EPA further recognizes Respondent's cooperation and initiative in connection with the Site and the matters addressed in this Order. EPA and Respondent further agree that Respondent's participation in this Order and any actions undertaken by Respondent in accordance with this Order do not constitute an admission of liability or agreement with EPA's findings of fact or determinations of law contained in this Order, except in a proceeding to enforce the terms of this Order. Respondent does not admit, and retains the right to controvert in any subsequent proceedings other than proceedings to implement or enforce this Order, the validity of the findings of facts, conclusions of law, and determinations in Sections IV and V of this Order. Respondent agrees to comply with and be bound by the terms of this Order and further agrees that it will not contest the basis or validity of this Order or its terms.

## II. PARTIES BOUND

5. This Order applies to and is binding upon EPA and upon Respondent and its successors and assigns and Respondent is liable for implementing all activities required by this Order. Any change in ownership or corporate status of a Respondent including, but not limited to, any transfer of assets or real or personal property shall not alter Respondent's responsibilities under this Order.

6. Respondent shall ensure that its contractors, subcontractors, and representatives receive a copy of this Order and comply with this Order. Respondent shall be responsible for any noncompliance with this Order.

A-51

4

## III. DEFINITIONS

7. Unless otherwise expressly provided herein, terms used in this Order which are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations. Whenever terms listed below are used in this Order or in the appendices attached hereto and incorporated hereunder, the following definitions shall apply:

a. "Action Memorandum" shall mean the EPA Action Memorandum relating to the Site signed on April 7, 2004, by the Assistant Regional Administrator, Office of Ecosystem Protection and Remediation, EPA Region 8, or his delegate, and all attachments thereto. The Action Memorandum is attached as Appendix A and incorporated herein by reference.

b. "CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601, et seq.

c. "Day" shall mean a calendar day. In computing any period of time under this Order, where the last day would fall on a Saturday, Sunday, or Federal holiday, the period shall run until the close of business of the next working day.

d. "Effective Date" shall be the effective date of this Order as provided in Section XXXII.

e. "EPA" shall mean the United States Environmental Protection Agency and any successor departments or agencies of the United States.

f. "Future Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States incurs in reviewing or developing plans, reports and other items pursuant to this Order, verifying the Work, or otherwise implementing, overseeing, or enforcing this Order, including but not limited to, payroll costs, contractor costs, travel costs, laboratory costs, the costs incurred pursuant to Paragraph 26 (costs and attorneys fees and any monies paid to secure access, including the amount of just compensation), Paragraph 38 (emergency response) and Paragraph 64 (work takeover) after the Effective Date of this Order.

g. "Interest" shall mean interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund established by 26 U.S.C. § 9507, compounded annually on October 1 of each year, in accordance with 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year.

h. "PacifiCorp Property" shall mean the real property located at 147 South 400 West in Salt Lake City, Salt Lake County, Utah, and described more fully in Appendix B attached hereto and incorporated herein.

5

i. "National Contingency Plan" or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

j. "Order" shall mean this Administrative Order on Consent and all appendices attached hereto (listed in Section XXXI). In the event of conflict between this Order and any appendix, this Order shall control.

k. "Paragraph" shall mean a portion of this Order identified by an Arabic numeral.

l. "Parties" shall mean EPA and Respondent.

m. "RCRA" shall mean the Solid Waste Disposal Act, as amended, 42 U.S.C. §§ 6901, *et seq.* (also known as the Resource Conservation and Recovery Act).

n. "Respondent" shall mean PacifiCorp, d/b/a Utah Power.

o. "Section" shall mean a portion of this Order identified by a Roman numeral.

p. "Site" shall mean the Vermiculite Intermountain Superfund Site, located at or near 333 West 100 South in Salt Lake City, Utah and depicted generally on the map in the Action Memorandum, which is attached as Appendix A.

q. "State" shall mean the State of Utah.

r. "Waste Material" shall mean 1) any "hazardous substance" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); 2) any pollutant or contaminant under Section 101(33) of CERCLA, 42 U.S.C. § 9601(33); and 3) any "solid waste" under Section 1004(27) of RCRA, 42 U.S.C. § 6903(27).

s. "Work" shall mean all activities Respondent is required to perform under this Order.

t. "Work Plan" shall mean a consolidated Work Plan containing two phases, Phase I (relating to response activities within the control building located on the PacifiCorp Property), and Phase II (relating to removal of soils within the PacifiCorp Property), as set forth in Appendix D to this Order, and any modifications made thereto in accordance with this Order.

6

## IV. FINDINGS OF FACT

8. EPA hereby makes the following findings of fact for purposes of this Order:

a. The Site includes the location of the former Vermiculite Intermountain plant (the "plant") and areas contaminated by asbestos emissions therefrom.

b. The plant, which operated between the early 1940s and 1984, performed various production operations with vermiculite concentrate from the Libby Vermiculite Mine, located in Libby, Montana. The Libby vermiculite concentrate contained amphibole asbestos, frequently above trace levels. EPA records show that the plant received at least 25,000 tons of vermiculite concentrate from the Libby Mine.

c. Historical records from the Libby Mine and data collected during investigations at the Libby Mine show that the handling and processing of Libby vermiculite during production processes releases high levels of respirable airborne asbestos fibers.

d. EPA's Libby investigations have shown that disturbance of dust or soils containing the amphibole asbestos from Libby vermiculite produces high levels of respirable airborne asbestos fibers.

e. EPA's investigations at the Libby Mine have shown that human exposure to the amphibole asbestos found in the Libby vermiculite concentrate may cause asbestos-related diseases, including lung cancer, mesothelioma and asbestosis.

f. Respondent owned the property on which the plant operated from 1944 until 1954, leasing the property during that time to the operator of the exfoliation plant. During this time, emissions containing amphibole asbestos left the plant and contaminated surrounding properties, which are now part of the Site. Respondent sold the property in 1954 and reacquired it in 1984.

g. EPA's sampling at the Site has found elevated levels of amphibole asbestos in soils, as well as in dust found in several buildings on the Site. A summary of the data reflecting these findings can be found in the Action Memorandum. EPA has determined that response actions are necessary on/in: 1) the former plant property; the Artistic Printing building, the Frank Edwards Building (and potentially its related Ampco Parking Lot) and the PacifiCorp Property.

## V. CONCLUSIONS OF LAW AND DETERMINATIONS

9. Based on the Findings of Fact set forth above, and the Administrative Record supporting this removal action, EPA has determined that:

a. The Vermiculite Intermountain Site is a "facility" as defined by Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

A-54

7

b. The contamination found at the Site, as identified in the Findings of Fact above, is a "hazardous substance(s)" as defined by Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

c. Respondent is a "person" as defined by Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

d. Respondent is a responsible party under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), and is liable for performance of response action and for response costs incurred and to be incurred at the PacifiCorp Property, as defined below for purposes of this Order:

  i. Respondent is the "owner" and/or "operator" of part of the facility, as defined by Section 101(20) of CERCLA, 42 U.S.C. § 9601(20), and within the meaning of Section 107(a)(1) of CERCLA, 42 U.S.C. § 9607(a)(1).

  ii. Respondent was the "owner" and/or "operator" of part of the facility at the time of disposal of hazardous substances at the facility, as defined by Section 101(20) of CERCLA, 42 U.S.C. § 9601(20), and within the meaning of Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

e. The conditions described in Paragraph 8 (Findings of Fact) above constitute an actual or threatened "release" of a hazardous substance from the facility as defined by Section 101(22) of CERCLA, 42 U.S.C.§ 9601(22).

f. The removal action required by this Order is necessary to protect the public health or welfare or the environment and, if carried out in compliance with the terms of this Order, will be considered consistent with the NCP, as provided in Section 300.700(c)(3)(ii) of the NCP.

## VI. ORDER

Based upon the foregoing Findings of Fact, Conclusions of Law, Determinations, and the Administrative Record for this Site, it is hereby Ordered and Agreed that Respondent shall comply with all provisions of this Order, including, but not limited to, all attachments to this Order and all documents incorporated by reference into this Order.

## VII. DESIGNATION OF CONTRACTOR, PROJECT COORDINATOR, AND ON-SCENE COORDINATOR

10. Respondent shall retain one or more contractors to perform the Work and shall notify EPA of the name(s) and qualifications of such contractor(s) within thirty (30) days of the Effective Date. Respondent shall also notify EPA of the name(s) and qualification(s) of any

8

other contractor(s) or subcontractor(s) retained to perform the Work at least five (5) days prior to commencement of such Work. EPA retains the right to disapprove of any or all of the contractors and/or subcontractors retained by Respondent. If EPA disapproves of a selected contractor, Respondent shall retain a different contractor and shall notify EPA of that contractor's name and qualifications within twenty-one (21) days of EPA's disapproval.

11.  Respondent hereby designates David Wilson of PacifiCorp as its Project Coordinator who has the authority for administration of all actions by Respondent required by this Order. Respondent's Project Coordinator's address is as follows:

> David Wilson, P.E.
> Safety & Environment Dept.
> PacifiCorp Power Delivery
> 825 NE Multnomah, Suite 1700 LCT
> Portland OR 97232
> Desk (503) 813-6635
> Fax (503) 813-5088
> Cell (503) 860-2307

12.  To the greatest extent possible, the Project Coordinator shall be present on Site or readily available during Site work. If EPA determines the performance of the Project Coordinator to be unacceptable, Respondent shall retain a different Project Coordinator and shall notify EPA of that person's name, address, telephone number, and qualifications within three (3) days following EPA's disapproval. Receipt by Respondent's Project Coordinator of any notice or communication from EPA relating to this Order shall constitute receipt by Respondent.

13.  EPA has designated Floyd Nichols of the Office of Preparedness, Assessment and Emergency Response, Region 8, as its On-Scene Coordinator ("OSC"). Except as otherwise provided in this Order, Respondent shall direct all submissions required by this Order to the OSC at U.S. EPA, EPR-ER, 999 18th Street, Suite 300, Denver, CO 80202. Delivery, except in emergency circumstances, shall be by U.S. mail. Mr. Nichols' desk number is (303) 312- 6983 and cell phone number is (303) 898-5132.

14.  EPA and Respondent shall have the right, subject to Paragraph 12, to change its respective designated OSC or Project Coordinator. Respondent shall notify EPA three (3) days before such a change is made. The initial notification may be made orally, but shall be promptly followed by a written notice.

9

## VIII. WORK TO BE PERFORMED

15. Work Plan.

a. Respondent shall perform, at a minimum, all actions necessary to implement the Work as set forth in the Work Plan, which has been approved by EPA. The Work Plan, including its attachments, is hereby incorporated into, and is enforceable under this Order.

b. Respondent shall not commence any Work except in conformance with the EPA-approved Work Plan.

16. Health and Safety Plan. Not less than ten (10) days prior to the date required for commencement of Work by the Work Plan, Respondent shall submit for EPA review and comment a plan that ensures the protection of the public health and safety during performance of on-Site work under this Order. This plan shall be prepared in accordance with EPA's Standard Operating Safety Guide (PUB 9285.1-03, PB 92-963414, June 1992). In addition, the plan shall comply with all currently applicable Occupational Safety and Health Administration ("OSHA") regulations found at 29 C.F.R. Part 1910. If EPA determines that it is appropriate, the plan shall also include contingency planning. Respondent shall incorporate all changes to the plan recommended by EPA and shall implement the plan during the pendency of the removal action.

17. Quality Assurance and Sampling.

a. All sampling and analyses performed pursuant to this Order shall conform to EPA direction, approval, and guidance regarding sampling, quality assurance/quality control ("QA/QC"), data validation, and chain of custody procedures. Respondent shall ensure that the laboratory used to perform the analyses participates in a QA/QC program that complies with the appropriate EPA guidance. Respondent shall follow, as appropriate, "Quality Assurance/Quality Control Guidance for Removal Activities: Sampling QA/QC Plan and Data Validation Procedures" (OSWER Directive No. 9360.4-01, April 1, 1990), as guidance for QA/QC and sampling. Respondent shall only use laboratories that have a documented Quality System that complies with ANSI/ASQC E-4 1994, "Specifications and Guidelines for Quality Systems for Environmental Data Collection and Environmental Technology Programs" (American National Standard, January 5, 1995), and "EPA Requirements for Quality Management Plans (QA/R-2) (EPA/240/B-01/002, March 2001)," or equivalent documentation as determined by EPA. EPA may consider laboratories accredited under the National Environmental Laboratory Accreditation Program ("NELAP") as meeting the Quality System requirements.

b. Upon request by EPA, Respondent shall have such a laboratory analyze samples submitted by EPA for QA monitoring. Respondent shall provide to EPA the QA/QC procedures followed by all sampling teams and laboratories performing data collection and/or analysis.

10

c. Upon request by EPA, Respondent shall allow EPA or its authorized representatives to take split and/or duplicate samples. Respondent and EPA shall notify each other not less than three (3) days in advance of any sample collection activity, unless shorter notice is agreed to by EPA. EPA shall have the right to take any additional samples that EPA deems necessary. Upon request, EPA shall allow Respondent to take split or duplicate samples of any samples it takes as part of its oversight of Respondent's implementation of the Work.

18. Post-Removal Site Control. In accordance with the Work Plan schedule, or as otherwise directed by EPA, Respondent shall submit a proposal for post-removal site control (that is determined to be necessary by EPA) at the PacifiCorp Property which is consistent with Section 300.415(*l*) of the NCP and OSWER Directive No. 9360.2-02. Upon EPA approval, Respondent shall implement such controls and shall provide EPA with documentation of all post-removal site control arrangements.

19. Reporting.

a. Respondent shall submit a written progress report to EPA concerning actions undertaken pursuant to this Order every tenth day after the date of receipt of EPA's approval of the Work Plan until termination of this Order, unless otherwise directed in writing by the OSC. These reports shall describe all significant developments during the preceding period, including the actions performed and any problems encountered, analytical data received during the reporting period, and the developments anticipated during the next reporting period, including a schedule of actions to be performed, anticipated problems, and planned resolutions of past or anticipated problems.

b. Respondent shall submit three (3) copies of all plans, reports or other submissions required by this Order or the Work Plan. Upon request by EPA, Respondent shall submit such documents in electronic form.

c. Respondent shall, at least thirty (30) days prior to the conveyance of any interest in the PacifiCorp Property, give written notice to the transferee that the property is subject to this Order and written notice to EPA and the State of the proposed conveyance, including the name and address of the transferee. Respondent also agrees to require that its successors comply with the immediately proceeding sentence and Sections IX (Site Access) and X (Access to Information).

20. Final Report. Within forty-five (45) days after completion of all Work required by this Order, Respondent shall submit for EPA review and approval a final report summarizing the actions taken to comply with this Order. The final report shall conform, at a minimum, with the requirements set forth in Section 300.165 of the NCP entitled "OSC Reports." The final report shall include a good faith estimate of total costs or a statement of actual costs incurred in complying with the Order, a listing of quantities and types of materials removed off-Site or handled on-Site, a discussion of removal and disposal options considered for those materials, a listing of the ultimate destination(s) of those materials, a presentation of the analytical results of

A-58

11

all sampling and analyses performed, and accompanying appendices containing all relevant documentation generated during the removal action (*e.g.*, manifests, invoices, bills, contracts, and permits). The final report shall also include the following certification signed by a person who supervised or directed the preparation of that report:

"Under penalty of law, I certify that to the best of my knowledge, after appropriate inquiries of all relevant persons involved in the preparation of the report, the information submitted is true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

21. Off-Site Shipments.

a. Respondent shall, prior to any off-Site shipment of Waste Material from the Site to an out-of-state waste management facility, provide written notification of such shipment of Waste Material to the appropriate state environmental official in the receiving facility's state and to the On-Scene Coordinator. However, this notification requirement shall not apply to any off-Site shipments when the total volume of all such shipments will not exceed 10 cubic yards.

i. Respondent shall include in the written notification the following information: 1) the name and location of the facility to which the Waste Material is to be shipped; 2) the type and quantity of the Waste Material to be shipped; 3) the expected schedule for the shipment of the Waste Material; and 4) the method of transportation. Respondent shall notify the state in which the planned receiving facility is located of major changes in the shipment plan, such as a decision to ship the Waste Material to another facility within the same state, or to a facility in another state.

ii. The identity of the receiving facility and state will be determined by Respondent following the award of the contract for the removal action. Respondent shall provide the information required by Paragraph 21(a) and 21(b) as soon as practicable after the award of the contract and before the Waste Material is actually shipped.

b. Before shipping any hazardous substances, pollutants, or contaminants from the Site to an off-site location, Respondent shall obtain EPA's certification that the proposed receiving facility is operating in compliance with the requirements of CERCLA Section 121(d)(3), 42 U.S.C. § 9621(d)(3), and 40 C.F.R. § 300.440. Respondent shall only send hazardous substances or pollutants or contaminants from the Site to an off-site facility that complies with the requirements of the statutory provision and regulation cited in the preceding sentence.

## IX. SITE ACCESS

22. Respondent shall, commencing on the Effective Date, provide EPA ,the State, and their representatives, including contractors, with access at all reasonable times to the PacifiCorp Property for the purpose of conducting any activity related to this Order.

A-59

12

23. EPA recognizes that the PacifiCorp Property includes an active, operating electrical substation that is an integral part of PacifiCorp's operations. EPA further recognizes that a number of critical health and safety policies, rules, regulations and restrictions are relevant to the PacifiCorp Property because of the dangerous nature of the electrical substation operations and for reasons entirely unrelated to any environmental conditions that may be present.

24. In the event that EPA, the State, and any of their representatives, including contractors, seek to have access to PacifiCorp Property, they shall provide PacifiCorp with reasonable advance notice. In all such cases, EPA, the State, and any of their representatives, including contractors, will:

    a. complete PacifiCorp's Substation Awareness Training,

    b. wear proper personal protective equipment (PPE) as described in the Work Plan, and

    c. request the presence of one or more PacifiCorp substation journeyman, who shall be fully 40-hour trained and available every day and on call for emergencies. Respondent shall ensure that a substation journeyman will be present when such a request has been made. If Respondent fails to provide a substation journeyman in violation of this Order, the stipulated penalties set forth in Paragraph 52 shall apply. Accompaniment of a substation journeyman is not required for entry into areas of the PacifiCorp Property where electrical equipment is not located, when such areas are demarcated by physical barriers (fences and walls).

25. EPA agrees to comply with those relevant and appropriate portions of health and safety plans, and policies, rules, regulations and restrictions that are more fully described in the Work Plan.

26. Where any action under this Order is to be performed in areas owned by or in possession of someone other than Respondent, Respondent shall use its best efforts to obtain all necessary access agreements within ten (10) days after the Effective Date, or as otherwise specified in writing by the OSC. Respondent shall immediately notify EPA if after using its best efforts it is unable to obtain such agreements. For purposes of this Paragraph, "best efforts" includes the payment of reasonable sums of money in consideration of access. Respondent shall describe in writing its efforts to obtain access. EPA may then assist Respondent in gaining access, to the extent necessary to effectuate the response actions described herein, using such means as EPA deems appropriate. Respondent shall reimburse EPA for all costs and attorney's fees incurred by the United States in obtaining such access, in accordance with the procedures in Section XV (Payment of Response Costs).

27. If Respondent is required to implement institutional controls on Property that is owned by Respondent, Respondent shall execute and record in the Recorder's Office of Salt Lake County, State of Utah , an easement, running with the land, that (i) grants a right of access for the

A-60

13

purpose of conducting any activity related to this Order, subject to the requirements of Paragraphs 24 and 25 above, and (ii) grants the right to enforce the land use restrictions more fully developed as attachments to the Work Plan attached as Appendix B to this Order, or other restrictions that EPA determines are necessary to implement, ensure non-interference with, or ensure the protectiveness of the response measures to be performed pursuant to this Order.  Respondent shall grant the access rights and the rights to enforce the land use restrictions to the State and its representatives and other appropriate grantees, as determined by EPA.  Respondent shall, within forty-five (45) days of the time that EPA determines that Respondent will be required to implement such institutional controls, submit to EPA for review and approval with respect to such property:

     a.     A draft easement that is enforceable under the laws of the State of Utah , and

     b.     A current title insurance commitment or some other evidence of title acceptable to EPA, which shows title to the land described in the easement to be free and clear of all prior liens and encumbrances (except when those liens or encumbrances are approved by EPA or when, despite best efforts, Respondent is unable to obtain release or subordination of such prior liens or encumbrances).

28.  Within fifteen (15) days of EPA's approval and acceptance of the easement and the title evidence, Respondent shall update the title search and, if it is determined that nothing has occurred since the effective date of the commitment to affect the title adversely, record the easement with the Recorder's Office of Salt Lake County.  Within thirty (30) days of recording the easement, Respondent shall provide EPA with a final title insurance policy, or other final evidence of title acceptable to EPA, and a certified copy of the original recorded easement showing the clerk's recording stamps.  If the easement is to be conveyed to the United States, the easement and title evidence (including final title evidence) shall be prepared in accordance with the U.S. Department of Justice Title Standards 2001, and approval of the sufficiency of title must be obtained as required by 40 U.S.C. § 3111.

29.  Notwithstanding any provision of this Order, EPA and the State retain all of their access authorities and rights, as well as all of their rights to require land use restrictions, including enforcement authorities related thereto, under CERCLA, RCRA, and any other applicable statutes or regulations.

## X. ACCESS TO INFORMATION

30.  Respondent shall provide to EPA and the State, upon request, copies of all documents and information within its possession or control or that of its contractors or agents relating to activities at the Site or to the implementation of this Order, including, but not limited to, sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, correspondence, or other documents or information related to the Work.  Respondent shall also make available to EPA and the State, for purposes of investigation, information gathering, or testimony, its employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Work.

14

31. Respondent may assert business confidentiality claims covering part or all of the documents or information submitted to EPA and the State under this Order to the extent permitted by and in accordance with Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b). Documents or information determined to be confidential by EPA will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B. If no claim of confidentiality accompanies documents or information when they are submitted to EPA and the State, or if EPA has notified Respondent that the documents or information are not confidential under the standards of Section 104(e)(7) of CERCLA or 40 C.F.R. Part 2, Subpart B, the public may be given access to such documents or information without further notice to Respondent.

32. Respondent may assert that certain documents, records and other information are privileged under the attorney-client privilege or any other privilege recognized by federal law. If the Respondent asserts such a privilege in lieu of providing documents, it shall provide EPA and the State with the following: 1) the title of the document, record, or information; 2) the date of the document, record, or information; 3) the name and title of the author of the document, record, or information; 4) the name and title of each addressee and recipient; 5) a description of the contents of the document, record, or information; and 6) the privilege asserted by Respondent. However, no documents, reports or other information created or generated pursuant to the requirements of this Order shall be withheld on the grounds that they are privileged.

33. No claim of confidentiality shall be made with respect to any data, including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, or engineering data, or any other documents or information evidencing conditions at or around the Site.

## XI. RECORD RETENTION

34. Until seven (7) years after Respondent's receipt of EPA's notification pursuant to Section XXIX (Notice of Completion of Work), Respondent shall preserve and retain all non-identical copies of records and documents (including records or documents in electronic form) now in its possession or control or which come into its possession or control that relate in any manner to the performance of the Work or the liability of any person under CERCLA with respect to the Site, regardless of any corporate retention policy to the contrary. Until seven (7) years after Respondent's receipt of EPA's notification pursuant to Section XXIX (Notice of Completion of Work), Respondent shall also instruct its contractors and agents to preserve all documents, records, and information of whatever kind, nature or description relating to performance of the Work.

35. At the conclusion of this document retention period, Respondent shall notify EPA and the State at least 90 days prior to the destruction of any such records or documents, and, upon request by EPA or the State, Respondent shall deliver any such records or documents to EPA or the State. Respondent may assert that certain documents, records and other information are privileged under the attorney-client privilege or any other privilege recognized by federal law. If Respondent asserts such a privilege, it shall provide EPA or the State with the following: 1) the title of the document, record, or information; 2) the date of the document, record, or information;

15

3) the name and title of the author of the document, record, or information; 4) the name and title of each addressee and recipient; 5) a description of the subject of the document, record, or information; and 6) the privilege asserted by Respondent. However, no documents, reports or other information created or generated pursuant to the requirements of this Order shall be withheld on the grounds that they are privileged.

36. Respondent hereby certifies individually that to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed or otherwise disposed of any records, documents or other information (other than identical copies) relating to its potential liability regarding the Site since notification of potential liability by EPA or the State or the filing of suit against it regarding the Site and that it has fully complied with any and all EPA requests for information pursuant to Sections 104(e) and 122(e) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e), and Section 3007 of RCRA, 42 U.S.C. § 6927.

## XII. COMPLIANCE WITH OTHER LAWS

37. Respondent shall perform all actions required pursuant to this Order in accordance with all applicable local, state, and federal laws and regulations except as provided in Section 121(e) of CERCLA, 42 U.S.C. § 6921(e), and 40 C.F.R. §§ 300.400(e) and 300.415(j). In accordance with 40 C.F.R. § 300.415(j), all on-Site actions required pursuant to this Order shall, to the extent practicable, as determined by EPA, considering the exigencies of the situation, attain applicable or relevant and appropriate requirements ("ARARs") under federal environmental or state environmental or facility siting laws.

## XIII. EMERGENCY RESPONSE AND NOTIFICATION OF RELEASES

38. In the event of any action or occurrence during performance of the Work which causes or threatens a release of Waste Material from the PacifiCorp Property or other property used by Respondent under this Order that constitutes an emergency situation or may present an immediate threat to public health or welfare or the environment, Respondent shall immediately take all appropriate action. Respondent shall take these actions in accordance with all applicable provisions of this Order, including, but not limited to, the Health and Safety Plan, in order to prevent, abate or minimize such release or endangerment caused or threatened by the release. Respondent shall also immediately notify the OSC or, in the event of his/her unavailability, the Regional Duty Officer at (800) 424-8802 or (303) 293-1788 of the incident or Site conditions. In the event that Respondent fails to take appropriate response action as required by this Paragraph, and EPA takes such action instead, Respondent shall reimburse EPA all costs of the response action not inconsistent with the NCP pursuant to Section XV (Payment of Response Costs).

39. In addition, in the event of any release of a hazardous substance from the PacifiCorp Property or other property used by Respondent under this Order, Respondent shall immediately notify the OSC at (303) 293-1788 and the National Response Center at (800) 424-8802. Respondent shall submit a written report to EPA within five (5) days after each release, setting forth the events that occurred and the measures taken or to be taken to mitigate any release or

16

endangerment caused or threatened by the release and to prevent the reoccurrence of such a release. This reporting requirement is in addition to, and not in lieu of, reporting under Section 103(c) of CERCLA, 42 U.S.C. § 9603(c), and Section 304 of the Emergency Planning and Community Right-To-Know Act of 1986, 42 U.S.C. § 11004, *et seq.*

## XIV. AUTHORITY OF ON-SCENE COORDINATOR

40. The OSC shall be responsible for overseeing Respondent's implementation of this Order. The CSC shall have the authority vested in an OSC by the NCP, including the authority to halt, conduct, or direct any Work required by this Order, or to direct any other removal action undertaken at the Site. Absence of the OSC from the Site shall not be cause for stoppage of work unless specifically directed by the OSC.

## XV. PAYMENT OF RESPONSE COSTS

41. Payments for Future Response Costs.

a. Respondent shall pay EPA all Future Response Costs not inconsistent with the NCP. On a periodic basis, EPA will send Respondent a bill requiring payment that includes a Regionally prepared cost summary (currently known as a SCOPRIOS Summary) which includes direct and indirect costs incurred by EPA and its contractors. Respondent shall make all payments within 30 days of receipt of each bill requiring payment, except as otherwise provided in Paragraph 43 of this Order.

b. Payment shall be made to EPA by Electronic Funds Transfer ("EFT") in accordance with current EFT below and shall be accompanied by a statement identifying the name and address of the party(ies) making payment, the Site name (Verminculite Insulation), EPA Region 8 and Site/Spill ID Number 08-GA, and the EPA docket number for this action. Respondent shall make such payments by wire transfer to the Federal Reserve Bank in New York City with the following information:

        ABA = 021030004
        TREAS/NYC/CTR/
        BNF=/AC-68011008

c. At the time of payment, Respondent shall send notice that payment has been made to

        Director, Financial Management Program, TMS-F
        U.S. EPA, Region 8
        999 18th Street, Suite 300
        Denver, CO 80202

        and

17

Cost Recovery Program Manager, ENF-RC
Superfund Enforcement Program
U.S. EPA, Region 8
999 18ᵗʰ Street, Suite 300
Denver, CO 80202

d. The total amount to be paid by Respondent pursuant to Paragraph 41(a) shall be deposited in the Vermiculite Insulation Special Account within the EPA Hazardous Substance Superfund to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

42. In the event that the payment for Future Response Costs are not made within 30 days of Respondent's receipt of a bill, Respondent shall pay Interest on the unpaid balance. The Interest on Past Response Costs shall begin to accrue on the Effective Date and shall continue to accrue until the date of payment. The Interest on Future Response Costs shall begin to accrue on the date of the bill and shall continue to accrue until the date of payment. Payments of Interest made under this Paragraph shall be in addition to such other remedies or sanctions available to the United States by virtue of Respondent's failure to make timely payments under this Section, including but not limited to, payment of stipulated penalties pursuant to Section XVIII.

43. Respondent may dispute all or part of a bill for Future Response Costs submitted under this Order, if Respondent alleges that EPA has made an accounting error, or if Respondent alleges that a cost item is inconsistent with the NCP. If any dispute over costs is resolved before payment is due, the amount due will be adjusted as necessary. If the dispute is not resolved before payment is due, Respondent shall pay the full amount of the uncontested costs to EPA as specified in Paragraph 41 on or before the due date. Within the same time period, Respondent shall pay the full amount of the contested costs into an interest-bearing escrow account. Respondent shall simultaneously transmit a copy of both checks to the persons listed in Paragraph 41(c) above. Respondent shall ensure that the prevailing party or parties in the dispute shall receive the amount upon which they prevailed from the escrow funds plus interest within fifteen (15) days after the dispute is resolved. Notification of disputes regarding all or part of a bill for Future Response Costs shall be sent to:

Cost Recovery Program Manager
EPA Region 8, ENF-RC
999 18ᵗʰ Street, Suite 300
Denver, CO 80202

44. Respondent shall notify EPA's Cost Recovery Program Manager in writing of its objections within fifteen (15) days of receipt of the bill that it is disputing. The Respondent's written objections shall define the dispute, state the basis of Respondent's objections, and be sent certified U.S. mail, return receipt requested or by other mail delivery service with a delivery tracking and verification system. Thereafter, the provisions of Section XVI (Dispute Resolution) shall apply to the dispute.

18

## XVI. DISPUTE RESOLUTION

45. Unless otherwise expressly provided for in this Order, the dispute resolution procedures of this Section shall be the exclusive mechanism for resolving disputes arising under this Order. The Parties shall attempt to resolve any disagreements concerning this Order expeditiously and informally.

46. If Respondent objects to any EPA action taken pursuant to this Order, including billings for Future Response Costs, it shall notify EPA in writing of its objection(s) within ten (10) days of such action, unless the objection(s) has/have been resolved informally. EPA and Respondent shall have fifteen (15) days from EPA's receipt of Respondent's written objection(s) to resolve the dispute through formal negotiations (the "Negotiation Period"). The Negotiation Period may be extended at the sole discretion of EPA.

47. Any agreement reached by the parties pursuant to this Section shall be in writing and shall, upon signature by both parties, be incorporated into and become an enforceable part of this Order. If the Parties are unable to reach an agreement within the Negotiation Period, an EPA management official at the office director level or higher will issue a written decision on the dispute to Respondent. EPA's decision shall be incorporated into and become an enforceable part of this Order. Respondent's obligations under this Order shall not be tolled by submission of any objection for dispute resolution under this Section. Following resolution of the dispute, as provided by this Section, Respondent shall fulfill the requirement that was the subject of the dispute in accordance with the agreement reached or with EPA's decision, whichever occurs.

## XVII. FORCE MAJEURE

48. Respondent agrees to perform all requirements of this Order within the time limits established under this Order, unless the performance is delayed by a *force majeure*. For purposes of this Order, a *force majeure* is defined as any event arising from causes beyond the control of Respondent, or of any entity controlled by Respondent, including but not limited to its contractors and subcontractors, which delays or prevents performance of any obligation under this Order despite Respondent's best efforts to fulfill the obligation. *Force majeure* does not include financial inability to complete the Work or increased cost of performance.

49. If any event occurs or has occurred that may delay the performance of any obligation under this Order, whether or not caused by a *force majeure* event, Respondent shall notify EPA orally within 24 hours of when Respondent first knew that the event might cause a delay. Within three (3) days thereafter, Respondent shall provide to EPA in writing an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Respondent's rationale for attributing such delay to a *force majeure* event if it intends to assert such a claim; and a statement as to whether, in the opinion of Respondent, such event may cause or contribute to an endangerment to public health, welfare or the environment. Failure to comply with the above

19

requirements shall preclude Respondent from asserting any claim of *force majeure* for that event for the period of time of such failure to comply and for any additional delay caused by such failure.

50. If EPA agrees that the delay or anticipated delay is attributable to a *force majeure* event, the time for performance of the obligations under this Order that are affected by the *force majeure* event will be extended by EPA for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the *force majeure* event shall not, of itself, extend the time for performance of any other obligation. If EPA does not agree that the delay or anticipated delay has been or will be caused by a *force majeure* event, EPA will notify Respondent in writing of its decision. If EPA agrees that the delay is attributable to a *force majeure* event, EPA will notify Respondent in writing of the length of the extension, if any, for performance of the obligations affected by the *force majeure* event.

## XVIII. STIPULATED PENALTIES

51. Respondent shall be liable to EPA for stipulated penalties in the amounts set forth in Paragraphs 52 and 53 for failure to comply with the requirements of this Order specified below, unless excused under Section XVII (*Force Majeure*). "Compliance" by Respondent shall include completion of the activities under this Order or the Work Plan or other plan approved under this Order identified below in accordance with all applicable requirements of law, this Order, the Work Plan or other documents approved by EPA pursuant to this Order and within the specified time schedules established by and approved under this Order.

52. Stipulated Penalty Amounts - Work. The following stipulated penalties shall accrue per violation per day for any noncompliance with terms of this Order, the Statement of Work and any EPA-approved work plans, but specifically excluding delinquency in the provision of progress reports:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $2,500 | 1st through 14th day |
| $5,000 | 15th through 30th day |
| $32,500 | 31st day and beyond |

53. Stipulated Penalty Amounts - Progress Reports. The following stipulated penalties shall accrue per violation per day for failure to submit timely or adequate progress reports pursuant to this Order:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $100 | 1st through 14th day |
| $250 | 15th through 30th day |
| $500 | 31st day and beyond |

20

54. In the event that EPA assumes performance of a portion or all of the Work pursuant to Paragraph 64 of Section XX, Respondent shall be liable for a stipulated penalty in the amount of $400,000.

55. All penalties shall begin to accrue on the day after the complete performance is due or the day a violation occurs, and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity. However, stipulated penalties shall not accrue: 1) with respect to a deficient submission under Section VIII (Work to be Performed), during the period, if any, beginning on the 31st day after EPA's receipt of such submission until the date that EPA notifies Respondent of any deficiency; and 2) with respect to a decision by the EPA Management Official at the office director level or higher, under Paragraph 42 of Section XVI (Dispute Resolution), during the period, if any, beginning on the 21st day after the Negotiation Period begins until the date that the EPA management official issues a final decision regarding such dispute. Nothing herein shall prevent the simultaneous accrual of separate penalties for separate violations of this Order.

56. Following EPA's determination that Respondent has failed to comply with a requirement of this Order, EPA may give Respondent written notification of the failure and describe the noncompliance. EPA may send Respondent a written demand for payment of the penalties. However, penalties shall accrue as provided in the preceding Paragraph regardless of whether EPA has notified Respondent of a violation.

57. All penalties accruing under this Section shall be due and payable to EPA within thirty (30) days of Respondent's receipt from EPA of a demand for payment of the penalties, unless Respondent invokes the dispute resolution procedures under Section XVI (Dispute Resolution). All payments to EPA under this Section shall be paid by wire transfer sent directly to the Federal Reserve Bank in New York City with the following information:

ABA = 021030004
TREAS/NYC/CTR/
BNF=/AC-68011008

and shall indicate that the payment is for stipulated penalties, and shall reference the EPA Region and Site/Spill ID Number 08-GA, the EPA Docket Number_____, and the name and address of Respondent. Copies of wire transfer paid pursuant to this Section, and any accompanying transmittal letter(s), shall be sent to EPA as provided in Paragraph 13, and to Kelcey Land, Cost Recovery Manager, ENF-RC, 999 18th Street, Suite 300, Denver, CO.

58. The payment of penalties shall not alter in any way Respondent's obligation to complete performance of the Work required under this Order.

59. Penalties shall continue to accrue during any dispute resolution period, but need not be paid until fifteen (15) days after the dispute is resolved by agreement or by receipt of EPA's decision.

A-68

21

60. If Respondent fails to pay stipulated penalties when due, EPA may institute proceedings to collect the penalties, as well as Interest. Respondent shall pay Interest on the unpaid balance, which shall begin to accrue on the date of demand made pursuant to Paragraph 52. Nothing in this Order shall be construed as prohibiting, altering, or in any way limiting the ability of EPA to seek any other remedies or sanctions available by virtue of Respondent's violation of this Order or of the statutes and regulations upon which it is based, including, but not limited to, penalties pursuant to Sections 106(b) and 122(*l*) of CERCLA, 42 U.S.C. §§ 9606(b) and 9622(*l*), and punitive damages pursuant to Section 107(c)(3) of CERCLA, 42 U.S.C. § 9607(c)(3). Provided, however, that EPA shall not seek civil penalties pursuant to Section 106(b) or 122(*l*) of CERCLA or punitive damages pursuant to Section 107(c)(3) of CERCLA for any violation for which a stipulated penalty is provided herein, except in the case of a willful violation of this Order or in the event that EPA assumes performance of a portion or all of the Work pursuant to Section XX, Paragraph 64. Notwithstanding any other provision of this Section, EPA may, in its unreviewable discretion, waive any portion of stipulated penalties that have accrued pursuant to this Order.

## XIX. COVENANT NOT TO SUE BY EPA

61. In consideration of the actions that will be performed and the payments that will be made by Respondent under the terms of this Order, and except as otherwise specifically provided in this Order, EPA covenants not to sue or to take administrative action against Respondent pursuant to Sections 106 and 107(a) of CERCLA, 42 U.S.C. §§ 9606 and 9607(a), for performance of the Work and for recovery of Future Response Costs. This covenant not to sue shall take effect upon completion of the Work pursuant to Section XXIX (Notice of Completion of Work). This covenant not to sue is conditioned upon the complete and satisfactory performance by Respondent of its obligations under this Order, including, but not limited to, payment of Future Response Costs pursuant to Section XV. This covenant not to sue extends only to Respondent and does not extend to any other person.

## XX. RESERVATIONS OF RIGHTS BY EPA

62. Except as specifically provided in this Order, nothing herein shall limit the power and authority of EPA or the United States to take, direct, or order all actions necessary to protect public health or welfare or the environment or to prevent, abate, or minimize an actual or threatened release of hazardous substances or pollutants or contaminants, or hazardous or solid waste on, at, or from the Site. Further, nothing herein shall prevent EPA from seeking legal or equitable relief to enforce the terms of this Order, from taking other legal or equitable action as it deems appropriate and necessary, or from requiring Respondent in the future to perform additional activities pursuant to CERCLA or any other applicable law.

63. The covenant not to sue set forth in Section XIX above does not pertain to any matters other than those expressly identified therein. EPA reserves, and this Order is without prejudice to, all rights against Respondent with respect to all other matters, including, but not limited to:

22

a.  claims based on a failure by Respondent to meet a requirement of this Order;

b.  liability for any and all costs not included within the definition of Future Response Costs;

c.  liability for performance of response action other than the Work;

d.  criminal liability;

e.  liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments;

f.  liability arising from the past, present, or future disposal, release or threat of release of Waste Materials outside of the PacifiCorp Property; and

g.  liability for costs incurred or to be incurred by the Agency for Toxic Substances and Disease Registry related to the Site.

64.  Work Takeover.  In the event EPA determines that Respondents has ceased implementation of any portion of the Work, is seriously or repeatedly deficient or late in its performance of the Work, or are implementing the Work in a manner which may cause an endangerment to human health or the environment, EPA may assume the performance of all or any portion of the Work as EPA determines necessary. Respondent may invoke the procedures set forth in Section XVI (Dispute Resolution) to dispute EPA's determination that takeover of the Work is warranted under this Paragraph. Costs incurred by the United States in performing the Work pursuant to this Paragraph shall be considered Future Response Costs that Respondent shall pay pursuant to Section XV (Payment of Response Costs). Notwithstanding any other provision of this Order, EPA retains all authority and reserves all rights to take any and all response actions authorized by law.

## XXI.  COVENANT NOT TO SUE BY RESPONDENT

65.  Respondent covenants not to sue and agrees not to assert any claims or causes of action against the United States, or its contractors or employees, with respect to the Work, Future Response Costs, or this Order, including, but not limited to:

a.  any direct or indirect claim for reimbursement from the Hazardous Substance Superfund established by 26 U.S.C. § 9507, based on Sections 106(b)(2), 107, 111, 112, or 113 of CERCLA, 42 U.S.C. §§ 9606(b)(2), 9607, 9611, 9612, or 9613, or any other provision of law;

b.  any claim arising out of response actions at or in connection with the PacifiCorp Property or other property used by Respondent under this Order, including any claim under the United States Constitution, the Utah Constitution, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, as amended, or at common law; or

23

c. any claim against the United States pursuant to Sections 107 and 113 of CERCLA, 42 U.S.C. §§ 9607 and 9613, relating to the PacifiCorp Property or other property used by Respondent under this Order.

66. Except as provided in Paragraph 68 (Waiver of Claims), these covenants not to sue shall not apply in the event the United States brings a cause of action or issues an order pursuant to the reservations set forth in Paragraphs 63 (b), (c), and (e) - (g), but only to the extent that Respondent's claims rise from the same response action, response costs, or damages that the United States is seeking pursuant to the applicable reservation.

67. Nothing in this Agreement shall be deemed to constitute approval or preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

68. Respondent agrees not to assert any claims and to waive all claims or causes of action that it may have for all matters relating to the PacifiCorp Property or other property used by Respondent under this Order, including for contribution, against any person that has entered into a final *de minimis* settlement under Section 122(g) of CERCLA, 42 U.S.C. § 9622(g), with EPA with respect to the PacifiCorp Property or other property used by Respondent under this Order as of the Effective Date. This waiver shall not apply with respect to any defense, claim, or cause of action that a Respondent may have against any person if such person asserts a claim or cause of action relating to the PacifiCorp Property or other property used by Respondent under this Order against such Respondent.

## XXII. OTHER CLAIMS

69. By issuance of this Order, the United States and EPA assume no liability for injuries or damages to persons or property resulting from any acts or omissions of Respondent. The United States or EPA shall not be deemed a party to any contract entered into by Respondent or its directors, officers, employees, agents, successors, representatives, assigns, contractors, or consultants in carrying out actions pursuant to this Order.

70. Except as expressly provided in Section XXI, Paragraph 68 (De Minimis Waiver) and Section XIX (Covenant Not to Sue by EPA), nothing in this Order constitutes a satisfaction of or release from any claim or cause of action against Respondent or any person not a party to this Order, for any liability such person may have under CERCLA, other statutes, or common law, including but not limited to any claims of the United States for costs, damages and interest under Sections 106 and 107 of CERCLA, 42 U.S.C. §§ 9606 and 9607.

71. No action or decision by EPA pursuant to this Order shall give rise to any right to judicial review, except as set forth in Section 113(h) of CERCLA, 42 U.S.C. § 9613(h).

24

## XXIII. CONTRIBUTION PROTECTION

72. The Parties agree that Respondent is entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Sections 113(f)(2) and 122(h)(4) of CERCLA, 42 U.S.C. §§ 9613(f)(2) and 9622(h)(4), for "matters addressed" in this Order. The "matters addressed" in this Order are the Work and Future Response Costs. Except as provided in Section XXI, Paragraph 68, of this Order (De Minimis Waiver), nothing in this Order precludes the United States or Respondent from asserting any claims, causes of action, or demands against any persons not parties to this Order for indemnification, contribution, or cost recovery.

## XXIV. INDEMNIFICATION

73. Respondent shall indemnify, save and hold harmless the United States, its officials, agents, contractors, subcontractors, employees and representatives from any and all claims or causes of action arising from, or on account of, negligent or other wrongful acts or omissions of Respondent, its officers, directors, employees, agents, contractors, or subcontractors, in carrying out actions pursuant to this Order. In addition, Respondent agrees to pay the United States all costs incurred by the United States, including but not limited to attorneys fees and other expenses of litigation and settlement, arising from or on account of claims made against the United States based on negligent or other wrongful acts or omissions of Respondent, its officers, directors, employees, agents, contractors, subcontractors and any persons acting on its behalf or under its control, in carrying out activities pursuant to this Order. The United States shall not be held out as a party to any contract entered into by or on behalf of Respondent in carrying out activities pursuant to this Order. Neither Respondent nor any such contractor shall be considered an agent of the United States.

74. The United States shall give Respondent notice of any claim for which the United States plans to seek indemnification pursuant to this Section and shall consult with Respondent prior to settling such claim.

75. Respondent waives all claims against the United States for damages or reimbursement or for set-off of any payments made or to be made to the United States, arising from or on account of any contract, agreement, or arrangement between Respondent and any person for performance of Work on or relating to the PacifiCorp Property or other property used by Respondent under this Order, including, but not limited to, claims on account of construction delays. In addition, Respondent shall indemnify and hold harmless the United States with respect to any and all claims for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between Respondent and any person for performance of Work on or relating to the PacifiCorp Property or other property used by Respondent under this Order, including, but not limited to, claims on account of construction delays.

A-72

25

## XXV. INSURANCE

76.   At least seven (7) days prior to commencing any on-Site work under this Order, Respondent shall secure, and shall maintain for the duration of this Order, comprehensive general liability insurance and automobile insurance with limits of one million dollars, combined single limit. Within the same time period, Respondent shall provide EPA with certificates of such insurance and a copy of each insurance policy. In addition, for the duration of the Order, Respondent shall satisfy, or shall ensure that its contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Work on behalf of Respondent in furtherance of this Order. If Respondent demonstrates by evidence satisfactory to EPA that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering some or all of the same risks but in an equal or lesser amount, then Respondent need provide only that portion of the insurance described above which is not maintained by such contractor or subcontractor.

## XXVI. FINANCIAL ASSURANCE

77.   Within 30 days of the Effective Date, Respondent shall establish and maintain financial security in the amount of $600,000 in one or more of the following forms:

a.   A surety bond guaranteeing performance of the Work;

b.   One or more irrevocable letters of credit equaling the total estimated cost of the Work;

c.   A trust fund;

d.   A guarantee to perform the Work by one or more parent corporations or subsidiaries, or by one or more unrelated corporations that have a substantial business relationship with Respondent; or

e.   A demonstration that Respondent satisfies the requirements of 40 C.F.R. Part 264.143(f).

78.   If Respondent seeks to demonstrate the ability to complete the Work through a guarantee by a third party pursuant to Paragraph 77(a) of this Section, Respondent shall demonstrate that the guarantor satisfies the requirements of 40 C.F.R. Part 264.143(f). If Respondent seeks to demonstrate its ability to complete the Work by means of the financial test or the corporate guarantee pursuant to Paragraph 77(d) or (e) of this Section, it shall resubmit sworn statements conveying the information required by 40 C.F.R. Part 264.143(f) annually, on the anniversary of the Effective Date. In the event that EPA determines at any time that the financial assurances provided pursuant to this Section are inadequate, Respondent shall, within 30 days of receipt of notice of EPA's determination, obtain and present to EPA for approval one of the other forms of financial assurance listed in Paragraph 77 of this Section. Respondent's inability to

26

demonstrate financial ability to complete the Work shall not excuse performance of any activities required under this Order.

79. If, after the Effective Date, Respondent can show that the estimated cost to complete the remaining Work has diminished below the amount set forth in Paragraph 77 of this Section, Respondent may, on any anniversary date of the Effective Date, or at any other time agreed to by the Parties, reduce the amount of the financial security provided under this Section to the estimated cost of the remaining Work to be performed. Respondent shall submit a proposal for such reduction to EPA, in accordance with the requirements of this Section, and may reduce the amount of the security upon approval by EPA. In the event of a dispute, Respondent may reduce the amount of the security in accordance with the written decision resolving the dispute.

80. Respondent shall submit proof of financial assurance to Daniela Golden, Financial Analyst, EPA-R8, 999 18th St., Suite 300, Denver, CO 80202. Respondent may change the form of financial assurance provided under this Section at any time, upon notice to and approval by EPA, provided that the new form of assurance meets the requirements of this Section. In the event of a dispute, Respondent may change the form of the financial assurance only in accordance with the written decision resolving the dispute.

## XXVII. MODIFICATIONS

81. Any requirements of this Order may be modified in writing by mutual agreement of the parties. Modifications to the Work Plan, schedules or other EPA-approved plans that are within the scope of the Action Memorandum may be made in writing or at the oral direction of the OSC, provided that the change is memorialized in writing within ten (10) days. Modifications requested by Respondent and orally approved by the OSC shall be memorialized in writing within ten (10) days by Respondent. Any oral modification, while memorialized in writing, shall have as its effective date the date of the OSC's oral direction. Respondent may not proceed with a requested deviation until receiving oral or written approval from the OSC or delegated decision-official pursuant to this Paragraph.

82. No informal advice, guidance, suggestion, or comment by the OSC or other EPA representatives regarding reports, plans, specifications, schedules, or any other writing submitted by Respondent shall relieve Respondent of its obligation to obtain any formal approval required by this Order, or to comply with all requirements of this Order, unless it is formally modified.

## XXVIII. ADDITIONAL REMOVAL ACTION

83. If EPA determines that additional removal actions not included in an approved plan are necessary to protect public health or welfare or the environment, EPA will notify Respondent of that determination. Unless otherwise stated by EPA, within thirty (30) days of receipt of notice from EPA that additional removal actions are necessary to protect public health or welfare or the environment, Respondent shall notify EPA of its intent to perform the additional removal actions. If Respondent agrees to perform the additional removal actions, it shall simultaneously submit for

A-74

27

approval by EPA a Work Plan for the additional removal actions. The plan shall conform to the applicable requirements of Section VIII (Work to Be Performed) of this Order. Upon EPA's approval of the plan pursuant to Section VIII, Respondent shall implement the plan for additional removal actions in accordance with the provisions and schedule contained therein. This Section does not alter or diminish the OSC's authority to make oral modifications to any plan or schedule pursuant to Section XXVII (Modifications).

## XXIX. NOTICE OF COMPLETION OF WORK

84.  When EPA determines, after EPA's review of the Final Report, that all Work has been fully performed in accordance with this Order, with the exception of any continuing obligations required by this Order, EPA will provide written notice to Respondent. If EPA determines that any such Work has not been completed in accordance with this Order, EPA will notify Respondent, provide a list of the deficiencies, and require that Respondent modify the Work Plan if appropriate in order to correct such deficiencies. Respondent shall implement the modified and approved Work Plan and shall submit a modified Final Report in accordance with the EPA notice. Failure by Respondent to implement the approved modified Work Plan shall be a violation of this Order.

## XXX. SEVERABILITY/INTEGRATION/APPENDICES

85.  If a court issues an order that invalidates any provision of this Order or finds that Respondent has sufficient cause not to comply with one or more provisions of this Order, Respondent shall remain bound to comply with all provisions of this Order not invalidated or determined to be subject to a sufficient cause defense by the court's order.

86.  This Order and its appendices constitute the final, complete and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Order. The parties acknowledge that there are no representations, agreements or understandings relating to the settlement other than those expressly contained in this Order.

28

## XXXI. EFFECTIVE DATE

87.    This Order shall be effective on the date the Order is signed by EPA.

The undersigned representative of Respondent certifies that he is fully authorized to enter into the terms and conditions of this Order and to bind the party he represents to this document.

Agreed this 29 day of July, 2004.

For Respondent PacifiCorp

By: _William Eaquinto_____
     William Eaquinto
     Vice President, T&D Operations

29

It is so ORDERED and Agreed this __11th__ day of ~~July,~~ August 2004 ~~2005~~.

BY: _____    DATE: _8/11/04_
Doug Skie, Director
Preparedness, Assessment and
 Emergency Response Branch
Region 8
U.S. Environmental Protection Agency

BY: _Michael T. Risner_    DATE: _8/10/04_
Michael Risner, Director
Legal Enforcement Program
Region 8
U.S. Environmental Protection Agency

BY: _Sharon T. Kercher_    DATE: _8/10/04_
Sharon Kercher, Director
Technical Enforcement Program
Region 8
U.S. Environmental Protection Agency

EFFECTIVE DATE: _8/11/04_

A-77

**EXHIBIT C**

# W.R. GRACE & CO.
# ASBESTOS PROPERTY DAMAGE
# PROOF OF CLAIM FORM

*The United States Bankruptcy Court for the District of Delaware*
*In re: W.R. Grace & Co., et al., Debtors, Case No. 01-01139 (JKF)*
*(Jointly Administered)*

## SUBMIT COMPLETED CLAIMS TO:

**Claims Processing Agent**
**Re: W.R. Grace & Co. Bankruptcy**
**PO Box 1620**
**Faribault, MN 55021-1620**

For a complete list of the Debtors in this case, please see "The Debtors" section of the General Instructions for Completing Proof of Claim Forms. The Debtors in this case are, collectively, referred to in this document as "Grace".

If you have a current claim against Grace for property damage allegedly resulting from an exposure to a Grace product (other than Zonolite Attic Insulation), THIS ASBESTOS PROPERTY DAMAGE PROOF OF CLAIM FORM MUST BE RECEIVED ON OR BEFORE 4:00 P.M. EASTERN TIME ON MARCH 31, 2003 or you will be forever barred from asserting or receiving payment for your claim.

PremierView™ forms by NCS Pearson  MW739276-2   654321   Printed in U.S.A.

## INSTRUCTIONS FOR FILING THE W.R. GRACE & CO. ASBESTOS PROPERTY DAMAGE PROOF OF CLAIM FORM

## WHO SHOULD USE THIS ASBESTOS PROPERTY DAMAGE PROOF OF CLAIM FORM

1. This Asbestos Damage Proof of Claim Form (referred to in this document as the "Form") applies only to <u>current</u> claims made against Grace by or on behalf of parties who are alleging property damage with respect to asbestos in real property owned by the party (such person is referred to in this document as the "claiming party") from a Grace asbestos-containing product or as a result of one of Grace's vermiculite mining, milling, or processing facilities.

2. The Bar Date does not apply to Asbestos Personal Injury Claims, Settled Asbestos Claims or Zonolite Attic Insulation Claims. Those claims will be subject to a separate claim submission process and should not be filed at this time.

3. This form should not be used for Medical Monitoring Claims or Non-Asbestos Claims. Instead, separate specialized proof of claim forms for these claims should be completed.

4. If you are alleging current claims against Grace with respect to asbestos in more than one (1) real property, the claiming party should complete an Asbestos Property Damage Proof of Claim Form for <u>each</u> property. You may request additional forms by calling the Claims Processing Agent at 1-800-432-1909.

## GENERAL INSTRUCTIONS

1. This form must be signed by the claimant or authorized agent of the claimant. THIS FORM MUST BE RECEIVED ON OR BEFORE 4:00 PM EASTERN TIME ON MARCH 31, 2003, or you forever will be precluded from asserting your claim(s) against or receiving payment from Grace. Return your completed form to the Claims Processing Agent, Re: W.R. Grace & Co. Bankruptcy, P.O. Box 1620, Faribault, MN 55021-1620.
   If you are returning this form by mail, allow sufficient time so that this form is received on or before March 31, 2003. Forms that are postmarked before March 31, 2003 but received after March 31, 2003 will not be accepted. Only original forms will be accepted for filing. Forms transmitted by facsimile will not be accepted for filing.

2. If you cannot fit all information in any particular section or page, please make a copy of that page before filling it out and attach as many additional pages as needed.

3. If you are unable to provide any of the information required by the proof of claim form, please so specify, as well as provide a short statement describing why such information is unavailable. If you are in the process of obtaining such information at the time you file your proof of claim, please so advise and indicate that the same shall be provided when obtained.

4. This form must be filled out completely using BLACK or BLUE ink or may be typewritten.
   • Please print clearly using capital letters only.        • Do not use a felt tip pen.
   • Skip a box between words.                                      • Do not bend or fold the pages of the form.
   • Do not write outside of the boxes or blocks.

5. Because this form will be read by a machine, please print characters using the examples below. For optimum accuracy, please print in capital letters and avoid contact with the edge of the character boxes.

6. Mark check boxes with an "X" (example at right).   ☒   `NAME HERE`

7. Be <u>accurate</u> and <u>truthful</u>. A Proof of Claim Form is an official court document that may be used as evidence in any legal proceeding regarding your claim. The penalty for presenting a fraudulent claim is a fine of up to $500,000 or imprisonment for up to five years or both. 18 U.S.C. §§ 152 & 3571.

8. Make a copy of your completed Form to keep for your records. <u>Send</u> only <u>original</u> Forms to the Claims Processing Agent at the following address: Claims Processing Agent, Re: W.R. Grace & Co. Bankruptcy
   PO Box 1620
   Faribault, MN 55021-1620.

9. You will receive written notification of the proof of claim number assigned to this claim once it has been processed.

## PART 1: CLAIMING PARTY INFORMATION

NAME:

Padifidorp d/d Mike Jenkins

*Name of individual claimant (first, middle and last name) or business claimant*

SOCIAL SECURITY NUMBER (Individual Claimants):    F.E.I.N. (Business Claimants)

93-0246090

*(last four digits of SSN)*

Other names by which claiming party has been known (such as maiden name or married name):

*First*            MI    *Last*

*First*            MI    *Last*

GENDER: ☐ MALE    ☐ FEMALE

Mailing Address:

201 South Main Suite 2200

*Street Address*

Salt Lake City            UT    84111

*City*                *State*    *Zip Code*
                  *(Province)* *(Postal Code)*

USA

*Country*

## PART 2: ATTORNEY INFORMATION

The claiming party's attorney, if any (You do not need an attorney to file this form):

Law Firm Name:

LeBoeuf Lamb Greene & MacRae

Name of Attorney:

Steven            J    McCardell

*First*        MI    *Last*

Mailing Address:

136 South Main Street Suite 1000

*Street Address*

Salt Lake City            UT    84101

*City*                *State*    *Zip Code*
                  *(Province)* *(Postal Code)*

Telephone:

(801) 320-6700

*Area Code*

9276101                SERIAL #

A-81

## PART 3: PROPERTY INFORMATION

### A. Real Property For Which A Claim Is Being Asserted

1. What is the address of the real property for which a claim is being asserted (referred to herein as "the property")?

`147 South 400 West`
*Street Address*

`Salt Lake City`
*City*

State (Province): `UT`   Zip Code (Postal Code): `84101`

`USA`
*Country*

2. Are you completing an Asbestos Property Damage Proof of Claim Form for any other real property other than the one listed at "1" above?

☒ Yes   ☐ No

3. Do you currently own the property listed in Question 1, above?

☒ Yes   ☐ No

4. When did you purchase the property?   `10` - `09` - `1911`
   *Month   Day   Year*          SEE ATTACHMENT A

5. What is the property used for (check all that apply)
   ☐ Owner occupied residence
   ☐ Residential rental
   ☐ Commercial
   ☒ Industrial   Specify: `electrical substation`
   ☐ Other   Specify:

6. How many floors does the property have?   `1-2`

7. What is the approximate square footage of the property?   `57,830`

8. When was the property built?
   ☒ Before 1969
   ☐ 1969 - 1973
   ☐ After 1973

9. What is the structural support of the property?
   ☐ Wood frame
   ☐ Structural concrete
   ☐ Brick
   ☒ Steel beam/girder
   ☐ Other   Specify:

10. Have you or has someone on your behalf completed any interior renovations on the property which affected any asbestos on the property?
    ☐ Yes   ☒ No

9276102                                           SERIAL #

**A. Real Property For Which A Claim Is Being Asserted (continued)**

If yes, please specify the dates and description of such renovations.

Year [    ]  Description [                    ]

Year [    ]  Description [                    ]

Year [    ]  Description [                    ]

11. To the best of your knowledge, have any other interior renovations been completed on the property during any other period of time which affected any asbestos on the property?

☐ Yes    ☒ No

If yes, please specify the dates and descriptions of such renovations.

Year [    ]  Description [                    ]

Year [    ]  Description [                    ]

Year [    ]  Description [                    ]

**B. Claim Category**

12. For which category are you making a claim on the property?

☐ Category 1:  Allegation with respect to asbestos from a Grace product in the property

☒ Category 2:  Allegation with respect to one of Grace's vermiculite mining, milling or processing operations

- If you checked Category 1 in question 12, complete section C.
- If you checked Category 2 in question 12, complete section D.

**C. Category 1 Claim:  Allegation With Respect To Asbestos From A Grace Product In The Property**

13. For what alleged asbestos-containing product(s) are you making a claim?

☐ Monokote-3 fireproofing insulation

☐ Other    Specify: [                    ]

(For a list of the brand names under which Grace manufactured products that may have contained commercially added asbestos, see Exhibit 2 to the Claims Bar Date Notice provided with this Proof of Claim Form.)

14. When did you or someone on your behalf install the asbestos containing product(s) in the property?

Year [    ]    ☐ I did not install the product(s)

15. If you or someone on your behalf did not install the asbestos containing product(s), to the best of your knowledge, when was/were the product(s) installed?

Year [    ]    ☐ Don't know.

9 2 7 6 1 0 3                    SERIAL #

A-83

16.  Do you have documentation relating to the purchase and/or installation of the product in the property?

☐ Yes    ☐ No

If Yes, attach all such documents. If the documents are too voluminous to attach, attach a summary of the documents indicating the name of each document, date of each document, a brief description of the document, the location of the document, and who has possession and control of the document.

If you provide a summary of documents rather than the documents themselves, you are required to consent to the production and release of those documents to Grace upon Grace's further request.

17.  If you do not have any such documents, explain why not and indicate who may have possession or control of such documents with respect to the property.

18.  When did you first know of the presence of asbestos in the property of the Grace product for which you are making this claim?

| | | | |
|---|---|---|---|

*Year*

Please attach all documents relating or referring to the presence of asbestos in the property for which you are making this claim. If the documents are too voluminous to attach, attach a summary of the documents indicating the name of each document, date of each document, a brief description of the document, the location of the document, and who has possession and control of the document.

If you provide a summary of documents rather than the documents themselves, you are required to consent to the production and release of those documents to Grace upon Grace's further request.

19.  How did you first learn of the presence of asbestos in the property of the Grace product for which you are making this claim?

20.  When did you first learn that the Grace product for which you are making this claim contained asbestos?

| | | |
|---|---|---|

*Year*

21.  How did you first learn that the Grace product for which you are making the claim contained asbestos?

22.  Have you or someone on your behalf made an effort to remove, contain and/or abate the Grace product for which you are making this claim?

☐ Yes    ☐ No

If Yes, attach all documents relating or referring to such efforts. If the documents are too voluminous to attach, attach a summary of the documents indicating the name of each document, date of each document, a brief description of the document, the location of the document, and who has possession and control of the document.

If you provide a summary of documents rather than the documents themselves, you are required to consent to the production and release of those documents to Grace upon Grace's further request.

23.  If you do not have any such documents, explain why not and indicate who may have possession and control of such documents with respect to the property.

24.  If you or someone on your behalf did not make an effort to remove, contain and/or abate the Grace product(s) for which you are making a claim, to the best of your knowledge, did anyone else make such an effort?

☐ Yes    ☐ No

9276104

SERIAL #

A-84

25. If you responded Yes to question 22. or 24. and you have not supplied documents, please specify the dates and descriptions of any such efforts.

| | | | | Description | |
|---|---|---|---|---|---|
Year

Description

Year

Description

Year

26. Have you or anyone on your behalf ever conducted any testing or sampling for the presence of asbestos or other particulates in the property?

☐ Yes     ☐ No     If Yes, Attach All Documents Related To Any Testing Of The Property.

27. If you responded Yes to question 26., but you have not provided documents, indicate who may have possession or control of such testing documents or where such documents may be located.

28. If you or someone on your behalf did not conduct any testing or sampling for the presence of asbestos or other particulates on the property, to the best of your knowledge, did anyone else conduct such testing or sampling with respect to the property?

☐ Yes     ☐ No

29. If you responded Yes to question 26. or 28. and you have not supplied related documents, please describe when and by whom and the type of testing and/or sampling (e.g. air, bulk and dust sampling).

Company/Individual

Year     Type of testing:

Company/Individual

Year     Type of testing:

Company/Individual

Year     Type of testing:

30. Has the Grace product or products for which you are making this claim ever been modified and/or disturbed?

☐ Yes     ☐ No

31. If yes, specify when and in what manner the Grace product or products was modified and/or disturbed?

Description

Year

Description

Year

Description

Year

9276105

SERIAL #

**D.** **Category 2 Claim:** Allegation With Respect To One of Grace's Vermiculite Mining, Milling Or Processing Operations

32. What is the business address or location of the Grace operation which has led to your claim?

Business Name: `Vermiculite Intermountain Insulation`

Street Address: `Approx. 333 West 100 South`

City: `Salt Lake City`

State (Province): `UT`    Zip Code (Postal Code): `84101`

Country: `USA`

33. If your claim relates to a personal residence, does (or did) anyone living in the household work for Grace?

☐ Yes    ☒ No

34. If yes, specify the following for each such individual:

Name of Individual Working at Grace Operation: 

Date of Birth: __ - __ - __ (Month Day Year)

Occupation(s) of Individual: 

Dates Worked at Operation: From: ____ (Year) To: ____ (Year)

Name of Individual Working at Grace Operation: 

Date of Birth: __ - __ - __ (Month Day Year)

Occupation(s) of Individual: 

Dates Worked at Operation: From: ____ (Year) To: ____ (Year)

Name of Individual Working at Grace Operation: 

Date of Birth: __ - __ - __ (Month Day Year)

Occupation(s) of Individual: 

Dates Worked at Operation: From: ____ (Year) To: ____ (Year)

Name of Individual Working at Grace Operation: 

Date of Birth: __ - __ - __ (Month Day Year)

Occupation(s) of Individual: 

Dates Worked at Operation: From: ____ (Year) To: ____ (Year)

35. When did you first know of the presence of asbestos on your property? `2002` Year

9276106

SERIAL #

A-86

36. How did you first learn of the presence of asbestos on your property?

```
See Attachment B.
```

Attach all documents relating or referring to the presence of asbestos on the property. If the documents are too voluminous to attach, attach a summary of the documents indicating the name of each document, date of each document, a brief description of the document, the location of the document, and who has possession or control of the document.

If you provide a summary of the documents rather than the documents themselves, you are required to consent to the production and release of those documents to Grace upon Grace's further request.

37. If you do not have any documents relating or referring to the presence of asbestos on the property, explain why not and indicate who may have possession or control of any such documents with respect to the property.

38. Have you or anyone on your behalf made an effort to remove, contain and/or abate the asbestos on your property?

☒ Yes     ☐ No                          SEE ATTACHMENT C

If Yes, attach all documents relating or referring to such efforts. If the documents are too voluminous to attach, attach a summary of the documents indicating the name of each document, date of each document, a brief description of the document, the location of the document, and who has possession or control of the document.

If you provide a summary of the documents rather than the documents themselves, you are required to consent to the production and release of those documents to Grace upon Grace's further request.

39. If you do not have any documents relating or referring to the removal, containment and/or abatement of the asbestos on your property, explain why not and indicate who may have possession and control of such documents with respect to the property.

40. If you or someone on your behalf did not make an effort to remove, contain and/or abate the asbestos on your property, to the best of your knowledge, did anyone else make such an effort?

☐ Yes     ☐ No

9276107                                      SERIAL #

A-87

41. If you responded Yes to question 38. or question 40. and you have not supplied related documents, please specify the dates and descriptions of any such efforts.

| | Description | |
Year

| | Description | |
Year

| | Description | |
Year

42. Have you or anyone on your behalf conducted any other testing or sampling for the presence of asbestos on your property?

☒ Yes     ☐ No          **SEE ATTACHMENT D**

If Yes, attach all documents relating or referring to such efforts. If the documents are too voluminous to attach, attach a summary of the documents indicating the name of each document, date of each document, a brief description of the document, the location of the document, and who has possession or control of the document.

If you provide a summary of the documents rather than the documents themselves, you are required to consent to the production and release of those documents to Grace upon Grace's further request.

43. If you do not have any documents relating or referring to any other such testing or sampling for the presence of asbestos on your property, explain why not and indicate who may have possession or control of such documents with respect to the property.

44. If you or someone on your behalf did not conduct any other testing or sampling for the presence of asbestos on your property, to the best of your knowledge, did anyone else conduct such testing or sampling?

☐ Yes     ☐ No

45. If you responded Yes to question 42. or question 44. and you have not supplied related documents, please specify the dates and descriptions of any such efforts.

| | Description | |
Year

| | Description | |
Year

| | Description | |
Year

46. Were you aware of the presence of asbestos on your property when you purchased your property?

☐ Yes     ☒ No

47. If you have sold the property, were you aware of the presence of asbestos on your property when you sold your property?

☐ Yes     ☐ No     ☐ Not Applicable, have not sold the property

9276108                    **SERIAL #**

A-88

## PART 4. ASBESTOS LITIGATION AND CLAIMS

### A. INTRODUCTION

1. Has any asbestos-related property damage lawsuit or claim been filed against Grace on behalf of this claiming party relating to the property for which you are making this claim?

   ☒ No
   ☐ Yes – lawsuit
   ☐ Yes – non-lawsuit claim (other than a workers' compensation claim)

2. Has any asbestos-related property damage lawsuit or claim been filed against any other party on behalf of this claiming party relating to the property for which you are making this claim?

   ☒ No
   ☐ Yes – lawsuit
   ☐ Yes – non-lawsuit claim (other than a workers' compensation claim)

   *If an asbestos-related property damage lawsuit has been filed by or on behalf of this claiming party relating to the property for which you are making a claim, complete Section B. below.*

   *If an asbestos-related property damage non-lawsuit claim has been made by or on behalf of this claiming party relating to the property for which you are making a claim, complete Section C. on the following page.*

### B. LAWSUITS

1. Please provide the following information about each asbestos-related property damage lawsuit which has been filed relating to the property for which you are making this claim or attach a copy of the face page of each complaint filed.

   a. Caption

   b. Court where suit originally filed: _____ Docket No.: _____
   *County/State*

   c. Date filed: ☐☐ - ☐☐ - ☐☐☐☐
   *Month   Day   Year*

   a. Caption

   b. Court where suit originally filed: _____ Docket No.: _____
   *County/State*

   c. Date filed: ☐☐ - ☐☐ - ☐☐☐☐
   *Month   Day   Year*

   a. Caption

   b. Court where suit originally filed: _____ Docket No.: _____
   *County/State*

   c. Date filed: ☐☐ - ☐☐ - ☐☐☐☐
   *Month   Day   Year*

   (Attach additional pages if necessary.)

9276109                                           SERIAL #

## C. NON-LAWSUIT CLAIMS

1. If the claiming party has made any claims relating to the property for which you are making a claim (including administrative claims) against anyone, that was not filed with a court of law, please provide the following information for each claim:

   a. Description of claim: [                    ]

   b. Date submitted: [  ] - [  ] - [    ]
      *Month*  *Day*  *Year*

   c. Name of entity to whom claim was submitted:
      ☐ Grace
      ☐ Other  [                    ]
                *Name of Entity*

   a. Description of claim: [                    ]

   b. Date submitted: [  ] - [  ] - [    ]
      *Month*  *Day*  *Year*

   c. Name of entity to whom claim was submitted:
      ☐ Grace
      ☐ Other  [                    ]
                *Name of Entity*

   a. Description of claim: [                    ]

   b. Date submitted: [  ] - [  ] - [    ]
      *Month*  *Day*  *Year*

   c. Name of entity to whom claim was submitted:
      ☐ Grace
      ☐ Other  [                    ]
                *Name of Entity*

## PART 5: SIGNATURE PAGE

All claims must be signed by the claiming party.

I have reviewed the information submitted on this proof of claim form and all documents submitted in support of my claim. I declare, under penalty of perjury,* that the above statements are true, correct, and not misleading.

CONSENT TO RELEASE OF RECORDS AND INFORMATION: To the extent that I have produced a summary rather than the documents themselves as requested above or indicated who has possession and control of certain documents, I hereby authorize and request that all other parties with custody of any documents or information concerning my property damage or the information contained in this Form, upon the reasonable request of Grace or Grace's representative, with a copy to the claiming party, disclose any and all records to Grace or to Grace's representative.

[signature]

[date: 01 - / / - 2005]
*Month*  *Day*  *Year*

SIGNATURE OF CLAIMANT

*The penalty for presenting a fraudulent claim is a fine up to $500,000.00 or imprisonment up to 5 years, or both.
18 U.S.C. §§ 152 & 3571.

9276110

Copyright © 2002 NCS Pearson, Inc. All rights reserved.

SERIAL #⌋

## ATTACHMENT A

The Real Property for which PacifiCorp is asserting its claim ("Subject Property") was purchased by PacifiCorp's predecessor company, Utah Light & Railway, in 1911. Utah Light & Railway sold the Subject Property in 1954. PacifiCorp reacquired the Subject Property in 1984.

## ATTACHMENT B

### D.36: Summary of Documents Relating or Referring to the Presence of Asbestos on the Property

The documents relating or referring to the presence of asbestos on the property are too voluminous to attach. A summary of relevant documents is set forth below. All documents referred to below are in the custody of Dale Rasmussen, Associate General Counsel of PacifiCorp, and are located at PacifiCorp's offices at the following address:

825 N.E. Multnomah, Suite 1800
Portland, OR 97232

1.     Correspondence between EPA and PacficiCorp regarding investigation of Vermiculite Intermountain Facility for possible amphibole asbestos contamination.

        a.  Memo from J.Ackerman (EPA) to J. Loomis (PacifiCorp), February 13, 2001.

        b.  PacifiCorp is still in the process of identifying relevant documents.

2.     Internal PacifiCorp memoranda regarding October 14-16, 2002 sampling tests.

        a.  Email from D. Wilson (PacifiCorp) to J. Loomis, May 30, 2003.

        b.  Email from J. Loomis to J. Christensen (PacifiCorp), November 3, 2003.

        c.  PacifiCorp is still in the process of identifying relevant documents.

## ATTACHMENT C

### D.38: Summary of Documents Relating or Referring to PacifiCorp's Efforts to Remove, Contain and/or Abate the Asbestos on the Property

The documents relating or referring to PacifiCorp's efforts to remove, contain and/or abate the asbestos on the property are too voluminous to attach. A summary of relevant documents is set forth below. All documents referred to below are in the custody of Dale Rasmussen, Associate General Counsel of PacifiCorp, and are located at PacifiCorp's offices at the following address:

825 N.E. Multnomah, Suite 1800
Portland, OR 97232

1.    Results and reports from asbestos sampling tests, performed at the Vermicuilite Intermountain Facility on October 14-16, 2002.

        a.  FAX from CDM Federal Programs Corporation to J. Loomis, October 30, 2002.

        b.  FAX from J. McGuiggin, U.S. DOT/RSPA/Volpe Center/DTS-33, to J. Loomis, received February 3, 2003.

        c.  PacifiCorp is still in the process of identifying relevant documents.

2.    Internal PacifiCorp memoranda regarding October 14-16, 2002 sampling tests.

        a.  E-mail from D. Wilson to J. Loomis, May 30, 2003.

        b.  PacifiCorp is still in the process of identifying relevant documents.

3.    Results and reports from asbestos sampling tests, performed at the Vermiculite Intermountain Facility on September 22-24, 2003.

        a.  PacifiCorp is still in the process of identifying relevant documents.

4.    Internal PacifiCorp memoranda regarding September 22-24, 2003 sampling tests.

        a.  PacifiCorp is still in the process of identifying relevant documents.

5.    Results and reports from asbestos sampling tests, performed at the Vermiculite Intermountain Facility in November/December, 2003.

        a.  Letter from D. Roskelley of Reservoirs Environmental, Inc. to PacifiCorp, December 8, 2003.

        b.  Letter from S. Dixon of Dixon Information Inc. to D. Roskelley, December 8, 2003.

        c.  PacifiCorp is still in the process of identifying relevant documents.

6.     Internal PacifiCorp memoranda regarding December, 2003 sampling tests.

        a.  PacifiCorp is still in the process of identifying relevant documents.

## ATTACHMENT D

### D.42: Summary of Documents Relating or Referring to PacifiCorp's Efforts to Conduct Testing or Sampling For the Presence of Asbestos on the Property

The documents relating or referring to PacifiCorp's efforts to conduct testing or sampling for the presence of asbestos on the property are too voluminous to attach. A summary of relevant documents is set forth below. All documents referred to below are in the custody of Dale Rasmussen, Associate General Counsel of PacifiCorp, and are located at PacifiCorp's offices at the following address:

825 N.E. Multnomah, Suite 1800
Portland, OR 97232

1.    Correspondence between EPA and PacifiCorp regarding cleanup of the Vermiculite Intermountain Facility Site.

  a.  E-mail from Floyd Nichols (EPA) to J. Loomis, January 26, 2004.

  b.  PacifiCorp is still in the process of identifying relevant documents.

2.    Documents relating to safety precautions taken by PacifiCorp for purposes of protecting PacifiCorp employees from amphibole asbestos exposure.

  a.  E-mail from J. Loomis to J. Christensen (PacifiCorp), November 3, 2003.

  b.  Letter from American Asbestos Abatement to J. Christensen, January 29, 2004.

  c.  Letter from PacifiCorp to PacifiCorp/Utah Power Retirees, May 26, 2004.

  d.  PacifiCorp is still in the process of identifying relevant documents.

3.    Documents relating to formation of the Administrative Order on Consent ("AOC") between EPA and PacifiCorp, including EPA memoranda.

  a.  Letter from EPA to D. Wilson, June 7, 2004.

  b.  PacifiCorp is still in the process of identifying relevant documents.

4.    AOC (July 29, 2004)

5.    Documents relating to PacifiCorp's removal action performed under the AOC.

  a.  Work Plan

  b.  Health and Safety Plan

  c.  Quality Assurance and Sampling Reports

        d.  Progress reports to EPA.

        e.  E-mail from F. Nichols to D. Wilson, August 2, 2004.

        f.  PacifiCorp is still in the process of identifying relevant documents.

6.      Documents relating to costs incurred by PacifiCorp in performing the removal action.  A summary of such documents and costs is attached hereto as Attachment D.1.

## ATTACHMENT D.1

### Summary of Documents and Costs Relating to Costs PacifiCorp
### Has Incurred in Cleaning Up the Subject Property

# Cost Estimate of Clean-up of the 3rd West Substation 12/9/04

## Backhoe Excavation

| Invoice # | Description | Amount | Status |
|---|---|---|---|
| 4536 | Initial 1500 yds excavation + set-up @ $161.49(.75)/yd | $181,676.25 | Paid |
| | 1500 yds backfill @ $161.49(.25)/yd | $60,558.75 | Work not done yet |
| 4536 | 817 yds excavated @ $134.50(.75)/yd | $82,414.88 | Paid |
| | 817 yds backfill @ $134.50(.25)/yd | $27,471.63 | Work not done yet |
| 4574 | 1547 yds excavated @ $134.50(.75)/yd | $156,053.63 | Paid |
| | 1547 yds backfill @ $134.50(.25)/yd | $52,017.88 | Work not done yet |
| 4610 | 3244 yds excavated @ $139.50(.75)/yd | $339,403.50 | Paid |
| | 3244 yds backfill @ $139.50(.25)/yd | $113,134.50 | Work not done yet |
| 4640 | 2482 yds excavated @ $139.50(.75)/yd | $259,679.25 | Paid |
| | 2482 yds backfill @ $139.50(.25)/yd | $86,559.75 | Work not done yet |
| 4656 | 3740 yds excavated @ $139.50(.75)/yd | $391,297.50 | Paid |
| | 3740 yds backfill @ $139.50(.25)/yd | $130,432.50 | Work not done yet |
| 4708 | 2006 yds excavated @ $139.50(.75)/yd | $209,877.75 | Billed, Not Paid |
| | 2006 yds backfill @ $139.50(.25)/yd | $69,959.25 | Work not done yet |
| | 1000 yds excavated @ $139.50(.75)/yd | $334,800.00 | Work not done yet |
| | 1000 yds backfill @ $139.50(.25)/yd | $111,600.00 | Work not done yet |
| | | | |
| | 16336 yds total | $2,606,937.02 | |
| | | | |
| | 6600 yds additional backfill, due to compaction | $230,208.00 | Work not done yet |
| | | | |
| | Downtime equipment rental charges | $3,575.00 | Billed, Not Paid |
| | | | |
| | **Total for backhoe excavation** | **$2,840,720.02** | |

## Air Mover Excavation

| Invoice # | Description | Amount | Status |
|---|---|---|---|
| 4536 | Area north of north transformer | $2,923.76 | Paid |
| 4574 | Area north of north transformer | $27,246.82 | Paid |
| 4610 | UTA Substation area | $16,709.64 | Paid |
| 4640 | UTA Substation area and east of control house | $23,509.71 | Paid |
| 4656 | Area east of control house | $20,015.02 | Paid |
| 4708 | Area east of control house | $32,373.47 | Billed, Not Paid |
| | Completion with air mover | $220,000.00 | Work not done yet |
| | Backfill energized areas | $72,000.00 | Work not done yet |
| | | | |
| | **Total for air mover excavation** | **$414,778.42** | |

## Additional costs

**EPA**

| | | |
|---|---|---|
| Oversight (Future Response Costs) | $200,000.00 | Not billed yet |
| Clean-up of contamination at property edge | $200,000.00 | Work not done yet |
| | | |
| **Total EPA** | **$400,000.00** | |

**Internal and Reports**

| | | |
|---|---|---|
| PERCo (Site history) | $22,305.64 | Paid |
| PERCo work remaining | $25,000.00 | Work not done yet |
| Misc. Expenses (DNW travel, etc.) | $200,000.00 | |

| | | |
|---|---:|---|
| Substation rebuild (locates, regrounding, etc) | $100,000.00 | |
| Total Internal and Reports | | $347,305.64 |
| **R&R Industrial Hygiene Consultant** | | |
| 2056 March '04 Work Plan prep | $5,837.82 | Paid |
| 2100 May '04 Work Plan & Sampling Plan prep | $4,401.76 | Paid |
| 2135 June '04 Work Plan & Sampling Plan prep | $3,775.00 | Paid |
| 2162 July '04 plan prep and site sampling | $3,210.00 | Paid |
| 2173 August '04 site documentation & sampling | $19,309.31 | Paid |
| 2190 Sept '04 site doc, sampling, & sample analysis | $29,979.25 | Paid |
| 2205 Oct '04 site doc, sampling, & sample analysis | $41,764.25 | Paid |
| 2222 Nov '04 site doc, sampling, & sample analysis | $37,064.88 | Paid |
| R&R work remaining | $100,000.00 | Work not done yet |
| Total R&R | | $245,342.27 |
| **Thermal West (Asbestos Abatement Contractor)** | | |
| 9577 control house cleaning | $22,000.00 | Paid |
| **Misc. Rentals, etc.** | | |
| 103195411 GE Capital (Office trailer rental, July-Aug) | $258.98 | Paid |
| 103222703 GE Capital (Office trailer rental, Aug-Sept) | $258.98 | Paid |
| 103257814 GE Capital (Office trailer rental, Sept-Oct) | $258.98 | Paid |
| 103285795 GE Capital (Office trailer rental, Oct-Nov) | $258.98 | Paid |
| GE Capital (Office trailer, projected need) | $900.00 | Work not done yet |
| Total GE Capital | | $1,935.92 |
| 70490 AMPCO Parking (Parking lot rental, Sept) | $2,135.00 | Paid |
| 70551 AMPCO Parking (Parking lot rental, Oct) | $2,135.00 | Paid |
| 70679 AMPCO Parking (Parking lot rental, Nov) | $2,135.00 | Paid |
| AMPCO Parking (Parking lot rental, Projected need) | $6,500.00 | Work not done yet |
| Total AMPCO | | $12,905.00 |
| IC8724 Work Care (Medical Imaging) | $614.00 | Paid |
| 583228 Work Care (Employee chest x-ray & asbestos review) | $302.00 | Paid |
| 584446 Work Care (Employee chest x-ray & asbestos review) | $218.00 | Paid |
| 585774 Work Care (Employee chest x-ray & asbestos review) | $501.00 | Paid |
| 586186 Work Care (Employee chest x-ray & asbestos review) | $151.00 | Paid |
| Work Care (Projected need) | $5,000.00 | Work not done yet |
| Total Work Care | | $6,786.00 |
| **Total Additional Costs** | $1,036,274.83 | |
| **Estimated total for project** | **$4,291,773.27** | |
| **Excavation** | | |
| Invoiced and paid | $1,089,617.44 | |
| Invoiced, not paid | $245,826.22 | |
| Work performed, not yet invoiced | | |
| Estimated work remaining | $1,363,883.01 | |
| **Total excavation** | **$2,699,326.67** | |

# EXHIBIT D