6

20. Describe all steps taken to prevent the release of hazardous substances during the demolition of those facilities.

21. Describe any air quality monitoring that was conducted at the Site during the demolition of those facilities and provide documents that show the results of that monitoring.

22. Describe how the debris resulting from the demolition was disposed of and identify the location of that disposal.

23. Does the Van Cott, Bagley, Cornwall and McCarthy Profit Sharing Trust that owned property at the Site continue to exist? If yes, identify the current trustees of that trust.

24. If the Van Cott, Bagley, Cornwall and McCarthy Profit Sharing Trust that owned property at the Site no longer exists, describe the circumstances of its termination, describe how the assets of the trust were distributed, and identify any successor trust or entity that was formed to take its place.

25. If you have reason to believe that there may be persons able to provide a more detailed or complete response to any Question contained herein or who may be able to provide additional responsive documents, identify such persons and the additional information or documents that they may have.

Printed on Recycled Paper

**ENCLOSURE 2**
**VERMICULITE INTERMOUNTAIN (#GA)**
**FIRST INFORMATION REQUEST**

**NOTARIZED CERTIFICATE**

I, _____, having been duly sworn and being of legal age, hereby state:

1.    I am the person authorized by the Van Cott Bagley Cornwall & McCarthy Profit Sharing Trust to respond to the Environmental Protection Agency's (EPA's) request for information concerning the Vermiculite Intermountain Site near Salt Lake City, Utah.

2.    I have made a complete and thorough review of all documents, information, and sources relevant to the request.

3.    I hereby certify that the attached response to EPA's request is complete and contains all information and documents responsive to the request.

_____
(Signature) (Name, Title)

(SEAL)

Subscribed and sworn to me
this____ day of_____, _____

_____
Notary Public

My Commission Expires_____
My address is_____
_____

Printed on Recycled Paper

# ATTACHMENT 2

 **PACIFICORP**
**LEGAL DEPARTMENT**

MICHAEL G. JENKINS
Assistant General Counsel
801-220-2233
801-220-3299 (fax)
michael.jenkins@pacificorp.com

One Utah Center, 201 South Main, Suite 2200, Salt Lake City, Utah 84140

**VIA E-MAIL ONLY**

September 20, 2004

Brian W. Burnett
Callister Nebeker & McCullough
Gateway Tower East, Suite 900
10 E. South Temple
Salt Lake City, Utah  84133

Re:    Third West Substation

Dear Brian,

As I mentioned to you when you picked up a copy of the site history report for the Third West Substation which PacifiCorp has made available to you for copying, I am sending along the attached report briefly describing the status of cleanup activities at PacifiCorp's Third West Substation property.

As we discussed, the area where the pure vermiculite has been discovered is the location of the historic vermiculite processing facility and is part of the property that your client, the Van Cott, Bagley, Cornwall and McCarthy Profit Sharing Trust (Trust), sold to PacifiCorp on May 9, 1984. At this point, our working assumption is that your client was an owner at the time the vermiculite was released into the environment and will bear responsibility for cleanup costs.

Also, as we discussed, we still are searching for records in regard to the demolition of the vermiculite processing facility. We also continue to look for information about the fire that reportedly destroyed many of the historic buildings on the block sometime in the mid 1980s, as well as information on the removal of the fire debris and remaining buildings. These records could have some impact on cleanup cost liability as well. Any records you are able to locate in that regard will be appreciated.

Brian W. Burnett
September 20, 2004
Page 2


    As is usually the case with projects like this, our understanding of the site and the site history continues to grow as cleanup activities progress. Although we have done quite a bit of historical research into past activities in this area, we are certainly willing to consider any additional information your clients may have that bears on liability for cleanup costs.

    Please let me know of any questions or concerns you may have.


Sincerely,


Michael G. Jenkins


cc:    David Wilson
       Matt Cohn, EPA

Attach.

Brian W. Burnett
September 20, 2004
Page 3

3rd West Substation
Control House Clean-up and
Excavation Update 9/17/04

Control House

Clean-up of the control house, both the basement storage area and the upstairs control
room, is complete. Both areas passed EPA's aggressive air monitoring for clearance.
The basement windows and door have been sealed, and the basement is not currently
being used. The control room windows remained sealed, and the room itself is
maintained under positive pressure. Make-up air is passed through HEPA filters. The
crawl space under the control room remains to be cleaned. This area contains LA-laden
dust 6 to 8 inches thick.

Excavation

The narrow section of the property at the extreme north has been excavated a second
time. Clearance samples were taken after excavating 6 vertical inches in this area. The
area did not pass clearance. An additional 6-plus inches has been excavated. A second
set of clearance samples were taken from this area today.

Excavation in the main open area of the property, east of the installed electrical
equipment, revealed pockets and veins of pure vermiculite. Excavation of these pockets
and veins led to a large area of pure vermiculite, beginning at a depth of about 4 to 6 feet
and extending to about 10 feet below ground surface. This area, in the southwest
quadrant of the main open area, is approximately 100 feet, north to south, by 70 feet, east
to west. (See attached photograph.) The excavation has uncovered concrete walls and
foundations, a concrete floor at a depth of 10 feet, and large concrete pedestals that were
apparently part of a public works facility, circa 1900. The vermiculite was tested and
found to contain LA. Due to the amount and configuration of the concrete, excavation
has been difficult.

The extreme southern edge of the main open area, from the southern property line to
about 30 feet north, has been found to be contaminated only near the surface. This area is
being excavated to a depth of 1 foot, and will be ready for clearance sampling Monday,
9/20/04.

Excavation has started in the UTA substation, the triangular area immediately south of
the Artistic Printing building. Moderate to heavy levels of vermiculite contamination
have been found near the building, along the old rail spur. Wood railroad ties have been
found at a depth of about 1 foot. Vermiculite has been found surrounding the wood ties
to a depth of about 2 feet.

Excavation has not yet begun in the energized areas of the substation.

Brian W. Burnett
September 20, 2004
Page 4



3rd West Substation 9/16/04

This shows the main open area, the eastern-most portion of the property, looking south from outside the fence at the northern end. The length of the concrete wall on the right is approximately 80 feet; its height is 10 feet. The length of the pit is approximately 100 feet, the width is about 70 feet at the widest point. The concrete pedestals are partially exposed just to the left of the concrete wall. Prior beginning the excavation, only the top of the concrete wall was exposed.

# EXHIBIT J

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | | Re: Docket No. 7571 |

**DEBTORS' OBJECTION TO PACIFICORP AND THE VANCOTT BAGLEY CORNWALL & MCCARTHY 401(K) PROFIT SHARING PLAN'S MOTION FOR LEAVE TO FILE LATE PROOFS OF CLAIM**

This Court should deny *Pacificorp and the Vancott Bagley Cornwall & McCarthy 401(k) Profit Sharing Plan's* ("Vancott" and, together with Pacificorp, the "Late Claimants") *Motion for Leave to File Late Proofs of Claim* (the "Motion").[2] The Late Claimants argue that they are

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

[2] The Late Claimants have filed a joint-motion for leave to file late proofs of claim. As described further herein, the relevant facts concerning notice differ with respect to each of the Late Claimants, and the Late Claimants are not legally-affiliated entities. Therefore, the Court should consider the merits of the Motion separately with respect to each of the Late Claimants.

entitled to file late claims because they did not receive adequate notice. This is not accurate. Both of the Late Claimants were "unknown" creditors and, therefore, the Debtors had no duty to provide them with actual notice of the Bar Date. Instead, the Debtors' Court-approved publication-notice constituted sufficient notice for each of the Late Claimants. Further, despite the Late Claimants' assertion to the contrary, Vancott received *actual notice* of the Bar Date. And, Pacificorp admits that it knew the Debtors were in bankruptcy well before the Bar Date, and it even filed a proof of claim nearly two years before the Bar Date.

Since notice was sufficient with respect to each of the Late Claimants, and the Late Claimants have cited no other reason for allowing their late claims, the Late Claimants have failed to demonstrate that the present situation falls within Rule 9006(b)(1)'s exception for tardy claims. In fact, neither of the Late Claimants have established any *neglect* for their failure to file timely claims, let alone *excusable neglect.* Moreover, courts have cast doubt on whether unknown claimants can ever challenge the merits of constructive notice. Therefore, even if the Late Claimants were to establish some sort of neglect, it would be extremely difficult (if not impossible) for them to prove that such neglect was "excusable."

Further, allowing either of the Late Claimants to file late proofs of claim would set a detrimental precedent in this case, as it would (i) open the floodgates for more prospective, late claims and (ii) tend to render the Debtors' publication notice meaningless. This is a matter of particular concern at the current stage of the Debtors' cases. The Debtors filed their first *Plan of Reorganization* on November 14, 2004 (and their *Amended Joint Plan of Reorganization* on January 13, 2005), and are currently working diligently with the various constituent groups toward confirmation. Therefore, the Debtors request that the Court enter an order denying the Motion and granting any other relief that the Court deems appropriate.

2

## FACTS AND BACKGROUND

1.     From 1940 until about 1984, the Debtors sold vermiculite to Intermountain

Insulation Co. ("Intermountain"). Intermountain processed the product at 333 W. First Street,

Salt Lake City, UT (the "Site"), and then Intermountain sold the product. Contrary to what is

stated or suggested in the Motion, the Debtors (a) never operated or arranged for the operation of

the Site or adjacent land; (b) never owned, leased, or otherwise held any ownership interest in the

Site or adjacent land; (c) never owned, leased, or otherwise held any ownership in any business

carried on at the Site or adjacent land; and (d) never permitted sale of Site product under the

Grace name.[3]

2.     According to the Motion, Pacificorp owned the Site from 1944 until 1954, and

repurchased it in 1984. According to the Motion, Vancott purchased a part of the "Subject

Property" in 1979, sold a portion of the "Subject Property" to Pacificorp in 1984, and sold the

remainder of its Subject Property in 1998.[4]

3.     On April 2, 2001 (the "Petition Date"), the Debtors filed for bankruptcy under

chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code"). Pursuant

to section 362 of the Bankruptcy Code, the automatic stay immediately prohibited the

commencement of any actions against the Debtors.

---

[3] Intermountain did hold licenses from Grace's predecessor for a processing technique and the "Zonolite" name.

[4] The Motion defines "Subject Property" to include both Site property and adjacent property, and it states that Vancott owned a portion of the Subject Property. It is left unclear in the Motion whether the Subject Property owned by Vancott included all, none, or part of the Site. See Motion at pg 1.

3

4.    On May 2, 2001, Pacificorp received notice of the Debtors' chapter 11 filing under its Utah Power & Light trade name.[5] On May 16, 2001, Pacificorp filed a proof of claim under its trade name for utility services.

5.    On June 27, 2001, the Debtors filed their *Motion for Entry of Case Management Order, Establishment of a Bar Date, Approval of the Proof of Claim Forms and Approval of the Notice Program* (the "Bar Date Motion").

6.    During the course of the following ten months, the Debtors worked with every official committee in these cases, as well as this Court, to craft the Bar Date Notice, the Bar Date Notice Package and a comprehensive system of publication of the Bar Date Notice (collectively, the "Bar Date Notice Program") that would ensure (with a high degree of probability) that every affected party was aware of the existence of the Bar Date, the scope of the Bar Date, and the process for filing a proof of claim. The Debtors filed successive versions of the Bar Date Motion during the course of this lengthy process. In addition, this Court received and considered multiple responses from all of the official committees in these bankruptcy cases.

7.    By order dated April 22, 2002 (the "Bar Date Order"), the Court approved the Bar Date Notice Program and set March 31, 2003 (the "Bar Date") as the last date for filing proofs of claim for (i) Non-Asbestos Claims, (ii) Asbestos Property Damage Claims and (iii) Medical Monitoring Claims (each of which is defined in the Bar Date Order). Of particular note, the Bar Date Order states as follows:

> ORDERED that notice of the entry of this Order and of the Bar Date to unknown claimants pursuant to the Debtors' Bar Date Notice Plan for Asbestos Property

---

[5] According to Pacificorp's web site, Pacificorp, "operates ... as Utah Power in Utah and Idaho." Pacificorp Home Page, which is available at http://www.pacificorp.com (a printed version of the Pacificorp Home Page is attached as Exhibit A).

4

> Damage Claims and Other Claims (the "Notice Plan"), as modified, and filed on
> April 12, 2002, shall be deemed good, adequate and sufficient notice of the Bar
> Date ...

Bar Date Order at pg. 5 [Docket No. 1963]. Once the detailed proof of claim forms were

approved and the Bar Date Order was entered, Grace spent *over $4 million* to publish the

Bar Date Notice.

    8.    On January 14, 2005, almost two years after the Bar Date had passed, the Late

Claimants filed the Motion. The Motion seeks leave from the Bar Date Order so that each of the

Late Claimants may file late proofs of claim on account of "environmental cleanup costs"

incurred and to be incurred to cleanup the Site and the adjacent Land. For the reasons set forth

herein, the Motion should be denied.

## ARGUMENT

### A.    The Debtors Had no Duty to Provide Actual Notice to Either of the Late Claimants

    9.    The Late Claimants were each "unknown" creditors and, therefore, they were not

entitled to receive actual notice. The Supreme Court of the United States has stated that a

"known" creditor is one whose identity is either "known or reasonably ascertainable by the

debtor." Tulsa Professional Collection Serv., Inc. v. Pope, 485 U.S. 478, 490 (1988). An

"unknown" creditor is one whose "interests are either conjectural or future or, although they

could be discovered upon investigation, do not in due course of business come to knowledge [of

the debtor]." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 317 (1950). A

creditor's identity is "reasonably ascertainable" if that creditor can be identified through

"reasonably diligent efforts." Mennonite Bd. Of Missions v. Adams, 462 U.S. 791, 798 n.4

(1983). The U.S. Court of Appeals for the Third Circuit (the "Third Circuit") has held that

"reasonable diligence" does not require "a vast, open-ended investigation. The requisite search

5

instead focuses on the debtor's own books and records.  Efforts beyond a careful examination of these documents are generally not required."  Chemetron Corp. v. Jones, 72 F.3d 341, 346-47 (3d Cir. 1995) (internal citations and quotes omitted).

10.    Several courts have held that chapter 11 debtors that own (or previously owned) allegedly contaminated property have no obligation to provide adjacent land-owners with actual notice of a claims bar date, because chapter 11 debtors have no obligation to undertake an ancillary investigation to locate such parties.  For example, in Chemetron Corp. v. Jones, the Third Circuit found that parties who either resided at or visited addresses in proximity to a nuclear waste-dump maintained by a chapter 11 debtor were not "known creditors," to whom debtor had to provide actual notice of its bankruptcy case and of bar date for filing proofs of claim.  Id.  Similarly, in In re Texaco Inc., 182 B.R. 937, 954-55 (Bankr. S.D.N.Y. 1995), the court found that the owner of land adjacent to a chapter 11 debtor was an "unknown" claimant.

11.    Furthermore, courts have also found that chapter 11 debtors have no duty to search out successors-in-interest to property, for purposes of providing them with actual notice of a claims bar date.  In In re Bicoastal Corp., 147 B.R. 807 (Bankr. M.D. Fla. 1992) (attached as Exhibit B), the court held that the claimant, which (i) owned property downstream from property that was formerly owned by the chapter 11 debtors and (ii) claimed that its property was environmentally damaged because of actions of the debtor on debtor's property, failed to establish "excusable neglect" for the allowance of a late proof of claim.  The court based this decision upon its determination that the potential claimant was not a "known creditor" of the debtor, because "[d]ue process requirements do not dictate that the Debtor must conduct such an 'impracticable and extended' search for all potential creditors."  Id. at 809, citing Mullane, 339 U.S. at 317-18.  Instead, the court found that the debtor's publication notice, which was

6

reasonably calculated to provide the claimant with notice of the bar date, was sufficient. <u>See</u> <u>In</u> <u>re Bicoastal Corp.</u>, 147 B.R. at 809.

12.    Under these standards, the Late Claimants were each "unknown creditors." The Debtors did not have any dealings with either of the Late Claimants in connection with the Site or adjacent land. Indeed, the Debtors merely sold product to a customer that operated at the Site. A search of the Debtors' books and records would not have uncovered either of the Late Claimants as creditors with respect to the Site or adjacent land. Due process does not require that the Debtors should be compelled to use the estates' resources to identify and serve every entity that owned property (and the property adjacent to) where the Debtors' products were used by independent third-parties. Such an expansive investigation does not constitute "reasonable diligence" and is not required by the applicable caselaw. <u>See</u> <u>Chemetron Corp. v. Jones</u>, 72 F.3d at 346-47.

13.    The Late Claimants' position is even *less-persuasive* than the *losing* arguments raised in the aforementioned cases. *First*, in <u>Chemetron</u>, <u>Texaco</u>, and <u>Bicoastal</u>, the debtors *owned* the property where the alleged contamination occurred. Here, however, the Debtors connection to the Late Claimants is even more attenuated. The Debtors never owned, operated, leased or had any other legal rights in the Site or adjacent land -- they merely sold vermiculite concentrate to the operators of the Site license. *Second*, in <u>Bicoastal</u>, the creditor did not have knowledge of the debtor's bankruptcy case until after the claims bar date. <u>See</u> <u>id</u>. The court, however, still found that the debtor had no duty to provide actual notice and held that the claimants were prohibited from filing a late proof of claim. In this situation, both of the Late Claimants knew of the Debtors' bankruptcy, and Vancott even received actual notice of the Bar Date.

7

14.    The Motion notes that the Debtors scheduled (on Schedule F) a contingent, disputed, unliquidated environmental claim for Intermountain Insulation Co., which is located at the Site. The Debtors scheduled this claim because the Debtors sold processed vermiculite to Intermountain, and the U.S. Environmental Protection Agency has argued that there were releases or threatened releases of hazardous substances at the Site. Since the Debtors sold vermiculite to Intermountain, the Debtors knew that Intermountain may possess a claim against the Debtors and, therefore, Intermountain was a "known" claimant. As a result, the Debtors' gave Intermountain actual notice of the Bar Date. See Affidavit of Service (attached as Exhibit C). As previously established, the Debtors, however, had no previous dealings with either of the Late Claimants in connection with the Site or adjacent land, and the Debtors were unaware of the Late Claimants interests in the Site or adjacent land. Therefore, the Debtors did not list the Late Claimants as potential creditors in the Debtors' records, and the Debtors did not schedule either of the Late Claimants as creditors for the Site or adjacent land.

15.    Under the legal standard established in Mullane and Chemetron, the Debtors had no duty to undertake an ancillary investigation to determine whether either of the Late Claimants may possess claims and, therefore, the Late Claimants were "unknown" creditors that were not entitled to actual notice. See Chemetron Corp. v. Jones, 72 F.3d at 346-47; Mullane v. Central Hanover Bank & Trust Co., 339 U.S. at 317.

**B.    The Debtors' Publication Notice was Legally Sufficient for Both Late Claimants**

16.    Because the Late Claimants were unknown creditors with respect to the Site and adjacent land, the Debtors' extensive publication notice constituted legally sufficient notice of the Bar Date with respect to each of the Late Claimants. See Chemetron, 72 F.3d at 348 ("Having held that claimants were 'unknown' creditors, we have little difficulty holding that the notice which Chemetron published in the *New York Times* and the *Wall Street Journal* was

8

sufficient. It is well established that, in providing notice to unknown creditors, constructive

notice of the bar claims date by publication satisfies the requirements of due process").

17.    In Chemetron, the Third Circuit found that Chemetron's publication notice, which

included publication in *New York Times, The Wall Street Journal*, and various local publications,

was legally sufficient. See Chemetron 72 F.3d at 348. The Debtors' publication notice far

exceeded this standard. In particular, the Debtors (i) engaged a specialist to study the

demographic readership of various publications and to assemble a stable of publications; and (ii)

ultimately spent over $4 million dollars to publish the Bar Date Notice in those publications,

which included (by way of example) *People Magazine, Parade Magazine, The New York Times,*

*Playboy,* and *The Wall Street Journal,* so that an estimated 83.8% of Americans saw the Bar

Date Notice. See Excerpts of Transcript from April 22, 2002 Omnibus Hearing before the

Honorable Judith K. Fitzgerald United States Bankruptcy Judge, 94 (attached as Exhibit D). The

Debtors also published the Bar Date Notice locally in Salt Lake City (in *The Tribune & Desert*

*News*).

18.    Further, the Bar Date Order specifically states that the Debtors' publication notice

was legally sufficient with respect to unknown claimants. See Bar Date Order at pg. 5. This

determination resulted from extensive debate between various constituent groups. During the

course of the Debtors' April 2002 omnibus hearing, these parties discussed whether the Debtors

needed to disseminate the Bar Date Notice via television advertisements or other additional

media. Ultimately, this Court determined that the increase in coverage that would be provided

by television spots (from 83.8% of American households to 95% of American households) was

not worth the additional $2.5 million in costs. See Exhibit D at pg. 94. This Court stated, "I

truly don't see, given the reach of the newspapers, the consumer magazines, the business

9

magazines, *The Wall Street Journal*, *The Parade Magazine*, the debtor's website, the other places, the opportunity for people to call in to the debtor's establishment to get information concerning a proof of claim, I don't see the need for a television ad." Id. at 95.

19.    Therefore, the Debtors' publication notice provided each of the Late Claimants with legally sufficient notice of the Bar Date.

## C.    Neither of the Late Claimants have Established Neglect, Much Less Excusable Neglect

20.    The Late Claimants have failed to satisfy the burden necessary for this Court to approve the Motion.  Bankruptcy Rule 9006(b)(1) grants the Court authority to accept late filings where the movant's failure to comply with the Bar Date "was the result of excusable neglect." The Supreme Court has held that under this rule, courts are *permitted, where appropriate,* to accept late filings caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control.  See Pioneer Inv. Services Co. v. Brunswick Ass'n Ltd. Partnership, 113 S.Ct. 1489, 1491 (1993) ("Pioneer").

21.    In determining whether to allow late proofs of claim, the Supreme Court has stated that the court's "inquiry is guided by one of the principal purposes of bankruptcy law, to secure within a limited period the prompt and effectual administration and settlement of the debtor's estate." Katchen v. Landy, 382 U.S. 323, 328 (1966).  Indeed, any other approach would severely undermine the fundamental purpose of a claims bar date - to serve as a "federally created statute of limitations, after which the claimant loses all of her right to bring an action against the debtor." See In re Grand Union Co., 204 B.R. 864, 871 (Bankr. D. Del. 1997), citing In re Trans World Airlines, Inc., 96 F.3d 687, 690 (3d Cir. 1996).

22.    Once neglect has been established, the determination of whether such neglect should be excused is determined by the following factors: (i) the danger of the prejudice to the

10

debtor; (ii) the length of delay and its potential impact on judicial proceedings; (iii) the reason for delay, including whether it was within the reasonable control of the movant; and (iv) whether the movant acted in good faith. See Pioneer, 113 S.Ct. at 1491. The burden of proving excusable neglect lies with the movant. See Jones v. Chemetron Corp., 212 F.3d 199, 204 (3d. Cir. 2000).

23.    While courts have stopped short of establishing a *per se* rule that "excusable neglect" cannot apply to "unknown creditors," such courts are loath to find excusable neglect for unknown creditors given the existence and purpose of publication notice:

> We leave for another day the issue of *whether excusable neglect can ever be a viable defense in cases where the claimant is only entitled to publication notice.* Pioneer involved a situation in which the claimant had received actual notice of the bar date, but had nonetheless failed to file a proof of claim. *It is considerably more difficult to apply the excusable neglect standard in cases involving publication notice.* Recognizing excusable neglect claims based on the failure of the claimant to read the published notices would be problematic in either of these two categories. In the former, recognizing claims that arise many years after the bankruptcy proceeding would subvert the very purpose of the bar date namely, to confer finality upon the proceedings. Similarly, allowing claimants whose very conduct has made the claim speculative to file late proofs of claim would reward lack of diligence. In both cases, permitting parties to file late proofs of claim would tend to render publication notice meaningless.

In re Trump Taj Mahal Assoc., 1993 WL 534494 at *6, fn. 7 (D.N.J. 1993) (emphasis added) (attached as Exhibit E).

24.    Neither of the Late Claimants have satisfied their burden of establishing excusable neglect. *First,* as noted by the Court in Taj Mahal, excusable neglect may not be available in situations involving constructive notice, because such an application would render publication notice meaningless. Therefore, since both of the Late Claimants were only entitled to publication notice with respect to the Site and adjacent land, they may be prohibited, as a matter of law, from establishing excusable neglect. See In re Trump Taj Mahal Assoc., 1993 WL 534494 at *6, fn. 7. *Second,* even if the Late Claimants are not precluded from pursuing excusable neglect, neither of the Late Claimants have shown that their respective failures to file

11

timely proofs of claim were the product of *any* neglect, let alone *excusable* neglect. Instead, the Late Claimants base their entire argument on the incorrect assertion that they each did not receive proper notice. However, both of the Late Claimants received sufficient constructive notice of the Bar Date -- notice that was approved by this Court. See Bar Date Order at pg. 5. Furthermore, the Late Claimants have not established any other facts that would support a finding of excusable neglect.

25.    Furthermore, with respect to Vancott, despite the Late Claimants' assertion to the contrary, the Debtors properly served Vancott with a copy of the Bar Date Package. See Declaration of Service (attached hereto as Exhibit F). Vancott received actual notice on account of dealings with the Debtors that are unrelated to their asserted claims, and it also received notice of the Debtors' chapter 11 cases. Despite its apparent awareness of the Debtors' chapter 11 cases, and actual receipt of the Bar Date Notice, Vancott has utterly failed to adequately explain its failure to file a timely claim.

26.    It appears that Pacificorp was not served with the Bar Date Notice Package. However, Pacificorp by its own admission did receive notice of the Debtors' chapter 11 cases, and filed a proof of claim under its trade name, Utah Power & Light, nearly two years before the Bar Date. Pacificorp thus (i) knew that the Debtors were in bankruptcy; (ii) knew that the proof of claim process was the appropriate method for asserting any claims against the Debtors; and (iii) could have filed a similar claim for the amounts in question at any time before the Bar Date. Nonetheless, Pacificorp does not offer any explanation for its failure to file a proof of claim with respect to the Site or adjacent land.

27.    Therefore, neither of the Late Claimants have satisfied their burdens of proving excusable neglect.

12

**D.    The Debtors Would be Severely Prejudiced if this Court Grants the Motion**

28.    Permitting the Late Claimants to file late proofs of claim would severely prejudice the Debtors. The Debtors submitted their *Plan of Reorganization* on November 14, 2004 [Docket No. 6895] and their Amended Joint Plan of Reorganization on January 13, 2005 [Docket No. 7560], and the Court held the first hearing concerning plan-related matters on January 21, 2005. Pursuant to the Court's directives, the Debtors are working diligently to establish viable case management procedures for estimation of asbestos-related liabilities and pursuing other plan-related matters. In order for the Debtors to confirm a comprehensive, viable plan of reorganization, they need complete and accurate information regarding the nature, amount and status of all claims that will be asserted in these chapter 11 cases. Accordingly, the Debtors requested (and this Court granted) March 31, 2003, as the deadline for the filing of certain proofs of claim or interest against the Debtors' estates. The Debtors' plan and related disclosure statement contain projections of allowed claims and estimates of how such claims will be paid under the plan. It would thwart the purposes of the Bar Date and detrimentally affect the Debtors' plan projections to now allow the Late Claimants to file a late claim at this stage in the process.

29.    Further, granting the Motion may also open the "flood gates" for similar claims and render the Debtors' publication notice meaningless.[6] In order to progress towards plan confirmation, the Debtors need a certain degree of certainty with respect to the potential claims that will have to be satisfied by the Debtors' reorganization plan. This is exactly why the

---

[6] The Debtors note that the Motion is not the first motion to file a late proof of claim that has been filed in these chapter 11 cases. Royal Indemnity Company [Docket No. 4667] and Intercat, Inc. [Docket No. 6151] also filed similar motions.

13

Debtors sought a Bar Date. Granting the Late Claimants' Motion would encourage uncertainty and deprive the Debtors of any assurance of the scope of their liabilities, which was the fundamental purpose behind the Bar Date. It would also render the Debtors' publication notice meaningless, and allow other "unknown" claimants to file late-filed claims in the wake of the Late Claimants' efforts.

### E.    The Bar Date Applies to the Late Claimants' Proposed Claim

30.    The Late Claimants suggest that the Bar Date "may not apply" to their proposed claims, and they support this proposition by quoting from the definition of an "Asbestos Property Damage Claim." See Motion at pg. 2, ¶2. The Late Claimant may be correct that their proposed claims would not fall within the definition of "Asbestos Property Damage Claims." The scope of the Bar Date, however, was not limited to "Asbestos Property Damage Claims" -- it also covered "Non-Asbestos Claims," which were defined as follows:

> *"Non-Asbestos Claims"* are *any claims* against the Debtors *as of the time immediately preceding the commencement of the Chapter 11 cases on April 2, 2001* other than Asbestos Personal Injury Claims, Asbestos Property Damage Claims, Zonolite Attic Insulation Claims, Settled Asbestos Claims or Medical Monitoring Claims. More specifically, Non-Asbestos Claims are those claims against one or more of the Debtors, whether in the nature of or sounding in tort, contract, warranty or any other theory of law or equity for, relating to or arising by reason of, directly or indirectly, any injury, damage or economic loss caused or allegedly caused directly or indirectly by any of the Debtors or any products or materials manufactured, sold, supplied, produced, specified, selected, distributed or in any way marketed by one or more of the Debtors and arising or allegedly arising directly or indirectly, from acts or omissions of one or more of the Debtors, including, but not limited to, all claims, debts, obligations or liabilities for compensatory and punitive damages. For purposes of the Bar Dates, the defined term "Non-Asbestos Claim" is not intended to include those claims separately defined herein as (a) Asbestos Personal Injury Claims; (b) Asbestos Property Damage Claims; (c) Zonolite Attic Insulation Claims; (d) Settled Asbestos Claims; or (e) Medical Monitoring Claims.

See *General Instructions for Completing All Proof of Claim Forms* (a copy of which is attached as Exhibit G). The Late Claimants' proposed claims falls squarely within the definition of Non-

14

Asbestos Claims and, therefore, the Late Claimants' suggestion that the Bar Date may not apply to their claim is wholly without merit.

WHEREFORE, for the foregoing reasons, the Debtors respectfully object to the Motion, and request this Court enter an order (substantially in the form attached hereto as Exhibit H) that (i) denies the Motion and (ii) grants such other relief as the Court deems just and proper.

Dated: February 11, 2005

Respectfully submitted,

KIRKLAND & ELLIS LLP
James H.M. Sprayregen, P.C.
Janet S. Baer
James W. Kapp III
Samuel L. Blatnick
200 East Randolph Drive
Chicago, Illinois 60601
Telephone: (312) 861-2000
Facsimile: (312) 861-2200

and

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.

Laura Davis Jones (Bar No. 2436)
David W. Carickhoff, Jr. (Bar No.3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Co-Counsel for the Debtors and Debtors in Possession

15

91100-001\DOCS_DE:105611.1

A-173

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                                    Chapter 11

W.R. GRACE & CO., et al.,                 Case No. 01-01139 (JFK)
                                          (Jointly Administered)
                        Debtors.


## REPLY BRIEF TO W.R. GRACE'S OBJECTION TO PACIFICORP AND THE VANCOTT BAGLEY CORNWALL & MCCARTHY 401(K) PROFIT SHARING PLAN'S MOTION FOR LEAVE TO FILE LATE PROOFS OF CLAIM

Richard S. Cobb (I.D. No. 3157)
Megan N. Harper (I.D. No. 4103)
LANDIS RATH & COBB LLP
919 Market Street, Suite 600
Wilmington, DE 19801

-and –

Steven J. McCardell
Jared L. Inouye
MABEY & MURRAY LC
1000 Kearns Building
136 South Main Street
Salt Lake City, UT 84101-1685
(801) 320-6700

-and-

J. Robert Nelson
VANCOTT, BAGLEY, CORNWALL &
MCCARTHY
50 South Main Street
Salt Lake City, UT 84144-0450
(801) 237-0270

Counsel to PacifiCorp and the VanCott Bagley
Cornwall & McCarthy 401(k) Profit Sharing Plan

DKT. NO. 8164
DT. FILED 4-4-05

A-174

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

SUMMARY OF ARGUMENT ................................................................................. 1

ADDITIONAL FACTS ........................................................................................... 2

ARGUMENT........................................................................................................... 5

A.  PacifiCorp Has a Claim Against Grace Under CERCLA .............................. 6

B.  The Debtor Had a Duty to Provide Actual Notice of The Bar Date
    to PacifiCorp, a Known Creditor................................................................. 8

    1.  Under Supreme Court Precedent, PacifiCorp
        Was Reasonably Ascertainable ............................................................ 9

    2.  PacifiCorp Was Reasonably Ascertainable Even If
        PacifiCorp Was Not Readily Identifiable Through
        The Debtor's Books and Records ........................................................ 10

C.  Given Grace's Knowledge of Its Environmental Liability Arising From
    Vermiculite Intermountain's Operations, It Was Reasonable For Grace
    To Perform A Simple Title Search.............................................................. 13

D.  PacifiCorp Was Entitled to Receive Actual Notice of the Bar Date Even
    Though It Knew of Grace's Bankruptcy Proceedings................................. 15

E.  The VanCott Plan Also Holds A Claim Against Grace ................................. 16

F.  The VanCott Plan Was A Known Creditor of Grace and Entitled to
    Actual Notice of the Bar Date ................................................................... 16

G.  VanCott Failed to Receive Actual Notice ................................................... 18

CONCLUSION........................................................................................................ 20

## TABLE OF AUTHORITIES

<u>CASES</u>

*Chemetron Corp. v. Jones,*
72 F.3d 341 (3d Cir. 1995)................................................................8, 9, 10, 13, 14, 15

*City of New York v. New York, N.H. & H.R. Co.,*
344 U.S. 293 (1953)........................................................................................8, 15

*Concrete Sales and Services, Inc. v. Blue Bird Body Co.,*
211 F.3d 1333 (11th Cir. 2000) .................................................................................8

*In re Argonaut Fin. Serv., Inc.,*
164 B.R. 107 (N.D. Cal. 1994) ..............................................................................11

*In re Bicoastal Corp.,*
147 B.R. 807 (Bankr. M.D. Fla. 1992) ....................................................................14, 15

*In re Eagle Bus. Mfg., Inc.,*
62 F.3d 730 (5th Cir. 1995) ....................................................................................18

*In re Longardner & Associates, Inc.,*
855 F.2d 455 (7th Cir. 1988) ...................................................................................19

*Jones-Hamilton v. Beazer Materials,*
972 F.2d 688 (9th Cir. 1992) ....................................................................................7

*Mennonite Bd. of Missions v. Adams,*
462 U.S. 791 (1983)........................................................................................8, 9, 10

*Morton Int'l, Inc. v. A.E. Staley Mfg. Co.,*
343 F.3d 669 (3d Cir. 2003).......................................................................................8

*Mullane v. Central Hanover Bank & Trust Co.,*
339 U.S. 306 (1950)..............................................................................................9

*Schroeder v. City of New York,*
371 U.S. 208 (1962)......................................................................................9, 10, 11

*Solow Building Co., LLC v. ATC Associates, Inc.,*
175 F. Supp. 2d 465 (E.D.N.Y. 2001) .....................................................................12, 13

*Spring Valley Farms, Inc. v. Crow (In re Spring Valley Farms),*
863 F.2d 832 (11th Cir. 1989) ...................................................................................16

A-176

*Sylvester Brothers Development,*
133 B.R. 648 (D. Minn. 1991) .................................................................................. 13

*Texaco Inc. v. Sanders (In re Texaco Inc.),*
182 B.R. 937 (Bankr. S.D.N.Y. 1995) ............................................................ 13-14, 15

*Tulsa Professional Collection Serv., Inc. v. Pope,*
485 U.S. 478 (1988) ............................................................................................... 10

*United States v. Aceto Agric. Chem. Corp.,*
872 F.2d 1373 (8th Cir. 1989) ................................................................................... 7

*U.S. v. Hercules,*
247 F.3d 706 (8th Cir. 2001) ................................................................................. 7-8

*United States v. Northeastern Pharm. & Chem. Co.,*
810 F.2d 726 (8th Cir. 1986) ..................................................................................... 7

*U.S. v. Shell Oil Co.,*
294 F.3d 1045 (9th Cir. 2002) ................................................................................... 7

*Walker v. City of Hutchinson,*
352 U.S. 112 (1952) ................................................................................................ 9

*Waterville Industries, Inc. v. First Hartford Corporation,*
124 B.R. 411 (D. Maine 1991) ...................................................................... 12, 13, 17

## STATUTES AND RULES

11 U.S.C. § 101(5) ................................................................................................ 16

42 U.S.C. § 9607(a) ................................................................................................. 6

42 U.S.C. § 9607(a)(3) ............................................................................................. 7

42 U.S.C. § 9613(f)(1) ............................................................................................. 6

CERCLA Section 107(a) ........................................................................................... 6

CERCLA Section 107(a)(3) ........................................................................................ 7

CERCLA Section 113(f)(3)(b) .................................................................................... 6

Federal Rules of Bankruptcy Procedure Rule 9006(e) ................................................. 18

## PRELIMINARY STATEMENT

A hearing on the PacifiCorp and the VanCott Bagley Cornwall & McCarthy 401(K)

Profit Sharing Plan's Motion For Leave to File Late Proofs of Claim (the "Motion")[1] and

Debtors' Objection thereto was held on February 28, 2005 (the "Hearing"). At the Hearing, the

Court ordered the parties to submit additional briefing on the issues of (1) whether PacifiCorp

and the VanCott Plan have a claim against the Debtor, and (2) whether the Debtor had a duty to

provide PacifiCorp and the VanCott Plan with actual notice of the bankruptcy claims bar date.

PacifiCorp and the VanCott Plan hereby submit this Reply Brief in support of the Motion.

## SUMMARY OF ARGUMENT

Under CERCLA, Grace is liable to PacifiCorp and the VanCott Plan and PacifiCorp and

the VanCott Plan have a right to contribution against Grace. Grace licensed its patented

vermiculite exfoliation process to Vermiculite Intermountain. Grace licensed Vermiculite

Intermountain to process and distribute various vermiculite-based products under various Grace

trademarks. Pursuant to these licenses, Grace processed Vermiculite Intermountain vermiculite

ore containing harmful asbestos, and Grace, for many years, received a royalty for every bag of

processed vermiculite sold by Vermiculite Intermountain. The arrangements between Grace and

Vermiculite Intermountain resulted in the release of asbestos and the contamination of land

currently owned by PacifiCorp and formerly owned by the VanCott Plan. Under CERCLA,

Grace is an "arranger" and therefore is a potentially responsible party ("PRP") since Grace

arranged for the disposal of a hazardous substance at the Vermiculite Intermountain Site.

The Debtor had a duty to provide actual notice to PacifiCorp and VanCott since both are

known creditors. Grace knew that it had contributed to contaminating certain property located at

"333 West First Street" and accordingly scheduled an environmental claim for that site. Grace

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

knew that it was subject to environmental liability arising from Vermiculite Intermountain's operations. Under relevant case law, Grace had a duty to provide actual notice to claimants, such as PacifiCorp and the VanCott Plan, to whom Grace reasonably knew it was liable.

## ADDITIONAL FACTS

Intermountain Insulation is the immediate predecessor company of Vermiculite Intermountain. See Certificate of Amendment to Intermountain Insulation Company's Articles of Incorporation, attached hereto as Exhibit 1.

Vermiculite Intermountain conducted its operations at 333 West First South in Salt Lake City, Utah. See Corporation Annual Report, attached hereto as Exhibit 2; and Map of North Half of Block 66 (created by PacifiCorp from publicly available sources), Salt Lake City, Utah, attached hereto as Exhibit 3.

Grace scheduled a claim for "Intermountain Insulation" at "333 West First Street" in Salt Lake City, Utah. See Schedule F, attached to Motion as Exhibit G.

"333 West First Street" is located on Block 66 in downtown Salt Lake City. See Affidavit of Tina M. Perkins, attached hereto as Exhibit 4, ¶ 6.

PacifiCorp is one of the current owners of Block 66. Exhibit 4, ¶ 7. In 1984, PacifiCorp's predecessor in interest, Utah Power & Light Company, purchased from the VanCott Plan, [2] a parcel of property in Block 66 previously owned and operated by Intermountain Insulation and Vermiculite Intermountain. See Administrative Order on Consent, attached to Motion as Exhibit B, ¶ 8; Affidavit of Stephen D. Swindle, attached to Motion as Exhibit H.

A title company would have been able to identify the current owners of Block 66 within a matter of minutes. Exhibit 4, ¶ 9, 11. The cost of such a search is nominal, if there is any cost at all. Exhibit 4, ¶ 10-11.

---

[2] PacifiCorp's environmental claim against Grace has never been transferred.

Grace owned the patented vermiculite exfoliation process and licensed Vermiculite

Intermountain to use the process. See unsigned Patent License Agreement between Vermiculite

Intermountain and W.R. Grace effective July 1, 1972, attached hereto as Exhibit 5, pp. 1-3;

Letter from Grace to Vermiculite Intermountain dated October 10, 1975, attached hereto as

Exhibit 6; Patent License Agreement between Robinson Insulation Company and W.R. Grace

dated September 1974, attached hereto as Exhibit 7, pp. 1-3.

Grace owned various trademarks under which Vermiculite Intermountain marketed and

distributed various vermiculite-based products. See Sales and Trademark Licensing Agreement

between W.R. Grace and Southwest Vermiculite Company dated June 1975, attached hereto as

Exhibit 8, pp. 1, 9-11; Letter from Grace to Southwest Vermiculite Co. dated October 10, 1975,

attached hereto as Exhibit 9; Exhibit 6; and Agreement between Zonolite Company and

Robinson Insulation Company dated June 1957, attached hereto as Exhibit 10, pp. 1-2.

Grace, through its subsidiary Construction Products Division and its predecessors,

entered into certain agreements with Vermiculite Intermountain, as well as other similarly

situated "processing distributors" that exfoliated and marketed the Libby vermiculite. In the

agreements, Grace agreed: (i) to supply Vermiculite Intermountain with vermiculite ore from the

Libby mine; (ii) to license Vermiculite Intermountain to market the exfoliated ore under one of

several other Grace trade names, including the Zonolite and Monokote brand names;[3] and (iii) to

provide technical assistance on the use, manufacture and marketing of the various products.

Exhibit 10, pp. 1-2; Exhibit 7, pp. 1-3; and Exhibit 8, pp. 1-3, 9-11.

---

[3] Exhibit 8 includes an attachment that lists all of the Vermiculite Intermountain Licensed Products at that time.

Prior to 1975, Grace received a royalty from Vermiculite Intermountain for every bag of "licensed product" sold by Vermiculite Intermountain. See Exhibit 5, p. 5; Exhibit 7, pp. 3-4; and Exhibit 10, p. 3.

Grace provided detailed specifications to the processing distributors on the various products. See Memorandum from J.A. Behan to "Dallas and Zono Licensees" dated Feb 27, 1976 attached hereto as Exhibit 11; Exhibit 6; Exhibit 10, Schedule A. One purpose for doing so was to allow Grace to "exercise control over the quality of vermiculite which is offered to the fertilizer trade [and] provide some royalty income." Letter from Brown, Jackson, Boettcher & Dienner to Harry Dresser of the Zonolite Company dated June 1954, attached hereto as Exhibit 12.

In 1976, Grace notified the processing distributors regarding OSHA standards relating to the "'tramp' mineral found in vermiculite deposits ... tremolite."[4] Memorandum from Grace Construction Products Division dated March 17, 1976, attached hereto as Exhibit 13, p. 1. Also Grace stated, "[a]lthough we remove a great deal of tremolite during processing, it is not now possible to provide our ore customers with a totally tremolite-free product .... **Significant amounts of the tremolite are removed during the expansion process.**" Exhibit 13, p. 2 (emphasis added).

In the course of pursuing its Libby environmental claims against Grace, EPA has sent Grace at least two Requests for Information Regarding the Libby Asbestos Site. See Excerpt from W.R. Grace & Co. – Conn. Response to the Second Request for Information Regarding the Libby Asbestos Site, attached hereto as Exhibit 14.

---

[4] Tremolite is the harmful substance in asbestos.

In response to EPA's inquiry as to when Grace found tremolite in the Libby vermiculite ore, Grace responded in 2000 that it was aware of the presence of tremolite in the ore when it purchased the Zonolite company in 1963. Exhibit 14, pp. 13-14.

In response to EPA's request to provide a list of non-Grace controlled companies that purchased Libby vermiculite, Grace provided a list of 36 licensees, one of which was "Verm. – Intermountain, Inc." Exhibit 14, p. 17, Attachment A. Grace also listed 129 "industrial" entities that purchased Libby Vermiculite. Exhibit 14, Attachment A.

Grace knew it had arranged for and profited from the contamination of the Vermiculite Intermountain site on Block 66 in downtown Salt Lake City. Exhibit 14. Grace filed bankruptcy on April 2, 2001 primarily to escape liability from this kind of contamination.

On March 28, 2003, EPA filed a timely proof of claim, claim number 00009634, asserting claims for environmental contamination at the Vermiculite Intermountain Site. See EPA's Claim, attached to Motion as Exhibit A.

## ARGUMENT

Under CERCLA, both PacifiCorp and the VanCott Plan have a direct statutory claim against Grace. Both PacifiCorp and the VanCott Plan should be allowed to file a late claim because they were "known" creditors, entitled to actual notice of the Bar Date, and Grace failed to provide PacifiCorp or the VanCott Plan with such notice. Moreover, given that Grace knew of its environmental liability at the Vermiculite Intermountain Site, that Grace scheduled a claim for Intermountain Insulation, and that EPA filed a timely proof of claim for the Vermiculite Intermountain Site, Grace cannot now claim that it will be prejudiced if PacifiCorp and the VanCott Plan are allowed to file their claims for the same site.

## A. PacifiCorp Has a Claim Against Grace Under CERCLA.

PacifiCorp is entitled to statutory contribution from Grace for costs it has incurred in the remediation of the Vermiculite Intermountain CERCLIS Site. Section 113(f)(3)(b) of the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA") provides that "[a] person who has resolved its liability to the United States for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement [and who has not entered into a similar agreement with the United States]." 42 U.S.C. § 9613(f)(1). PacifiCorp entered into an Administrative Order on Consent ("AOC") with EPA in August of 2004 for the Vermiculite Intermountain Site, which contained a covenant not to sue from EPA. See AOC attached to Motion as Exhibit B. Thus, PacifiCorp has a valid CERCLA contribution claim against Grace so long as (1) Grace has not entered into an administrative or judicial settlement with EPA, and (2) Grace is a PRP for the Vermiculite Intermountain Site. Each of these facts is undisputed.

Section 107(a) of CERCLA imposes liability for response costs on four classes of "potentially responsible parties." These four categories are: (1) current owners and operators of the site; (2) owners and operators of the site at the time of "disposal of any hazardous substance"; (3) "any person who by contract, agreement, or otherwise arranged for disposal or treatment"; and (4) "any person who accepts or accepted any hazardous substances for transport to disposal." 42 U.S.C. § 9607(a).

Grace's objection to PacifiCorp's claim focuses on the first two categories of liability under section 107(a) by asserting that it was never an owner or operator of the Vermiculite Intermountain Site. However, Grace fails to recognize its liability under the third category, as an arranger for the disposal or treatment of asbestos-contaminated vermiculite at the Site.

6

Grace arranged for Vermiculite Intermountain to remove "[s]ignificant amounts of the tremolite" from the Grace products "during the expansion process." Exhibit 13, p. 2.

Arranger liability falls upon companies, like Grace, that enter into processing agreements with other companies for the manufacture of a product when the manufacturing process itself results in significant contamination to the processor's property. United States v. Aceto Agric. Chem.Corp., 872 F.2d 1373 (8th Cir. 1989). In Aceto, the court rejected a chemical company's characterization of its processing contract as a mere service contract and recognized the chemical company's potential arranger status. Id. at 1381-82. Similarly, in Jones-Hamilton v. Beazer Materials, Beazer supplied raw materials to a contract chemical formulator to produce wood preservation compounds. 972 F.2d 688, 690 (9th Cir. 1992). The court found Beazer liable because the agreement between Beazer and the chemical formulator indicated that Beazer retained ownership of the materials supplied and contemplated two-percent spillage of the materials. See id. at 694-95.

CERCLA case law establishes that "parties who did not literally own or physically possess hazardous waste at the time it was disposed of or released" may be liable as CERCLA arrangers. U.S. v. Shell Oil Co., 294 F.3d 1045, 1058 (9th Cir. 2002) (citing United States v. Northeastern Pharm. & Chem. Co., 810 F.2d 726, 743-744 (8th Cir. 1986) ("We believe requiring proof of personal ownership or actual physical possession of hazardous substances as a precondition for liability under CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3), would be inconsistent with the broad remedial purposes of CERCLA."). Furthermore, some courts have held entities liable as arrangers even when the parties characterize the relationship as a "sale" of a hazardous substance rather than an arrangement for disposal. See, e.g., U.S. v. Hercules, 247

A-184

F.3d 706 (8th Cir. 2001) (imposing indirect arranger liability, even without clear evidence of retained ownership throughout the transaction).

The critical elements of arranger liability are present. Grace knew of the asbestos content of the vermiculite ore; Grace knew that its licensed process released the asbestos from the ore and would result in the disposal of the asbestos; Grace made the decision to place the ore in the hands of its licensee, Vermiculite Intermountain, to process, and remove asbestos from the ore to make Grace's licensed product, Zonolite; Grace retained an interest in its vermiculite ore (and its asbestos) by virtue of its licensing arrangements and retained a royalty in the ultimate licensed product. See Morton Int'l, Inc. v. A.E. Staley Mfg. Co., 343 F.3d 669, 677 (3d Cir. 2003); Concrete Sales and Services, Inc. v. Blue Bird Body Co., 211 F.3d 1333, 1336-37 (11th Cir. 2000).

Accordingly, under CERCLA and applicable case law, Grace is an arranger and a PRP. Moreover, under CERCLA, PacifiCorp has a contribution claim against Grace.

**B.    The Debtor Had a Duty to Provide Actual Notice of the Bar Date to PacifiCorp, a Known Creditor**

PacifiCorp was a known creditor and therefore was entitled to actual notice of the bar claims date. Due Process requires that "known" creditors must be provided with "actual written notice" of a debtor's bar claims date. Chemetron Corp. v. Jones, 72 F.3d 341, 346 (3d Cir. 1995); City of New York v. New York, N.H. & H.R. Co., 344 U.S. 293, 296 (1953). A "'known' creditor is one whose identity is either known or 'reasonably ascertainable by the debtor.'" Chemetron, 73 F.3d at 346. "A creditor's identity is 'reasonably ascertainable' if that creditor can be identified through 'reasonably diligent efforts.'" Id. (quoting Mennonite Bd. of Missions v. Adams, 462 U.S. 791, 798 n.4 (1983)).

*1.    Under Supreme Court Precedent, PacifiCorp Was Reasonably Ascertainable*

The Third Circuit, in <u>Chemetron</u>, held that <u>Mullane v. Central Hanover Bank & Trust Co.</u>, 339 U.S. 306, 317 (1950), "set the standard for notice required under the Due Process Clause in Chapter 11 bar date cases." <u>Chemetron</u>, 73 F.3d at 346 n.1. In <u>Mullane</u>, the Supreme Court held that trust beneficiaries whose names and addresses were known were entitled to actual notice of an action to settle the accounts of the trust. 339 U.S. at 318. The Supreme Court has applied <u>Mullane</u> in several cases, holding that a person whose name is reasonably ascertainable from public records is entitled to actual notice. <u>Mennonite</u>, 462 U.S. at 798; <u>Schroeder v. City of New York</u>, 371 U.S. 208, 212-13 (1962); <u>Walker v. City of Hutchinson</u>, 352 U.S. 112, 116 (1952).

<u>Schroeder</u> involved a statute allowing the city to condemn property after publication notice to affected landowners. The statute violated the due process clause because "a [landowner] whose name and address are known or very easily ascertainable and whose legally protected interests are directly affected by the proceedings in question" is entitled to actual notice. <u>Schroeder</u>, 371 U.S. at 212-13. The landowner's "name and address were readily ascertainable from both deed records and tax rolls." <u>Id.</u> Similarly, in <u>Mennonite</u>, the Court held that a mortgagee identified in a publicly recorded mortgage is "reasonably identifiable" and entitled to actual notice of a proceeding to sell the mortgaged property for nonpayment of taxes. <u>Mennonite</u>, 462 U.S. at 798. This was true even though the mortgage on file only identified the mortgagee by name and did not list an address. The Court stated, "[w]e assume that the mortgagee's address could have been ascertained by reasonably diligent efforts." <u>Id.</u> at 798 n.4.

Under Supreme Court precedent, it is clear that PacifiCorp was reasonably ascertainable and entitled to actual notice. First, Grace knew of its environmental liability relating to the

Vermiculite Intermountain Site, located at 333 West First Street on Block 66 in downtown Salt Lake City. Grace knew it had sold Libby asbestos to Vermiculite Intermountain/Intermountain Insulation's exfoliation facility at 333 W. First Street over many years. See Grace Objection at ¶ 3, n.3. Grace knew that it had licensed Vermiculite Intermountain to use its patented vermiculite processing techniques and trademarked product names. Grace knew that it received royalty payments on a host of Grace products manufactured and sold by Vermiculite Intermountain. Grace knew that environmental and health hazards were directly linked to the exfoliation of Libby asbestos and told the EPA that the Vermiculite Insulation Site was an exfoliation site. Grace scheduled an environmental claim relating to Intermountain Insulation at "333 W. First Street." Indeed, Grace is currently in bankruptcy due to the litigation stemming from Libby asbestos.

Second, like the landowners in Schroeder and Mennonite, PacifiCorp's identity was in the public records as the current owner of certain property located on Block 66 on which Vermiculite Intermountain conducted its exfoliation operations. Thus, under Schroeder and Mennonite, because PacifiCorp's name was listed in the public records, PacifiCorp's identity and location could have been ascertained by reasonably diligent efforts.

2.    *PacifiCorp Was Reasonably Ascertainable Even If PacifiCorp Was Not Readily Identifiable Through The Debtor's Books and Records*

The Third Circuit has held that while a debtor's duty of reasonable diligence does not require "a vast, open-ended investigation," the debtor has at least a duty to review its "own books and records." Chemetron, 73 F.3d at 346-47. In addition, the Third Circuit has acknowledged that "[s]ituations may arise when creditors are 'reasonably ascertainable,' although not identifiable through the debtor's books and records." Id. at 347 n.2 (citing Tulsa Professional Collection Serv., Inc. v. Pope, 485 U.S. 478, 491 (1988)). See also Mennonite, 462 U.S. at 798

(as discussed above); and <u>Schroeder v. City of New York</u>, 371 U.S. at 212-13 (1962) (as discussed above).

As noted, the Supreme Court has repeatedly held that due process requires actual notice to a claimant who is identifiable in public records. This rule applies in bankruptcy. In <u>In re Argonaut Fin. Serv., Inc.</u>, 164 B.R. 107, 112 (N.D. Cal. 1994), the court concluded that Argonaut, a co-debtor, was "aware of certain facts as to alert a reasonable debtor that [claimants] might have a claim against it" and "should have known of the possibility of such claims" where (1) Argonaut knew that the claimants were assignees of a certain promissory note and a certain deed of trust, and (2) "it would have been easy for Argonaut to have learned of the assignment and gotten the list of assignees." <u>In re Argonaut Fin. Serv., Inc.</u>, 164 B.R. at 112. The court noted that the assignment was recorded in official county records. <u>Id.</u>

The facts of this case are stronger and much more compelling than the facts of <u>Argonaut</u>. In <u>Argonaut</u>, the court found that the debtor's knowledge of the **possibility** of liability was sufficient to make the claimant a known creditor. <u>In re Argonaut Fin. Serv., Inc.</u>, 164 B.R. at 112. Here, however, as discussed above, Grace had **concrete** knowledge that it was subject to environmental liability at and around Block 66.

Given Grace's knowledge that it was subject to environmental liabilities at and around Block 66, it would have been "easy" for Grace to identify and notify the parties to whom Grace would be liable. <u>See Argonaut</u>, 164 B.R. at 112. With minimum effort and nominal cost, it would have been an "easy" task for Grace to identify the current owners of Block 66.

Cases in which courts have refused to discharge a debtor's environmental obligations for failure to provide actual notice hold that a debtor has a duty to provide actual notice if the debtor has facts which would alert a reasonable debtor that a claimant might have a claim against it. In

<u>Waterville Industries, Inc. v. First Hartford Corporation</u>, the court held that the debtor did not

give proper notice to Waterville, since the debtor "knew of certain specific environmental claims

and knew of a class of claimants – subsequent titleholders . . . that it could have listed." 124

B.R. 411, 413 (D. Maine 1991). The court found that the debtor knew that environmental

agencies were pursuing specific environmental problems on the Waterville property, which the

debtor had previously owned. <u>Id.</u> "As a result, **it was on notice that successors in title to the**

**Waterville real estate . . . could be ultimately obliged to incur cleanup costs . . . giving them**

**a right to recovery against [the debtor].**" <u>Id.</u> (emphasis added).

In <u>Solow Building Co., LLC v. ATC Associates, Inc.</u>, 175 F. Supp. 2d 465, 473

(E.D.N.Y. 2001), the court held that "[c]ase law seems to suggest that courts dispense with the

requirement of actual notice only in cases where a bankruptcy petitioner does not have in its

possession any information sufficient to alert the petitioner to the existence of a problem

underlying a claim in issue." The court determined that the debtor, an asbestos remediation

company, had a duty to provide actual notice to Solow because the debtor knew of its potential

liability to Solow. <u>Id.</u> The debtor knew that it had released asbestos into the environment while

performing the abatement; Solow sent letters addressed to the debtor informing the debtor about

the problem and that plaintiffs would hold the debtor liable; and the debtor was well aware of the

litigation between Solow and Solow's lessee over the condition of the property. <u>Id.</u> The court

held that the debtor's obligation to Solow was not discharged and allowed Solow to file a late

claim. <u>Id.</u>

PacifiCorp was therefore entitled to actual notice. In both <u>Waterville Industries</u> and

<u>Solow</u>, the debtors knew of specific parcels of real property, which posed known environmental

liabilities to such debtors. In <u>Waterville Industries</u>, the debtor knew that environmental agencies

were pursuing environmental problems on the property, 124 B.R. at 413; in Solow, the debtor knew that its abatement action had resulted in asbestos contamination, 175 F. Supp. 2d at 473. Here, there is no question that Grace knew of a specific parcel of property – "333 West First Street" – that its processes had actually contaminated.

Like the debtor in Waterville, which knew of environmental liabilities and therefore "was on notice that successors in title to the Waterville real estate . . . could be ultimately obliged to incur cleanup costs," Grace was on notice that successors in title to Vermiculite Intermountain's property could ultimately be obliged to incur cleanup costs. Waterville Indus., 124 B.R. at 413. Grace could easily have identified PacifiCorp. A title searcher could have ascertained that PacifiCorp owned property on Block 66 within a matter of minutes and for little or no cost.

The fact that Grace did not actually own the Subject Property does not distinguish cases like Waterville Industries from the case at hand since liability under statutory obligations under CERCLA extend beyond mere owners and operators of land. For example, in Sylvester Brothers Development, 133 B.R. 648 (D. Minn. 1991), the debtor did not own the contaminated land, but was a PRP. As a PRP, the court found that the debtor was required to give actual notice to the owner of the contaminated land. Grace holds the same CERCLA status as the debtors in Sylvester Brothers Development and Waterville Industries – a PRP. As discussed above, "owners and operators" and "arrangers" are all PRPs. Furthermore, the requirements of due process apply to Grace, whether or not it owned the Subject Property.

C.    **Given Grace's Knowledge of Its Environmental Liability Arising From Vermiculite Intermountain's Operations, It was Reasonable For Grace To Perform a Simple Title Search**

The difficulties discussed in Chemetron, which made a title search impossible under the circumstances of that case are simply not present under the facts of this case. In cases like Chemetron, 72 F.3d at 347; Texaco Inc. v. Sanders (In re Texaco Inc.), 182 B.R. 937, 955

(Bankr. S.D.N.Y. 1995), or In re Bicoastal Corp., 147 B.R. 807, 809 (Bankr. M.D. Fla. 1992), (1) it was difficult to determine the area in which title searches were to be undertaken, and (2) the debtors would have been required to perform a large number of searches.

While Grace may argue that a simple current owner search would have been unreasonable, the nature of this case completely undermines that argument: (1) the core issue in Grace's bankruptcy is contamination caused by Grace's products; (2) Grace knew its products were processed at an identified expansion plant in Salt Lake City, knew of the potential claims, and knew an address from which PacifiCorp could have been identified with reasonable diligence; (3) Grace would not have had to incur much effort to determine this as to expansion plant sites – (i) EPA's proof of claim lists 30 environmental sites in 18 states total, of which only 13 are vermiculite expansion plants (located in the following 11 states – NJ, MD, PA (two sites), KY, MN, MT, UT (two sites), ND, CO, CA, WA), (ii) Grace knew that it had licensed its patented vermiculite exfoliation process and trademarks to 36 licensees; and (4) hiring title searchers to determine current owners for such sites is not an unreasonable burden, especially given that Grace paid approximately $4 million for its publication notice. This case does not involve scattered tort claimants or users of products in unknown locations, as in the cases cited by Grace. This case involves a known parcel of real property Grace's products contaminated, and a claim by the current owner.

Accordingly, the cases Grace relies on in its Objection – Chemetron, Texaco, and Bicoastal – are properly distinguished: all involve claimants who were not identifiable through a diligent search, and therefore were not "reasonably ascertainable." Chemetron, 72 F.3d at 347; Texaco, 182 B.R. at 955; Bicoastal Corp., 147 B.R. at 809.

In Chemetron, for example, of the twenty-one personal injury claimants asserting exposure to chemicals, only two had actually occupied properties in the vicinity of the landfill. And these two did not occupy the properties when the debtor filed for bankruptcy. The Third Circuit observed that "[w]e are hard-pressed to conceive of any way the debtor could identify, locate, and provide actual notice to these claimants." Chemetron, 72 F.3d at 347. The case at hand is far different. It does not involve speculative injuries to roving people. It involves known contamination to a discrete parcel of real property, the address of which was known to Grace.

In Texaco and Bicoastal, contamination from the debtors' property migrated to the claimants' land. In both cases, the courts determined that the debtors could not have known or reasonably ascertained the extent of the toxic plumes emanating from the debtors' property. The courts further determined that the debtors did not know that the claimants' property had been affected and that the debtors could not have undertaken a search for possible claimants since the geographic area affected by the toxic plumes was unknown and very large. Texaco, 182 B.R. at 955; Bicoastal, 147 B.R. at 809. Here, however, Grace knew that Libby vermiculite had been exfoliated on a specific portion of real property; Grace had the physical address of the property.

**D.    PacifiCorp Was Entitled to Receive Actual Notice of the Bar Date Even Though It Knew of Grace's Bankruptcy Proceedings**

The fact that the customer service division of Utah Power & Light, a name under which PacifiCorp does business, had a general knowledge of Grace's bankruptcy case and filed a $1,375.58 proof of claim for electric service provided in a another city does not negate PacifiCorp's constitutional right to actual notice of the Bar Date. The Supreme Court has held that actual knowledge of the bankruptcy case does not negate constitutionally required notice of the claims bar date. City of New York v. New York, N.H. & H.R. Co., 344 U.S. at 297. Even creditors who know about a bankruptcy case can assume that they will receive the reasonable

statutory notice. Id.; Spring Valley Farms, Inc. v. Crow (In re Spring Valley Farms), 863 F.2d

832, 835 (11th Cir. 1989) (due process required the debtor to give actual notice of the bar date,

even though "the creditor had actual knowledge of the general existence of the bankruptcy

proceedings").

### E.    The VanCott Plan Also Holds a Claim Against Grace

The foregoing arguments, it is submitted, apply equally to the VanCott Plan and compel

the conclusions that (a) the Plan holds a valid claim against Grace and (b) the Plan was a known

creditor of Grace entitled to actual notice of the fixing of a bar date for filing claims

As to the first point, the VanCott Plan, for nearly 20 years, owned a substantial part of

Block 66, including property occupied or owned by Grace's licensee Vermiculite Intermountain.

Indeed, it was only in 1998 that the Plan sold its last remaining portion of its Block 66 property

to La Quinta Inns. Although the VanCott Plan has not yet expended sums in connection with

clean up of Block 66, as a longtime property owner, the Plan is considered and being treated both

by EPA and PacifiCorp as a PRP under CERCLA. For the reasons set forth above with respect

to PacifiCorp, under CERCLA the VanCott Plan also holds a contribution claim against Grace.

Although that claim, at this stage, is contingent and unliquidated, it nonetheless qualifies as a

claim for bankruptcy purposes under 11 U.S.C. § 101(5).

### F.    The VanCott Plan Was a Known Creditor of Grace and Entitled to Actual Notice of the Bar Date

As to the second point, the authorities cited above in Section B with respect to PacifiCorp

equally support the conclusion that, for purposes of notice of the bar date, the VanCott Plan must

be treated as a known creditor. Those cases support the conclusion cited above in section B that

known creditors include not only those creditors known in fact, but those who would be

discovered through exercise of reasonable diligence.

PacifiCorp has pointed to Grace's familiarity with Block 66 and operations conducted thereon, its interest in those operations, its clear knowledge of the environmental problems associated with the property and the ease with which Grace could have determined current owners of Block 66 in support of its position that PacifiCorp was a known creditor of Grace for purposes of notice of the bar date.

In terms of this issue, the applicable facts with respect to the VanCott Plan are virtually identical. The same property is involved, Block 66. There is no difference in Grace's connection with the property or in its knowledge of the environmental implications. The only factual difference is that PacifiCorp is a current owner and the VanCott Plan a former owner of the property. That, however, is a difference without significance. For nearly twenty years, the VanCott Plan owned, as a matter of record, substantial portions of Block 66 that were formerly owned or occupied by Grace's licensee Vermiculite Intermountain. A quick and inexpensive search of local real estate records would have disclosed that long term ownership interest. The above-cited case of Waterville Industries, Inc. v. First Hartford Corporation, 124 B.R. 411, 414 (D. Maine 1991) found that, in identifying creditors for purposes of notice, it was reasonable to require the debtor, the former owner of a property with environmental problems, to determine and notify not only current, but also successor owners. It is equally reasonable in this case for Grace to have undertaken a simple date-down search to determine owners of Block 66 during the period that it was occupied by Grace's licensee. Such a search would have disclosed the VanCott Plan as an owner and PRP. As such, the VanCott Plan qualifies as a known creditor for purposes of service of the bar date notice.

G.    **VanCott Failed to Receive Actual Notice**

In terms of notice, there is another factor which distinguishes the two movants. The notice of bar date was not served on PacifiCorp. In contrast, the relevant proof of service indicates that it was mailed to VanCott, Bagley Cornwall & McCarthy, LLP. On that basis, Grace contends that, under applicable law, the VanCott Plan in fact did receive actual notice of the bar date. The debtor is mistaken in that regard.

The fact that VanCott appeared on Grace's mailing list is not dispositive of proper service of the bar date notice. Grace's "actual notice" argument rests on the "presumption of receipt" that arises under both Rule 9006(e) of the Federal Rules of Bankruptcy Procedure and common law with respect to mailed pleadings. While there unquestionably is a presumption, it arises only with respect to pleadings that are properly mailed. In that regard, the court, in In re Eagle Bus. Mfg., Inc., 62 F.3d 730 (5th Cir. 1995) noted, "[t]o determine if a mailing was accomplished the courts may consider whether the notice was correctly addressed, whether proper postage was affixed, whether it was properly mailed, and whether a proper certificate of service was filed." Eagle involved a bar date notice which was served on a creditor at her last known address. The creditor, who had moved but failed to notify the debtor of her new address, contended that she had not in fact received the bar date notice. The Fifth Circuit held that "[m]ailing a notice by First Class U.S. Mail to Rogers' last known address was reasonably calculated to inform her of the bar date for filing proofs of claim. Therefore, we conclude that Rogers' due process rights were not violated." Id.

In this case, the VanCott Plan rests its argument of inadequate service on substantially more than a mere denial of receipt. The Supplemental Affidavit of Stephen D. Swindle, President of VanCott and a Trustee of the VanCott Plan, attached hereto as Exhibit 15, not only

denies that the notice of the bar date was received by VanCott, it goes on to identify three distinct problems with the alleged notice. In that regard, the deficiencies are clearly more significant than as addressed in In re Longardner & Associates, Inc., 855 F.2d 455 (7th Cir. 1988) in which the only mailing error, failure to include a zip code, was found to weaken but not entirely overcome the presumption of notice.

The first of the problems was that the alleged notice was sent to the wrong party. The proof of service lists VanCott, the firm, but makes no mention of the Plan. Service never was effected on the potential claimant.

Next, even as to VanCott, the proof of service reflects mistakes in the address that was used. Like Longardner, the wrong zip code was used. More importantly, the indicated address failed to include a suite number. As indicated in the Supplemental Swindle Affidavit, based on experience, failure to include a suite number was material because, in the past, the oversight had resulted in non-delivery of other mail to the firm.

In view of the foregoing, the VanCott Plan submits that the presumption of actual notice based on mailing has been overcome and that the Plan cannot be deemed to have received actual notice of the bar date.

**CONCLUSION**

For the foregoing reasons, the Motion should be granted.

Dated: April 4 , 2005

LANDIS RATH & COBB LLP

By: _____
Richard S. Cobb (I.D. No. 3157)
Megan N. Harper (I.D. No. 4103)
919 Market Street, Suite 600
Wilmington, DE 19801
(302) 467-4400

-and-

Steven J. McCardell
Jared L. Inouye
MABEY & MURRAY LC
1000 Kearns Building
136 South Main Street
Salt Lake City, UT 84101-1685
(801) 320-6700

-and-

J. Robert Nelson
VANCOTT, BAGLEY, CORNWALL &
MCCARTHY
50 South Main Street
Salt Lake City, UT 84144-0450
(801) 237-0270

Counsel to PacifiCorp and the VanCott Bagley
Cornwall & McCarthy 401(k) Profit Sharing
Plan

A-197

# EXHIBIT 1

STATE OF UTAH  
COUNTY OF SALT LAKE

ss.

     I, Alvin Keddington, Clerk in and for the County of Salt Lake and Ex-Officio Clerk of the District Court of the Third Judicial District in and for Salt Lake County, State of Utah, do hereby certify that the foregoing is a full, true and correct copy of the original_____Certificate of Amendment to:_____

## Articles of Incorporation

### of

## Intermountain Insulation Company

### No. 14063

Changing Name to :

    Vermiculite-Intermountain, Inc.

as appears of record in my office.

    IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal, this_____26th_____

day of_____August_____, A. D. 19__54__

    ALVIN KEDDINGTON_____Clerk

By_____Helen Lloyd_____Deputy Clerk

# EXHIBIT 2