Information for any purpose, other than to carry out the Company's obligations as provided in this Agreement, or disclose the same to third parties. Company will insure that within its own organization it will restrict dissemination of Confidential Information to the minimum number of employees who reasonably need to have access to the same for the purposes permitted by Grace. Company will further insure that all of its employees who shall have to be given access to Confidential Information as aforesaid are informed of the terms and conditions of this Agreement in respect thereof and will take such steps as are necessary to insure that each such employee agrees to be bound by them.

(b) Use of Confidential Information by Company is at Grace's sole discretion and Grace shall have the right at any time to withdraw Company's right to use Confidential Information by giving written notice thereof to Company but any such notice (except in case of default) shall not become effective sooner than one hundred and eighty (180) days from the date of the giving of such notice.

(c) Neither the receipt of Confidential Information hereunder nor the purchase of vermiculite ore from Grace confers any right or license of any kind, express or implied under any patents or patent applications owned or controlled by Grace; such rights, if any, as are to be conferred under said patents or patent applications, are to be at Grace's sole discretion pursuant to separate written agreement or agreements containing such terms deemed appropriate or necessary by each party.

- 12 -

WRGO5424464

S8020118628

A-251

16.  Right to Sublicense Applicators

(a)  Grace hereby grants to Company the right to
sublicense, in the Territory, the use of the Trademark
"Zonolite" solely in connection with the appointment of
approved applicators for the Licensed Product "Zonolite
Roof Decks", (hereinafter "Roof Decks") provided that such
sublicensing is accomplished by means of a written agreement
between Company the applicator in the form attached hereto
as Schedule C.  It is understood and agreed that Grace shall
have no obligation to supply Licensed Products or vermiculite
ore to any applicator appointed by Company.

(b)  Company agrees to use its best efforts to
police the use of any Trademarks sublicensed to applicators to
ensure that any such use by applicators is consistent with the
manner of use and application to products of Trademarks as
specified and sanctioned by Grace.  Company further agrees to
use its best efforts to ensure that the quality of the Roof
Decks as applied by applicators conforms to Grace's specifications
for Roof Decks from time to time in effect.

(c)  Company agrees that any agreement entered into
between Company and an applicator for Roof Decks which does
not conform to the form of agreement in Schedule C hereof shall
be subject to the prior written approval of Grace.  It is
understood that Grace assumes no responsibility for selection
of applicators by Company, and appointment of any applicator
by Company shall not be deemed an approval of such applicator
by Grace.

- 13 -

WRG05424465

S8020118629

A-252

(d)  Company agrees to indemnify, defend, and hold harmless Grace, its officers, employees, representatives, successors, and assigns from any and all claims, damages, losses, liabilities and expenses of every nature, including attorneys fees, judgments, demands, and causes of action whatsoever or however occasioned, arising out of or in connection with the application of a Roof Deck by an applicator appointed by the Company.

17.  <u>Termination and Suspension of Performance</u>

(a)  Grace may terminate this Agreement by written notice to the Company at any time if:

(i)  The Company shall fail to observe or perform any of the terms or conditions of this Agreement on Company's part to be observed or performed; provided however, that if the default alleged to exist on the part of the Company shall be an act other than non-payment for ore purchased, then Grace will give the Company written notice specifying the existing default and the Company shall have thirty (30) days after such notice to cure any such default.

(ii)  The Company shall attempt to assign this Contract without Grace's prior written consent.

(iii)  A receiver or trustee shall be appointed for Company or for any substantial amount of Company's property, or Company shall become insolvent or unable to pay its debts as they mature or shall cease to pay its debts in the ordinary course of business or Company shall make an assignment for the benefit of creditors, or any proceedings shall be commenced

- 14 -

WRG05424466

S8020118630

A-253

by or against Company under the provisions of any bankruptcy, insolvency or debtor's relief law; provided however, that anything contained herein to the contrary notwithstanding, no right, legal, and/or equitable to contest any debt, shall be taken from the Company;

(b)  If Company shall fail to fulfill the terms of payment to Grace for any amount lawfully due to Grace under any contract between Company and Grace, Grace may, without liability and without prejudice to any other lawful remedy, defer further shipments of vermiculite ore hereunder until such default is made good.

18.  Force Majeure

(a)    Company acknowledges that delivery dates are based on the assumption that there will be no delay due to causes beyond the reasonable control of Grace.

(b)  Grace shall not be charged with any liability for delay or nondelivery or failure to perform hereunder when such delays, nondelivery, or failure to perform is due to delays of suppliers, production problems, acts of God, or the public enemy, compliance with any applicable foreign or domestic court order or governmental regulation, order or request whether or not it proves to be invalid, fires, riots, labor disputes, unusually severe weather, or any other cause beyond the reasonable control of Grace. During the period when deliveries are affected by the matters identified in this paragraph, Grace may omit delivery during the period of continuance of such circumstances and the maximum quantities deliverable

WRG05424467

S8020118631

hereunder shall be reduced by the quantity so omitted, but this Agreement shall remain otherwise in effect. Grace shall endeavor to allocate any available vermiculite ore among all buyers including its own divisions, departments, and affiliates in such manner as it considers fair.

(c) Grace shall have the right at any time to cease or suspend the operation of any facility where it is producing any quantities of vermiculite ore deliverable hereunder. In such case Grace shall have the right to terminate this Agreement in its entirety by written notice to Company if said facility is the only facility at which Grace is then producing vermiculite ore to be sold hereunder. If said facility is not the only facility at which Grace is then producing vermiculite ore deliverable hereunder and Grace is unable to supply Company's total demands of vermiculite ore hereunder Grace shall have the right to allocate the available supply of said vermiculite ore among all buyers, including its own divisions, departments and affiliates in such manner as it considers fair. In no event shall Grace be obligated to purchase vermiculite ore from others in order to enable it to deliver vermiculite ore to Company hereunder.

19. Compliance with Fair Labor Standards Act

Grace hereby certifies that all goods sold hereunder which are produced or manufactured in the United States of America are produced in compliance with Sections 6, 7, or 12 of the Fair Labor Standards Act of 1938, as amended (29 U.S. Code 201-219), or of any order of the administrator issued under

- 16 -

WRG05424468

S8020118632

A-255

Section 14 of said Act. All requirements as to the certificate contemplated in the October 26, 1949 Amendment to the Fair Labor Standards Act of 1938 shall be considered as satisfied by this certification.

20. Assignment

The rights and privileges granted hereunder are personal in character and cannot be assigned in whole or in part by the Company without the prior written consent of Grace.

21. Waiver

No delay or failure on Grace's part to enforce any term, provision, or condition hereunder shall constitute a waiver on Grace's part of such term, provision, or condition. Any waiver by Grace of any term, provision, or condition hereof or of any default hereunder in any one or more instances shall not be deemed to be a further or continuing waiver of such term, provision or condition or of any subsequent default hereunder.

22. Severability

Any provision or condition appearing in this contract which is found to be unenforcable or in violation of any valid law or regulation of the United States or of any state shall be deemed severable and shall be deleted from this Agreement without affecting or impairing the enforceability and validity of the remaining provisions and conditions of this Agreement.

23. Accrued Obligations

No termination of this Agreement shall relieve either party of the obligation to pay to the other party any amounts

- 17 -

WRG05424469

S8020118633

A-256

due the other party at the time of termination, regardless of whether these amounts are then or thereafter payable. No termination of this Agreement shall relieve Company of its obligations with respect to confidential information as provided under Article 15.

24. Cancellation of Previous Agreements

The Sales Agreement dated September 14, 1967 (effective January 1, 1966) and the Trademark Licensing Agreement dated September 14, 1967 (effective January 1, 1966) between W. R. Grace & Co. and Southwest Vermiculite Company are hereby cancelled and superseded without, however, cancelling any amounts for which either party may now be indebted to the other.

25. Duration

This Agreement shall become effective January 1, 1975 and unless sooner terminated as otherwise provided herein, shall continue in effect unless and until terminated by either party giving to the other party written notice of termination provided that (except in case of default) no such termination shall be effective sooner than one hundred and eighty (180) days from the date of the giving of such notice.

26. Notices, Demands, and Communications

Notices, demands, and communications hereunder, to Company or Grace, must be given or sent and shall be deemed to have been given if mailed, postage prepaid, by registered mail,

(a) if intended for Company, addressed to Southwest Vermiculite Company, 5119 Edith Boulevard, N.E., Albuquerque, New Mexico, attention of J. B. Lyall, Jr., or

(b) if intended for Grace, addressed to Grace at

- 18 -

S8020118634

62 Whittemore Avenue, Cambridge, Massachusetts 02140, attention of B. R. Williams.

Either party may designate, by notice in writing, a new address to which any notice, demand, or communication may hereafter be so given or sent.

27. Entire Contract and Interpretation

The terms and conditions herein contained constitute the entire agreement between the parties hereto in respect of the subject matter hereof and shall supersede all previous communications, representations, or agreements, either oral or written, between the parties hereto with respect to the subject matter hereof, and no agreement or understanding varying or extending the same will be binding upon either party hereto unless in writing, signed by a duly authorized officer or representative thereof specifically referring to this Agreement.

All deliveries of vermiculite ore to Company during the term of this Agreement shall be subject to the terms and conditions contained herein and Company's orders and Grace's invoices shall be in verification of quantity, prices, and shipping dates only.

This Agreement shall be construed in accordance with the laws of the Commonwealth of Massachusetts. Captions are for convenience of reference only and shall not be used for interpreting the text of the paragraph in which they appear.

WRG05424471

S8020118635

A-258

IN WITNESS WHEREOF, the parties hereto have caused
this Agreement to be executed in duplicate (each of which
duplicates shall be deemed to be an original), as of the day
and year first above written.

W. R. GRACE & CO.
Construction Products Division

By _~B~Williams~_____

SOUTHWEST VERMICULITE COMPANY

By _~J. B. Lyall~_____

- 20 -

WRG05424472

S8020118636

A-259

# EXHIBIT 9

# ZONOLITE
### CONSTRUCTION PRODUCTS DIVISION

BRUCE R. WILLIAMS,
VICE PRESIDENT

October 10, 1975

Mr. J. B. Lyall, Jr.
Southwest Vermiculite Co.
5119 Edith Boulevard N.E.
Albuquerque, New Mexico

Dear Jack:

Thank you for returning your signed copy of the Licensee Agreement for Southwest Vermiculite Co.

Last spring when I sent you the new Licensee Agreement, I pointed out that we would be preparing ore specifications (Schedule A) and would send these to you to become a part of the Agreement.

We have delayed preparing these specifications to gain more time and experience in operating the new Libby mill.

Establishing ore specifications this year has been difficult because the characteristics of the output from the new mill are not yet fixed. Changes to improve mill performance are continuing. Further, there are process and equipment modifications planned for other improvements throughout next year. Consequently, in the near term we still can have periods of erratic operation, which may result in some exceptions to the specifications enclosed.

In the interest of completing the Licensee Agreement, we have decided to prepare specifications for the ore as it is now being produced.

Enclosed is Schedule A to become a part of the Licensee Agreement.

If you have any questions on these specifications, please let me know.

Very truly yours,

Bruce R. Williams

GRACE

BRW:cj
Enclosure

WRG05424473

S8020118637

## SCHEDULE A -- SPECIFICATIONS
### ENOREE MILL VERMICULITE ORE CONCENTR~

**XPANSION CHARACTERISTICS**

| pecification # | TYPICAL | | | | SPECIFICATION RANGE | | | |
|---|---|---|---|---|---|---|---|---|
| | #1 | #2 | #3 | #4 | #1 | #2 | B3C-1-75 #3 | B4C-1-75 #4 |
| re Size | | | | | | | | |
| xpanded Yield ags/Ton | | | 61 | 50 | | | 55 min. | 48 min. |
| Rock | | | 6.5 | 4.5 | | | 12 max. | 12 max. |
| ulk Density bs/cu.ft. | | | 45-60 | 40-55 | | | | |

### TEST METHODS

| | |
|---|---|
| C-31 | Sampling Procedures |
| C-31F | Determination of Expanded Yield |
| C-31C | Determination of % Rock |
| C-31D | Determination of Density |

**CREEN ANALYSIS**

| SCREEN | | TYPICAL | | | | SPECIFICATION RANGE | | | |
|---|---|---|---|---|---|---|---|---|---|
| S.    TYLER | | #1 | #2 | #3 | #4 | #1 | #2 | #3 | #4 |
| 8    8 | | | | | | | | 0 - 1 | |
| 2    10 | | | | 5.0 | | | | 0 - 15 | |
| 6    14 | | | | 21.0 | | | | 15 - 35 | |
| 0    20 | | | | 34.0 | | | | 25 - 45 | 0 - 1.5 |
| 0    28 | | | | 26.0 | 10.0 | | | 15 - 40 | 2 - 15 |
| 0    35 | | | | 7.0 | 29.0 | | | 2 - 14 | 20 - 40 |
| 0    48 | | | | 3.0 | 28.0 | | | 0 - 8 | 20 - 40 |
| 0    65 | | | | 2.0 | 20.0 | | | 0 - 5 | 15 - 30 |
| 0    100 | | | | | 8.0 | | | | 5 - 15 |
| n    Pan | | | | 2.0 | 5.0 | | | 0 - 5 | 0 - 10 |

### TEST METHODS

| | |
|---|---|
| C-31 | Sampling Procedures |
| C-31A | Screen Analysis |

RCE/lpj
10/3/75

WRG05424474

S8020118638

## SCHEDULE A  —  SPECIFICATIONS
### LIBBY HILL VERMICULITE ORE CONCENTRATE

**EXPANSION CHARACTERISTICS**

| Specification # | TYPICAL | | | | SPECIFICATION RANGE | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | L1C-1-75 | L2C-1-75 | L3C-1-75 | L4C-1-7 |
| Ore Size | #1 | #2 | #3 | #4 | #1 | #2 | #3 | #4 |
| Expanded Yield Bags/Ton | 83 | 70 | 70 | 51 | 80 min. | 66 min. | 65 min. | 45 min |
| % Rock | 18 | 28 | 20 | 20 | 22 max. | 32 max. | 22 max. | 22 max |
| Bulk Density lbs/cu.ft. | 45-60 | 50-65 | 55-65 | 55-65 | | | | |

**TEST METHODS**

| | |
| --- | --- |
| C-31 | Sampling Procedures |
| C-31F | Determination of Expanded Yield |
| C-31C | Determination of % Rock |
| C-31D | Determination of Density |

**SCREEN ANALYSIS**

| SCREEN U.S. | TYLER | TYPICAL | | | | SPECIFICATION RANGE | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | #1 | #2 | #3 | #4 | #1 | #2 | #3 | #4 |
| .530 | .525 | | | | | | | | |
| 3/8 | .371 | | | | | | | | |
| .265 | 3 | 1.0 | | | | 0 - 10 | | | |
| 4 | 4 | 15.0 | | | | 5 - 30 | | | |
| 6 | 6 | 43.0 | 1.0 | | | 25 - 60 | 0 - 3 | | |
| 8 | 8 | 29.0 | 26.0 | | | 15 - 45 | 10 - 45 | 0 - 1 | |
| 12 | 10 | 7.0 | 47.0 | 1.0 | | 0 - 15 | 30 - 65 | 0 - 8 | |
| 14 | 12 | ---- | 13.0 | --- | | ----- | 5 - 25 | ----- | |
| 16 | 14 | 2.0 | 8.0 | 17.0 | | 0 - 6 | 0 - 20 | 5 - 35 | |
| 20 | 20 | 1.0 | 3.0 | 33.0 | | 0 - 6 | 0 - 12 | 20 - 45 | 0 - 1.5 |
| 30 | 28 | | | 29.0 | 13.0 | | | 20 - 40 | 5 - 25 |
| 40 | 35 | | | 12.0 | 35.0 | | | 5 - 20 | 20 - 50 |
| 50 | 48 | | | 4.0 | 32.0 | | | 0 - 10 | 20 - 45 |
| 70 | 65 | | | 1.0 | 13.0 | | | 0 - 5 | 5 - 25 |
| 100 | 100 | | | | 4.0 | | | | 0 - 10 |
| Pan | Pan | 2.0 | 2.0 | 3.0 | 3.0 | 0 - 9 | 0 - 9 | 0 - 9 | 0 - 9 |

**TEST METHODS**

| | |
| --- | --- |
| C-31 | Sampling Procedures |
| C-31A | Screen Analysis |

KE/lp
10/3/75

S8020118639

WRG0 5424475

A-263

SOUTHWEST VERMICULY COMPANY          SCHEDULE P

## Licensed Products

| | |
|---|---|
| ZONOLITE® | Concrete Aggregate |
| ZONOLITE® | Roof Decks |
| ZONOLITE® | Roof Deck Applicators |
| ZONOLITE® | Insulating Concrete |
| ZONOLITE® | INSULPERM$^{TM}$ Insulation |
| ZONOLITE® | Plaster Aggregate |
| ZONOLITE® | Masonry Fill |
| ZONOLITE® | Industrial Vermiculite |
| TERRA-LITE® | Vermiculite Soil Conditioner |
| ZONOLITE® | Fill Insulation |

## U. S. Trademarks

| | |
|---|---|
| Reg. 216,862 | ZONOLITE |
| Reg. 431,731 | TERRA-LITE |
| Application Serial #8023 | INSULPERM |

S8020118640

WRG05424476

A-264

# EXHIBIT 10

*Original signed copy*

AGREEMENT, made and entered into this 1st day of June 1957 between ZONOLITE COMPANY, a Montana corporation, having its principal office at 135 South LaSalle Street, Chicago, Illinois (hereinafter called the "Company") and ROBINSON INSULATION COMPANY a corporation having its principal office at 12th St., North & River Dr., Great Falls, Montana (hereinafter called the "Distributor").

WHEREAS, the Company is engaged in the mining of vermiculite ore which it is desirous of marketing through distributors; and

WHEREAS, the Distributor desires to engage in the business of expanding vermiculite ore and selling expanded vermiculite and the products that may be manufactured therefrom;

NOW, THEREFORE, in consideration of the promises and agreements hereinafter set forth, it is agreed between the parties hereto as follows:

1. The Distributor will, at its own cost and expense, provide adequate facilities for the expansion of vermiculite ore.

2. The Company will sell and the Distributor will purchase vermiculite ore having the specifications shown on Schedule "A" hereto attached, at the price and subject to the terms and conditions of sale shown on Schedule "B" hereto attached. The Company will use its best efforts to fill promptly all of the Distributor's orders therefor. A minimum of five hundred (500) tons shall be purchased each of the years that this agreement is in effect.

3. The Distributor agrees to expand the vermiculite ore purchased from the Company in accordance with the Company's specifications in order to produce materials of satisfactory and uniform quality.

4. The Company grants to the Distributor the exclusive right to use: (a) the registered trade-mark "Zonolite", registered in the United States Patent Office, Registry No. 216,862, August 24, 1926 (renewed); and (b) the registered trade-mark "Terra-Lite", registered in the United States Patent Office, Registry No. 431,731, August 5, 1947, in the territory

- 1 -

S8020058322

WRG05251017

A-266

described on Schedule "C" hereto attached, in the sale of all products made from vermiculite ore purchased from the Company and expanded in accordance with the specifications of the Company.

The use of said trade-marks and the sale of all products bearing said trade-marks shall be in accordance with the following conditions:

(a) The bags, containers, or packages which bear said trade-marks shall be plainly marked "Zonolite" or "Terra-Lite", as the case may be, and such marking shall be followed by descriptive matter indicating the type of material to which the trade-mark is applied, which descriptive matter shall clearly indicate that the "Zonolite" or "Terra-Lite" brand is applied to the material contained in the bag, container, or package, e.g., "Zonolite Brand of Vermiculite Insulating Fill" or "Terra-Lite Brand of Vermiculite Fertilizer Conditioner". Such legend shall be followed by the words "Processing Distributor".

(b) Each bag, container, or package shall contain the statement "Zonolite (or Terra-Lite, as the case may be) is the registered trade-mark of Zonolite Company".

(c) The Company shall have the sole right to specify the uses to which the trade-marks "Zonolite" and "Terra-Lite", may be put, the products and articles to which they shall apply, and the manner in which they may be employed. The Company, in the exercise of this right, shall fully, entirely and exclusively govern and control the use of said trade-marks by the Distributor.

(d) The exclusive right herein granted shall not prohibit the shipment into the territory of the Distributor, nor the sale in such territory of mixed, formed or fabricated products containing vermiculite which may be manufactured by other persons, natural or corporate, and marked with the "Zonolite" or "Terra-Lite" trade-marks, under appropriate agreement with the Company.

The Company may, from time to time, own or acquire other trade-marks which will be used in the manufacture and sale of other products made from vermiculite. If such trade-marks shall be so acquired and the Distributor desires to use any such trade-marks in the manufacture and sale of products made from vermiculite purchased from the Company, the Company will, on the written request of the Distributor, grant the Distributor the right to use any trade-mark owned by it in the manufacture and sale of products made from vermiculite purchased from the Company on terms comparable to those above specified with reference to "Zonolite" and "Terra-Lite", provided such a grant shall not be in violation of existing contractual commitments of the Company or its plans for merchandising any product under a specific trade-mark.

5. The Distributor shall be privileged to purchase vermiculite ore from other sources but ore so purchased and expanded by the Distributor

- 2 -

231

WRG05251018

S8020058323

A-267

shall not be sold under the trade-marks "Zonolite" or "Terra-Lite" or
other trade-marks of the Company. The Company will not sell vermiculite
ore or expanded vermiculite to other persons, natural or corporate, in the
territory shown on Schedule "C" which territory is hereby allotted to the
Distributor, except as follows:

(a) The Company may sell vermiculite ore or expanded
vermiculite to persons, natural or corporate, having expanding
or manufacturing plants outside the territory allotted to the
Distributor for use by the purchasers thereof in the manufacture
of mixed, formed or fabricated products containing vermiculite,
which products may be sold in the territory allotted to the
Distributor by such manufacturers, their agents and distributors.

(b) The Company may sell expanded vermiculite or mixed,
formed or fabricated products containing vermiculite, to persons,
natural or corporate, who are engaged in nationwide distribution
of merchandise and such nationwide distributors shall have the
right to sell and deliver such products in the territory allotted
to the Distributor. A nationwide distributor shall be considered
as a person, natural or corporate, distributing its products
through agents, or subsidiaries, dealers, distributors, or otherwise,
in five or more states. The Company will use reasonable effort to
arrange for the purchase from the Distributor by nationwide dis-
tributors for delivery in the territory allotted to the Distributor
provided the Distributor shall be then manufacturing such products.

(c) The Company may sell vermiculite ore and equipment for
the processing of vermiculite ore to persons, natural or corporate,
within the territory allotted to the Distributor for the manufac-
ture of mixed, formed or fabricated products containing vermiculite.
Before such sales are made, the Company will advise the Distributor
and will pay a commission, subject to negotiation, of not less than
5 percent and not more than 25 percent of the net selling price of
all ore so sold.

(d) The Distributor shall have the privilege of requesting the
approval of the Company to resell vermiculite ore purchased from the
Company to persons, natural or corporate, within the territory allotted
to the Distributor. As part of the request for approval the Distri-
butor shall advise the Company the resale price of vermiculite by
grades that will be quoted by the Distributor. The Distributor commission
on such vermiculite ore sale shall be negotiated between the Company
and the Distributor, and shall be for not less than 5 percent of the
net selling price of all ore so sold.

(e) The Distributor shall not sell, under the trade-mark
"Zonolite", expanded vermiculite manufactured by it or purchased
through the Company outside the territory allotted to the Distributor.
If the Distributor shall be engaged in the manufacture of mixed,
formed or fabricated products containing vermiculite, it may sell such
products outside of the territory allotted to it through its agents,
subsidiaries, distributors or otherwise.

(f) Stabilized concrete and plaster aggregate, acoustical plaster
and insulating cement shall not be considered as mixed products under
the definitions used in the above paragraphs.

- 3 -

Z 32

WRG05251019

S8020058324

A-268

6. This agreement shall remain in effect until December 31, 1961. Thereafter it shall continue from year to year, subject, however, to termination by either party hereto at the end of any yearly period by giving ninety (90) days written notice of cancellation to the other party. During such time the Company agrees:

(a) To furnish in suitable form such manufacturing and engineering information at a reasonable cost to the Distributor concerning the physical processing of expanded vermiculite as may be generally available from time to time.

(b) To make available to the Distributor advertising material being used from time to time by the Company for use by the Distributor.

(c) To sell to the Distributor, if it desires to purchase from the Company, at the current schedule of prices fixed by the Company, all containers, bags, packages and shipping fasteners that the Distributor may require.

The Distributor agrees during the time this agreement remains in effect:

(a) To aggressively promote the sale of expanded vermiculite in the territory allotted to it.

(b) Not to use any trade-mark of the Company without the written consent of the Company.

7. Failure to perform on the part of either party hereto shall be excused where such non-performance is due to fires, strikes, lockouts, government regulations, State or Federal, differences with workmen, accidents to machinery, war, delays or defaults of common carriers, orders, decrees or judgments of any court, failure of the usual source of supply of manufacturers, or other conditions beyond the control of either party hereto.

8. If either party hereto shall fail to continue in business for thirty (30) days, or if a receiver, trustee or other custodian shall be appointed for such party or such party shall make an assignment for the benefit of creditors or be adjudicated a voluntary or involuntary bankrupt, then the other party shall, in addition to any remedy accorded by law, be privileged to cancel this agreement as to the party who came within any of the conditions contained in this paragraph.

9. The Distributor shall not assign this contract without the written consent of the Company. The Company may assign this agreement

- 4 -

S8020058325

provided its assignee shall assume all obligations of the Company hereunder.

10. This agreement shall be binding when executed by a duly authorized officer of the Company at Chicago, Illinois, according to the laws of which State, Illinois, it shall be construed. Wherever the word "it" is used in referring to the Distributor, it shall be taken to mean the party herein contracting with the Company, whether a corporation, partnership or individual.

11. This agreement shall supersede any existing agreements between the Distributor and the Company, all previous agreements being hereby terminated and cancelled.

IN WITNESS WHEREOF, the Company and the Distributor have caused this agreement to be executed under their corporate seals, by their officers thereunto duly authorized, the day and year above set forth.

ZONOLITE COMPANY

BY _____
            Vice President

ATTEST:

_____

ROBINSON INSULATION COMPANY

BY _____
            V. Pres.

ATTEST:

_____
            Secty.

- 5 -

S8020058326

234
WRG0525 1021

A-270

## SCHEDULE A - SPECIFICATIONS

All screen sizes are to be Tyler Standard Screens. All grades of ore shall not have more than ten percent (10%) moisture loss on expansion. Items 1 and 2 below shall contain not more than ten percent (10%) non-micaceous gangue (rock); items 3, 4, and 5 not more than fifteen percent (15%) non-micaceous gangue (rock); item 6, not more than twenty percent (20%). Other specifications are as follows:

1. Minus 2 plus 4 mesh ore.

   This grade of ore shall not retain more than ten percent (10%) on a two (2) mesh screen, nor shall more than ten percent (10%) pass through a four (4) mesh screen.

2. Minus 3 plus 14 mesh ore.

   This grade of ore shall not retain more than ten percent (10%) on a three (3) mesh screen, nor shall more than ten percent (10%) pass through a fourteen (14) mesh screen.

3. Minus 8 plus 20 mesh ore.

   This grade of ore shall not retain more than ten percent (10%) on an eight (8) mesh screen nor shall more than twenty-five percent (25%) pass through a twenty (20) mesh screen.

4. Concrete aggregate ore.

   This grade of ore shall not retain more than ten percent (10%) on an eight (8) mesh screen and not more than fifteen percent (15%) shall pass a sixty-five (65) mesh screen.

5. Plaster aggregate ore.

   This grade of ore shall not retain more than ten percent (10%) on an eight (8) mesh screen and not more than fifteen percent (15%) shall pass a sixty-five (65) mesh screen.

6. Number four (4) ore.

   This grade of ore shall not retain more than fifteen percent (15%) on a twenty-eight (28) mesh screen and not more than fifteen percent (15%) shall pass a sixty-five (65) mesh screen.

WRG05251022

A-271

SE020058327

## SCHEDULE A

### METHOD OF TESTING CRUDE VERMICULITE

The analysis of crude vermiculite shall comprise (1) sampling, (2) screen analysis, (3) ignition loss and impurities test, according to the following procedure.

(1) Sampling. When a carload or large pile of ore is being tested, the sample tested shall accurately represent the whole pile. This can be done by taking a handful of ore from directly beneath the surface at five-foot intervals over the entire area of the pile. Surface material is to be avoided since it does not give a representative sample. This composit sample should not be less than 10 pounds for a carload of ore. This material is then mixed and reduced to a smaller size for assaying. This reduction shall be done with a Jones Riffle Sampler, or if this is not available, it may be done by the method of coning and quartering. The sample should be reduced to about 1-3/4 pounds or 800 grams.

(2) Screen Analysis. The screen analysis shall be made on a Ro-Tap testing sieve shaker and the screens used are to be Tyler Standard Testing Sieves. If the amount of oversize and undersize are wanted, the two screens are used which represent the size in the ore specifications. (For Example, 3 mesh and 14 mesh are the nominal limits of No. 1 ore and this size is called minus 3 plus 14. A complete screen analysis is made by using all of the standard screen sizes between these limits.) Five-hundred grams of the properly reduced sample is placed in the top screen and shaken in the Ro-Tap for exactly seven minutes. Each fraction is then weighed and the results computed to a percentage basis.

(3) Ignition Loss and Impurities Test. From the remaining part of the above prepared sample, weigh out two portions of 100 grams each. One sample is placed in a muffle furnace and heated to a dull red or until there is no further movement after the sample is shaken in the hot pan. A gas plate may be used for heating if care is taken to get complete expansion. The sample is then weighed and the loss in weight is the percentage loss on ignition or moisture loss. The sample is then cooled and used for the impurities test. Failure to cool the sample will cause the vermiculite to go with the impurities, particularly in the finer sizes. The vermiculite is separated from the impurities by floating off the vermiculite in a container of water. A pan 5" x 10" x 4" deep is a convenient size. The expanded sample is added to the water and stirred so that all heavy material drops to the bottom. The vermiculite is decanted with the water and the residue is further washed to remove all adhering particles of vermiculite. The residue is then completely dried and weighed and the percentage of impurity figured on the basis of the original 100-gram sample. After the gangue is dried, any remaining particles of micaceous material that remains shall be removed by hand picking or by gently blowing the micaceous material out of the gangue. The second 100-gram sample is then treated by exactly the same procedure and the results compared with the first test. If the two results vary by more than ½ of 1% of the original 100-gram sample, a third sample is run and the two closest results are averaged for the final answer.

- 2 -

226
WRG05251023

A-272

## SCHEDULE B - PRICES

Ore prices are as follows:

| | | |
|---|---|---|
| (1) | Minus 2 plus 3 mesh ore | $13.50 |
| (2) | Minus 3 plus 14 mesh ore | 15.00 |
| (3) | Minus 8 plus 20 mesh ore | 12.00 |
| (4) | Concrete aggregate ore | 10.50 |
| (5) | Plaster aggregate ore | 10.50 |
| (6) | Number 4 ore | 8.00 |

All prices shall be per ton of two thousand pounds (2,000 lbs.) f.o.b. cars Libby, Montana; terms net thirty (30) days. The above prices may be revised from time to time by the Company during the life of this agreement. Effective dates for price changes shall be January 1st, April 1st, July 1st and October 1st. At least sixty (60) days notice of price revision will be given by the Company to the Distributor before the same becomes effective. The Distributor shall pay, in addition to the prices above provided for, seventy-five cents a ton for national advertising costs.

237
WRG0525 1024

A-273

SR02005R329

## SCHEDULE C – TERRITORY

The Distributor is assigned the following territory:

All of the State of Montana except and not including the counties of Lincoln, Flathead, Sanders, Lake, Mineral, Missoula and Ravalli.

That part of the State of North Dakota lying west of and including the counties of Towner, Eddy, Emmons, Ramsey, Wells, Benson and Burleigh.

The following counties in the State of Wyoming: Park, Washakie, Campbell, Yellow Stone National Park, Hot Springs, Sheridan, Crook, Big Horn, Johnson and Weston.

238 -
WRG05251025

S8020058330

A-274

# EXHIBIT 11

| Originator | J. A. Behan | | CHARGE 39-12-01-1-04 | | PRODUCT Vermiculite Soil Conditioner |
|---|---|---|---|---|---|

Originator: J. A. Behan

Approval:
Lab    R. R. Retter
Mfg.    W. R. Wright
Prod. Mgr.    R. C. Abernathy
Qual. Assur.    R. C. Ericson

CHARGE 39-12-01-1-04
THIS DRAFT CANCELS
PRIOR DRAFT NO. LJC-984-2
(1)    (2) jd  (2)    (4)

PRIOR DRAFT OR LAB. BK. PG. NO.

PRODUCT Vermiculite Soil Conditioner (3 c.f. size only)
BATCH NO. OR
PLANT NAME Dallas & Zono Licensees Listed on page 2
DRAFT NO. LJC-1051-1-2
DATE February 27, 1976

## SPECIFICATIONS

1. Only Libby #3/Kearney #3/or Libby #2 vermiculite to be used for this product. See density tables below.

   #3 and #2 vermiculite to be screened over a #14 mesh screen at the furnace to remove fines. (Fines may be packaged as any end use specified in the -14 Mesh Screenings formula if they meet specs listed thereon.)

2. Package Contents: Stated Volume (see packaging step).

3. Screen Analysis:    #3 Aggregate

| Screen Size | % Retained Min. | Max. |
|---|---|---|
| 4 | - | - |
| 8 | 0 | 15 |
| 16 | 50 | 90 |
| 30 | 95 | 100 |
| 50 | 90 | 100 |
| 100 | - | - |
| PAN | - | - |

4. Vermiculite Quality Control:    Target

   VAC    70-80  (C-10) (Info Only)
   Bulk Density  4.0-6.0 #/c.f.(C-17B)(  "  )
   % Heavy Particles  3% Max. (C-31C)

### Q. C. TESTS

| Packed Volume: (C/D 6-17B) | Target Average | Shipping Limits Individual Bags Min. | Max. |
|---|---|---|---|
| 3 c.f. D-18 Automatic Bag filler | 3.00 c. f. | 2.88 | 3.06 |
| Operator Fill | 3.00 c. f. | 2.76 | 3.24 |

A — Keep away from strong fumes as much as possible.
C — Flammable - No flames, or sparks.
E — Corrosive - If spilled, remove immediately from skin or clothing. Use goggles and gloves for safety.
F — Spontaneous Combustion - If brought in contact with organic material (Sawdust, Turpentine, etc.)
I — Use goggles

B — Don't breathe dust. Use respirator.
D — Avoid skin irritation by washing off with soap and water.
Y — Combustible - Burns at 85 - 150°F. Avoid flames.

WRG05099935

Confidential Business Information
CS8020003177

A-276

| DRAFT NO. LIC-1051 | | | PRODUCT | Vermiculite Soil Conditioner(3 c.f. size only) | BATCH NO. OR PLANT NAME | Dallas and ZONO Licensees Listed BELOW |

| MATERIAL | Safety Instr. | AMOUNT POUNDS | INSTRUCTIONS |
|---|---|---|---|
| Bulk Density:  (For Info Only)    CMD C-17B | | | #1 |

Aggregate Grade

| Grade | Lbs./Cu.Ft. | | Aggregate Grade | #/c.f. |
|---|---|---|---|---|
| L3A | 5.0 - 6.0 | | I2A | 4.0 - 6.0 |
| L3D16/L3D18 | 4.5 5.0 - 6.0 | | L2D16/D18 | 4.0 - 6.0 |
| K3A | 5.5 6.5 - 7.5 | | | |
| K3D16/K3D18 | 5.5 6.0 - 7.0 | | | |

## Q. C. SAMPLING PROCEDURE

Manufacturing control of packing volume:

(a)  At middle of each shift, take three (3) consecutive bags, weigh and cube out in volume measure.

(b)  Calculate average volume and average density.  Average volume and density must fall in target range.  No single bag of the three (3) samples may contain less than the minimum tolerance.

Effective at the following licensee locations:

Southwest Vermiculite - Albuquerque
Robinson Insulation - Great Falls
F. Hyde & Co. - Montreal
Vermiculite Intermountain - Salt Lake City

60F-13B

## KEY TO SAFETY INSTRUCTIONS

A – Keep away from strong fumes as much as possible.     B – Don't breathe dust. Use respirator.
C – Flammable - No flames, or sparks.     D – Avoid skin irritation by washing off with soap and water,
E – Corrosive - If spilled, remove immediately from skin or clothing. Use goggles and gloves for safety.
F – Spontaneous Combustion - If brought in contact with organic material (Sawdust, Turpentine, etc.)
I. Use goggles     Y – Combustible - Burns at 80 - 150° F. Avoid flames.

WRG05099936

Confidential Business Information
CS8020003178

A-277

Originator: J. A. Behan

Approval:
Lab: R. R. Rettew
Mfg.: W. R. Wright
Prod. Mgr.: R. C. Abernathy
Qual. Assur: R. C. Ericson

CHARGE ____ See Page 1
THIS DRAFT CANCELS ____ LIC-984-2
PRIOR DRAFT NO.
(1)    (2)    (2)    (4)

PRODUCT: Vermiculite Soil Conditi...
(3 c.f. size)
BATCH NO. OR: Dallas and ZONO
PLANT NAME: Licensees listed on
Pg. 2
DRAFT NO.: LIC-1051

DATE: February 27, 1976

PRIOR DRAFT OR
LAB. BK. PG. NO.

SPECIFICATIONS:

See separate sheet.

| MATERIAL | Safety Instr. | AMOUNT POUNDS | INSTRUCTIONS |
|---|---|---|---|

BATCH SIZE

LAB NOTES — BATCH SIZE SCALING, EQUIPMENT AND OTHER LIMITATIONS OF THIS FORMULA:

**Step 1**

Fill paper bags directly from furnace with vermiculite to stated volume as specified. Aggregate size may not be changed without approval.

**Step 2**
**Closure**

Stitch bag shut. Use 17" x 41-3/4" paper bag.

Volume Fill Specs.

| Target | Shipping Min. | Limit Max. |
|---|---|---|
| 3.00 c.f. | 2.88 | 3.06 |
| | | Automatic Filler |
| | 2.76 | 3.24 |
| | | Operator Fill |

Palletize xx/pallet.

80F-29

KEY TO SAFETY INSTRUCTIONS                                    Page 3 of 3 pc

A — Keep away from strong fumes as much as possible.
C — Flammable - No flames, no sparks.
E — Corrosive - If spilled, remove immediately from skin or clothing. Use goggles and gloves for safety.
F — Spontaneous Combustion - If brought in contact with organic material (Sawdust, Turpentine, etc.)
B — Don't breathe dust. Use respirator.
D — Avoid skin irritation by washing off with soap and water.

WRG05099937

Confidential Business Information
CS8020003179

A-278

CAMBRIDGE                          DATE: 3/9/76

**FORMULA - ACKNOWLEDGMENT OF RECEIPT/CANCELLATION NOTICE/Q.C. TEST METHOD RECEIPT**

SENT TO: X Acct'g ZONO - C. Hall

| | | GENERAL PLANT MANAGERS | MISCELLANEOUS |
|---|---|---|---|
| X Santa Ana | C. Boyer/Acctg. | | |
| ATLANTA | G. B. Dyer | R. W. Anderson | R.C.Autenrieth |
| W. CHICAGO | R. E. Ward | L. W. Farmer/SOUTH GATE | B.A.Blessington |
| X DALLAS | G. L. Gipson | X R. L. Junker/DALLAS | X L. G. Feldman |
| DEARBORN | J. C. Phillips | S. N. Mangino/W.CHIC.ZONO | R. T. Frohlich |
| DENVER | A. B. Dean | J. M. Timmons/TRAV. REST | R. H. Locke |
| EASTHAMPTON | D. Powling | | T. H. Pezzullo |
| HIGH POINT | J. A. Israel | | R. E. Schneider |
| JACKSONVILLE | T. E. Winkel | LICENSEES | X W. R. Wright |
| KEARNEY | R. L. Kilbaugh | L.Cambo/Antilles Perl./SanJuan | P. E. Korenberg |
| LITTLE ROCK | D. R. Blakley | X A.Webster/F.Hyde/Montreal | R. Merther |
| LOS ANGELES | H. D. Haight | X D.Robinson/Robs.Insul./Gr.Falls | |
| MILWAUKEE | F. E. Kees | X J.Lyall/S.W.Verm./Albuquerque | O.F.Stewart/Enoree |
| MINNEAPOLIS | D. E. Nyvold | J.York/Verm.of Hawaii/Honolulu | J.K.Chapin/Tr.Rest |
| MUIRKIRK | J. L. Dean | X V.McDonald/Verm.Inter./S.L.C. | R.G.Massimo/ICG NY |
| NASHVILLE | V. W. Turner | J.H.Greer/Verm.Prod./Houston | Pompano Q.C. |
| NEW CASTLE | T. R. Shaffer | | J.E.Smola/Lexington |
| NEW ORLEANS | J. E. McGee | CANADIAN PLANTS | P.Berry/Scarborough |
| NEWARK | B. J. Bigley | R.W.Grabinsky/Ajax | X W. R. Hanlon |
| OKLA. CITY | T. A. James | R.C.Dennis/Edmonton | X R.C. Abernathy |
| OMAHA | L. J. McClanahan | T. Branagh/St. Thomas | R.D.Ramsey/W.Chic.* |
| PHOENIX | Ray Mariani | J.P.Cruz/Scarborough | X J.C.Wyatt/Dallas* |
| POMPANO BEACH | H. G. Mason | N.F.Bushell/Vancouver | Tickle |
| PORTLAND | E. F. Johnson | N.Kivell/Vancouver | |
| SAN ANTONIO | W. W. Moore | P.Preston/Winnipeg | *Attach Formula Copy |
| SANTA ANA | M. M. McDaniel | | |
| ST. LOUIS | W. J. Skiles | | |
| TAMPA | H. L. Parker | SUBJECT: ZONO Formula Draft # LIC-1051 | |
| TRAV. REST | J. R. Wright | | |
| TRENTON | R. F. Devine | PRODUCT: Vermiculite Soil Conditioner | |
| WEEDSPORT | P. R. Reyer | | |
| WILDER | J. W. Ashworth | (3 c. f. size) | |
| X CPD LAB | E. J. Petrasek | | |
| X T.R. LAB | R. R. Rettew | Q.C. TEST METHOD NO. | |
| LIBBY | R. L. Oliverio | | |
| ENOREE | S. L. Presnell | | |
| CAMBRIDGE | R. E. Schneider | | |
| X VAULT | J. A. Behan | R. M. SPEC. | |

1.) Enclosed are your copies of Subject Formula Draft. X

2.) This formula does X /does not ___ cancel formulas that have been in effect at your plant.

3. Enclosed is your copy of Subject Q.C. Test ___/R.M. Spec. ___.

4.) The primary reasons for the new formula/test method/raw material spec./cancellation are:

   To insert Screen Analysis and Vermiculite Quality Control tests as requirements for q. c. testing.

5. Please cancel Subject Formula Draft. ____

6. Remove all obsolete formulas from your active file and mark an "X" across the face.

7. Please acknowledge receipt of Subject Formula Draft/Q.C. Test Method/R.M. Specification/ Cancellation Notice of old formulas, by signing and returning the attached copy of this Receipt Form to me at Construction Products Division/Cambridge.

Jane Behan

WRG05099938

Confidential Business Information

CS8020003180

A-279

| DRAFT NO. LIC-1051-2 | PRODUCT | Vermiculite Soil Conditioner | BATCH NO. OR PLANT NAME | All ZONOLITE Licensees and Dallas Plant having Howe-Richardson Scales |
|---|---|---|---|---|

**INSTRUCTIONS**

3 C.F. BAGS

## VERMICULITE VOLUME CHECK

### Weighing Procedures for Expanded Vermiculite Products on Furnaces with Howe-Richardson Gross Bagging Scales

Vermiculite densities will be established twice each production run. At a point in time (when furnace conditions are stable), in the beginning and in the middle of each production run, a three bag sample of vermiculite will be taken. The sample bags will be evaluated according to test procedure C-17B and the average density obatined from the three bag sample will be the bulk density value that is used to determine vermiculite bag weights (until the next three bag sample is taken).

Vermiculite Bag Weight target ranges should be based upon the following table when using the Howe-Richardson Gross Bagging Scale:

| Average Vermiculite Bulk Density | 3.0 c.f. Bag Wgt. Range Min. | Target | Max. | Average Vermiculite Bulk Density | 3.0 c.f. Bag Wgt. Range Min. | Target | Max. |
|---|---|---|---|---|---|---|---|
| 3.90 | 11.3 | 11.7 | 12.1 | 7.00 | 20.4 | 21.0 | 21.6 |
| 4.00 | 11.6 | 12.0 | 12.4 | 7.10 | 20.7 | 21.3 | 21.9 |
| 4.10 | 11.9 | 12.3 | 12.7 | 7.20 | 20.9 | 21.6 | 22.2 |
| 4.20 | 12.2 | 12.6 | 13.0 | 7.30 | 21.2 | 21.9 | 22.6 |
| 4.30 | 12.5 | 12.9 | 13.3 | 7.40 | 21.5 | 22.2 | 22.9 |
| 4.40 | 12.8 | 13.2 | 13.6 | 7.50 | 21.8 | 22.5 | 23.2 |
| 4.50 | 13.1 | 13.5 | 13.9 | 7.60 | 22.1 | 22.8 | 23.5 |
| 4.60 | 13.4 | 13.8 | 14.2 | 7.70 | 22.4 | 23.1 | 23.8 |
| 4.70 | 13.7 | 14.1 | 14.5 | 7.80 | 22.7 | 23.4 | 24.1 |
| 4.80 | 14.0 | 14.4 | 14.8 | 7.90 | 23.0 | 23.7 | 24.4 |
| 4.90 | 14.2 | 14.7 | 15.2 | 8.00 | 23.3 | 24.0 | 24.7 |
| 5.00 | 14.5 | 15.0 | 15.5 | 8.10 | 23.6 | 24.3 | 25.0 |
| 5.10 | 14.8 | 15.3 | 15.8 | 8.20 | 23.9 | 24.6 | 25.3 |
| 5.20 | 15.1 | 15.6 | 16.1 | 8.30 | 24.2 | 24.9 | 25.6 |
| 5.30 | 15.4 | 15.9 | 16.4 | 8.40 | 24.4 | 25.2 | 25.9 |
| 5.40 | 15.7 | 16.2 | 16.7 | 8.50 | 24.7 | 25.5 | 26.3 |
| 5.50 | 16.0 | 16.5 | 17.0 | 8.60 | 25.0 | 25.8 | 26.6 |
| 5.60 | 16.3 | 16.8 | 17.3 | 8.70 | 25.3 | 26.1 | 26.9 |
| 5.70 | 16.6 | 17.1 | 17.6 | 8.80 | 25.6 | 26.4 | 27.2 |
| 5.80 | 16.9 | 17.4 | 17.9 | 8.90 | 25.9 | 26.7 | 27.5 |
| 5.90 | 17.2 | 17.7 | 18.2 | 9.00 | 26.2 | 27.0 | 27.8 |
| 6.00 | 17.5 | 18.0 | 18.5 | 9.10 | 26.5 | 27.3 | 28.1 |
| 6.10 | 17.8 | 18.3 | 18.8 | 9.20 | 26.8 | 27.6 | 28.4 |
| 6.20 | 18.0 | 18.6 | 19.2 | 9.30 | 27.1 | 27.9 | 28.7 |
| 6.30 | 18.3 | 18.9 | 19.4 | 9.40 | 27.4 | 28.2 | 29.0 |
| 6.40 | 18.6 | 19.2 | 19.8 | 9.50 | 27.6 | 28.5 | 29.3 |
| 6.50 | 18.9 | 19.5 | 20.1 | 9.60 | 27.9 | 28.8 | 29.7 |
| 6.60 | 19.2 | 19.8 | 20.4 | 9.70 | 28.2 | 29.1 | 30.0 |
| 6.70 | 19.5 | 20.1 | 20.7 | 9.80 | 28.5 | 29.4 | 30.3 |
| 6.80 | 19.8 | 20.4 | 21.0 | 9.90 | 28.8 | 29.7 | 30.6 |
| 6.90 | 20.1 | 20.7 | 21.3 | 10.00 | 29.1 | 30.0 | 30.9 |

BOF-33

**KEY TO SAFETY INSTRUCTIONS**

Page 2A of ____ Pages

A — Keep away from strong fumes as much as possible.          B — Don't breathe dust.
C — Flammable - No flames, or sparks. Flash Point @ or below 80°F.     D — Avoid skin irritation by washing off with soap and water.
E — Corrosive - If spilled, remove immediately from skin or clothing. Use goggles and gloves for safety.
F — Spontaneous Combustion if brought in contact with organic material (Sawdust, Turpentine, etc.)

WRG05099939

Confidential Business Information
CS8020003181

A-280

# EXHIBIT 12

05010118

## BROWN, JACKSON, BOETTCHER & DIENNER

ARTHUR H. BOETTCHER
JOHN A. DIENNER
CAMERON K. V. HILDEBRECHT
CAMERON A. WHITSETT
HENRY H. BABCOCK
EDWARD C. GRELLE
ARTHUR C. JOHNSON
JOHN A. DIENNER, JR.
C. LYMAN EHRICH, JR.
BRUNO J. VERBECK

WILLIAM A. FURRNER
KEITH K. NICOLLE
ARTHUR J. WAGNER
THOMAS R. JUETTNER
DON R. WILSON
RAYMOND C. NORDHAUS
JOHN M. MANN

**ATTORNEYS AND COUNSELORS**

**PATENT AND TRADEMARK LAW**

1550 MONADNOCK BLOCK

53 W. JACKSON BLVD.

**CHICAGO 4**

June 16, 1954

CHARLES A. BROWN 1890-1956
JOHN L. JACKSON 1892-1949

TELEPHONE·HARRISON 7-0757
CABLE ADDRESS·PATMARK, CHICAGO

WASHINGTON OFFICE
800 F STREET N. W.

JUN 17 1954

Harry Dresser
Zonolite Company
135 S. LaSalle Street
Chicago 3, Illinois

Dear Mr. Dresser:

At our conference last Thursday June 10 in connection with Dresser Patent No. 2,669,510 the advisability and practicality of licensing expanders of vermiculite under the foregoing patent was brought up. The advantages of licensing the expanders of vermiculite instead of the fertilizer producers themselves includes, first of all, simplicity since there are only a few expanders to deal with, as contrasted to a great many commercial fertilizer manufacturers; that is to say, the "mechanics" of licensing would be relatively simple since only two or three parties - expanders - would be involved. Another advantage would be that a standard of quality could be more readily maintained, referring to the grade or quality of vermiculite used in the Dresser process.

We have accordingly drawn up a proposed draft of a license agreement which would involve primarily expanders of vermiculite who wish to sell such expanded vermiculite to

WRG05519832

S8020140587

A-282

BROWN, JACKSON, BOETTCHER & DIENNER

05010119

Harry Dresser                          -2-                          June 16, 1954

fertilizer manufacturers for practicing the Dresser Patent
Method. The draft agreement is simple and would involve
direct license negotiations only with those expanders of
vermiculite of your choosing. Such a license agreement would
permit you, as above mentioned, to exercise control over the
quality of vermiculite which is offered to the fertilizer
trade, provide some royalty income, and would proclaim to
the trade that the Zonolite owned Dresser Patent is based on
research and experimental work done over a period of years
by the Zonolite Company.

If the proposed agreement is of interest then the
matter can be pursued further after Mr. Bishop and other
interested persons have considered it.

Yours truly,

Enclosure

cc/Dr. George Ziegler
cc/John A. Bishop, Esq.

WRG05519833

3020140588

A-283

05010120

# LICENSE AGREEMENT

THIS AGREEMENT, entered into at _____

this _____ day of _____, 1954, by and between

ZONOLITE COMPANY, a Montana Corporation, having its principal

place of business at Chicago, Illinois, hereinafter referred to

as "LICENSOR", and KUHN AND STEEL, a _____

_____, having its principal place of

business at Boston, Massachusetts, hereinafter referred to as

"LICENSEE";

WHEREAS LICENSOR represents that it owns United States

Letters Patent No. 2,669,510, claiming, among other things, a

method for producing a free-flowing fertilizer, and LICENSEE

desires to sell exfoliated vermiculite for use with that method.

NOW, THEREFORE, IT IS AGREED:

1. LICENSOR authorizes LICENSEE to extend to purchasers

of exfoliated vermiculite sold by LICENSEE, a non-exclusive license

under the foregoing Patent to produce free-flowing fertilizer with

such exfoliated vermiculite and to sell the fertilizer so produced.

2. All containers in which LICENSEE sells exfoliated

vermiculite which is to be used in accordance with the patented

method, shall bear a prominent notation reading as follows:

-1-

WRG05519834

S8020140589

A-284

05010121

"The use of the contents to
practice the method of _____
a free-flowing fertilizer according
to the claims of U.S. Patent No.
2,669,510 is hereby licensed."

3.    LICENSEE will pay LICENSOR in return a royalty on
account of its aggregate net sales of exfoliated vermiculite
which is sold for use in practicing the patented method.   The
royalty shall be equal to _____ percent (_____%) of such sales
on the first _____ thereof, and shall be
equal to _____ percent (_____%) of such sales thereafter.
"Net sales" are gross sales less discounts, returns and allowances
on account of such sales.

4.    LICENSEE will advise LICENSOR, at 135 South La Salle
Street, Chicago, Illinois, in writing, not later than thirty (30)
days after the end of each calendar quarter whether or not it sold
any such exfoliated vermiculite during the quarter, and if it did,
will accompany its advice with payment of any amount shown by the
report to be due.

5.    LICENSEE will keep a full and accurate record of its
gross sales of exfoliated vermiculite which is sold for use with the
patented method, and will permit reputable certified public account-
ants selected by LICENSOR, at reasonable intervals during the term
of this agreement and for one (1) year thereafter, to inspect this
record and such of LICENSEE'S other records as they may consider

-2-

S8020140590

A-285

05010122

necessary to enable them to verify the accuracy of said record and whether all royalties due have been properly accounted for.

6. If LICENSOR hereafter during the term of this agreement grants to a competitor of LICENSEE authority to sell its exfoliated vermiculite for use in producing a free-flowing fertilizer according to the method of the foregoing patent, then LICENSEE shall from and after the date of such grant, be entitled, while such grant is in effect, to any more favorable royalty rate contained in it to the extent that the difference does not represent only the fair value of rights, patents or other considerations received in return for granting the more favorable royalty rate.

7. LICENSOR may terminate this agreement by written notice to LICENSEE:

(a) if any of LICENSEE'S exfoliated vermiculite offered for use in producing fertilizer according to the patented method does not conform to such reasonable standards of quality and performance (not higher than those adhered to by LICENSOR) as LICENSOR from time to time establishes;

(b) if royalties payable for any calendar year after the first are less than _____ Dollars ($_____), and LICENSEE does not make up the difference within _____ ( ) days after the end of the year.

-3-

WRGO5519836

S8020140591

A-286

05010123

(c)   if LICENSEE fails to cure a default within fifteen (15) days after it is given written notice thereof.

(d)   if LICENSEE becomes insolvent or commits any act of bankruptcy.

Waiver of a default in any instance is a waiver for that instance only.

8.   LICENSEE may terminate this agreement by written notice to LICENSOR if the foregoing patent is declared invalid by a decree of a United States Court from whose decision no appeal is taken or no appeal or other proceeding for review can be taken, providing that LICENSEE was not a party to the proceeding, and that it did not voluntarily aid or abet them directly or indirectly.

9.   Upon any termination of this agreement, all accrued royalties shall forthwith become payable, and the termination shall be without prejudice to LICENSOR'S right to recover them.

10.   This agreement shall continue during the life of the licensed patent unless sooner terminated as provided in Sections 7 or 8.

IN WITNESS WHEREOF, the parties hereto have executed this agreement as of the place and date first above written.

SONOLITE COMPANY

By _____

                                      President

Attest:

_____
      Secretary

MUNN AND STEEL

By _____

                                        President

Attest:

_____
      Secretary

-4-

WRG05519837

S8020140592

# EXHIBIT 13

# CONSTRUCTION PRODUCTS DIVISION

0641904

03625606

March 17, 1976

## IMPORTANT NOTICE TO VERMICULITE ORE PROCESSORS

W. R. Grace & Co. is finding it necessary to use dust control for ore handling and processing to meet current OSHA dust regulations in plants. As employers of workers handling vermiculite ore, you should be aware of these regulations and of pending changes to them.

The most difficult standard to meet applies to a "tramp" mineral found in vermiculite deposits. It is tremolite, defined by OSHA as one of the asbestos family. Dust control systems you install should be selected on the basis of keeping airborne concentration of this material within limits.

Current requirements which limit exposure of employees to an eight hour time weighted concentration of five fibers per cubic centimeter of air can be found in detail in title 29 Code of Federal Regulations PART 1910. This will be reduced to two fibers on July 1, 1976. A further reduction to 0.5 fibers has been proposed.

Comments on the proposed standard may be made to OSHA through April 9, 1976. Thereafter hearings will be held on the proposed standard. A copy of the Notice of Proposed Rulemaking is enclosed for your information. Grace believes the proposed 0.5 fiber limit is too stringent for current technology to achieve.

As an ore processor, you should sample air of your operation and take appropriate action regarding the current and proposed OSHA regulations.

Richard I. Morris

RIM:cj

GRACE

# EXHIBIT 14

### W.R. GRACE & CO. - CONN.
### RESPONSE TO THE SECOND REQUEST
### FOR INFORMATION REGARDING THE LIBBY ASBESTOS SITE

## GENERAL OBJECTIONS

W.R. Grace & Co.-Conn. ("Grace") makes the following General Objections:

1. Grace objects to the Request, and to each paragraph therein, on the grounds that it is overly broad, unduly burdensome and prohibitively time consuming, and some of the information requested could be located and identified as easily by the U.S. Environmental Protection Agency ("EPA") as by Grace.

2. Grace objects to the Request, and to each paragraph therein, to the extent it calls for information or documents that are protected under the attorney-client privilege or the work product doctrine.

3. Grace objects to the Request, and to each paragraph therein, to the extent the Request seeks to impose on Grace an obligation to obtain information or documents from third persons or others, which are not in Grace's custody or control.

4. Grace objects to the Request, and to each paragraph therein, to the extent that it calls for disclosure of information subject to Montana's constitutionally protected right to privacy.

5. Grace objects to the Request, and to each paragraph therein, to the extent that it calls for disclosure of confidential information in which there is an actual and reasonable expectation of privacy.

6. Grace objects to the Request, and to each paragraph therein, to the extent that it calls for disclosure of confidential information to the extent that it could subject Grace to claims by persons or entities asserting that such information was impermissibly disclosed.

7. Grace objects to the Request, and to each paragraph therein, to the extent that it calls for the disclosure of confidential or proprietary business information and/or information protected under various trade secret and intellectual property laws.

8. Grace objects to the Request, and to each paragraph therein, to the extent that it seeks to impose on Grace an obligation or obligations outside the purview of EPA's authority under 42 U.S.C. § 9604(e).

9. The following answers are based upon facts known or believed by Grace at the time of answering these questions. Much of the information is sought from many years ago and is, therefore, difficult or impossible to reconstruct or retrieve. Grace therefore reserves the right to amend these answers as and if new or better information becomes available to

4595382 v4

surveillance program had been evolving since 1959 when X-ray testing of employees at Libby was conducted. In 1964 and annually thereafter, another set of X-rays was done on Libby employees and periodic X-ray testing was begun at that time, the results of which were made available to the personal physician of each employee for interpretation, with instructions to the employee to contact his physician to discuss the results. The X-ray tests were performed and evaluated by independent physicians selected by personnel at the Libby facility.

Beginning in the early 1970s, Grace management met with employees individually to discuss their X-ray test results and to recommend further evaluation from a personal physician. Pulmonary function tests were added in 1974. Spirometry tests were performed on Libby employees in 1964 and were conducted periodically after 1975. In 1977, Grace commissioned a chest X-ray evaluation program to determine the nature of lung problems of Grace's employees at the mining and milling operations in Libby. Since 1978, Grace required its Libby employees to complete a health status questionnaire. Since the mid-1970s, Grace required that all new employees be non-smokers.

Grace is unaware of any "identifiers" for its employee medical records.

Grace incorporates here by reference its response to Question 20.

Question 6:

When did WRG first find Tremolite in the vermiculite ore? Thereafter, did WRG regularly sample the vermiculite ore to determine the percentage of tremolite? What was a representative percentage of tremolite in the vermiculite ore?

Response Question 6:

Grace incorporates here by reference its General Objections and its Objections To The Instructions and Definitions. Grace further objects to Question 6 as vague, ambiguous, overly broad and unduly burdensome to the extent that it requests information regarding "vermiculite ore" and a "representative percentage." These terms are not defined and are subject to differing opinions as to their ordinary meaning. Grace further objects to Question 6 because this request is not limited by location or time period and is outside the purview of EPA's authority under 42 U.S.C. § 9604(e). Without waiving these objections, Grace responds as follows:

Grace was aware of the presence of tremolite in the vermiculite ore deposits when it purchased the company in 1963. Grace determined the amount of vermiculite present in the ore and was generally if not specifically aware of the content of tremolite in both the deposits and the ore. The amount of tremolite varied as different geologic concentrations of vermiculite ore were mined. On average, after the vermiculite ore was milled and concentrated, the amount of tremolite in the concentrate was 1% or less. After the concentrate was expanded or exfoliated, if any tremolite remained, it was only a trace amount.

Grace had drill hole data that specified where the concentrations of vermiculite were and the various grades; it also identified how much tremolite was in each hole as well as other non-vermiculite materials. Grace had a policy of not processing vermiculite containing higher concentrations of tremolite – those portions of the mine went directly to waste piles rather than through the mill.

Grace incorporates here by reference its response to Question 8.

Question 7:

Has WRG determined that tremolite caused asbestosis? When did WRG first tell the employees of this health hazard?

Response Question 7:

Grace incorporates here by reference its General Objections and its Objections To The Instructions and Definitions. Grace further objects to Question 7 as vague, ambiguous, overbroad and unduly burdensome to the extent that it requests information regarding the term "health hazard." The term "health hazard" is not defined and is subject to differing opinions as to its ordinary meaning. Grace objects to Question 7 to the extent that it seeks legal or medical opinions regarding "causation" and "asbestosis." Grace also objects to Question 7 because it seeks information outside the purview of EPA's authority under 42 U.S.C. § 9604(e). Without waiving these objections, Grace responds as follows:

Grace has determined that asbestiform tremolite may cause asbestosis under certain conditions, including substantial dose and duration.

Grace cannot identify the precise date or manner in which one or more of its employees might have become aware of alleged health hazards associated with the inhalation of asbestos fibers by human beings. However, through established Health and Safety Committees, Grace employees met periodically to discuss health, safety and asbestos issues. Grace has no documented information regarding specific topics discussed at these meetings. Additionally, union records reflect the existence of a dust committee specifically tasked with addressing dust issues at the Libby facilities and knowledge on the part of the union in approximately 1962 or 1963 regarding health hazards associated with the dust.

Beginning in 1972, Grace placed government required signs in the mine with the following warning:

ASBESTOS
DUST HAZARD
Avoid Breathing Dust.
Wear Assigned Protective Equipment.
Do Not Remain In Area Unless Your Work Requires It.
Breathing Asbestos Dust May Be Hazardous To Your Health.

85953 82 v4                              14

CONFIDENTIAL

**ATTACHMENT A**

Licensees:
J.J. Brouk & Co.
Certain-Teed Prod.
Cleveland Builders
Cleveland Gypsum Co.
Diversified Insulation
Examet Ltd. - Smithville
Genstar Gypsum
I.C.I. - United States Inc.
International Vermiculite Co.
MacArthur Co.
Mica Pellets Inc.
B.F. Nelson Mfg. Co.
Nawrocki Insulation
Oklahoma Verm. Co.
Robinson Insul. - Minot
Robinson Insul. - Great Falls
Southwest Verm. Co. - Albuquerque
Southwest Verm. Co. - Lubbock
Stronglite Products Co.
Supreme Perlite Co.
Tennessee Zonolite Co.
Texas Verm. Co. - Dallas
Texas Verm. Co. - San Antonio
Thermic Refractories
Verm. - Intermountain Inc.
Verm. Products - Houston
Verm. Industrial Corp.
Verm. Industries - E. Palestine
Verm. of Hawaii
Verm. Insulation - Ligabine
Wempco - Denver
Wempco - Milwaukee
Wempco - Minneapolis
Wempco - Omaha
Westrec Ind. - Oakville
World's Best Transport
Industrial:
3-M Company
Adams & Co.
Allied American Gyp.
Allied Block
Allied Chem Dye - Edgewater

Allied Chem Dye - Philadelphia
Al-Par Peat
American Gypsum Co.
American Perlite
Wm. R. Barnes
Bestwall Gypsum - Acme
Bestwall Gypsum - Akron
Bestwall Gypsum - Blue Rapids
Bestwall Gypsum - Brunswick
Bestwall Gypsum - Ft. Dodge
Bestwall Gypsum - Grand Rapids
Bestwall Gypsum - New Orleans
Bestwall Gypsum - Wilmington
Big Horn Gypsum Co. - S. Mateo
Big Horn Gypsum Co. - Cody
Blue Diamond Co. - Arden
Blue Diamond Co. - Niles
California Gypsum
Caltex Petroleum Inc.
Carboline Co.
Carborundum
Celotex Corp. - Cody
Celotex Corp. - Edgewater
Celotex Corp. - Hamlin
Celotex Corp. - Philadelphia
Celotex Corp. - Port Clinton
Celotex Corp. - Fort Dodge
Centex American Gyp.
Chron Chemical
C.M.I.
C.M.I. Texas Inc.
Colorado Kansas Seed Co.
Cominco Ltd.
Dearborn Chemical
Diercks Forest Ind.
Dodson Mfg.
Examet - Smithville
Fibreboard Paper - Florence
Fibreboard Paper - Newark
Fibreboard Paper - Southgate
FlintKote Co. - Sweetwater
FlintKote Co. - Arden
FlintKote Co. - Camden


CONFIDENTIAL

#595382 v4

1

CONFIDENTIAL

FlintKote Co. - Niles
Foseco Ltd. - Cucamonga
H.B. Fuller Co.
Garlok Inc.
C. Gartenmann & Co.
General Electric - San Bernadino
General Mills - Minneapolis
Genstar
Georgia-Pacific, Sigurd
Georgia-Pacific, Bestwall
Georgia-Pacific, Fort Dodge
Georgia-Pacific, Himes
Grand Rapids Gypsum
James Hardie Gypsum
Inland Steel Corp. - Chicago
J.E. Love & Sons Ltd.
Johns-Manville, Apex
Johns-Manville, Florence
Kaiser Gypsum - Seattle
Kaiser Gypsum - Antioch
Kaiser Gypsum - Long Beach
Kaiser Gypsum - Rosario
Kalo Inoculant
N.S. Koos & Sons
Lexington Mill & Elevator Co.
Lloyd A. Fry Roofing Co.
Marvelite Industries
Masonite Comm. Div.
Midwest Rubber
National Gypsum - Rotan
National Gypsum - Richmond
National Gypsum - Long Beach
National Gypsum - Fort Dodge
Norwest Gypsum Co.
O.M. Scott & Sons Inc.
Onduline-USA Virginia
Pabco Gypsum Co.
Pabco Products - Apex
Pabco Products - Newark
Paul Marsh Inc.

Premier Enterprises
Pryor Giggey
PVP Industries
Rapid Indust. Plastic
Ruberaid Co. - Caledonia
Republic Gypsum Co.
Republic Housing - Rosario
Riley Ruminant Nutrient
Robt. T. Smith
Shelter Shield
Steel Services
Swift & Company
Temple Gypsum - Memphis
Texas Gypsum - El Paso
Texas Gypsum - Irving
Three Rivers Gypsum
Topex Company
Truroc Gypsum
Twin Cities Wholesale
U.S. Gypsum - Empire
U.S. Gypsum - Irving
U.S. Gypsum - Lewistown
U.S. Gypsum - Plaster City
U.S. Gypsum - Santa Fe Springs
U.S. Gypsum - Sigurd
U.S. Gypsum - Southard
U.S. Gypsum - Sperry
U.S. Gypsum - Staten Island
U.S. Steel Corp. - Chicago
U.S. Steel Corp. - Duquesne
U.S. Steel Corp. - Ensley
U.S. Steel Corp. - Fairfield
U.S. Steel Corp. - Fainose Hills
U.S. Steel Corp. - Gary
Van-Packer Co.
Voluntary Purchasing Group
Western Gypsum - Oakville
Western Gypsum - Santa Fe
Westroc Ind. - Oakville
Weyerhaeuser Co.

# EXHIBIT 15

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| W.R. GRACE & CO., et al., | Case No. 01-1139 (JKF) |
| Debtor. | (Jointly Administered) |

### SUPPLEMENTAL AFFIDAVIT OF STEPHEN D. SWINDLE IN SUPPORT OF MOTION FOR LEAVE TO FILE LATE PROOFS OF CLAIM

The undersigned, Stephen D. Swindle, hereby declares as follows:

1. I am a shareholder and the president of Van Cott, Bagley, Cornwall and McCarthy ("Van Cott"). I am also a trustee of the Van Cott, Bagley, Cornwall & McCarthy 401(k) Profit Sharing Plan (the "Plan"). In those capacities, and in support of a Motion for Leave to File Late Proofs of Claims (the "Motion"), I previously signed and submitted an Affidavit which detailed the Plan's purchase and ownership of a parcel of real property located at 333 West 100 South in Salt Lake City, Utah (the "Subject Property").

2. In its Objection to the Motion, the debtor, W.R. Grace ("Grace"), represented that Van Cott was included on Grace's mailing matrix and that proofs of service disclosed that Grace's motion to establish a bar date for filing claims had been served on Van Cott, but not on the Plan, on June 21, 2002.

3. Van Cott may have been included on the mailing matrix because it previously had functioned as Grace's counsel in a Utah litigation matter.

635:307495v3

A-295.2

Representation in that matter began in 1994 and was wholly unrelated to the Subject

Property. Van Cott's work with respect to that matter was completed in 1998. Van Cott

received final payment from Grace with respect to the matter on June 5, 1998. Van

Cott performed no further work for Grace and had no relationship with Grace as of the

April 2, 2001 Grace chapter 11 petition date. Grace has also been adverse to Van Cott

clients. The Plan has never had a relationship with Grace.

      4.     To the best of my knowledge, until late 2004, when it formally requested

notice of proceedings in the Grace bankruptcy, neither Van Cott nor the Plan received

any notices in connection with Grace's pending bankruptcy. If there had been such

notices to Van Cott, they would have been directed to me or to my predecessor, Robert

M. Anderson, in our capacity as president of Van Cott. If there had been such notices

to the Plan, they would have been directed to me in my capacity as a Trustee of the

Plan. I did not, however, receive any Grace-related notices, as confirmed by my recent

review of my records, and Mr. Anderson has confirmed with me that he has never

received such a notice. The explanation for this probably lies in the fact that the firm

address allegedly used by Grace in its notices did not include a suite number. The Van

Cott firm in 2002 only occupied two floors (suite numbers 1600 and 1700) in a multi-

story office building located at 50 South Main Street, Salt Lake City, Utah. Historically,

mail that fails to include a suite number is often not delivered to the firm. In addition,

the proof of service indicates that Grace used an incorrect zip code, 84145, rather than

84144.

635:307495v3

A-295.3

5.      In 2002, the year of the alleged mailing to Van Cott, as provided in paragraph 2, above, Van Cott had a procedure for docketing unclaimed or "dead" mail and nothing has been found in this system having been received from Grace.

6.      For reasons explained in my Affidavit, however, even if the notice of bar date had been properly served, it would not have triggered any realization that a claim should be filed. On March 31, 2003, the apparent bar date for filing claims, neither I nor any other trustee of the Plan was aware of any basis for asserting a claim against Grace with respect to the Subject Property. Until it received a letter from the Environmental Protection Agency dated more than a year after the bar date, the Plan was not aware of any possible environmental problem stemming from product delivered to the Subject Property by Grace.

DATED this 30th day of March, 2005.

Stephen D. Swindle

STATE OF UTAH          )
                       : ss.
COUNTY OF SALT LAKE )

SUBSCRIBED AND SWORN to before me this 30th day of March, 2005, by STEPHEN D. SWINDLE.



STACEY BRAITHWAITE
NOTARY PUBLIC • STATE OF UTAH
50 SOUTH MAIN STE 1600
SALT LAKE CITY, UT 84144
My Comm. Exp. 07/28/2007

Notary Signature and Seal

635:307495v3

A-295.4

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al., | ) | Case No. 01-01139 (JKF) |
| Debtors | ) | Jointly Administered |
| | ) | Re: Docket Nos. 7571, 7746, |
| | | 8087 & 8164 |

**DEBTORS' RESPONSE TO PACIFICORP AND THE VANCOTT BAGLEY
CORNWALL & MCCARTHY 401(K) PROFIT SHARING PLAN'S BRIEF IN SUPPORT
OF THEIR MOTION FOR LEAVE TO FILE LATE PROOFS OF CLAIM**

During the February 28, 2005 omnibus hearing, the Court directed Pacificorp and the

Vancott Bagley Cornwall & McCarthy 401(k) Profit Sharing Plan (collectively, the "Late

Claimants") to brief the issue of whether the Debtors had an obligation to search public records

for the purpose of identifying the Late Claimants as potential creditors to serve with actual notice

of the Bar Date.[1]  In response to the Court's request, the Late Claimants have filed a nineteen-

page brief that fails to cite a single case that requires a chapter 11 debtor to search through public

records to identify a potential creditor that is unidentifiable through a diligent search of the

debtor's books and records.  The Late Claimants' failure to locate any support for their position

is not surprising, as their position has no basis in existing law.

While one single title search may not be cost-prohibitive in isolation, the Late Claimants

are urging the creation of precedent that would require the Debtors to search the title records

with respect to any property (and adjacent property) where the Debtors' product might have been

---

[1]  Capitalized terms not otherwise defined herein have the meanings given in the *Debtors'
Objection to the Pacificorp and Vancott Bagley & Cornwall & McCarthy 401(k) Profit Sharing
Plan's Motion for Leave to File Late Proofs of Claim* (the "Objection").

processed or used by the Debtors' hundreds of customers. This sort of open-ended and widespread investigation would be unduly burdensome, cost-prohibitive, and an administrative nightmare that would almost certainly impede the Debtors' ability to oversee these chapter 11 cases and operate its businesses. Courts, however, do not require a debtor to undertake such an elaborate investigation to identify claimants.

Instead, as set forth herein, courts have consistently held that a debtor generally need only *review its own books and records* for "known" creditors, and other potential creditors are only entitled to publication notice. The Debtors' search of their books and records was reasonable. Indeed, the Late Claimants do not dispute the reasonableness of the Debtors' review of their books and records to identify claimants, nor do they contend that such a search should have uncovered the Late Claimants. In fact, it is undisputed that the Debtors did not conduct any business transactions or have any contractual dealings with either of the Late Claimants with respect to the Site (as defined herein). Moreover, the Late Claimants never alerted, or otherwise gave notice, to the Debtors as to their claims relating to the Site. It is also not contested that the Debtors never (i) operated the Site, (ii) owned or leased the Site, or (iii) had any other connection to the Site - other than the fact that the Debtors sold vermiculite to a company that apparently processed the vermiculite at the Site. Therefore it is apparent that the Debtors had no actual knowledge, through a careful search of their books and records or otherwise, that the Late Claimants had any interests in the Site.

The Debtors had no obligation to undertake any ancillary review of the public records. The Late Claimants' reliance upon caselaw to assert that the Debtors' investigation was insufficient is misplaced. Indeed, the Late Claimants urge this Court to ignore controlling, factually-similar precedent, and to follow antiquated caselaw pertaining to factually

2

distinguishable situations outside of the bankruptcy context.  As discussed herein, the applicable standard in this jurisdiction requires that a debtor's investigation to identify "known creditors" need not be vast and open-ended, and, instead, should focus on the debtor's own books and records.  See Chemetron Corp. v. Jones, 72 F.3d 341, 346-47 (3d Cir. 1995).

In any event, while neither of the Late Claimants was entitled to actual notice of the Bar Date, the Debtors did properly serve Vancott with a copy of the Bar Date notice package. Moreover, Pacificorp obviously was adequately notified of these chapter 11 cases to enable it to file a timely proof of claim, because it filed a timely proof of claim well-before the Bar Date. Finally, the question of whether the Late Claimants received adequate notice of the Bar Date is ultimately a moot issue, as neither of the Late Claimants possess a valid claim against the Debtors.

Since (i) the Late Claimants are not "known" creditors that were entitled to actual notice, (ii) the Late Claimants have failed to argue any other basis for a finding of "excusable neglect," and (iii) this Court has already determined that allowing the Late Claimants to file proofs of claim at this time (nearly two years after the Bar Date and while the Debtors are moving towards confirmation of a plan of reorganization) would be prejudicial to the Debtors' estates,[2] the Court should enter an order denying the Motion.

---

[2] See February 28, 2005 Hearing Transcript, pg. 33, lns. 21-22.

3

## Facts and Background

1.      From 1940 until about 1984, the Debtors sold unprocessed vermiculite to Intermountain Insulation Co. ("Intermountain").  Upon information and belief, Intermountain processed the product, at least in part, at 333 W. First Street, Salt Lake City, Utah (the "Site"), and then Intermountain sold the product under the "Zonolite" name, pursuant to licenses that were issued by a predecessor of the Debtors.

2.      The Debtors (i) never owned, leased, or otherwise held any ownership interest in the Site or adjacent land, (ii) never owned, leased, or otherwise held any ownership in any land located or any business carried on adjacent to the Site and (iii) never operated any business or other activity at the Site or on adjacent land.  Further, the Debtors also (i) had no contractual dealings concerning the Site with either of the Late Claimants, (ii) did not know that either of the Late Claimants had any legal interest in the Site; and (iii) never received any communication from the Late Claimants, by which the Late Claimants expressed an intent to seek recovery from the Debtors on account of alleged contamination at the Site.

3.      On April 2, 2001 (the "Petition Date"), the Debtors filed for bankruptcy under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code").

4.      On January 14, 2005, almost two years after the Bar Date[3] had passed, the Late Claimants filed their Motion [Docket No. 7571].  The Motion seeks leave from the Bar Date Order so that each of the Late Claimants may file late proofs of claim on account of

---

[3] The Objection contains a detailed description of the Bar Date and the process by which the Bar Date and the associated notice materials were developed and approved.

4

"environmental cleanup costs" incurred and to be incurred to cleanup the Site and the adjacent Land. According to the Late Claimants, (i) Pacificorp is the current owner of "Block 66," which includes the Site, and (ii) in 1984, Pacificorp's predecessor in-interest, Utah Power & Light Company, purchased a portion of Block 66 from Vancott. See *Reply Brief to W.R. Grace's Objection to Pacificorp and the Vancott Bagley Cornwall & McCarthy 401(k) Profit Sharing Plan's Motion for Leave to File Late Proofs of Claim* (the "Late Claimants' Brief"), pg. 2.

5.    On, February 10, 2005, the Debtors filed their Objection [Docket No. 7746]. In the Objection, the Debtors argued that neither of the Late Claimants are entitled to the relief requested in the Motion because (i) both of the Late Claimants were "unknown" creditors and, therefore, not entitled to receive actual notice of the Bar Date; and, in any event, (ii) Vancott received *actual notice* of the Bar Date, and Pacificorp knew the Debtors were in bankruptcy (and filed a timely proof of claim) well before the Bar Date. The Debtors also argued that the Claimants had failed to assert any grounds for establishing "excusable neglect."

6.    On February 28, 2005, the Court heard legal argument on the Motion, and the Court found that allowing the Late Claimants to file a late proof of claim would be prejudicial to the Debtors' estates. See February 28, 2005 Hearing Transcript at pg. 33, lns. 21-22. The Court, however, permitted further briefing on the Motion with respect to "the issue of [a] debtor's inquiry notice obligation to find a current owner of a property which [the] debtor does not lease and does not use versus the creditor or interest holder['s] ... obligation to file a transfer of claim or proof of claim timely." Id. at pg. 33, lns. 14-18.

5