<u>Argument</u>

I.    **The Late Claimants Were Unknown Creditors and Were Not Entitled to Actual Notice of the Bar Date**

7.    As the Late Claimants were "unknown" creditors, the Debtors had no obligation to serve them with actual notice of the Bar Date. A "known" creditor is one whose identity is either "known or reasonably ascertainable by the debtor." <u>Tulsa Professional Collection Serv., Inc. v. Pope</u>, 485 U.S. 478, 490 (1988). An "unknown" creditor is one whose "interests are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to knowledge [of the debtor]." <u>Mullane v. Central Hanover Bank & Trust Co.</u>, 339 U.S. 306, 317 (1950). A creditor's identity is "reasonably ascertainable" if that creditor can be identified through "reasonably diligent efforts." <u>Mennonite Bd. Of Missions v. Adams</u>, 462 U.S. 791, 798 n.4 (1983). The Court of Appeals for the Third Circuit (the "<u>Third Circuit</u>") held that "reasonable diligence" does not require "a vast, open-ended investigation. The requisite search instead focuses on the debtor's own books and records. Efforts beyond a careful examination of these documents are generally not required." <u>Chemetron Corp. v. Jones</u>, 72 F.3d 341, 346-47 (3d Cir. 1995) (internal citations and quotes omitted).

8.    The Debtors' efforts to identify "known" creditors were reasonable and satisfy <u>Chemetron</u> and its progeny. In, particular, the Debtors diligently reviewed their books and records to identify potential or actual claimants. Indeed, this search identified Intermountain (the entity that operated at the Site), as Intermountain conducted direct business transactions with the Debtors. The Late Claimants do not dispute the reasonableness of the Debtors' investigation of their books and records, nor do they contend that such a search would have uncovered the Late Claimants' alleged claims. In fact, it is undisputed that the Debtors did not conduct any business

6

transactions or have any contractual dealings with either of the Late Claimants with respect to the Site. Therefore, it is apparent that the Late Claimants' interests concerning the Site did not come to the knowledge of the Debtors in the due course of business. See Mullane v. Central Hanover Bank & Trust Co., 339 U.S. at 317.

9.    Moreover, the particular factual circumstances only emphasize the Debtors' unawareness of the Late Claimants' interests in the Site. It is undisputed that the Debtors (i) never operated or arranged for the operation of the Site or adjacent land, (ii) never owned, leased, or otherwise held any ownership interest in the Site or adjacent land, and (iii) never owned, leased, or otherwise held any ownership in any business carried on at the Site or adjacent land. Indeed, the Debtors had no reason to believe that Intermountain (an entity already receiving notice of these chapter 11 cases and the Bar Date) was not the owner of the Site. It is also undisputed that the Late Claimants never communicated, or otherwise gave notice, to the Debtors of their claims relating to the Site.[4] Thus, the Debtors had no actual knowledge, through

---

[4] Therefore, the present situation is distinguishable from Solow Building Co., LLC v. ATC Assoc., Inc., 175 F.Supp. 2d 465 (E.D.N.Y. 2001), which the Late Claimants cite in their reply. In Solow, the court held that the debtor had a duty to provide actual notice to the owner of an office building where the debtor had performed allegedly deficient asbestos-abatement. The court found that such notice was required because the owner was a "known" creditor. The court based this decision on a finding that the claimant had sent multiple letters to the debtor, before the bar date, and these letters indicated that (i) the claimant believed that the debtor was performing illegal procedures in its abatement and (ii) that the claimant would hold the debtor liable for any damages or claims from the debtor's failure to properly control the asbestos in the premises. Id. at 472.

7

a diligent search of their books and records or otherwise, that the Late Claimants had legal interests in the Site.[5]

10.    Finally, the EPA did notify the Debtors that the EPA had a potential claim by alleging that the Site may be contaminated. In response, the Debtors properly scheduled a claim for potential contamination for the Site. See Waterville Industries, Inc. v. First Hartford Corp., 124 B.R. 411(D. Me. 1991) (holding that the reorganized debtor's discharge was not applicable to a party that purchased contaminated property from the party that purchased the land from the debtor, because the debtor had failed to schedule a claim for the property in its bankruptcy filing). In addition, the Debtors properly gave actual notice to the EPA and Intermountain (as known creditors) of the chapter 11 cases and of the Bar Date.

11.    The Debtors did not have any obligation to investigate beyond their books and records to ascertain whether anyone else possessed a claim on account of alleged contamination at the Site. Indeed, courts have held that chapter 11 debtors that own (or previously owned) allegedly contaminated property have no obligation to undertake an ancillary investigation to locate parties that may assert claims on account of such contamination. For example, in Chemetron Corp. v. Jones, 72 F.3d 341 (3d Cir. 1995), the Third Circuit found that a chapter 11

---

[5] Unlike the debtor in In re Argonaut, 164 B.R. 107, 112 (N.D. Cal. 1994), the Debtors had no reason to know that other claimants existed. In Argonaut, the debtor, a lessee of real property, failed to provide notice of its chapter 11 cases to investors who had purchased interests in the deed of trust lender's interest in the property. The court found that these investors should have received actual notice of the debtors' bankruptcy cases because they were "known" creditors. The court based its decision on its finding that, "[t]here is some evidence, including a declaration by Duane Tucker, Argonaut's attorney at the time of the filing, that Argonaut knew that the Del Mar [the deed of trust lender] interest had been further assigned to some other entities [the investors]." Id. Here, there is no evidence whatsoever that the Debtors had any knowledge as to the ownership of the Site or that Intermountain was not the owner of the Site.

8

debtor that owned and operated a nuclear facility and nearby landfill had no obligation to provide

actual notice to parties that resided on (or visited) the land. In reaching this decision, the Third

Circuit noted that the bankruptcy court had incorrectly applied a "reasonably foreseeable" test,

rather than the appropriate "reasonably ascertainable" standard, and that the potential claimants

were not "reasonably ascertainable." Id at 346-47. In this respect, it was certainly "reasonably

foreseeable" to the debtor that such claimants may exist, but their identities were not "reasonably

ascertainable" to the debtor. See id. As a result, the Third Circuit held that such an

investigation, above and beyond an investigation of the debtor's books and records, was not

required. See id at 349.

12.    Similarly, In re Bicoastal Corp., 147 B.R. 807 (Bankr. M.D. Fla. 1992), the court

held that a claimant, which (i) owned property downstream from property that was formerly

owned by the chapter 11 debtors and (ii) claimed that its property was environmentally damaged

because of the actions of the debtor on the debtor's property, was not a known creditor of the

debtor. In particular, the court held that due process requirements did not require the debtor to

conduct an "impracticable and extended" search for all potential creditors. See id, citing

Mullane, 339 U.S. at 317-18. Instead, the court found that the debtor's publication notice was

reasonably calculated to provide the claimant with sufficient notice of the bar date. Likewise, in

In re Texaco Inc., 182 B.R. 937, 954-55 (Bankr. S.D.N.Y. 1995), the court found that the owner

of land adjacent to a chapter 11 debtor was an "unknown" creditor. The courts in each of these

cases based their determinations on findings that the respective debtors were not in a position to

determine the extent of the toxins emanating from their respective properties.

13.    The facts in the present case are even more compelling than the facts in

Chemetron, Bicoastal, and Texaco. In particular, the debtors in such cases each owned the

9

property where the contamination developed and operated the business from which such contamination arose. Accordingly, they were in the best position to know the extent of any contamination that stemmed from their respective businesses. Still, the courts, including the Third Circuit, held that an investigation beyond the debtors' books and records was not required. Here, however, the Debtors never owned the Site or had any involvement in Intermountain's business on the Site. Therefore, the Debtors were even less-equipped to ascertain the extent of any contamination caused by Intermountain on the Site (or adjacent land) than the debtors in Chemetron, Bicoastal, and Texaco.

14.     Therefore, as the Debtors' diligent investigation of its books and records did not uncover the claims of the Late Claimants relating to the Site, nor is there any evidence to indicate that the Debtors otherwise had actual knowledge of such claims, the Late Claimants are undeniably "unknown" creditors. As a result, the Late Claimants were not entitled to receive actual notice of the Bar Date and the publication notice was sufficient to inform the Late Claimants of the Bar Date.

II.     **The Debtors Had No Obligation to Conduct an Ancillary Investigation of the Public Records**

15.     The Late Claimants incorrectly cite to three Supreme Court cases to support their erroneous proposition that a debtor has an obligation to conduct an ancillary investigation of public records in order to identify potential claimants. Each of the cases, however, addresses whether specific statutes (each providing for publication notice by the state to notify affected parties of specified events relating to real property) provided Constitutionally adequate notice to affected parties. See Mennonite Bd. Of Missions v. Adams, 462 U.S. 791, 798 n.4 (1983); Schroeder v. City of New York, 371 U.S. 208, 212-13 (1962); and Walker v. City of Hutchinson,

10

352 U.S. 112, 116 (1952) (collectively, the "State Foreclosure Cases"). For the following reasons, the State Foreclosure Cases are inapposite to the pending issue of whether a chapter 11 debtor has an obligation to search public records (in addition to a search of its own books and records) to identify potential claimants.

16.    *First*, the fact that the State Foreclosure Cases dealt with state entities is significant because the public recording systems are kept by the state and, therefore, constitute the state's own books and records. Therefore, the holding in the State Foreclosure Cases - that the state entities had duties to check their public records - is effectively the same standard as the rule enumerated in Chemetron (that a party must review its own books and records). Such an investigation would be much more burdensome for a chapter 11 debtor, who would have to undertake an ancillary, independent investigation of the public records to locate such parties, with all of the corresponding effort and expense that such an investigation would require. It would have been far from "easy"[6] for the Debtors to undertake such an investigation to identify owners and part owners of every location where it sold its products (and every plot adjacent to such locations). Such a time-intensive and burdensome endeavor would undermine the "principal purpose of bankruptcy law, to secure within a limited period the prompt and effectual administration and settlement of the debtor's estate." Katchen v. Landy, 382 U.S. 323, 328 (1966)

17.    *Second*, all of the State Foreclosure Cases addressed the limited issue of whether the publication notice of a particular statutory scheme was sufficient to notify interested parties.

---

[6] See Late Claimants' Reply at pg. 11.

11

It is essential to note that none of the State Foreclosure Cases involved a debtor in a bankruptcy context. This distinction is critical because the issue of what constitutes sufficient notice in a bankruptcy context has been decided by courts in the wake of the State Foreclosure Cases. In particular, in <u>Chemetron</u> - which is controlling precedent and more recent than the State Foreclosure Cases - the Third Circuit held that a debtor's investigation to identify "known" creditors need not be vast and open-ended, and, instead, should focus on the debtor's own books and records. <u>See Chemetron Corp. v. Jones</u>, 72 F.3d at 346-47. The Late Claimants, however, are in effect asking the Court to ignore a controlling precedent specifically addressing the issue, in favor of cases that (i) deal with a different issue outside of a bankruptcy context, (ii) were decided before the most applicable line of controlling cases, and (iii) can be distinguished from the present situation.

18.     In any event, the issue of what constitutes sufficient publication notice (the precise issue in the State Foreclosure Cases) has already been determined by this Court. Indeed, the Debtors' publication notice was specifically developed to reach the Debtors' creditors. <u>See</u> <u>Mennonite Bd. Of Missions v. Adams</u>, 462 U.S. 791, 798 (1983), <u>quoting Wiswall v. Sampson</u>, 55 U.S. 52, 67 (1852) (publication notice must be "reasonably calculated" to reach the intended recipient). In these chapter 11 cases, the Debtors took unprecedented measures to ensure that potential claimants knew of the Bar Date. Specifically, the Debtors (i) retained a notice-consultant to design a notice program that would reach (with a high degree of probability) each of the Debtors' potential claimants, (ii) worked with the Court and every official committee in these cases, over the course of ten months, to develop a Bar Date notice program that would reach substantially all potential creditors, and (ii) spent over *$4 million* to publish the Bar Date

12

Notice in a myriad of national and local publications, including publication in the Utah area, specifically including Salt Lake City.

19.    Further, the Court specifically determined that the Debtors' notice program was legally sufficient. In particular, in addition to approving the Bar Date Notice, the Bar Date Order provides:

> ORDERED that notice of the entry of this Order and of the Bar Date to unknown claimants pursuant to the Debtors' Bar Date Notice Plan for Asbestos Property Damage Claims and Other Claims (the "Notice Plan"), as modified, and filed on April 12, 2002, shall be deemed good, adequate and sufficient notice of the Bar Date ...

Bar Date Order at pg. 5.

20.    Thus, for the reasons set forth, the State Foreclosure Cases are inapplicable to the present circumstances and do not require the Debtors to sort through public records to identify claims with respect to property (or property adjacent thereto) where its product may have been used or processed.

III.    The Debtors Properly Served Vancott with the Bar Date Notice

21.    While neither of the Late Claimants were entitled to actual notice of the Bar Date, the Debtors properly served Vancott with a copy of the Bar Date notice package. The Debtors sent the Bar Date materials to "Vancott, Bagley, Cornwall & McCarthy." See Affidavit of Service (attached as Exhibit C to the Objection). While the notice may not have been specifically sent to the firm's 401(k) profit sharing plan, this is a distinction without any material difference. Indeed, the 401(k) profit sharing plan is affiliated with the law firm. In particular, the 401(k) plan's offices are located in the same offices as the law firm (50 S. Main St., Salt Lake City, Utah). On April 14, 2005, the Debtors' counsel called the Vancott Bagley law firm

13

91100-001\DOCS_DE:107510.1

A-308

and asked the receptionist where one should send correspondence to the Vancott, Bagley, Cornwall & McCarthy 401(k) Profit Sharing Plan. Without hesitating, the receptionist stated that the correct mailing address is: "50 South Main Street, Salt Lake City, Utah 84144, Suite 1600." Therefore, service upon the law firm should be imputed to the 401(k) plan. See, e.g., Haynes v. Locks, 711 F.Supp. 901 (E.D. Tenn. 1989) (finding that service of process upon a subsidiary is constructive notice to two parent corporations).

22.     The Late Claimants are apparently correct that the address listed in the Debtors' records contains the incorrect zip code. However, courts have recognized that the failure to include the correct zip code only weakens the presumption of receipt by the addressee. See In re Longardner & Assoc., Inc., 855 F.2d 455 (7th Cir. 1988). In the present situation, it is highly unlikely that the incorrect zip code resulted in the letter not being properly delivered, as there is only one "South Main Street" in Salt Lake City, Utah. See Map of St. Lake City, Utah (a copy of which is attached as Exhibit A). Also, the zip code listed in the Debtors' records (84144) is not materially different from the allegedly correct zip code (84145). Therefore, the street address and city were most-likely sufficient to ensure delivery.

## IV.     The Debtors Should Not be Held Accountable for Pacificorp's Incomplete Proof of Claim

23.     It appears that Pacificorp was not served with the Bar Date Notice Package. Pacificorp by its own admission, however, did receive notice of the Debtors' chapter 11 cases, and filed a proof of claim under its trade name, Utah Power & Light, before the Bar Date. Pacificorp thus (i) knew that the Debtors were in bankruptcy; (ii) knew that the proof of claim process was the appropriate method for asserting any claims against the Debtors; and (iii) could have filed a similar claim with respect to the Site. Pacificorp has provided no justification for its

14

failure to set forth claims related to the Site in their timely proof of claim. The bottom line, however, is that Pacificorp obviously was sufficiently notified of these chapter 11 cases and the Bar Date to enable it to file a timely proof of claim, because it did exactly that.

### V.   Neither of the Late Claimants Have a Claim Against the Debtors

24.   In any event, the issue of whether the Late Claimants received adequate notice of the Bar Date is ultimately moot, as neither of the Late Claimants possess a valid claim against the Debtors for either or both of the following reasons: *first*, The Debtors were not an "arranger" under CERCLA; and, *second*, the Late Claimants' attempt to assert a contribution claim under Section 113(f) of CERCLA is barred by Cooper Industries, Inc. v. Aviall Services, Inc., 543 U.S. ___, 125 S.Ct. 577 (2004) and Pharmacia Corp. v. Clayton Chemical Acquisition LLC, 2005 WL 615755 (S.D. Ill. 2005).

25.   The sole basis for the Late Claimants' claim against the Debtors is alleged liability as an "arranger" under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a). The Late Claimants allege that some of the Debtors "enter[ed] into processing agreements" with Intermountain with knowledge that "the manufacturing process itself results in significant contamination to the processor's property." Late Claimants' Reply at 7.

26.   The Debtors dispute the Late Claimants' characterization of the facts. Nonetheless, even accepting them at face value, the alleged facts fall short of CERCLA "arranger" status. There is no dispute that the vermiculate the Debtors sold to Intermountain was a valuable commercial product, nor was it in any sense a waste to the Debtors. In law as well as common parlance, a sale of a useful product does not constitute an arrangement for disposal, even though the ultimate fate of all products is to become waste and to be disposed.

15

27.    Dozens of cases hold that the sale of a useful product containing hazardous substances does not constitute an "arrangement for disposal" of the hazardous substances, so long as the "product" is not essentially a waste to the seller. E.g, G.J. Leasing Co., Inc. v. Union Elec. Co., 54 F.3d 379, 384 (7th Cir. 1995) ("[T]he sale of a product which contains a hazardous substance cannot be equated to the disposal of the substance itself or even the making of arrangements for its subsequent disposal . . . .") (citations omitted); United States v. Union Corp., 277 F. Supp. 2d 478, 489-91 (E.D. Pa. 2003) (sale of polychlorinated biphenyls by Monsanto did not constitute an arrangement for disposal of the polychlorinated biphenyls) ("CERCLA liability does not extend to the seller of a new or useful product because such a sale does not constitute an arrangement for disposal of a hazardous substance") (citing seven cases); United States v. Gordon Stafford, Inc., 810 F.Supp. 182, 185 (N.D. W.V. 1993) (sale of used transformers did not constitute an arrangement for disposal of PCBs contained in the transformers).

28.    Especially relevant are cases holding that sales of products containing asbestos were not arrangements for disposal of the asbestos in the products. Grace entities were defendants in some of these cases. E.g., Dayton Independent School District v. U.S. Mineral Products Co., 906 F.2d 1059, 1065 (5th Cir. 1990) ("there is no possible reasonable interpretation of the term 'disposal' that could encompass the sale of asbestos-containing useful building products by the defendant manufacturers and suppliers") (W.R. Grace & Co. was a defendant); Prudential Insurance Co. of America v. United States Gypsum Co., 711 F. Supp. 1244, 1253-55 (D. N.J. 1989) (there was no "disposal" where the defendant "convey[ed] a useful substance for a useful purpose"; sale of asbestos-containing products for use in building materials was not disposal "even though such substances may have come to eventually flake off and potentially pose a health risk") (W.R. Grace & Co. was a defendant).

16

29.    Courts have rejected "arranger" allegations in cases involving facts similar to those alleged by the Late Claimants. E.g., Edward Hines Lumber Co. v. Vulcan Materials Co., 685 F. Supp. 651, 656 (N.D. Ill. 1988) ("the mere sale of ... substances for use in the wood treatment process does not constitute arranging for the disposal or treatment of a hazardous substance), aff'd, 861 F.2d 155 (1989).

30.    The cases relied upon by the Late Claimants involve critical distinctions from the facts alleged here. The Late Claimants prominently rely on three cases involving "toll" manufacturing arrangements. In each case, the defendant sent materials to a contractor's facility for processing, and later got back processed product. In each case, the contractor's facility became contaminated. In finding the defendants liable, all of the courts placed central reliance on the fact that the sender retained ownership of both the material and the hazardous substances in it throughout the processing operation. United States v. Aceto Agric. Chem. Corp., 872 F.2d 1373, 1382 (8th Cir. 1989) (involving a pesticide processing facility; the defendants "actually owned the hazardous substances, as well as the work in process"); Jones-Hamilton Co. v. Beazer Materials & Services, Inc., 973 F.2d 688, 695 (9th Cir. 1992) (involving processor of wood treating chemicals; under the parties' agreement the defendant "retained ownership of all the materials it supplied to" the processing facility); United States v. Vertac Chemical Corp., 966 F.Supp. 1491, 1501 (E.D. Ark. 1997) ("[t]he Court concludes that the evidence establishes that Uniroyal owned the TCB it supplied to Vertac for processing into 2,4,5-T, that Uniroyal retained an ownership interest in its material during the processing stage, that Uniroyal owned the 2,4,5-T that was returned . . . ."), aff'd sub nom United States v. Hercules Inc., 247 F.3d 706 (8th Cir. 2001). In Vertac, the court determined that the seller of hazardous material used as a raw material in the same toll manufacturing process was not liable, stating "[t]he Court will not

17

extend CERCLA liability to SCD which sold a hazardous, but useful product to Vertac for its original use as raw material in Vertac's manufacturing operation". 966 F.Supp. at 1509.

31.    In contrast to the defendants in the cases cited by the Late Claimants, the Debtors were not involved in a "toll" manufacturing arrangement with Intermountain. The Debtors had no ownership of the vermiculite after it was sold. The Debtors got no product back from Intermountain. The alleged facts provide no basis to hold the Debtors as an "arranger" for disposal at the Site.

32.    Even if the Debtors qualified as a CERCLA "arranger," the Late Claimants fail to state a valid claim. Their alleged claim is one for contribution under Section 113(f)(1) and/or 113(f)(2) of CERCLA, 42 U.S.C § 9613(f)(1)-(2). The Late Claimants have not been sued by the EPA or any other agency for cleanup of the Site. Rather, they are parties to an "Administrative Order on Consent" under Section 106 of CERCLA issued by the EPA. The recent Supreme Court decision Cooper Industries, Inc. v. Aviall Services, Inc., 543 U.S. ___, 125 S.Ct. 577, 584 (2004), held that, to sue for contribution under Section 113(f)(1) of CERCLA, a party must previously have been sued in a "civil action" as stated in Section 113(f)(1). The Court left open the question of whether an administrative order under Section 106 of CERCLA qualifies as a "civil action" for purposes of Section 113(f)(1). See id. The recent case Pharmacia Corp. v. Clayton Chemical Acquisition LLC, 2005 WL 615755 (S.D. Ill. 2005) answered this question "no." Pharmacia also held that an administrative order on consent under CERCLA Section 106 did not qualify as a "settlement," and therefore established no ground for a contribution claim under Section 113(f)(2) of CERCLA, which authorizes contribution claims by a party to a "judicially or administratively approved settlement." As a result of these holdings, the court dismissed the plaintiffs' contribution claims. Here, the Late Claimants'

18

alleged contribution claim suffers exactly the same defects and should be dismissed for the same reasons.

### Conclusion

33.     Since (i) the Late Claimants have failed to establish that they were "known" creditors that were entitled to actual notice of the Bar Date; (ii) the Late Claimants have failed to argue any other basis for a finding of "excusable neglect;" and (ii) this Court has already determined that allowing the Late Claimants to file proofs of claim at this time (nearly two years after the Bar Date and while the Debtors are moving towards confirmation of a plan of reorganization) would be prejudicial to the Debtors' estates, the Court should enter an order denying the Motion.

19

WHEREFORE, for the foregoing reasons, the Debtors request that this Court enter an order that (i) denies the Motion and (ii) grants such other relief as the Court deems just and proper (a proposed order is attached as Exhibit B).

Respectfully Submitted:

Dated: April 25, 2005

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet S. Baer
James W. Kapp III
Samuel L. Blatnick
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

and

PACHULSKI, STANG, ZIEHL, YOUNG, JONES
& WEINTRAUB P.C.

Laura Davis Jones (Bar No. 2436)
David W. Carickhoff, Jr. (Bar No. 3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400

Co-Counsel for the Debtors and
Debtors in Possession

20

A-315

# EXHIBIT A

Map of Salt Lake City, Utah

Salt Lake City - Map of Utah

## Map of Utah . net Presents the best map of Utah



As illustrated in the maps on this website, the state of Utah is perhaps the world's most scenically and geologically region. Elevations in Utah range from 2,000 feet to over 13,000 feet above sea level. Much of western Utah is a p Great Basin desert. Southern Utah is a region with significant sections of sandstone and other rock formations. Th Mountains, part of the rocky mountains are a significant part of central and northern Utah. These maps will give y detail about each part of the state.

**Major Cities in Utah**    | Brian Head | Cedar City | Logan | Moab | Ogden | Page AZ | Provo | Salt Lake City | St. George | Vernal | Home      Cities C

**Parks in Utah**    | Arches National Park | Bryce Canyon National Park | Canyonlands National Park | Capitol Reef National Park | Dinosaur National Monument | Flaming Gorge NRA | Lake Powell | Glen Canyon NRA | Zion National Park | Home      Park D

### Utah Best Golf / Red Rock Golf Trail



Southern Utah Golf Course information including green fees and contact information. You'll also find links to hotels, dining, shopping, scenic attractions, maps, photo gallery, transportation, history, area activities and much more!...(Click Here)

### Bryce Canyon Country

Bryce Canyon Country is the place for great hikir mountain biking, fishing, horseback riding, back-exploring, ATV Riding, scenic aerial tours, and m more. Bryce Canyon Country is the most scenica diverse place in the world! - (Click Here)

**Adobe Acrobat Version (PDF)**                    **Macromedia Flash Ve**

Salt Lake City Levels: ■ General Map ■ Street Map □ Down Town Map



These maps may be printed for personal use, but may not be copied or utilized for any comercial purposes.

**Click for More Info about Utal**

A-317

16

1  got signed confidentiality agreements.  We supplied information
2  to the unsecured creditors' committee, the asbestos personal
3  injury committee, the futures representative, and the Libby
4  plaintiffs.  We had conferences with all of those parties, and
5  based on that nobody other than the PI committee filed an
6  objection and that, of course, objection has now been resolved,
7  so we would ask for entry of the order.
8          THE COURT:  Why don't you file one on a COC so that
9  it's clear on the record that, in fact, the parties who were
10 served have agreed.
11         MS. BAER:  We'll do so, Your Honor.
12         THE COURT:  All right.  Thank you.
13         MS. BAER:  Your Honor, we've also -- already talked
14 about item Number 7 and we'll file a COC with that.  That takes
15 us to item Number 8.  Item Number 8, Your Honor, is the motion
16 of PacifiCorp and Van Cott Bagley Cornwall for leave to file
17 late proofs of claim.  Counsel for the plaintiffs is here.
18         MR. COBB:  Good morning, Your Honor.  Richard Cobb on
19 behalf of the movants.  Your Honor, from an administrative
20 perspective, we were trying desperately to comply with the
21 court administrative procedures.  We contacted Rachel, and she
22 advised us that the Court would like to hear brief legal
23 argument.
24         Your Honor, as the Court is aware, on a motion to
25 late file claim, and particularly in this context with respect

17

1   to timing and notice and what the claimants believe should have
2   been done by the debtors, we believe this is a very
3   fact-specific inquiry that will -- justice will be served in
4   other words, Your Honor, by having a full evidentiary hearing
5   after the facts have been fully developed, the parties have had
6   an opportunity to exchange their versions of the facts and
7   perhaps come up with at least some stipulated facts to present
8   to the Court.  I know --
9           THE COURT:  Well, what's the nature of the this
10  claim?  Because the debtor seems to think the debtor doesn't
11  have an obligation to list PacifiCorp at all, that there is no
12  direct claim against the debtor, so what is the nature of the
13  claim?
14          MR. COBB:  Your Honor, the nature of the claim is
15  with respect to property damage that occurred at a specific
16  piece of real estate in Salt Lake City, Utah.  PacifiCorp was
17  an owner at various times of that property.  The property --
18  on the property, Intermountain operated a vermiculite
19  processing facility and the debtor has scheduled a claim with
20  respect to that -- this particular real estate address.  It's
21  PacifiCorp's position that it was a known creditor and,
22  therefore, deserved to receive actual notice of the bar date.
23  And that process whereby we would have -- the debtor should
24  have determined that we were a known creditor is very -- is
25  fact specific.

18

1          With respect to the Van Cott plan, likewise, it

2   believes it was a known creditor.  Van Cott disputes that it

3   ever received actual notice.  Your Honor may recall that in the

4   debtor's response the debtor claims that Van Cott did receive

5   actual notice of the bar date.  We're prepared to present

6   testimony that Van Cott did not receive that actual notice

7   because of a faulty address location, as well as a faulty

8   addressee, that is the bar date notice was sent to the Van Cott

9   law firm and not to the Van Cott 401(k) plan trustee.

10          And so, Your Honor, there are a number of facts here

11  that will drive the legal analysis.  Your Honor is aware, of

12  course, of the Chemtron case and the other cases that are cited

13  both by the movants and by the debtors in response, and they

14  all turn on, it seems to me, Your Honor, the Court taking a

15  look at all the factual evidence and then making a very case

16  specific determination as to whether or not the claim should be

17  permitted to be late filed.  And so I would suggest, Your

18  Honor, that the parties meet and confer.  When we're prepared

19  to request a hearing date from the Court, we'll contact Rachel.

20  We'll get that date.  And I think it's also appropriate perhaps

21  that we put in some sort of scheduling order so that this will

22  proceed forward in a structured fashion and make the most

23  efficient use of the Court's limited time.

24          THE COURT:  All right.  Well, it seems to me that

25  most of the facts ought to be able to be stipulated to.  I

J&J COURT TRANSCRIBERS, INC.

A-320

19

1 mean, I'm not sure --

2          MR. COBB:   Well --

3          THE COURT:   At some point, you may need some

4 discovery, but I'm not sure who's going to appear to do what in

5 the case.   I mean, if your affidavits are going to say you

6 didn't get the information and discovery doesn't show that you

7 did, why do I need a witness?   File an affidavit.

8          MR. COBB:   Well, Your Honor, affidavits are hearsay,

9 and unless the debtors concede those facts, which I sincerely

10 doubt they won't, an affidavit won't be sufficient, and so we'd

11 need to bring a witness in order to present --

12          THE COURT:   Well, that's fine.

13          MR. COBB:   -- their version.

14          THE COURT:   I'm talking about -- I'm sorry, I

15 misspoke I guess.   I'm talking about with respect to your

16 direct case, and then if there's a challenge the witness can be

17 available for cross examination if that's necessary.   But I'm

18 not even sure if you're doing appropriate discovery what type

19 of cross examination there is going to be.

20          MR. COBB:   But --

21          THE COURT:   What are you going to say?   We didn't get

22 it.   Okay.

23          MR. COBB:   I understand, Your Honor.   But we --

24 specifically with respect to PacifiCorp, PacifiCorp maintains

25 the position that with a simple inquiry it would have taken

20

1  several minutes at no cost to the debtors.  The debtors could

2  have determined that PacifiCorp was the present owner of the

3  property at or about the time that the bar date motion should

4  have been served on the owner of that property.

5            THE COURT:  Well, I don't --

6            MR. COBB:  And that would --

7            THE COURT:  Okay.  If that's the issue, I have not

8  dealt with that issue of what inquiry notice the debtor has to

9  make, as opposed to listing the claims that the debtor had as

10 of the date that the case was filed.  It seems to me that when

11 claims are transferred it's the creditor's obligation to make

12 sure that the appropriate notices are filed with the Court, not

13 the debtor's obligation to go seek out an issue as to whether

14 or not a creditor transferred a claim that it held

15 pre-petition.  So, if I'm incorrect, give me some cases that

16 show me that.  Otherwise, I don't know that the debtor has that

17 inquiry notice.  If you've got cases that tell you -- tell me,

18 then, please, give me a brief.  I have not had to look at that

19 issue.

20           MR. COBB:  Your Honor, we would be -- we'd be pleased

21 to present the Court with briefing on this.  Your Honor, this

22 is not a claim transfer situation.  PacifiCorp believes it did

23 hold this claim, that there was no transferring among creditors

24 for pecuniary interests or otherwise of this claim.  However,

25 and I won't belabor the point, Your Honor, but we do believe

21

1 that the cases instruct the Court that beyond the debtor's

2 books and records may be appropriate under certain

3 circumstances. And I do appreciate hearing the Court's

4 leanings in that respect, but we do believe --

5        THE COURT: I don't have any leanings. I'm asking a

6 question.

7        MR. COBB: I understand, Your Honor. Your Honor,

8 well, then I'll provide you the answer the movants would like

9 you to hear, and that is we do believe that in certain

10 circumstances, based upon the facts of a particular case in

11 dispute that the debtors have an obligation to go beyond the

12 mere papers, the mere books and records that they have before

13 them, and this is just that sort of case. But that will turn

14 on, again, either the debtors accepting that it would have been

15 at virtually no cost if not -- zero cost to the debtors' estate

16 to simply place a phone call to a local abstract company in

17 Salt Lake City, based on a property address where they had

18 scheduled a claim, to determine the present owner. So, we

19 could have that --

20        THE COURT: Okay. Yes, I do definitely want a brief,

21 because it seems to me that unless that present owner was the

22 same owner pre-petition that it's the creditor, i.e. the

23 owner's burden to make sure that the interest is transferred of

24 record on the Bankruptcy Court dockets. And it's -- a proof of

25 interest is the same as a proof of claim in that regard. So I

22

1  don't think the debtor has that inquiry notice, particularly

2  when there are something like 450,000 creditors involved in a

3  case.  So -- but if I'm wrong and if there in fact is case law

4  to show me that, then please set it out.  I haven't had to look

5  at that issue.

6      MR. COBB:  Thank you, Your Honor.  We would suggest

7  it's not several hundred thousand here.  There are certain

8  limited sites that the debtor would have perhaps had to make

9  this sort of inquiry, at minimal cost and minimal time.  But,

10 Your Honor --

11     THE COURT:  Maybe, but it seems to me that that's

12 splitting hairs because as soon as I require it for the debtor

13 for one property or one creditor, then why don't they have it

14 for everybody else?  And I believe that the Code specifically

15 imposes on the creditors and the interest holders the burden to

16 transfer -- to file the notices of those transfers.  So I think

17 you're not going to win on that score.  But like I said, I

18 haven't seen cases to the contrary, so if they're out there

19 give them to me.  I want to read them and analyze them.

20     MR. COBB:  Thank you, Your Honor.  We will certainly

21 do our best to persuade you in the papers.  And we will contact

22 chambers when it's appropriate to seek an evidentiary hearing.

23 Is that --

24     THE COURT:  Well, I think what I would like is to get

25 -- first of all, to hear from the debtor.  If the debtor agrees

J&J COURT TRANSCRIBERS, INC.

A-324

23

1  that some discovery is necessary, then I'd like a schedule for
2  discovery.  I'd like a pretrial conference that will be set at
3  which the issues will be identified first, because before I set
4  an evidentiary hearing I want to find out what is agreed, what
5  isn't agreed, how much time it's going to take.  I definitely
6  will ask that you present your cases in chief by affidavit and
7  have witnesses available for cross examination.  So, let's lay
8  out that process first.  Ms. Baer?

9         MS. BAER:  Your Honor, I'm actually a little
10 surprised that Mr. Cobb thinks we need the kind of evidentiary
11 hearing he's suggesting.  I thought this was a little more
12 straightforward than that.  Your Honor, this is apparently a
13 potential environmental claim that the owners of some property
14 have against W.R. Grace.  Your Honor, Grace never owned this
15 property.  Grace never owned the operating facility on the
16 property.  Grace never owned the adjacent land.  Grace supplied
17 vermiculite to Intermountain Insulation Company, and
18 Intermountain Insulation Company was its only contact with
19 respect to this property.  Grace did schedule Intermountain
20 Insulation Company as a creditor, did give them notice of the
21 bar date.  We did not know of PacifiCorp nor did we know of Van
22 Cott Bagley and did not, therefore, list them with respect to
23 being a creditor related to anything to do with the
24 Intermountain liability.

25         We did, however, again give actual notice to

25

1 | EPA's proof of claim as a site that they were looking into.

2 | Your Honor, I think the case law that we've cited in
3 | our brief makes it very clear, under <u>Chemtron</u> we do not have a
4 | duty to provide adjacent landowners or a duty to provide people
5 | who are nearby the vicinity of a -- of even the site that Grace
6 | owns with actual notice of a bar date. And we certainly don't
7 | have the obligation under the <u>Bicoastal</u> Authority to search out
8 | successors in interest, and under <u>Mullane v. Central Hanover</u>
9 | <u>Bank</u>, Your Honor, we do not have to conduct an impractical and
10 | extended search to find all potential creditors of Grace. We
11 | just have to notify those that are reasonably ascertainable,
12 | and in that respect we notified our customer. That's who we
13 | know may have a claim against us.

14 | Your Honor, under this case law we believe the notice
15 | was adequate and that the bar date order very clearly provides
16 | that these kinds of unknown claimants are barred by the
17 | publication notice. Your Honor, the standard for them is
18 | excusable neglect, and they have not said anything in their
19 | papers vis-a-vis excusable neglect. What they've said is we
20 | should have given them actual notice. Obviously our position
21 | is that they were not entitled to actual notice. We don't have
22 | an obligation under the case law to do that, and we have
23 | already cited that case law in our responsive brief.

24 | In addition, Your Honor, they did actually have
25 | actual notice that Grace was in Chapter 11. They had actual

26

1 notice of the bar date, for different reasons, for different
2 claims, not these. But they certainly were on notice. And you
3 add that to the $4 million that we spent to publish notice to
4 the world, and we believe, Your Honor, that the bar date order
5 is very clear and that they're barred.

6 Your Honor, again, their standard is to prove that we
7 won't be prejudiced. That's not case here, Your Honor. This
8 really puts at issue our publication notice. It puts at issue
9 the validity of publication notices and spending this kind of
10 money to do this extended kind of a program to let the world
11 know and bring unknown claimants forward to file their proof of
12 claim by the bar date. We complied with the Court's rules and
13 under the Court's order, their claim should be barred.

14 I don't quite understand why the kind of discovery
15 that's being requested here is necessary. They knew they owned
16 the property. We didn't know that. We knew that we sold
17 vermiculite to our customer. We notified our customer, and we
18 published notice to everybody else telling them if they think
19 they have a claim against Grace, step forward and file that
20 claim by the bar date.

21 This isn't the first time you've had to deal with a
22 late proof of claim, Your Honor, and there's nothing that
23 particularly unique about this the circumstances. For the same
24 reasons that you've denied late proofs of claim before here, we
25 believe you have sufficient evidence right now to deny the

27

1  filing of the late proof of claim.

2          THE COURT:  Well, I'm still not clear how there is

3  even a claim against this estate by these entities.  What

4  you're telling me is that the debtor had a relationship with

5  Intermountain by which it supplied Intermountain vermiculite.

6  Intermountain was actually the entity that had possession of

7  the property that's owned by Pacific, not the debtor.

8          MS. BAER:  That's exactly correct, Your Honor.

9          THE COURT:  Well --

10         MS. BAER:  We don't know -- we don't know either, and

11 now they want the right to file something.  That's our

12 position, that they're barred.

13         THE COURT:  Mr. Cobb, I don't see -- number one, I'm

14 not sure I see a claim, but even if I do, I don't see how the

15 debtor has any duty to search out your client under these

16 circumstances.

17         MR. COBB:  Your Honor, Richard Cobb again.  Well,

18 Your Honor, let's start with the simple fact that we're not

19 dealing with adjacent property, like the cases that are cited

20 by the debtors, and we're not dealing with personal injury

21 claimants.  We're dealing with property, the identical

22 property, that was owned by PacifiCorp and the Van Cott plan.

23         THE COURT:  But they debtor wasn't in possession of

24 it.

25         MR. COBB:  But the debtor --

28

1    THE COURT:  The debtor's customer was in possession

2 of it.

3    MR. COBB:  That's correct, Your Honor, but the debtor

4 put into the marketplace and the debtor knowingly shipped to

5 that location products which ended up, we allege, contaminating

6 that soil, which has resulted in significant monetary claims

7 being asserted by --

8    THE COURT:  No, that's too attenuated.  I'm sorry.

9 It's just too attenuated.  If anything, as the owner of that

10 property your client certainly had the duty to make sure that

11 it was aware of the bar date.  If it knew that Intermountain

12 was getting vermiculite from some source other than the

13 property itself, then it had a duty to seek that out and

14 determine whether or not it should file a claim here.  So, as

15 to that one, I see no basis.  I'm not permitting discovery.

16 I'm simply going to deny the late proof of claim.  This debtor

17 is well on the road toward trying to get a confirmable plan

18 together.  Having late filed claims at this point in time will

19 jeopardize that process.  It will certainly change

20 distributions to other creditors within certain classes.  The

21 claim itself seems to be highly attenuated.  I'm not even sure

22 there is an allowable claim against the estate, but I don't

23 need to go there at this point in time because obviously that's

24 not at issue today.  The only question today is whether the

25 claim should be permitted to be filed at all.  But I don't see

29

1   a basis for it.

2        MR. COBB:  Your Honor, I would respectfully request

3   that we be given an opportunity to present the factual evidence

4   to the Court.  The case law directly states, Your Honor, that

5   the Court is to make a factual investigation of the nature of

6   the reason why the claims were not filed timely.  Your Honor,

7   you -- Your Honor, the Van Cott plan did not have notice of the

8   bar date.  Your Honor, Van Cott plan did not even have a claim

9   that it knew that it could lodge against this debtor until well

10  after the bar date.  The Van Cott is a little different

11  factually.  With respect to PacifiCorp, PacifiCorp, under its

12  trade name, Utah Power & Light, filed something like a fifteen

13  hundred dollar claim relating to electricity, as I understand

14  it.

15       THE COURT:  That's enough isn't it?

16       MR. COBB:  Your Honor, due process requires that my

17  client had been given notice of the bar date --

18       THE COURT:  No, it doesn't.  Due process --

19       MR. COBB:  -- not general notice of the bankruptcy.

20       THE COURT:  No, due process requires that if your

21  client was a creditor known to the debtor that it had -- that

22  it get actual notice, but your client, at this point in time,

23  I'm not even convinced -- I'm talking about Pacific at the

24  moment.

25       MR. COBB:  Correct.


**J&J COURT TRANSCRIBERS, INC.**

30

1        THE COURT:  I'm not convinced is a creditor of the

2   debtor, number one.  Number two, the debtor had no direct

3   relationship with Pacific.  It wasn't leasing property from

4   Pacific.  It wasn't dealing with Pacific in any kind of

5   customer capacity.  You've already said this isn't a personal

6   injury action.  Therefore, how is the debtor ever to know that

7   it has -- I mean, under that theory, everybody in the world

8   could potentially have a claim against the debtor, and the

9   debtor would have to notify every single person, entity,

10  company in the entire world that it may have a claim based on

11  some third-party transaction.  That's too much.  That's not

12  what the Code requires.  That's what the publication notice is

13  all about.  Under these circumstances, Grace did widespread

14  publication.  This is an -- if it's a creditor at all, it's a

15  clearly unknown creditor.  That publication notice as to

16  Pacific is sufficient, and I don't need any further factual

17  investigation on that score.  So that claim -- the motion as to

18  that is denied.  Now, what's the difference between Pacific and

19  Van Cott?

20       MR. COBB:  Your Honor, with respect to Van Cott, Van

21  Cott did not even know that it had a claim against the debtors

22  until well after the bar date, number one.  Number two, Van

23  Cott would provide evidence that it never received notice of

24  the bar date.  In fact, I believe Van Cott had knowledge of the

25  bankruptcy, but it may have.  I can't sit here today, Your

A-331

31

1  Honor, and provide testimony as a lawyer in that respect.  But

2  I can tell you that they would be prepared to testify they

3  never received notice of the bar date, so they never had actual

4  notice in that respect.

5      THE COURT:  Okay.  And the debtor's affidavits

6  indicate that, in fact, they were served, that actual notice

7  was provided --

8      MR. COBB:  The debtor's affidavits indicate, Your

9  Honor, that Van Cott, the law firm, was served at a certain

10  address, an incorrect address, and therefore they claim they

11  received actual notice.  And Van Cott would claim in response,

12  would respond by saying that the address was incorrect, it did

13  not contain the suite number of the law firm, that it should

14  have been addressed to the plan trustee, the 401(k) plan

15  trustee, because that is the claimant here, and therefore --

16  and following on that, they never received actual notice.

17      THE COURT:  All right.  Ms. Baer?

18      MS. BAER:  Your Honor, with respect to the last

19  point, our certificate of service shows that Van Cott Bagley

20  Cornwall was served at 50 South Main Street, Salt Lake City,

21  Utah.  The claimant here who filed this motion, Van Cott

22  Bagley, Cornwall, McCarthy, is located at 50 South Main Street,

23  Salt Lake City, Utah.  That law firm who filed this motion got

24  served with the bar date notice.  But, Your Honor, I'm not --

25  we didn't even have to serve them.  They are in exactly the

J&J COURT TRANSCRIBERS, INC.

32

1 same position as PacifiCorp. Van Cott 401(k) plan apparently

2 was also in the title of ownership of this site at one time.

3 For the same reason we didn't have to serve PacifiCorp, we

4 didn't have to serve Van Cott. They're another unknown owner

5 who apparently is somewhere in the chain of title with respect

6 to this real property. For the same reasons we didn't have to

7 serve PacifiCorp, we didn't have to serve them. They were an

8 unknown owner, an unknown claimant, and just -- the publication

9 to them is just as applicable as the publication notice to

10 PacifiCorp.

11          THE COURT: Okay. Mr. Cobb?

12          MR. COBB: Your Honor, I applaud counsel's acumen to

13 stand up and simply say it's the same argument. She's right.

14 I mean, if the Court has made a finding today before we've had

15 an opportunity to present all of our factual evidence that we

16 are not entitled -- that the debtor did not have any inquiry

17 obligation outside of simply listing in its schedule the claim

18 with respect to its known customer then, if that's the Court's

19 ruling, then assuming that Van Cott was entitled to receive

20 actual notice then its claim also cannot be filed late. And,

21 Your Honor, I have to say again I believe that all of the facts

22 should be put before the Court with respect to what type of

23 inquiry and what type of investigation and then notice the

24 debtor should have given. Forget the publication notice --

25          THE COURT: Why don't you give me a brief first on

33

1  the -- on whether or not the debtor has to do this type of

2  inquiry at all, because I still have some -- and even if the

3  debtor does, how the creditor can get around showing prejudice

4  even if the debtor doesn't do it when the creditor or interest

5  holder has an obligation under the Bankruptcy Code to file

6  transfers of interest.

7       MR. COBB:  I understand that, Your Honor.  We'd be

8  glad to do that, and I'll confer with counsel with respect to

9  timing on that.

10       THE COURT:  No --

11       MR. COBB:  It should not be a lengthy period of time.

12       THE COURT:  All right.  Then what I will do is take

13  an order that requires a brief on a certification of counsel

14  that sets out a briefing schedule on the issue of debtor's

15  inquiry notice obligation to find a current owner of a property

16  which debtor does not lease and does not use versus the

17  creditor or interest holder, whichever you choose, obligation

18  to file the transfer of claim or proof of the claim timely.  I

19  will take a look at whatever cases you've given me.  If there

20  are no cases that tell me that the debtor has this inquiry

21  notice, you already know my rulings.  I find that this is

22  prejudicial.  It's too little too late.  I don't see any

23  excusable neglect.  Number one, I'm not even sure excusable

24  neglect has been laid out.  Maybe I should clarify.  You don't

25  seem to be basing the argument on excusable neglect.  You seem

34

1 to be basing the argument on the fact that these two entities

2 have the right to actual notice, whereas all they had was

3 constructive notice, in your view.

4          MR. COBB:  Your Honor, first of all, we dispute that

5 they ever had constructive notice of the bar date --

6          THE COURT:  Well the --

7          MR. COBB:  -- number one.

8          THE COURT:  Certainly that's difficult to dispute

9 with all the publication almost worldwide in the case.  Surely

10 they had constructive notice.

11         MR. COBB:  Your Honor, we believe the law is clear

12 that if they're entitled to actual notice they're entitled to

13 actual notice.

14         THE COURT:  Okay.

15         MR. COBB:  In this instance, Your Honor, the failure

16 to provide actual notice allows the relief that we are

17 requesting.  And whether that's described as --

18         THE COURT:  That's what I'm saying.

19         MR. COBB:  Your Honor, whether that's described as

20 excusable neglect, we -- our neglect for -- our failure to file

21 is excusable because we didn't receive actual notice or it's

22 described as a due process issue we believe that, Your Honor,

23 we are entitled to the relief.  And so, Your Honor, we're happy

24 to brief this and provide the Court with whatever case law we

25 can that supports our position --

1           THE COURT:  All right.  That's fine.

2           MR. COBB:  -- and we'll do so relatively quickly.

3           THE COURT:  I'll take the brief.  Ms. Baer, is the

4   debtor going to respond?

5           MS. BAER:  Yes, Your Honor, we will take the

6   opportunity to respond.

7           THE COURT:  Okay.  I will take this matter under

8   advisement.  I do not think I need an argument.  I understand

9   the issue.  I just want to take a look at whatever cases you've

10  got, so I will take it -- no brief is to exceed 20 pages.

11          MR. COBB:  Thank you, Your Honor.

12          MS. BAER:  Thank you, Your Honor.

13          THE COURT:  And you'll submit an order that will set

14  out the schedule on a COC?

15          MS. BAER:  We will, Your Honor.

16          THE COURT:  All right.

17          MS. BAER:  I'll talk with Mr. Cobb and we'll work

18  that out.

19          THE COURT:  Thank you.

20          MS. BAER:  Your Honor, that takes us to the various

21  claims objections.  With respect to item Number 9, the fourth

22  omnibus claims objections, we have another order that simply

23  continues the few remaining contested matters.

24          THE COURT:  I'm sorry, what agenda number are you up

25  to?

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                          ) Chapter 11
                                )
W.R. GRACE & CO., et al.,       ) Case No. 01-01139 (JKF)
                                )
Debtors.                        ) (Jointly Administered)
                                )

## ORDER ~~GRANTING~~ DENYING PACIFICORP AND THE VANCOTT BAGLEY CORNWALL & MCCARTHY 401(K) PROFIT SHARING PLAN'S MOTION FOR LEAVE TO FILE LATE PROOFS OF CLAIM

THIS matter coming before the Court on the Motion of PacifiCorp and the VanCott Bagley Cornwall & McCarthy 401(k) Profit Sharing Plan (the "VanCott Plan") pursuant to 11 U.S.C. § 105(a) and Rule 9006(b) of the Federal Rules of Bankruptcy Procedure, for leave to file a late proof of claim (the "Motion"); and the Court having reviewed the Motion and all other pleadings related thereto, and otherwise being fully advised in the premises of the Motion; and the Court having found that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (ii) this is a core matter pursuant to 28 U.S.C. § 157(b), (iii) Notice of the Motion was sufficient under the circumstances, and (iv) good cause exists to grant the relief requested by the Motion, now, therefore, for the reasons more fully set forth in the record of the hearing on the Motion,

IT IS HEREBY ORDERED THAT:

1.     The Motion is ~~GRANTED~~ DENIED; and

2.     ~~PacifiCorp and the VanCott Plan are hereby allowed thirty days (30) from the date of the entry of this Order to each file a proof of claim with the Debtors' claims agent, Rust~~

*The Court has reviewed the briefs, response briefs, reply brief, all exhibits and considered the arguments of*

counsel. The court agrees with and adopts ⊕

~~Consulting, Inc., which claims shall be deemed timely filed notwithstanding the Bar Date of~~

~~March 31, 2003, previously set by this Court.~~

Signed this _20_ day of _Sept_ , 2005.

⊕ the reasoning in Debtor's Brief (D.I. 7746) and Response (D.I. 8283). Excusable neglect has not been established.

HON. JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

2

SEP-22-2005  08:52 FROM:JKF        412644544B        TO:INTUITY FAX        P.3/3