## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| W. R. Grace & Co., *et al.*, | Chapter 11 |
| Debtors. | Case No. 01-01139 (JKF) Jointly Administered |
| Pacificorp and the VanCott Bagley Cornwall & McCarthy 401(k) Profit Sharing Plan, | Case No. 05-764 (RLB) |
| Appellants, | On Appeal from an Order of the United States Bankruptcy Court for the District of Delaware in Case No. 01-01139 (JKF) |
| v. | Re: Docket Nos. 3 and 4 |
| W. R. Grace & Co., *et al.*, | |
| Appellees. | |

## APPENDIX TO BRIEF OF APPELLEES

Counsel for the Appellees:
David M. Bernick, P.C.
Janet S. Baer
James W. Kapp III
Lori Sinanyan
**KIRKLAND & ELLIS LLP**
200 East Randolph Drive
Chicago, Illinois 60601
Telephone: (312) 861-2000
Facsimile: (312) 861-2200

and

Laura Davis Jones (#2436)
James E. O'Neill (#4042)
**PACHULSKI, STANG, ZIEHL, YOUNG JONES & WEINTRAUB PC**
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Dated: December 14, 2005

# TABLE OF CONTENTS

Debtors' Objection to Pacificorp and the Vancott Bagley
    Cornwall & McCarthy 401(k) Profit Sharing Plan's Motion
    for Leave to File Late Proofs of Claim ........................................................................B-01

In re Comdisco, Inc.,
    2003 WL 685645, at *8 (N.D. Ill. 2003)...........................................................................B-52

In re Trump Taj Mahal Assoc.,
    1993 WL 534494 at *6, fn. 7 (D.N.J. 1993) ....................................................................B-59

In re Nam,
    1993 WL 436026, at *1, fn. 3 (E.D. Pa. 1993) ................................................................B-65

In re Gordon,
    1996 WL 673169, at *3 (Bankr. N.D. Ohio 1996)...........................................................B-67

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | | Re: Docket No. 7571 |

## DEBTORS' OBJECTION TO PACIFICORP AND THE VANCOTT BAGLEY CORNWALL & MCCARTHY 401(K) PROFIT SHARING PLAN'S MOTION FOR LEAVE TO FILE LATE PROOFS OF CLAIM

This Court should deny *Pacificorp and the Vancott Bagley Cornwall & McCarthy 401(k)*

*Profit Sharing Plan's* ("Vancott" and, together with Pacificorp, the "Late Claimants") *Motion for*

*Leave to File Late Proofs of Claim* (the "Motion").[2]  The Late Claimants argue that they are

---

[1]  The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

[2]  The Late Claimants have filed a joint-motion for leave to file late proofs of claim.  As described further herein, the relevant facts concerning notice differ with respect to each of the Late Claimants, and the Late Claimants are not legally-affiliated entities.  Therefore, the Court should consider the merits of the Motion separately with respect to each of the Late Claimants.

---

entitled to file late claims because they did not receive adequate notice. This is not accurate. Both of the Late Claimants were "unknown" creditors and, therefore, the Debtors had no duty to provide them with actual notice of the Bar Date. Instead, the Debtors' Court-approved publication-notice constituted sufficient notice for each of the Late Claimants. Further, despite the Late Claimants' assertion to the contrary, Vancott received *actual notice* of the Bar Date. And, Pacificorp admits that it knew the Debtors were in bankruptcy well before the Bar Date, and it even filed a proof of claim nearly two years before the Bar Date.

Since notice was sufficient with respect to each of the Late Claimants, and the Late Claimants have cited no other reason for allowing their late claims, the Late Claimants have failed to demonstrate that the present situation falls within Rule 9006(b)(1)'s exception for tardy claims. In fact, neither of the Late Claimants have established any *neglect* for their failure to file timely claims, let alone *excusable neglect*. Moreover, courts have cast doubt on whether unknown claimants can ever challenge the merits of constructive notice. Therefore, even if the Late Claimants were to establish some sort of neglect, it would be extremely difficult (if not impossible) for them to prove that such neglect was "excusable."

Further, allowing either of the Late Claimants to file late proofs of claim would set a detrimental precedent in this case, as it would (i) open the floodgates for more prospective, late claims and (ii) tend to render the Debtors' publication notice meaningless. This is a matter of particular concern at the current stage of the Debtors' cases. The Debtors filed their first *Plan of Reorganization* on November 14, 2004 (and their *Amended Joint Plan of Reorganization* on January 13, 2005), and are currently working diligently with the various constituent groups toward confirmation. Therefore, the Debtors request that the Court enter an order denying the Motion and granting any other relief that the Court deems appropriate.

2

## FACTS AND BACKGROUND

1.      From 1940 until about 1984, the Debtors sold vermiculite to Intermountain
Insulation Co. ("Intermountain").  Intermountain processed the product at 333 W. First Street,
Salt Lake City, UT (the "Site"), and then Intermountain sold the product.  Contrary to what is
stated or suggested in the Motion, the Debtors (a) never operated or arranged for the operation of
the Site or adjacent land; (b) never owned, leased, or otherwise held any ownership interest in the
Site or adjacent land; (c) never owned, leased, or otherwise held any ownership in any business
carried on at the Site or adjacent land; and (d) never permitted sale of Site product under the
Grace name.[3]

2.      According to the Motion, Pacificorp owned the Site from 1944 until 1954, and
repurchased it in 1984.  According to the Motion, Vancott purchased a part of the "Subject
Property" in 1979, sold a portion of the "Subject Property" to Pacificorp in 1984, and sold the
remainder of its Subject Property in 1998.[4]

3.      On April 2, 2001 (the "Petition Date"), the Debtors filed for bankruptcy under
chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code").  Pursuant
to section 362 of the Bankruptcy Code, the automatic stay immediately prohibited the
commencement of any actions against the Debtors.

---

[3] Intermountain did hold licenses from Grace's predecessor for a processing technique and the
"Zonolite" name.

[4] The Motion defines "Subject Property" to include both Site property and adjacent property,
and it states that Vancott owned a portion of the Subject Property.  It is left unclear in the Motion
whether the Subject Property owned by Vancott included all, none, or part of the Site.  See
Motion at pg 1.

3

4.      On May 2, 2001, Pacificorp received notice of the Debtors' chapter 11 filing

under its Utah Power & Light trade name.[5]  On May 16, 2001, Pacificorp filed a proof of claim

under its trade name for utility services.

5.      On June 27, 2001, the Debtors filed their *Motion for Entry of Case Management

Order, Establishment of a Bar Date, Approval of the Proof of Claim Forms and Approval of the

Notice Program* (the "Bar Date Motion").

6.      During the course of the following ten months, the Debtors worked with every

official committee in these cases, as well as this Court, to craft the Bar Date Notice, the Bar Date

Notice Package and a comprehensive system of publication of the Bar Date Notice (collectively,

the "Bar Date Notice Program") that would ensure (with a high degree of probability) that every

affected party was aware of the existence of the Bar Date, the scope of the Bar Date, and the

process for filing a proof of claim.  The Debtors filed successive versions of the Bar Date Motion

during the course of this lengthy process.  In addition, this Court received and considered

multiple responses from all of the official committees in these bankruptcy cases.

7.      By order dated April 22, 2002 (the "Bar Date Order"), the Court approved the Bar

Date Notice Program and set March 31, 2003 (the "Bar Date") as the last date for filing proofs of

claim for (i) Non-Asbestos Claims, (ii) Asbestos Property Damage Claims and (iii) Medical

Monitoring Claims (each of which is defined in the Bar Date Order).  Of particular note, the Bar

Date Order states as follows:

> ORDERED that notice of the entry of this Order and of the Bar Date to unknown
> claimants pursuant to the Debtors' Bar Date Notice Plan for Asbestos Property

---

[5] According to Pacificorp's web site, Pacificorp, "operates ... as Utah Power in Utah and Idaho."
Pacificorp Home Page, which is available at http://www.pacificorp.com (a printed version of the
Pacificorp Home Page is attached as Exhibit A).

> Damage Claims and Other Claims (the "Notice Plan"), as modified, and filed on April 12, 2002, shall be deemed good, adequate and sufficient notice of the Bar Date ...

Bar Date Order at pg. 5 [Docket No. 1963]. Once the detailed proof of claim forms were approved and the Bar Date Order was entered, Grace spent *over $4 million* to publish the Bar Date Notice.

8.    On January 14, 2005, almost two years after the Bar Date had passed, the Late Claimants filed the Motion. The Motion seeks leave from the Bar Date Order so that each of the Late Claimants may file late proofs of claim on account of "environmental cleanup costs" incurred and to be incurred to cleanup the Site and the adjacent Land. For the reasons set forth herein, the Motion should be denied.

## ARGUMENT

### A.    The Debtors Had no Duty to Provide Actual Notice to Either of the Late Claimants

9.    The Late Claimants were each "unknown" creditors and, therefore, they were not entitled to receive actual notice. The Supreme Court of the United States has stated that a "known" creditor is one whose identity is either "known or reasonably ascertainable by the debtor." Tulsa Professional Collection Serv., Inc. v. Pope, 485 U.S. 478, 490 (1988). An "unknown" creditor is one whose "interests are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to knowledge [of the debtor]." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 317 (1950). A creditor's identity is "reasonably ascertainable" if that creditor can be identified through "reasonably diligent efforts." Mennonite Bd. Of Missions v. Adams, 462 U.S. 791, 798 n.4 (1983). The U.S. Court of Appeals for the Third Circuit (the "Third Circuit") has held that "reasonable diligence" does not require "a vast, open-ended investigation. The requisite search

5

instead focuses on the debtor's own books and records. Efforts beyond a careful examination of these documents are generally not required." Chemetron Corp. v. Jones, 72 F.3d 341, 346-47 (3d Cir. 1995) (internal citations and quotes omitted).

10.     Several courts have held that chapter 11 debtors that own (or previously owned) allegedly contaminated property have no obligation to provide adjacent land-owners with actual notice of a claims bar date, because chapter 11 debtors have no obligation to undertake an ancillary investigation to locate such parties. For example, in Chemetron Corp. v. Jones, the Third Circuit found that parties who either resided at or visited addresses in proximity to a nuclear waste-dump maintained by a chapter 11 debtor were not "known creditors," to whom debtor had to provide actual notice of its bankruptcy case and of bar date for filing proofs of claim. Id. Similarly, in In re Texaco Inc., 182 B.R. 937, 954-55 (Bankr. S.D.N.Y. 1995), the court found that the owner of land adjacent to a chapter 11 debtor was an "unknown" claimant.

11.     Furthermore, courts have also found that chapter 11 debtors have no duty to search out successors-in-interest to property, for purposes of providing them with actual notice of a claims bar date. In In re Bicoastal Corp., 147 B.R. 807 (Bankr. M.D. Fla. 1992) (attached as Exhibit B), the court held that the claimant, which (i) owned property downstream from property that was formerly owned by the chapter 11 debtors and (ii) claimed that its property was environmentally damaged because of actions of the debtor on debtor's property, failed to establish "excusable neglect" for the allowance of a late proof of claim. The court based this decision upon its determination that the potential claimant was not a "known creditor" of the debtor, because "[d]ue process requirements do not dictate that the Debtor must conduct such an 'impracticable and extended' search for all potential creditors." Id. at 809, citing Mullane, 339 U.S. at 317-18. Instead, the court found that the debtor's publication notice, which was

6

reasonably calculated to provide the claimant with notice of the bar date, was sufficient. <u>See</u> <u>In re Bicoastal Corp.</u>, 147 B.R. at 809.

      12.    Under these standards, the Late Claimants were each "unknown creditors." The Debtors did not have any dealings with either of the Late Claimants in connection with the Site or adjacent land. Indeed, the Debtors merely sold product to a customer that operated at the Site. A search of the Debtors' books and records would not have uncovered either of the Late Claimants as creditors with respect to the Site or adjacent land. Due process does not require that the Debtors should be compelled to use the estates' resources to identify and serve every entity that owned property (and the property adjacent to) where the Debtors' products were used by independent third-parties. Such an expansive investigation does not constitute "reasonable diligence" and is not required by the applicable caselaw. <u>See</u> <u>Chemetron Corp. v. Jones</u>, 72 F.3d at 346-47.

      13.    The Late Claimants' position is even *less-persuasive* than the *losing* arguments raised in the aforementioned cases. *First*, in <u>Chemetron</u>, <u>Texaco</u>, and <u>Bicoastal</u>, the debtors *owned* the property where the alleged contamination occurred. Here, however, the Debtors connection to the Late Claimants is even more attenuated. The Debtors never owned, operated, leased or had any other legal rights in the Site or adjacent land -- they merely sold vermiculite concentrate to the operators of the Site license. *Second*, in <u>Bicoastal</u>, the creditor did not have knowledge of the debtor's bankruptcy case until after the claims bar date. <u>See</u> <u>id</u>. The court, however, still found that the debtor had no duty to provide actual notice and held that the claimants were prohibited from filing a late proof of claim. In this situation, both of the Late Claimants knew of the Debtors' bankruptcy, and Vancott even received actual notice of the Bar Date.

7

14.     The Motion notes that the Debtors scheduled (on Schedule F) a contingent, disputed, unliquidated environmental claim for Intermountain Insulation Co., which is located at the Site. The Debtors scheduled this claim because the Debtors sold processed vermiculite to Intermountain, and the U.S. Environmental Protection Agency has argued that there were releases or threatened releases of hazardous substances at the Site. Since the Debtors sold vermiculite to Intermountain, the Debtors knew that Intermountain may possess a claim against the Debtors and, therefore, Intermountain was a "known" claimant. As a result, the Debtors' gave Intermountain actual notice of the Bar Date. See Affidavit of Service (attached as Exhibit C). As previously established, the Debtors, however, had no previous dealings with either of the Late Claimants in connection with the Site or adjacent land, and the Debtors were unaware of the Late Claimants interests in the Site or adjacent land. Therefore, the Debtors did not list the Late Claimants as potential creditors in the Debtors' records, and the Debtors did not schedule either of the Late Claimants as creditors for the Site or adjacent land.

15.     Under the legal standard established in Mullane and Chemetron, the Debtors had no duty to undertake an ancillary investigation to determine whether either of the Late Claimants may possess claims and, therefore, the Late Claimants were "unknown" creditors that were not entitled to actual notice. See Chemetron Corp. v. Jones, 72 F.3d at 346-47; Mullane v. Central Hanover Bank & Trust Co., 339 U.S. at 317.

**B.      The Debtors' Publication Notice was Legally Sufficient for Both Late Claimants**

16.     Because the Late Claimants were unknown creditors with respect to the Site and adjacent land, the Debtors' extensive publication notice constituted legally sufficient notice of the Bar Date with respect to each of the Late Claimants. See Chemetron, 72 F.3d at 348 ("Having held that claimants were 'unknown' creditors, we have little difficulty holding that the notice which Chemetron published in the *New York Times* and the *Wall Street Journal* was

8

sufficient. It is well established that, in providing notice to unknown creditors, constructive

notice of the bar claims date by publication satisfies the requirements of due process").

17.    In Chemetron, the Third Circuit found that Chemetron's publication notice, which

included publication in *New York Times, The Wall Street Journal*, and various local publications,

was legally sufficient. See Chemetron 72 F.3d at 348. The Debtors' publication notice far

exceeded this standard. In particular, the Debtors (i) engaged a specialist to study the

demographic readership of various publications and to assemble a stable of publications; and (ii)

ultimately spent over $4 million dollars to publish the Bar Date Notice in those publications,

which included (by way of example) *People Magazine, Parade Magazine, The New York Times*,

*Playboy,* and *The Wall Street Journal,* so that an estimated 83.8% of Americans saw the Bar

Date Notice. See Excerpts of Transcript from April 22, 2002 Omnibus Hearing before the

Honorable Judith K. Fitzgerald United States Bankruptcy Judge, 94 (attached as Exhibit D). The

Debtors also published the Bar Date Notice locally in Salt Lake City (in *The Tribune & Desert*

*News*).

18.    Further, the Bar Date Order specifically states that the Debtors' publication notice

was legally sufficient with respect to unknown claimants. See Bar Date Order at pg. 5. This

determination resulted from extensive debate between various constituent groups. During the

course of the Debtors' April 2002 omnibus hearing, these parties discussed whether the Debtors

needed to disseminate the Bar Date Notice via television advertisements or other additional

media. Ultimately, this Court determined that the increase in coverage that would be provided

by television spots (from 83.8% of American households to 95% of American households) was

not worth the additional $2.5 million in costs. See Exhibit D at pg. 94. This Court stated, "I

truly don't see, given the reach of the newspapers, the consumer magazines, the business

9

magazines, *The Wall Street Journal*, *The Parade Magazine*, the debtor's website, the other places, the opportunity for people to call in to the debtor's establishment to get information concerning a proof of claim, I don't see the need for a television ad." Id. at 95.

19.     Therefore, the Debtors' publication notice provided each of the Late Claimants with legally sufficient notice of the Bar Date.

**C.     Neither of the Late Claimants have Established Neglect, Much Less Excusable Neglect**

20.     The Late Claimants have failed to satisfy the burden necessary for this Court to approve the Motion. Bankruptcy Rule 9006(b)(1) grants the Court authority to accept late filings where the movant's failure to comply with the Bar Date "was the result of excusable neglect." The Supreme Court has held that under this rule, courts are *permitted, where appropriate*, to accept late filings caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control. See Pioneer Inv. Services Co. v. Brunswick Ass'n Ltd. Partnership, 113 S.Ct. 1489, 1491 (1993) ("Pioneer").

21.     In determining whether to allow late proofs of claim, the Supreme Court has stated that the court's "inquiry is guided by one of the principal purposes of bankruptcy law, to secure within a limited period the prompt and effectual administration and settlement of the debtor's estate." Katchen v. Landy, 382 U.S. 323, 328 (1966). Indeed, any other approach would severely undermine the fundamental purpose of a claims bar date - to serve as a "federally created statute of limitations, after which the claimant loses all of her right to bring an action against the debtor." See In re Grand Union Co., 204 B.R. 864, 871 (Bankr. D. Del. 1997), citing In re Trans World Airlines, Inc., 96 F.3d 687, 690 (3d Cir. 1996).

22.     Once neglect has been established, the determination of whether such neglect should be excused is determined by the following factors: (i) the danger of the prejudice to the

10

debtor; (ii) the length of delay and its potential impact on judicial proceedings; (iii) the reason for delay, including whether it was within the reasonable control of the movant; and (iv) whether the movant acted in good faith. See Pioneer, 113 S.Ct. at 1491. The burden of proving excusable neglect lies with the movant. See Jones v. Chemetron Corp., 212 F.3d 199, 204 (3d. Cir. 2000).

23.     While courts have stopped short of establishing a *per se* rule that "excusable neglect" cannot apply to "unknown creditors," such courts are loath to find excusable neglect for unknown creditors given the existence and purpose of publication notice:

> We leave for another day the issue of *whether excusable neglect can ever be a viable defense in cases where the claimant is only entitled to publication notice.* Pioneer involved a situation in which the claimant had received actual notice of the bar date, but had nonetheless failed to file a proof of claim. *It is considerably more difficult to apply the excusable neglect standard in cases involving publication notice.* Recognizing excusable neglect claims based on the failure of the claimant to read the published notices would be problematic in either of these two categories. In the former, recognizing claims that arise many years after the bankruptcy proceeding would subvert the very purpose of the bar date namely, to confer finality upon the proceedings. Similarly, allowing claimants whose very conduct has made the claim speculative to file late proofs of claim would reward lack of diligence. In both cases, permitting parties to file late proofs of claim would tend to render publication notice meaningless.

In re Trump Taj Mahal Assoc., 1993 WL 534494 at *6, fn. 7 (D.N.J. 1993) (emphasis added) (attached as Exhibit E).

24.     Neither of the Late Claimants have satisfied their burden of establishing excusable neglect. *First,* as noted by the Court in Taj Mahal, excusable neglect may not be available in situations involving constructive notice, because such an application would render publication notice meaningless. Therefore, since both of the Late Claimants were only entitled to publication notice with respect to the Site and adjacent land, they may be prohibited, as a matter of law, from establishing excusable neglect. See In re Trump Taj Mahal Assoc., 1993 WL 534494 at *6, fn. 7. *Second*, even if the Late Claimants are not precluded from pursuing excusable neglect, neither of the Late Claimants have shown that their respective failures to file

11

timely proofs of claim were the product of *any* neglect, let alone *excusable* neglect. Instead, the Late Claimants base their entire argument on the incorrect assertion that they each did not receive proper notice. However, both of the Late Claimants received sufficient constructive notice of the Bar Date -- notice that was approved by this Court. See Bar Date Order at pg. 5. Furthermore, the Late Claimants have not established any other facts that would support a finding of excusable neglect.

25.    Furthermore, with respect to Vancott, despite the Late Claimants' assertion to the contrary, the Debtors properly served Vancott with a copy of the Bar Date Package. See Declaration of Service (attached hereto as Exhibit F). Vancott received actual notice on account of dealings with the Debtors that are unrelated to their asserted claims, and it also received notice of the Debtors' chapter 11 cases. Despite its apparent awareness of the Debtors' chapter 11 cases, and actual receipt of the Bar Date Notice, Vancott has utterly failed to adequately explain its failure to file a timely claim.

26.    It appears that Pacificorp was not served with the Bar Date Notice Package. However, Pacificorp by its own admission did receive notice of the Debtors' chapter 11 cases, and filed a proof of claim under its trade name, Utah Power & Light, nearly two years before the Bar Date. Pacificorp thus (i) knew that the Debtors were in bankruptcy; (ii) knew that the proof of claim process was the appropriate method for asserting any claims against the Debtors; and (iii) could have filed a similar claim for the amounts in question at any time before the Bar Date. Nonetheless, Pacificorp does not offer any explanation for its failure to file a proof of claim with respect to the Site or adjacent land.

27.    Therefore, neither of the Late Claimants have satisfied their burdens of proving excusable neglect.

12

**D.      The Debtors Would be Severely Prejudiced if this Court Grants the Motion**

28.      Permitting the Late Claimants to file late proofs of claim would severely prejudice the Debtors. The Debtors submitted their *Plan of Reorganization* on November 14, 2004 [Docket No. 6895] and their Amended Joint Plan of Reorganization on January 13, 2005 [Docket No. 7560], and the Court held the first hearing concerning plan-related matters on January 21, 2005. Pursuant to the Court's directives, the Debtors are working diligently to establish viable case management procedures for estimation of asbestos-related liabilities and pursuing other plan-related matters. In order for the Debtors to confirm a comprehensive, viable plan of reorganization, they need complete and accurate information regarding the nature, amount and status of all claims that will be asserted in these chapter 11 cases. Accordingly, the Debtors requested (and this Court granted) March 31, 2003, as the deadline for the filing of certain proofs of claim or interest against the Debtors' estates. The Debtors' plan and related disclosure statement contain projections of allowed claims and estimates of how such claims will be paid under the plan. It would thwart the purposes of the Bar Date and detrimentally affect the Debtors' plan projections to now allow the Late Claimants to file a late claim at this stage in the process.

29.      Further, granting the Motion may also open the "flood gates" for similar claims and render the Debtors' publication notice meaningless.[6] In order to progress towards plan confirmation, the Debtors need a certain degree of certainty with respect to the potential claims that will have to be satisfied by the Debtors' reorganization plan. This is exactly why the

---

[6] The Debtors note that the Motion is not the first motion to file a late proof of claim that has been filed in these chapter 11 cases. Royal Indemnity Company [Docket No. 4667] and Intercat, Inc. [Docket No. 6151] also filed similar motions.

13

Debtors sought a Bar Date. Granting the Late Claimants' Motion would encourage uncertainty and deprive the Debtors of any assurance of the scope of their liabilities, which was the fundamental purpose behind the Bar Date. It would also render the Debtors' publication notice meaningless, and allow other "unknown" claimants to file late-filed claims in the wake of the Late Claimants' efforts.

### E.    The Bar Date Applies to the Late Claimants' Proposed Claim

30.    The Late Claimants suggest that the Bar Date "may not apply" to their proposed claims, and they support this proposition by quoting from the definition of an "Asbestos Property Damage Claim." See Motion at pg. 2, ¶2. The Late Claimant may be correct that their proposed claims would not fall within the definition of "Asbestos Property Damage Claims." The scope of the Bar Date, however, was not limited to "Asbestos Property Damage Claims" -- it also covered "Non-Asbestos Claims," which were defined as follows:

> *"Non-Asbestos Claims"* are *any claims* against the Debtors *as of the time immediately preceding the commencement of the Chapter 11 cases on April 2, 2001* other than Asbestos Personal Injury Claims, Asbestos Property Damage Claims, Zonolite Attic Insulation Claims, Settled Asbestos Claims or Medical Monitoring Claims. More specifically, Non-Asbestos Claims are those claims against one or more of the Debtors, whether in the nature of or sounding in tort, contract, warranty or any other theory of law or equity for, relating to or arising by reason of, directly or indirectly, any injury, damage or economic loss caused or allegedly caused directly or indirectly by any of the Debtors or any products or materials manufactured, sold, supplied, produced, specified, selected, distributed or in any way marketed by one or more of the Debtors and arising or allegedly arising directly or indirectly, from acts or omissions of one or more of the Debtors, including, but not limited to, all claims, debts, obligations or liabilities for compensatory and punitive damages. For purposes of the Bar Dates, the defined term "Non-Asbestos Claim" is not intended to include those claims separately defined herein as (a) Asbestos Personal Injury Claims; (b) Asbestos Property Damage Claims; (c) Zonolite Attic Insulation Claims; (d) Settled Asbestos Claims; or (e) Medical Monitoring Claims.

See *General Instructions for Completing All Proof of Claim Forms* (a copy of which is attached as Exhibit G). The Late Claimants' proposed claims falls squarely within the definition of Non-

14

Asbestos Claims and, therefore, the Late Claimants' suggestion that the Bar Date may not apply to their claim is wholly without merit.

WHEREFORE, for the foregoing reasons, the Debtors respectfully object to the Motion, and request this Court enter an order (substantially in the form attached hereto as Exhibit H) that (i) denies the Motion and (ii) grants such other relief as the Court deems just and proper.

Dated: February 11, 2005

Respectfully submitted,

KIRKLAND & ELLIS LLP
James H.M. Sprayregen, P.C.
Janet S. Baer
James W. Kapp III
Samuel L. Blatnick
200 East Randolph Drive
Chicago, Illinois 60601
Telephone: (312) 861-2000
Facsimile: (312) 861-2200

and

PACHULSKI, STANG, ZIEHL, YOUNG, JONES &
WEINTRAUB P.C.

Laura Davis Jones (Bar No. 2436)
David W. Carickhoff, Jr. (Bar No.3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Co-Counsel for the Debtors and Debtors in Possession

15

## EXHIBIT A

PacifiCorp

# Making it happen.



PacifiCorp is one of the lowest-cost electricity producers in the United States, providing more than 1.5 million customers with reliable, efficient energy. The company works to meet growing energy demand while protecting and enhancing the environment. PacifiCorp has more than 8,300 megawatts of generation capacity from coal, hydro, renewable wind power, gas-fired combustion turbines and geothermal. PacifiCorp operates as Pacific Power in Oregon, Washington, Wyoming and California; and as Utah Power in Utah and Idaho. The company merged with ScottishPower in 1999.

**PacifiCorp Companies**

**Pacific Power**   **Utah Power**

B-17

**<u>EXHIBIT B</u>**

IN RE BICOASTAL CORP.    807
Cite as 147 B.R. 807 (Bkrtcy.M.D.Fla. 1992)

"necessary" compensation standards of 11 U.S.C. § 330(a). *In re Gibbons-Grable Co.,* 141 B.R. 614 (Bankr.N.D.Ohio 1992). Where the debtor and the attorney for the debtor have misrepresented facts to the Court with the magnitude that has occurred in this case, there is no alternative available to the Court but to deny all compensation, including that previously awarded. Indeed, any attempt to deceive the Court and wreak havoc on the estate is misconduct not to be tolerated and when such occurs, courts have been brutally harsh. *Matter of Evangeline Refining Co.,* 890 F.2d 1312 (5th Cir.1989).

Vigilance is required by court-approved counsel, in particular, to enforce the standards of the Code. Numerous limitations imposed by the Bankruptcy Code upon compensation of court-approved counsel are designed to insure the highest standards of ethical conduct and minimize the overhead expenses which can easily deplete a debtor's estate. This Court believes that some vehicle is necessary to control possible abuses and to compel court-approved counsel to perform their fiduciary duty.

IT IS THEREFORE ORDERED that although the Court approved the employment of HJ & L, and later S & W, as general counsel for the debtor-in-possession, and further authorized S & W's appointment as special counsel for the trustee, subsequent revelations discussed above have convinced the Court that not only will all fees and costs be denied for the Fifth Application before the Court today, and for applications currently under advisement, but also disgorgement of all previously awarded sums will be required of S & W and HJ & L.



In re BICOASTAL CORPORATION, d/b/a Simuflite, f/k/a The Singer Company, Debtor.

Bankruptcy No. 89-8191-8P1.

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Jan. 8, 1992.

Claimant moved for permission for late filing of claim in Chapter 11 case. The Bankruptcy Court, Alexander L. Paskay, Chief Judge, held that claimant, which owned property downstream from property formerly owned by Chapter 11 debtor, and which claimed that its property was environmentally damaged because of actions of debtor on debtor's property, did not show "excusable neglect" justifying failure to file motion for extension of time to file claim until nearly one and one-half years after expiration of bar date.

Motion denied.

1. Bankruptcy ⟨key⟩2900(1)

Claimant, which owned property downstream from property formerly owned by Chapter 11 debtor, and which claimed that its property was environmentally damaged because of actions of debtor on debtor's property, did not show "excusable neglect" justifying its failure to file motion for extension of time to file claim until nearly one and one-half years after expiration of bar date, and thus, motion for relief from bar date was denied; debtor, who had no notice of potential claim by claimant, relied on notice by publication, and claimant failed to file a motion to extend time for over year after learning of bankruptcy. Bankr.Code, 11 U.S.C.A. § 502(c); Fed.Rules Bankr. Proc.Rules 2002(a)(8), 3003(c)(3), 9006(b), 11 U.S.C.A.

See publication Words and Phrases for other judicial constructions and definitions.

**2. Bankruptcy ⚖️2131**

**Constitutional Law ⚖️306(4)**

Notice of bankruptcy by publication to creditors who are not known or whose identity is not reasonably ascertainable does not violate due process. U.S.C.A. Const. Amends. 5, 14.

**3. Constitutional Law ⚖️306(4)**

Due process requirements do not dictate that debtor must conduct an impracticable and extended search for all creditors. U.S.C.A. Const. Amends. 5, 14.

---

Donald Engle, Robert H. Wheeler, for debtor.

William Goldman and Dykema Gossett, for Creditors' Committee.

Gregory L. Germain, for Hudson, I.S.C.

ORDER ON MOTION TO PERMIT
LATE FILING OF CLAIM

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 11 case and the matter under consideration is the Motion to Permit Late Filing of Claim filed by Hudson, I.S.C. (Hudson), a California corporation. Hudson seeks authority to file a claim in this case even though the bar date heretofore fixed by this Court is long gone. The Court has considered the Motion, together with the record and argument of counsel, and finds the relevant facts as appear from the record are as follows:

The Debtor's predecessor-in-interest, Singer Company (Singer), was the owner of real property located at 2350 Washington Avenue in San Leandro, California a decade prior to the filing of the Debtor's Chapter 11 case. Singer also conducted business at 2481 Washington and 2450 Washington Avenue in San Leandro, California. Hudson owns property downstream from the property formerly owned by the Debtor and claims that its property is environmentally damaged because of actions of the Debtor on the upstream property.

In the mid-1970's, the State of California began an investigation of ground water contamination in and around the vicinity of the property formerly owned by Singer.

Hudson learned of the contamination sometime in 1988 and tried to identify potentially responsible parties for the contamination. Hudson was advised by its counsel in mid-1990 that Singer might be a potentially responsible party.

On November 10, 1989, the Debtor filed its Petition for Relief under chapter 11 of the Bankruptcy Code. Soon after, Hudson became aware at that time that the successor corporation of Singer, the Debtor filed a Petition for Relief under Chapter 11 of the Bankruptcy Code. However, Hudson did not file a claim at that time on the advice of its former counsel. According to Hudson, upon learning that a claim filed untimely by the State of California was disallowed, Hudson chose not to file a claim. Hudson now seeks the authority to file a claim based on the environmental damage to property it owns and Hudson argues that the claim should not be time-barred because it will not prejudice the Debtor. Further, Hudson argues it should not be bound by the publication notice the Debtor was required to give.

It is undisputed that the Debtor did not list Hudson as a creditor on either its initial or amended Schedule of Liabilities. Further, the Debtor did not serve Hudson with formal, written notice of the claims bar date. On November 30, 1989, this Court entered an Order establishing December 30, 1989, as the bar date by which creditors were required to file proofs of claims against the Debtor. The Order further provided that in accordance with Bankruptcy Rule 2002(a)(8), (i) and (k), the Debtor shall provide at least twenty (20) days notice of this Order by first class regular mail to "all entities which have filed a proof of claim or interest or which have been listed in the Schedules, as supplemented or amended, filed herein as holding a claim or who are otherwise known to the Debtor ..." Further, the Order provided that the Debtor shall "cause a copy of the Notice to be published on one occasion at least twenty (20) days prior to the Bar Date in each of the following publications: national editions of *The Wall Street Journal* and *New York Times*, together with local newspa-

IN RE BICOASTAL CORP. **809**
Cite as 147 B.R. 807 (Bkrtcy.M.D.Fla. 1992)

pers in cities where the Debtor has maintained a business location ..." Thereafter, this Court entered an Order extending the bar date to January 31, 1990.

In order to efficiently administer a Chapter 11 reorganization case, a bar date within which creditors must file their claims is essential. It can hardly be disputed that to propose a meaningful plan of reorganization, it is absolutely essential for the Debtor to be apprised of the total amount and type of claims with which the plan must deal. Without this knowledge, the Debtor cannot present a meaningful plan of reorganization.

[1] Bankruptcy Rule 2002(a)(8) provides in pertinent part that all creditors of a Debtor are to receive by mail at least twenty days notice of the time for filing proofs of claims. However, Bankruptcy Rule 2002(c), an exception to the general notice rule, provides that "the court may order notice by publication if it finds that notice by mail is impracticable or that it is undesirable to supplement the notice."

[2] Notice by publication to creditors who are not known or whose identity is not reasonably ascertainable is not a violation of due process. *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950); *Tulsa Professional Collection Services v. Pope*, 485 U.S. 478, 108 S.Ct. 1340, 99 L.Ed.2d 565 (1988).

An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. *Mullane*, 339 U.S. at 314, 70 S.Ct. at 657.

[3] Due process requirements do not dictate that the Debtor must conduct such an "impracticable and extended" search for all potential creditors. *Mullane*, 339 U.S. at 317–18, 70 S.Ct. at 658–59. In this case, the Court is satisfied that the publication was reasonably calculated to provide Hudson with notice of the Debtor's claims bar

date. In light of the fact that the Debtor had no notice of the potential claim of Hudson, this Court is satisfied that notice by publication was sufficient. *See In re Charter Co.*, 113 B.R. 725 (Bankr.M.D.Fla. 1990).

This Court recognizes that Hudson did not have knowledge of the Debtor's bankruptcy case until after the claims bar date. Ordinarily, this would constitute excusable neglect sufficient to provide that the claim of Hudson could not be filed late. *In re Loveridge*, 2 B.C.D. 1597 (Bankr.D.Conn. 1977). Bankruptcy Rule 3003(c)(3) provides that the Court may extend the time within which proofs of claim may be filed for cause shown. Further, Bankruptcy Rule 9006(b) provides that when an act is required to be done within a specified time period, the Court may enlarge the time period for cause shown on Motion made after the time period expired if the failure to act was due to excusable neglect. Certainly, if Hudson filed a Motion for Relief from the Claims Bar Date as soon as Hudson knew that the bar date expired, the Court would have found excusable neglect sufficient to extend the bar date. However, where this Court finds that Hudson failed to file such a Motion to Extend Time for well over one year, the neglect of Hudson is not excusable.

While there might have been slight prejudice to the Debtor to grant a Motion to file a late claim soon after the bar date passed, such is clearly not the case nearly one and one-half years after the expiration of the bar date. The potential claim of Hudson, a contingent, unliquidated claim would have to be estimated or liquidated in this Court pursuant to Section 502(c) of the Code before it could be allowed. In the past eighteen months, the Debtor has been involved in extensive claims litigation, including but not limited to, the claim of the Defense Logistics Agency, the URDA claim, the Graves Hahn claim, and the SSMC claim, all very complicated claims requiring an extensive estimation process since all of them were unliquidated and contingent. To require the Debtor to begin extensive litigation with another unliquidated, contingent claim would clearly be preju-

dicial to not only the Debtor but to the entire estate.

In sum, the fact that Hudson did not attempt to file a claim in the Debtor's case for a full year after it admittedly know of the Debtor's case supports the Debtor's objection to the relief from the claims bar date Hudson now seeks. In light of the foregoing, this Court is satisfied that the Motion for Relief from Claims Bar Date should be denied.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Motion for Relief from Claims Bar Date filed by Hudson, I.S.C. be, and the same is hereby, denied.

DONE AND ORDERED.

**In re Frank James PARKER and Beverly Estes Parker, Debtors.**

**Bankruptcy No. 91-6497-BKC-3P7.**

United States Bankruptcy Court, M.D. Florida, Jacksonville Division.

Nov. 17, 1992.

Chapter 7 trustee objected to claimed exemptions. The Bankruptcy Court, George L. Proctor, J., held that: (1) payments to debtor stock broker of interest derived from investment pool during course of employment were not exempt from garnishment under Florida statute exempting payments for personal labor or services of head of family, and (2) only portion of debtor's payroll checks meant for wages, and not expense reimbursement portion, were exempt from garnishment under Florida statute as payment for "personal labor or services."

Objection sustained.

**1. Bankruptcy ⇐2802**

Debtors have burden of proving entitlement to an exemption.

**2. Exemptions ⇐16**

Evidence that husband was primary source of support for his wife, that he lived in Florida, and that wife's income was nominal and insufficient to sustain family established that husband was "head of the family" residing in Florida, as required to exempt wages from garnishment under Florida statute. West's F.S.A. § 222.11.

See publication Words and Phrases for other judicial constructions and definitions.

**3. Exemptions ⇐48(2)**

Payments to debtor stock broker of interest derived from investment pool during course of employment, which pool was limited to certain employees designated by employer, were in nature of "passive income," rather than payments for "personal labor or services," and thus were not exempted from garnishment under Florida statute exempting payments for personal labor or services of head of family; agreement did not predicate distribution on personal service, but was designed more as employee benefit that provided passive income to recipient. West's F.S.A. § 222.11.

See publication Words and Phrases for other judicial constructions and definitions.

**4. Exemptions ⇐48(2)**

Only the portion of debtor's payroll checks meant for wages, and not expense reimbursement portion, was exempt from garnishment under Florida statute as payment for "personal labor or services," and thus, because payments of both types were commingled on single account from which various withdrawals had been made, precluding tracing of exempt wages, bank account could not be exempted. West's F.S.A. § 222.11.

---

Alan P. Woodruff, St. Petersburg, Fla., for debtors.

Alexander G. Smith, Jacksonville, Fla., for trustee.

**EXHIBIT C**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

## DECLARATION OF SERVICE REGARDING:

1. **Claims Bar Date Notice Materials**
2. **Grace Non-Asbestos Proof of Claim Form**
3. **W.R. Grace and Co. Asbestos Property Damage Proof of Claim Form**
4. **W.R. Grace and Co. Asbestos Medical Monitoring Proof of Claim Form**

I, _____Craig A. Zink_____, state as follows:

1.    I am over eighteen years of age and I believe the statements contained herein are true

based on my personal knowledge. My business address is c/o R.R. Donnelley,

---

[1] The Debtors consist of the following 62 entities: W.R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W.R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W.R. Grace Capital Corporation, W.R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

2.    On June 21, 2002, at the direction of the United States Bankruptcy Court for the

District of Delaware, I caused service of the following documents:

      a.  Bar Date Notice Package attached hereto as Exhibit 1;

      b.  Form 10 attached hereto as Exhibit 2;

      c.  PD Form attached hereto as Exhibit 3; and

      d.  MM Form attached hereto as Exhibit 4;

to be effected as follows:

      a.  Exhibit 1 was served on those parties listed in Exhibit 5;

      b.  Exhibit 2 was served on those parties listed in Exhibit 6; and

      c.  Exhibits 1, 2, 3 and 4 were served on those parties listed in Exhibit 7.

3.    All address lists were provided by Bankruptcy Management Corporation. Service was effected via first-

class mail and deposited with the United States Postal Service with postage thereon fully prepaid.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: June  2 7 , 2002
El Segundo, California

                    _Craig A. Zink_

State of California          )
                   ) ss
County of Los Angeles    )

Personally appeared before me on this  2 7 ᵗʰ day of June 2002,  Craig Zink ,
an individual, known to me to be the person who executed the foregoing instrument and
acknowledged the same.

                    _Theresa M. Taylor_

Notarial Seal
Theresa M. Taylor, Notary Public
East Lampeter Twp., Lancaster County
My Commission Expires Dec. 6, 2003
Member, Pennsylvania Association of Notaries

## Exhibit 6
## Bar Date Notice & Non-Asbestos POC

INTERMOUNTAIN INSULATION CO
333 W FIRST ST
SALT LAKE CITY, UT
USA

INTERMOUNTAIN ROADBUILDERS
PULLAM AIRPORT IMPROVEMENTS
CITY OF FLAGSTAFF
FLAGSTAFF, AZ 86001
USA

INTERMOUNTAIN SUPPLY
5113 FAST RAILROAD DR
SPOKANE, WA 99212
USA

INTERMOUNTAIN SUPPLY
850 WEST BRUCH WELLMAN RD
DELTA, UT 84624
USA

INTERMOUNTAIN SUPPLY
850 WEST BRUCH WELLMAN ROAD
DELTA, UT 84624
USA

INTERMOUNTAIN SUPPLY
E. 5113 RAILROAD
SPOKANE, WA 99212
USA

INTERNAL MEDICINE & CARDIOLOGY
P O BOX 1000
MEMPHIS, TN 38148-0423
USA

INTERNAL MEDICINE & CARDIOLOGY
P O BOX 1000
MEMPHIS, TN 38148-0423
USA

INTERNAL MEDICINE OF LANCASTER
PO BOX 127
EAST PETERSBURG, PA 17520-0127
USA

INTERNAL REVENUE SERVICE ACS
PO BOX 149047
AUSTIN, TX 14904
USA

INTERNAL REVENUE SERVICE
.
ATLANTA, GA 39901
USA

INTERNAL REVENUE SERVICE
.
ATLANTA, GA 93301
USA

INTERNAL REVENUE SERVICE
.
MEMPHIS, TN 37501
USA

INTERNAL REVENUE SERVICE
7850 SW 6TH COURT
PLANTATION, FL 33324
USA

INTERNAL REVENUE SERVICE
ANDOVER, MA 05501
USA

INTERNAL REVENUE SERVICE
ATLANTA SERVICE CENTER
ATLANTA, GA 39901
USA

INTERNAL REVENUE SERVICE
P O BOX 1233
CHARLOTTE, NC 28201-1233
USA

INTERNAL REVENUE SERVICE
P O BOX 2502
MEMPHIS, TN 38101-9926
USA

INTERNAL REVENUE SERVICE
P O BOX 57
BENSALEM, PA 19020
USA

INTERNAL REVENUE SERVICE
P.O. BOX 149047
AUSTIN, TX 14904
USA

INTERNAL REVENUE SERVICE
P.O. BOX 419236
KANSAS CITY, MO 84141
USA

INTERNAL REVENUE SERVICE
P.O. BOX 57
BENSALEM, PA 19020
USA

INTERNAL REVENUE SERVICE
PHILADELPHIA, PA 19255
USA

INTERNAL REVENUE SERVICE
PO BOX 47-421
DORAVILLE, GA 30362
USA

INTERNAL REVENUE SERVICE
UNITED STATES TREASURY
7850 SW 6TH COURT
PLANTATION, FL 33324
USA

INTERNAL REVENUE SERVICE
WOLFGANG GUENTHER SS# 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
1998 TAX RETURN,
UNK

INTERNATIOANL LOSS CONTROL INSTITUT
P.O. BOX 101916
ATLANTA, GA 30392-1916
USA

INTERNATION LINK NETWORK CORP
ATTN: SCARLETT
6591 NW, 82ND AVENUE
MIAMI,  33166
VENZUALA

INTERNATION PAINT
PO BOX 386
UNION, NJ 07083
USA

INTERNATIONAL ADVERTISING
527 THIRD AVENUE  SUITE 311
NEW YORK, NY 10016
USA

## EXHIBIT D

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          . Case No.  01-1139(JFK)
                                .
                                .
W.R. GRACE & CO., et al.,       .
                                . 5414 USX Tower Building
                                . Pittsburgh, PA 15222
                   Debtors.     .
                                . April 22, 2002
. . . . . . . . . . . . . . . . 10:05 a.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:                 Kirkland & Ellis
                                By:  DAVID M. BERNICK, ESQ.
                                     JAMES KAPP, ESQ.
                                     JANET S. BAER, ESQ.
                                200 East Randolph Dr.
                                Chicago, IL 60601

For the Environmental           U.S. Department of Justice
Protection Agency:              Environment and Natural Resources
                                   Division
                                By:  JAMES D. FREEMAN, ESQ.
                                (Telephonically)

For Edythe Kellogg:             Scanlon, Sessums, Parker
                                   & Dallas, P.L.L.C.
                                By:  PAT H. SCANLON, ESQ.
                                1650 Mirror Lake Plaza
                                2829 Lakeland Drive
                                Jackson, MS 39208
                                (Telephonically)

Audio Operator:                 Cathy Younker

Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.


J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

(609) 586-2311  Fax No.  (609) 587-3599



T012

93

1  at this point in time, especially since it is the case that
2  we've resolved every other issue amongst ourselves since the
3  last hearing.

4          THE COURT:  What's the cost?  I want a cost benefit
5  analysis.  What happens if we put the TV and the earned media
6  back in?

7          MR. BAENA:  Well, Judge, if we're going to have cost
8  benefit analyses --

9          THE COURT:  Because we may have to do it again.  So I
10 want to know --

11          MR. BAENA:  If we're going to have that, then I'm not
12 going to -- I'm going to put Mr. Bernick on the stand if he's
13 going to testify to it.  I want to take testimony on that.

14          THE COURT:  I want to know what the cost is.

15          MR. BAENA:  I don't know.

16          THE COURT:  Okay.

17          MR. BAENA:  The program as it stands now is estimated
18 to cost approximately $2.9 million.

19          THE COURT:  No, I meant with the TV in, because there
20 were estimates earlier.

21          MR. BAENA:  Well, the -- but the other estimate
22 included additional notices in addition to television, for
23 Zonolite.

24          THE COURT:  Oh, well, yes.

25          MR. BAENA:  So it's not like we're right back to

94

1  where we started from, it's just the television component of
2  the former program.

3          THE COURT:  Well, we're pretty much back where we
4  started if the same market is attempting to be solicited.

5          MR. BAENA:  No, they were going to publish different
6  sorts of ads and they had to show product for the Zonolite.  It
7  was a different program, Judge.

8          MR. BERNICK:  Your Honor, in specific response to
9  your question, the cost of the TV is $2.5 million.  And that's
10  set forth in our original revised bar date notice program filed
11  in November.  That's the television, not the part of the
12  program now.

13          Non-TV, without the TV reaches 83.8 percent of
14  households already.  If you put the TV in, you go from 83 to 95
15  percent.  So you're producing a spread from 83 to 95 at a cost
16  of two and a half million dollars.  So significant is that,
17  that Mr. Hilsay in his own affidavit filed in March of this
18  year in this case specifically said that U.S. television would
19  be for ZAI and PI, not for property damage.  That was his own
20  judgment at the time.  So it's not a question of what we'll
21  represent to the Court, it's already a matter of record from
22  their own expert.  So what's essentially happening is although
23  Mr. Hilsay hasn't actually submitted something to say it, is
24  that first he didn't want to say anything about property
25  damage, nothing.  Then he said, oh, yes, property damage can

J&J COURT TRANSCRIBERS, INC.

B-30

1  have a program, does not involve television.  Then we eliminate
2  everything else and now he says well, maybe we want to have
3  television.

4          THE COURT:  I truly don't see, given the reach of the
5  newspapers, the consumer magazines, the business magazines, the
6  *Wall Street Journal*, the Parade magazine, the debtor's website,
7  the other places, the opportunity for people to call in to the
8  debtor's establishment and get information concerning a proof
9  of claim, I don't see the need for a television ad.

10          MR. BAENA:  Well, Judge, I don't know that anything
11  you've heard or seen so far permits you to come to that
12  conclusion, respectfully.

13          THE COURT:  I have several affidavits, all of which
14  I've read, are you going to challenge the credibility of those
15  witnesses?

16          MR. BAENA:  No, I'm --

17          THE COURT:  Do I need an evidentiary hearing?
18          MR. BAENA:  Those affidavits do not parse out the
19  program we're talking about now.

20          THE COURT:  Which is what?

21          MR. BAENA:  Which is a program for traditional
22  property damage claimants consisting of both commercial and
23  residential as well as state and other government claimants.
24  And I would add, Judge, that if you look back on Celetex where
25  we had in addition to commercial residential claimants, you

**J&J COURT TRANSCRIBERS, INC.**

**EXHIBIT E**

Westlaw.

Not Reported in F.Supp.
1993 WL 534494 (D.N.J.)
(Cite as: 1993 WL 534494 (D.N.J.))

Page 1

▷
Only the Westlaw citation is currently available.

United States District Court, D. New Jersey.
In re TRUMP TAJ MAHAL ASSOCIATES,
Trump Taj Mahal, Inc., The Trump Taj Mahal
Corporation, and Trump Taj Mahal Funding, Inc.,
Debtors.
TRUMP TAJ MAHAL ASSOCIATES,
Plaintiffs-Appellees,
v.
Helen O'HARA and Eugene O'Hara
Defendants-Appellants,
and
Ginan ALIBRAHAM, Rashid Alibraham, Cynthia
Smith, Ann Jordan, Marilyn Kunkel,
Robert W. Matthews, Louis J. Picariello, Cynthia
Picariello Rita Newman,
Madelyn Tolerico, Louise Mc Ree and Earl McRee,
Defendants.
Civ. A. No. 93-3571 (JEI) Adv. No. 93-2056.

Dec. 13, 1993.
Schwartz, Tobia & Stanziale, P.C. by Martin L.
Borosko, Montclair, NJ, for plaintiffs-appellees.

Carmen R. Faia, P.C. by Carmen R. Faia,
Pleasantville, NJ, for defendants-appellants Helen
O'Hara and Eugene O'Hara.

MEMORANDUM OPINION AND ORDER
AFFIRMING OPINION AND ORDER OF
BANKRUPTCY COURT

IRENAS, District Judge.

*1 On July 16, 1991, Trump Taj Mahal Associates,
Trump Taj Mahal, Inc., Trump Taj Mahal
Corporation, and Trump Taj Mahal Funding, Inc.
(collectively, the "Taj" or the "debtor") filed
petitions under Chapter 11 of the Bankruptcy Code,
11 U.S.C. §§ 101 *et seq.* Thereafter, pursuant to an
order dated July 17, 1991, the bankruptcy court
established August 23, 1991, as the deadline for
filing proofs of claim against the debtor (the "bar

date") and allowed notice of the bar date by
publication in several local and national newspapers.

This case comes before the Court on appeal from a
decision of Bankruptcy Judge Rosemary
Gambardella enjoining a group of personal injury
claimants, including the appellants, from filing
proofs of claim after the bar date had passed.
Applying the "known or reasonably ascertainable"
standard set forth in *Tulsa Professional Collection
Services v. Pope,* 485 U.S. 478 (1988), Judge
Gambardella concluded that appellants' claims
resulting from a slip and fall incident at the Trump
Taj Mahal were "speculative and conjectural," and
that publication notice of the bar date was sufficient
to satisfy due process requirements.

We find that the Bankruptcy Court did not commit
an abuse of discretion in finding that appellants'
claims against the Taj were speculative and
conjectural, where appellants had filed a prepetition
incident report but failed to respond to a letter from
debtor's claim adjuster mailed ten months before the
bar date. The order of the bankruptcy court
enjoining the appellants from filing a proof of claim
will be affirmed.

I. BACKGROUND

*A. Factual Background*

The facts of this case are detailed in the opinion
accompanying Judge Gambardella's order, *In re
Trump Taj Mahal Associates,* 156 B.R. 928
(Bankr.D.N.J.1993). On August 23, 1990,
appellant Helen O'Hara was allegedly injured in a
"slip and fall" incident at the Trump Taj Mahal.
She and her husband, appellant Eugene O'Hara,
filed a report of the incident with a security guard or
other Taj representative that same day.

On October 12, 1990, Jay Baver, a Claims Adjuster
for the Taj, sent a letter to Mrs. O'Hara in which he
acknowledged receipt of the accident report and
advised her that the Taj was "willing to consider
paying your out-of-pocket medical bills associated

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1993 WL 534494 (D.N.J.)
(Cite as: 1993 WL 534494 (D.N.J.))

Page 2

with this matter as well as additional compensation for distress." Letter from Jay Baver to Helen O'Hara dated Oct. 12, 1990. Baver requested that Mrs. O'Hara forward to him copies of all medical bills, as well as a doctor's evaluation of her injury. The O'Haras apparently failed to reply to this letter. [FN1]

### B. Procedural History

The debtor petitioned for bankruptcy under Chapter 11 of the Bankruptcy Code on July 16, 1991. By Order dated July 17, 1991, Judge Gambardella (1) established August 23, 1991, as the bar date for filing proofs of claim, [FN2] and (2) allowed notice of the bar date by publication in the New York Times, the Wall Street Journal, the Newark Star-Ledger, the Atlantic City Press, and the Philadelphia Inquirer. In addition to publication notice, the debtor was required to give actual notice by mail to known creditors.

On August 21, 1992, almost one year to the day after the bar date had passed, the O'Haras filed a complaint in the Superior Court of New Jersey, Law Division--Atlantic County, seeking damages as a result of the injuries allegedly suffered by Mrs. O'Hara at the Taj Mahal. On October 7, 1992, appellants' counsel was advised by Nicholas F. Moles, Senior Vice President of Law at the Taj, that since appellants had not filed a proof of claim before the bar date, "further proceedings in this matter are barred by the provisions of the United States Bankruptcy Code." Letter from Nicholas F. Moles to Carmen Faia dated Oct. 5, 1992. Appellants continued with the litigation, and requested copies of the bankruptcy pleadings thus far submitted so that Mrs. O'Hara could file a proof of claim.

*2 Debtor filed a "Second Order to Show Cause Why Defendants Should not be Enjoined from Prosecuting an Action against Debtors Barred by 11 U.S.C. § 362, the Restraining Order Dated July 17, 1991, the Order of Confirmation Dated August 28, 1991 and 11 U.S.C. § 524(a)(3)" ("Second Order to Show Cause") against appellants and other personal injury claimants who had instituted actions against the Taj after the bar date had passed. On April 4, 1992, Judge Gambardella delivered an oral opinion in which she (1) granted the debtor's Second Order

to Show Cause, (2) declared null and void any "complaints concerning prepetition debts filed against the Debtor in the present case after the onset of the automatic stay," 156 B.R. at 935, (3) enjoined the defendants from prosecuting the subject law suits against the debtor, and (4) found that the defendant's actions were for prepetition claims subject to the automatic stay provisions of § 524(a)(3).

A second hearing was held to discuss the "excusable neglect" [FN3] claims of defendants O'Hara and Jordan in light of the Supreme Court decision in Pioneer Investment Serv. Co. v. Brunswick Assoc., 113 S.Ct. 1489 (1993). On July 1, 1993, Judge Gambardella issued a written opinion in which she found that the defendants had failed to establish excusable neglect. On July 14, 1993, an order was issued permanently enjoining Helen O'Hara and Eugene O'Hara, among others, from pursuing their cause of action.

Appellants filed a Notice of Appeal from the order on August 5, 1993. The issues designated for appeal addressed whether (1) the O'Haras could properly be considered "unknown" claimants; (2) publication notice of the bar date claims was adequate to provide due process to the O'Haras; (3) the Bankruptcy Court correctly held that the O'Haras' failure to file a claim did not constitute excusable neglect; and (4) the Bankruptcy Court acted within its discretion in denying the O'Haras request to enlarge the time within which to file a proof of claim.

## II. LEGAL DISCUSSION

### A. Standard of Review

The decision to permit or deny an untimely proof of claim lies within the sound discretion of the bankruptcy court, and the court's decision will only be disturbed upon a showing of an abuse of that discretion. In re Vertientes, Ltd., 845 F.2d 57, 59 (3d Cir.1988). Reviewing courts should give wide deference to a determination whether a claimant in bankruptcy constitutes a known creditor deserving of actual notice. In the Matter of Chicago, M. St. P. & P. RR. Co., 974 F.2d 775, 788 (7th Cir.1992). Assuming that a bankruptcy court has correctly applied proper legal precepts, and that the court's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

B-34

Not Reported in F.Supp.
1993 WL 534494 (D.N.J.)
(Cite as: 1993 WL 534494 (D.N.J.))

Page 3

basic and inferred factual findings are not clearly erroneous, [FN4] the bankruptcy court's ultimate determination should be affirmed absent an abuse of discretion. *In re Dykes,* No. 93-7235, slip op. at 2 (3d Cir. Nov. 30, 1993); *Meridian Bank v. Alten,* 958 F.2d 1226, 1230 n. 2 (3d Cir.1992); *In re Sharon Steel Corp.,* 871 F.2d 1217, 1222 (3d Cir.1989); *see also Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 102-03 (3d Cir.1981).

B. *Notice Requirements under the Due Process Clause*

\*3 Appellants contend that their submission of an accident report to the Taj transformed them into "known creditors" entitled to actual notice of the August 23, 1991, bar date and that the failure of the Taj to provide them with such notice rendered their failure to timely file a proof of claim excusable neglect. Appellees respond that the Taj receives thousands of such reports each year, the vast majority of which do not proceed to litigation. Particularly where the putative plaintiff has failed to respond to offers of compensation, the Taj argues that the existence of a claim is too speculative to merit actual notice.

Due process requires notice that is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950). However, "impracticable and extended searched are not required in the name of due process." *Id.* at 316-19. Whether a particular method of notice is reasonably calculated to reach interested parties depends upon the particular circumstances of each case. *Tulsa Professional Collection Services, Inc. v. Pope,* 485 U.S. 478, 484 (1988).

Bankruptcy law divides creditors into two groups when determining the proper notice to be given of bar dates: known and unknown creditors. The due process standard set forth in *Mullane* requires that the debtor's known creditors be given actual notice of the bankruptcy proceedings and relevant bar dates. *City of New York v. New York, N.H. & H.R. Co.,* 344 U.S. 293, 296 (1953). Unknown creditors, however, are merely entitled to constructive notice

of the pendency of a bankruptcy proceeding and of relevant bar dates. *Mullane,* 339 U.S. at 314; *In re GAC Corp.,* 681 F.2d 1295, 1300 (11th Cir.1982). The first task for the bankruptcy court, then, is to determine whether the Taj had knowledge of the appellants' claims.

Unknown creditors are "those whose identities or claims are not reasonably ascertainable *and* those creditors who hold only conceivable, conjectural or speculative claims." *In re Thomson McKinnon Sec., Inc.,* 130 B.R. 717, 720 (Bankr.S.D.N.Y.1991) (citing *In re Charter Crude Oil Co.,* 125 B.R. 650, 655 (M.D.Fla.1991)) (emphasis added); *see also Pope,* 485 U.S. at 490 ("Nor is everyone who may conceivably have a claim properly considered a creditor entitled to actual notice.... [I]t is reasonable to dispense with actual notice to those with mere 'conjectural' claims."); *In re GAC Corp.,* 681 F.2d at 1300 (11th Cir.1982); *In re Hunt,* 146 B.R. 178 (Bankr.N.D.Texas 1992). Debtors are not required to search out every conceivable or possible creditor. It is enough if the debtor has made reasonably diligent efforts to uncover the identities and claims of any creditors.

Courts in other districts, reviewing factual situations similar to that of the instant case, have found the claims alleged to be speculative and conjectural. [FN5] In *In re L.F. Rothschild Holdings, Inc.,* No. 92-1129, 1992 WL 200834 (S.D.N.Y. Aug. 3, 1992), appellant John Barry had been the head of the debtor firm's investment banking division until he resigned in 1989. After his departure, Barry continued to contact executives at the firm, hoping to resolve a dispute over his 1988 bonus. The debtor filed a voluntary Chapter 11 petition in early 1991, and the bankruptcy court established May 1, 1991, as the bar date. Barry did not receive actual notice of the bar date, and sought permission to file a late proof of claim. The district court found that Barry's negotiations with the firm failed to constitute "a dispute ... of which LFR should have been aware." 1992 WL 200834 at \*4. It concluded:

\*4 [I]t is undisputed that after his resignation in September 1989, Barry gave no notice to LFR that he had any claim against LFR until more than two years later in November 1991.... Barry does not attempt to give any explanation why, despite his failure to notify LFR of his claim during the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00764-RLB    Document 13    Filed 12/14/2005    Page 38 of 72

Not Reported in F.Supp.
1993 WL 534494 (D.N.J.)
(Cite as: 1993 WL 534494 (D.N.J.))

two-year period, LFR should nevertheless have known that he had not abandoned any claims he may have had. Failure to remind LFR of the size and existence of his claim in his letter of resignation or to pursue it at any time thereafter seems inconsistent with status as a known creditor as opposed to a conceivable, or conjectural creditor.

*Id.; see also In re Flanigan's Enterprises, Inc.,* 77 B.R. 963 (Bankr.S.D.Fla.1987) (refusing to allow insurance company that had prior contractual relationship with debtor to file late proof of claim, where claimant had delayed in informing debtor of claim).

Similarly, in *In re Charter Company,* 125 B.R. 650 (M.D.Fla.1991), the court found that a dispute between the debtor and one of its oil suppliers was insufficient to render the supplier a "known creditor." Pemex had entered into a sales contract for the sale of oil to the debtor. However, the parties fell into a dispute over the effective date of a price reduction established by Pemex. The parties attempted to reconcile their differences, and the debtor believed the dispute was resolved when Pemex took no further action for several years.

The bankruptcy court held that Pemex was a known creditor entitled to formal, actual notice of the bar date. The district court reversed this determination, finding that Pemex's delinquency in pursuing any disputes it might have had against the debtor rendered it an unknown creditor for the purposes of determining the appropriate standard of notice:

Even assuming Charter knew there was a possibility of a claim by Pemex, Charter was not required to give actual notice to creditors with merely conceivable, conjectural or speculative claims.... Also, if Charter reasonably believed, or could have believed, that Pemex had abandoned its claim, then even Charter's actual or constructive knowledge of a remote possibility of a claim by Pemex would not raise Pemex to the level of a known creditor deserving of actual notice of the bar date.

125 B.R. at 656 (citing *Mennonite Bd. of Missions v. Adams,* 462 U.S. 791 (1983)); *see also Mullane,* 339 U.S. at 316 (noting that publication notice is sufficient for those creditors whom the debtor can reasonably assume to have abandoned their

property interest).

In the instant case, appellants filed an incident report with the Taj in August of 1990 but refrained from further communication until August of 1992, when they filed suit in state court. Significantly, appellants failed to respond to a letter from a Taj Claims Adjuster, submitted to them ten months prior to the bar date, that offered to compensate them for medical and related expenses, as well as pain and suffering. There was nothing in the appellants' conduct that distinguished their case from the many thousands of claims received each year by the Taj that do not progress beyond the filing of an incident report. We cannot say that the bankruptcy judge erred in finding the appellants' claims to be speculative and conjectural. [FN6]

### C. Excusable Neglect

**\*5** In the alternative, appellants argued that their failure to timely file proofs of claim is the result of excusable neglect, and that the bankruptcy court should have allowed them to file late pursuant to Rule 9006(b). The Third Circuit has held that Rule 9006(b) and Rule 3003(c)(3) are to be read in conjunction, and that the bankruptcy court may allow the filing of an untimely proof of claim only where the claimant's failure to timely file was due to excusable neglect. *In re Vertientes, Ltd.,* 845 F.2d 57 (3d Cir.1988).

The Supreme Court recently clarified the meaning of "excusable neglect" as the term is used in Rule 9006(b)(1). The Court found that "by empowering the court to accept late filings 'where the failure to act was the result of excusable neglect,' Rule 9006(b)(1), Congress plainly contemplated that the court would be permitted, where appropriate, to accept late filings cause by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control." *Pioneer Investment Serv. Co. v. Brunswick Assoc. Ltd. Partnership,* 113 S.Ct. 1489, 1495 (1993). The determination of whether neglect is excusable

is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission. These include ... the danger of prejudice to the debtor, the length of the delay and its impact on the judicial proceedings, the reason for the delay, including whether it was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1993 WL 534494 (D.N.J.)
(Cite as: 1993 WL 534494 (D.N.J.))

within the reasonable control of the movant, and whether the movant acted in good faith." 113 S.Ct. at 1498. The burden of proving "excusable neglect" is on the creditor seeking to extend the bar date. *In re Nutri\*Bevco*, 117 B.R. 771, 781 (Bankr.S.D.N.Y.1990).

In the case at bar, the bankruptcy court found that (1) the Taj would be prejudiced should the untimely claims be allowed, in that the claims would "deny the Debtor the 'fresh start' to which it is entitled," 156 B.R. at 937; (2) the impact of the delay upon the proceedings was significant; (3) appellants' inaction was the source of the delay; and (4) the defendants acted in good faith. In addition, the court noted that the appellants had received adequate notice of the bar date and that the bar date order was not ambiguous. Based on these findings, Judge Gambardella found that the appellants had failed to establish excusable neglect.

The O'Haras cannot claim excusable neglect based on the alleged insufficiency of publication notice, when their own conduct made them unknown creditors entitled only to publication notice. [FN7] The bankruptcy court properly considered and applied the relevant standard for the O'Haras's failure to file their proofs of claim in a timely manner. Given that its findings of fact were not clearly erroneous and its refusal to excuse appellants' dilatory conduct was not an abuse of discretion, the bankruptcy court's order enjoining appellants from filing proofs of claim is affirmed.

For the reasons set forth above,

\*6 IT IS on this *13th* day of December, 1993,

ORDERED that the order of the bankruptcy court enjoining appellants from filing proofs of claim after expiration of the bar date be, and hereby is, AFFIRMED.

> FN1. It appears that the first communication from the appellants to the Taj after the filing of the incident report was the service of the summons and complaint in August of 1992.

> FN2. Rule 3003(c)(3) of the Rules of Bankruptcy Procedure allows the

bankruptcy court to "fix and for cause shown [to] extend the time within which proofs of claim or interest may be filed." Bankr.R. 3003(c)(3).

> FN3. Rule 9006(b) allows the Court to extend the period for filing proofs of claim "on motion made after the expiration of the specified period ... where the failure to act was the result of excusable neglect." Bankr.R. 9006(b)(2).

> FN4. The Third Circuit distinguishes among three types of facts: basic facts, inferred factual conclusions, and ultimate facts. "Basic facts are the historical and narrative events elicited from the evidence.... Inferred factual conclusions are drawn from basic facts.... No legal precept is implicated in drawing permissible factual inferences." *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 102 (3d Cir.1981). Findings of these two types of facts are subject to the clearly erroneous standard.
> Ultimate facts are expressed in the language of a standard of law. *Id.* When reviewing an ultimate fact, the Court applies a mixed standard of review, "accept[ing] the trial court's findings of historical or narrative facts unless they are clearly erroneous, but exercis[ing] a plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts." *In re Sharon Steel Corp.*, 871 F.2d 1217, 1223 (3d Cir.1989) (quoting *Universal Minerals*, 669 F.2d at 103).

> FN5. We find this case to be somewhat different from the line of cases involving "truly unknown" claimants, such as employees who develop occupational injuries subsequent to the company's insolvency. *See, e.g., In re Charter Company (Ziegler)*, 113 B.R. 725 (M.D.Fl.1990) (discharging wrongful death claims made by claimants who were not aware of claims prior to the bar date); *In re Chicago, Rock Island, and Pac. R.R.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1993 WL 534494 (D.N.J.)
(Cite as: 1993 WL 534494 (D.N.J.))

Page 6

*Co.,* 90 B.R. 329 (N.D.Ill.1987).

FN6. However, we emphasize that if the debtor had petitioned for bankruptcy shortly after the appellants filed their incident report, we would not find the appellants' claims to be speculative.

FN7. We leave for another day the issue of whether excusable neglect can ever be a viable defense in cases where the claimant is only entitled to publication notice. *Pioneer* involved a situation in which the claimant had received actual notice of the bar date, but had nonetheless failed to file a proof of claim. It is more considerably more difficult to apply the excusable neglect standard in cases involving publication notice.

Claims whose holders are entitled only to publication notice can be classified in one of two ways. The first relates to the nature of the claim and comprises those claims which, because of causational or attributional indeterminacies, are not discovered until after the bar date has passed. The most common example of this category is a claim for occupational exposure (e.g., asbestos), where the medical condition arises years after the exposure or where the cause of the condition is not known to the claimant at the time of the bar date. The second category includes cases in which the conduct of the claimant has rendered an otherwise known claim speculative, such as where a claimant fails to pursue or make known her claim for a protracted period. The instant case is an example of this category.

Recognizing excusable neglect claims based on the failure of the claimant to read the published notices would be problematic in either of these two categories. In the former, recognizing claims that arise many years after the bankruptcy proceeding would subvert the very purpose of the bar date, namely, to confer finality upon the proceedings. Similarly, allowing claimants whose very conduct has made the claim speculative to file late proofs of claim would reward lack of diligence. In both cases, permitting parties to file late proofs of claim would tend to render publication notice meaningless.

1993 WL 534494 (D.N.J.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT F**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

### DECLARATION OF SERVICE REGARDING:

1. **Claims Bar Date Notice Materials**
2. **Grace Non-Asbestos Proof of Claim Form**
3. **W.R. Grace and Co. Asbestos Property Damage Proof of Claim Form**
4. **W.R. Grace and Co. Asbestos Medical Monitoring Proof of Claim Form**

I, _Craig A. Zink_ , state as follows:

1.     I am over eighteen years of age and I believe the statements contained herein are true based on my personal knowledge. My business address is c/o R.R. Donnelley,

---

[1] The Debtors consist of the following 62 entities: W.R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W.R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W.R. Grace Capital Corporation, W.R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

2.    On June 21, 2002, at the direction of the United States Bankruptcy Court for the

District of Delaware, I caused service of the following documents:

    a.  Bar Date Notice Package attached hereto as Exhibit 1;

    b.  Form 10 attached hereto as Exhibit 2;

    c.  PD Form attached hereto as Exhibit 3; and

    d.  MM Form attached hereto as Exhibit 4;

to be effected as follows:

    a.  Exhibit 1 was served on those parties listed in Exhibit 5;

    b.  Exhibit 2 was served on those parties listed in Exhibit 6; and

    c.  Exhibits 1, 2, 3 and 4 were served on those parties listed in Exhibit 7.

3.    All address lists were provided by Bankruptcy Management Corporation. Service was effected via first-class mail and deposited with the United States Postal Service with postage thereon fully prepaid.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: June  2 7 , 2002
El Segundo, California

State of California        )
                    ) ss
County of Los Angeles      )

Personally appeared before me on this _27th_ day of June 2002, _Craig Zink_ , an individual, known to me to be the person who executed the foregoing instrument and acknowledged the same.

Notarial Seal
Theresa M. Taylor, Notary Public
East Lampeter Twp., Lancaster County
My Commission Expires Dec. 6, 2003
Member, Pennsylvania Association of Notaries

**Exhibit 6**

**Bar Date Notice & Non-Asbestos POC**

VAN BURN, DALLAS
P.O. BOX 69
ROCK SPRINGS, WY 82902

VAN BUSSUM, DEBORAH
4506 MCINTIRE CROSSING
OWENSBORO, KY 42301

VAN CAMP TRAILER & BODY, INC.
6045 I-55 SOUTH/W.FRONTAGE RD.
JACKSON, MS 39212
USA

VAN CAN COMPANY
9046 CARROLL WAY
SAN DIEGO, CA 92121
USA

VAN CASTER, CHRISTINA
5833 HIGHLAND TERRACE #2
MIDDLETON, WI 53562

VAN CLEAVE, MELVIN
104 N WEST STREET APT. 4
SIGOURNEY, IA 52591

VAN COTT, BAGLEY, CORNWALL &
50 SOUTH MAIN STREET
SALT LAKE CITY, UT 84145
USA

VAN COURT, SUSAN
623 1/2 E SCENIC DR
PASS CHRISTIAN, MS 39571

VAN DAALWYK, BRENDA
900 10TH AVENUE
UNION GROVE, WI 53182

VAN DE DEY, PAMALA
1593 CEDAR ST
GREEN BAY, WI 54302

VAN DE HEY, KENNETH
1017 FAIR RD
GREENLEAF, WI 541269762

VAN DE VELDE, MARTINE
HULLEKEN 20 B-9940
EVERGEM, 09940

VAN DELFT, JAN
103 BROAD RIVER ROAD
SANTEE, SC 29142

VAN DELP ELECTRICAL CONTRACTOR
786 RT. 45
PILESGROVE, NJ 08098
USA

VAN DEN ELZEN, LORI
12919 VELP AVE
GREEN BAY, WI 54313

VAN DER STEUR, LUCIA
16 ROBIN LANE
PEPPERELL, MA 01463

VAN DER VAART BLDG. SUP
PO BOX 490
SHEBOYGAN, WI 53081
USA

VAN DER VAART BRICK CO
1440 SO. 16TH ST.
SHEBOYGAN, WI 53081
USA

VAN DER VAART BRICK CO
P O BOX 490
SHEBOYGAN, WI 53081
USA

VAN DER VAART BRICK CO
PO BOX 490
SHEBOYGAN, WI 53082
USA

VAN DER VAART BRICK
1820 JOHNSON DRIVE
MANITOWOC, WI 54220
USA

VAN DEUSEN, JOHN
353 W. LEESIDE ST.
GLENDORA, CA 91740

VAN DEWATER & VAN DEWATER
40 GARDEN STREET
POUGHKEEPSIE, NY 12602
USA

VAN DONSEL, DAYNA
1658 WINDSOR DR   APT 1
GREEN BAY, WI 54302

VAN DOORN, THOMAS
8113 NW WALNUT WAY
PARKVILLE, MO 64152

VAN DYKE, B
324 E NORA
MESA, AZ 85213

VAN DYKE, DANIEL
22 AMELIA STREET
NEWPORT, KY 41071

VAN EREM, TRACY
5472 CTY TRK W
DE PERE, WI 54115

VAN ESS, JOHN
2741 ONTARIO RD
GREEN BAY, WI 54311

VAN ETTEN, KIMBERLY
N3805 HWY J
POYNETTE, WI 53955

VAN GHEEM, STEVEN
853 SMITS ST
DE PERE, WI 54115

VAN GIESEN, GAIL
221 FOLKSTONE CIRCLE
AUGUSTA, GA 30907

VAN GORDER, JAMES
6023 NE FAILING
PORTLAND, OR 97213

VAN GORP, STEPHANIE
7629 CHARLES #203
LENEXA, KS 66216

**EXHIBIT G**

## GENERAL INSTRUCTIONS FOR COMPLETING ALL PROOF OF CLAIM FORMS

*The instructions and definitions below are general explanations of the law. In particular types of cases or circumstances, such as bankruptcy cases that are not filed voluntarily by a debtor, there may be exceptions to these general rules.*

### – GENERAL DEFINITIONS –

*"Bar Date"* is the date set by the Court as the date by which all persons and entities who have present claims against the Debtors must file proofs of claim or be forever barred from asserting any such claims against the Debtors.

*"Debtor"* is the person, corporation, or other entity that has filed a bankruptcy case.

*"Creditor"* is any person, corporation, or other entity to whom the debtor owed a debt on the date the bankruptcy case was filed.

*"Proof of Claim"* is a form telling the bankruptcy court how much the debtor owed a creditor at the time the bankruptcy case was filed (the amount of the creditor's claim). This form must be filed with the claims agent described below.

### – THE DEBTORS –

The Bar Date for filing Proofs of Claim shall apply to persons and entities having claims within section 101(5) of the Bankruptcy Code against any or all of the following entities or their predecessors-in-interest **as of the time immediately preceding the Bar Date**: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc, (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company (herein collectively referred to as the "Debtors" or "Grace").

### – SPECIFIC DEFINITIONS –

The Debtors have created specialized Proof of Claim forms for the following claims: Asbestos Personal Injury Claims, Asbestos Property Damage Claims, Zonolite Attic Insulation Claims, Settled Asbestos Claims, and Non-Asbestos Claims. Such claims are defined as follows:

*"Asbestos Personal Injury Claims"* are those claims as of the time immediately preceding the Bar Date involving personal injuries or damages related to exposure to asbestos containing products manufactured by the Debtors or exposure to vermiculite mined or milled by the Debtors. More specifically, Asbestos Personal Injury Claims are those claims against one or more of the Debtors, whether in nature of or sounding in tort, contract, warranty or any other theory of law or equity for, relating to or arising by reason of, directly or indirectly, physical, emotional or other personal injuries or other damages caused, or allegedly caused, directly or indirectly, by the exposure to, asbestos containing products or materials manufactured, sold, supplied, produced, specified, selected, distributed or in any way marketed by one or more of the Debtors or by the exposure to vermiculite mined, milled or processed by the Debtors, and arising or allegedly arising, directly or indirectly, from acts or omissions of one or more of the Debtors, including, but not limited to, all claims, debts, obligations or liabilities for compensatory damages such as loss of consortium, medical monitoring, personal or bodily injury, wrongful death, survivorship, proximate, consequential, general and special damages and punitive damages. For purposes of the Bar Date, the defined term "Asbestos Personal Injury Claim" is not intended to include those claims separately defined herein as (a) Asbestos Property Damage Claims; (b) Zonolite Attic Insulation Claims; (c) Settled Asbestos Claims; or (d) Non-Asbestos Claims even though such claims may or may not arise directly or indirectly as a result of exposure to asbestos or asbestos-containing products or the mining, milling or processing of vermiculite.

*"Asbestos Property Damage Claims"* are claims as of the time immediately preceding the Bar Date that relate, for example, to the cost of removal, diminution of property value or economic loss caused by asbestos in products manufactured by the Debtors or from vermiculite mined, milled, or processed by the Debtors. More specifically, Asbestos Property Damage Claims are those claims against, or any debt, obligation or liability of, one or more of the Debtors, whether in the nature of or sounding in tort, contract, warranty or any other theory of law or equity for, relating to or arising by reason of, directly or indirectly, property damage, including, but not limited to, diminution in the value thereof, or environmental damage or economic loss caused or allegedly caused, directly or indirectly, by asbestos in products or materials, manufactured, sold, supplied, produced, specified, selected, distributed or in any way marketed by one or more of the Debtors or from vermiculite mined, milled, or processed

by the Debtors and arising or allegedly arising, directly or indirectly, from acts or omissions of one or more of the Debtors, including, but not limited to, all claims, debts, obligations or liabilities for compensatory and punitive damages. For purposes of the Bar Date, the defined term "Asbestos Property Damage Claim" is not intended to include those claims separately defined herein as (a) Asbestos Personal Injury Claims; (b) Zonolite Attic Insulation Claims; (c) Settled Asbestos Claims; or (d) Non-Asbestos Claims even though such claims may or may not arise directly or indirectly as a result of claims for property damage relating to asbestos or vermiculite.

*"Zonolite Attic Insulation Claims"* are claims as of the time immediately preceding the Bar Date relate, for example, to the cost of removal, diminution of property value or economic loss caused by the Zonolite Attic Insulation manufactured by the Debtors. More specifically, Zonolite Attic Insulation Claims are those claims against, or any debt, obligation or liability of, one or more of the Debtors, whether in the nature of or sounding in tort, contract, warranty or any other theory of law or equity, relating to or arising by reason of, directly or indirectly, property damage, including, but not limited to, diminution in the value thereof, or environmental damage or economic loss caused or allegedly caused, directly or indirectly, by the Zonolite Attic Insulation sold, supplied, produced, specified, selected, distributed or in any way marketed by one of the Debtors — and arising or allegedly arising, directly or indirectly, from acts or omissions of one or more of the Debtors, including, but not limited to, all claims, debts, obligations or liabilities for compensatory and punitive damages. For purposes of the Bar Date, the defined term "Zonolite Attic Insulation Claim" is not intended to include those claims separately defined herein as (a) Asbestos Personal Injury Claims; (b) Asbestos Property Damage Claims; (c) Settled Asbestos Claims; (d) or Non-Asbestos Claims even though such claims may or may not arise directly or indirectly as a result of claims for property damage relating to Zonolite Attic Insulation.

*"Settled Asbestos Claims"* are those Asbestos Personal Injury Claims against the Debtors for which the Claimant and one or more of the Debtors entered into a fully-effective and binding settlement agreement, for a liquidated amount, as of the commencement of the Debtors' chapter 11 cases on April 12, 2001, but for which the Claimant has yet to receive payment. For purposes of the Bar Date, the defined term "Settled Asbestos Claim" is not intended to include those claims separately defined herein as (a) Asbestos Personal Injury Claims; (b) Asbestos Property Damage Claims; (c) Zonolite Attic Insulation Claims; or (d) Non-Asbestos Claims even though such claims may or may not arise directly or indirectly as a result of exposure to asbestos or asbestos-containing products or the mining, milling or processing of vermiculite.

*"Non-Asbestos Claims"* are any claims against the Debtors as of the time immediately preceding the Bar Date other than administrative expenses or other than Asbestos Personal Injury Claims, Asbestos Property Damage Claims, Derivative Asbestos Claims, Zonolite Attic Insulation Claims or Settled Asbestos Claims. More specifically, Non-Asbestos Claims are those claims against one or more of the Debtors, whether in the nature of or sounding in tort, contract, warranty or any other theory of law or equity for, relating to or arising by reason of, directly or indirectly, any injury, damage or economic loss caused or allegedly caused directly or indirectly by any of the Debtors or any products or materials manufactured, sold, supplied, produced, specified, selected, distributed or in any way marketed by one or more of the Debtors and arising or allegedly arising directly or indirectly, from acts or omissions of one or more of the Debtors, including, but not limited to, all claims, debts, obligations or liabilities for compensatory and punitive damages. For purposes of the Bar Date, the defined term "Non-Asbestos Claim" is not intended to include those claims separately defined herein as (a) Asbestos Personal Injury Claims; (b) Asbestos Property Damage Claims; (c) Zonolite Attic Insulation Claims; or (d) Settled Asbestos Claims.

The Bar Date for filing all claims against the Debtors is _____; 2001.

*Be sure to date the claim and place original signature of claimant or person making claim for creditor where indicated at the bottom of the claim form. Please type or print name of individual under the signature. Be sure all items are answered on the claim form. If not applicable, insert "Not Applicable".*

**RETURN CLAIM FORM (WITH ATTACHMENTS, IF ANY) TO THE FOLLOWING CLAIMS AGENT FOR THE DEBTORS:**

(Insert name and address of claims agent here)

-2-

## EXHIBIT H

Form of Proposed Order

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al., | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | Re: Docket No. 7571 and |
| | | 2/28/05 Agenda Item 8 |

## ORDER DENYING PACIFICORP AND THE VANCOTT BAGLEY CORNWALL & MCCARTHY 401(K) PROFIT SHARING PLAN'S MOTION FOR LEAVE TO FILE LATE PROOFS OF CLAIM

This matter coming before the Court on the *Pacificorp and the Vancott Bagley Cornwall & McCarthy 401(k) Profit Sharing Plan's Motion for Leave to File Late Proofs of Claim* (the "Motion"), which was filed in the above-captioned bankruptcy cases; the Court having reviewed and considered the Motion; the Court finding that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and (iii) no further notice or hearing on the Motion being required:

IT IS HEREBY ORDERED THAT the Motion is denied.

Dated: February _____, 2005

_____
The Honorable Judith K. Fitzgerald
United States Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al., | ) | Case No. 01-1139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |

## CERTIFICATE OF SERVICE

I, David W. Carickhoff, Jr., hereby certify that on the 11th day of February, 2005,

I caused a copy of the following document(s) to be served on the individuals on the attached

service list(s) in the manner indicated:

1.    **DEBTORS' OBJECTION TO PACIFICORP AND THE VANCOTT BAGLEY CORNWALL & MCCARTHY 401(K) PROFIT SHARING PLAN'S MOTION FOR LEAVE TO FILE LATE PROOFS OF CLAIM.**

David W. Carickhoff, Jr. (DE Bar No. 3715)

91100-001\DOCS_DE:94013.43

B-48

W. R. Grace Core Group Service List
Case No. 01-1139 (JKF)
Document Number: 27348
07 – Hand Delivery
11 – First Class Mail

(Counsel to Debtors and Debtors in
Possession)
Laura Davis Jones, Esquire
David Carickhoff, Esquire
Pachulski, Stang, Ziehl, Young & Jones
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705

(Counsel to Debtors and Debtors in
Possession)
Hamid R. Rafatjoo, Esquire
Pachulski, Stang, Ziehl, Young & Jones
10100 Santa Monica Boulevard, Suite 1100
Los Angeles, CA 90067-4100

(Copy Service)
Parcels, Inc.
Vito I. DiMaio
10th & King Streets
Wilmington, DE 19801

*Hand Delivery*
(Counsel to Official Committee of
Unsecured Creditors)
Michael R. Lastowski, Esquire
Duane, Morris & Heckscher LLP
1100 North Market Street, Suite 1200
Wilmington, DE 19801-1246

*Hand Delivery*
(Local Counsel to DIP Lender)
Steven M. Yoder, Esquire
The Bayard Firm
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899

*Hand Delivery*
(Local Counsel to Asbestos Claimants)
Marla Eskin, Esquire
Campbell & Levine
Chase Manhattan Centre
1201 N. Market Street, Suite 1500
Wilmington, DE 19801

*Hand Delivery*
(Counsel for The Chase Manhattan Bank)
Mark D. Collins, Esquire
Deborah E. Spivack, Esquire
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

*Hand Delivery*
(Counsel for Property Damage Claimants)
Michael B. Joseph, Esquire
Ferry & Joseph, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899

*Hand Delivery*
(United States Trustee)
Frank J. Perch, Esquire
Office of the United States Trustee
844 King Street, Room 2311
Wilmington, DE 19801

*Hand Delivery*
(Equity Committee Counsel)
Teresa K. D. Currier
Klett Rooney Lieber & Schorling
1000 West Street, Suite 1410
Wilmington, DE 19801

*First Class Mail*
(Counsel to Debtor)
James H.M. Sprayregen, Esquire
James Kapp, III, Esquire
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

**First Class Mail**
(W. R. Grace & Co.)
David B. Siegel
W.R. Grace and Co.
7500 Grace Drive
Columbia, MD 21044

**First Class Mail**
(Official Committee of Unsecured
Creditors)
Lewis Kruger, Esquire
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038-4982

**First Class Mail**
(Official Committee of Personal Injury
Claimants)
Elihu Inselbuch, Esquire
Rita Tobin, Esquire
Caplin & Drysdale, Chartered
399 Park Avenue, 27th Floor
New York, NY 10022

**First Class Mail**
(Official Committee of Property Damage
Claimants)
Scott L. Baena, Esquire
Member
Bilzin Sumberg Dunn Baena Price &
Axelrod LLP
First Union Financial Center
200 South Biscayne Blvd, Suite 2500
Miami, FL 33131

**First Class Mail**
(Equity Committee Counsel)
Philip Bentley, Esquire
Kramer Levin Naftalis & Frankel LLP
919 Third Avenue
New York, NY 10022

**First Class Mail**
Peter Van N. Lockwood, Esquire
Julie W. Davis, Esquire
Trevor W. Swett, III, Esquire
Nathan D. Finch, Esquire
Caplin & Drysdale, Chartered
One Thomas Circle, N.W.
Washington, DC 20005

**First Class Mail**
(Counsel to Official Committee of
Unsecured Creditors)
William S. Katchen, Esquire
Duane, Morris & Heckscher LLP
One Riverfront Plaza, 2nd Floor
Newark, NJ 07102

**First Class Mail**
(Counsel to DIP Lender)
J. Douglas Bacon, Esquire
Latham & Watkins
Sears Tower, Suite 5800
Chicago, IL 60606

**First Class Mail**
(Counsel to David T. Austern, Future
Claimant's Representative)
Swidler, Berlin, Shereff, Freidman, LLP
Roger Frankel
Richard H. Wyron
Matthew W. Cheney
3000 K Street, NW, Suite 300
Washington, DC 20007

**First Class Mail**
(Counsel to David T. Austern, Future
Claimant's Representative)
Phillips, Goldman & Spence, P.A.
John C. Phillips, Jr.
1200 North Broom Street
Wilmington, DE 19806

**W. R. Grace**
**Special Service List for PacifiCorp 2/11/05**
Case No. 01-1139 (JKF)
Doc. No. 105589
01 – Hand Delivery
02 – First Class Mail

*Hand Delivery*
(Pacific Corp and the VanCott Bagley
Cornwall & McCarthy 401(k) Profit Sharing Plan)
Richard S. Cobb
919 Market Street, Suite 600
PO Box 2087
Wilmington, DE  19899

(*First Class Mail*
(Pacific Corp and the VanCott Bagley
Cornwall & McCarthy 401(k) Profit Sharing Plan)
J. Robert Nelson
Vancott Bagley Cornwall & McCarthy
50 South Main Street
Salt Lake City, UT  84144

*First Class Mail*
(PacifiCorp)
Steven J. McCardell
Jared L. Inouye
1000 Kearns Building
136 South Main Street
Salt Lake City, UT  84101

Not Reported in F.Supp.2d
30 Employee Benefits Cas. 1615
(Cite as: 2003 WL 685645 (N.D.Ill.))

United States District Court,
N.D. Illinois, Eastern Division.

In re: COMDISCO, INC., et al., Reorganized
Debtors.
Enrico GALIETTA, et al., Appellants,
v.
COMDISCO HOLDING COMPANY, INC., et
al., Appellees.

Nos. 02 C 7030, 02 C 7031.

Feb. 27, 2003.

MEMORANDUM OPINION AND ORDER

KENNELLY, J.

*1 This case is before the Court on an appeal from
the United States Bankruptcy Court. Appellants are
former employees of appellee Comdisco. They
contend that Comdisco has wrongfully refused to
pay them bonuses to which they are entitled
pursuant to an employee incentive plan. Appellants
filed applications in the bankruptcy court for
payment of these bonuses as an administrative
expense pursuant to section 503(b)(1)(A) of the
Bankruptcy Code. The bankruptcy court denied the
applications. For the reasons stated below, we
affirm the bankruptcy court's decision.

BACKGROUND

On July 16, 2001, Comdisco and certain of its
domestic subsidiaries and affiliates filed voluntary
petitions for reorganization under Chapter 11 of the
Bankruptcy Code. The debtors continued to operate
their businesses as debtors-in-possession pursuant to
sections 1107(a) and 1108 of the Code.
Subsequently, Comdisco, Inc. ceased operations,
and the debtors were reorganized as Comdisco
Holding Company, Inc.

As part of the reorganization process, Comdisco
obtained the bankruptcy court's approval to sell its
world-wide disaster recovery services business, the
Availability Solutions Division, to SunGard Data
Systems, Inc. The sale closed on November 15,
2001. Prior to the closing, on August 29, 2001, the
bankruptcy court authorized Comdisco to continue
in effect until the closing certain incentive plans that

had been developed and partially implemented
before the Chapter 11 filings. The purpose of the
incentive plans was to "boost [ ] morale and
discourag[e] resignations among key employees, as
well as incentiviz[e] employees to vigorously assist
in retaining the value of the Debtors' estates through
the sale process." R. 59 (Debtor's Mot. for Order
Authorizing Continuation of Key Employee
Retention, Incentive, and Severance Programs ¶ 45).
[FN1]

> FN1. Two cases were consolidated for purposes of
> this appeal, Nos. 02 C 7030 and 02 C 7031. The
> content of the records in the two cases is almost
> identical, but their page numbers do not
> correspond. For convenience, citations to the
> Record in this opinion refer to the record in case
> No. 02 C 7030.

Appellants are former Comdisco employees who
worked in the Availability Solutions Division and
who participated in an incentive plan. Comdisco
employed appellants until the Division was sold to
SunGard on November 15, 2001. On that day,
appellants became employees of SunGard.

The present dispute concerns bonuses that
appellants allege Comdisco owes them pursuant to
the incentive plan. [FN2] The plan is a two page
document requiring the employee's signature at the
bottom of the second page. By its terms, the plan
covers Comdisco's 2001 fiscal year--October 1,
2000 through September 1, 2001--and establishes
two dates for the payment of bonuses--May 15,
2001 and December 1, 2001. A provision entitled
"Qualifying Participants" sets out the requirements
for plan eligibility and states in relevant part that
"Employees whose employment terminates for any
reason prior to the payment date ... are not eligible
to participate or receive payments under this plan."
R. 20 (emphasis in original). A provision entitled
"No Vested Rights" states that "No employee shall
have any vested interest in the Incentive Plan prior
to any payment by Comdisco. This document is only
designed to communicate the basic provisions of the
Plan, and should not be construed as a contract
between a participant and Comdisco." R. 21.

> FN2. Appellants characterize the payments as
> "commissions," and Comdisco refers to them as
> "bonuses." Despite this difference, the parties are in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2003 WL 685645, *1 (N.D.Ill.))

agreement that the distinction does not affect the merits of this appeal. Because the incentive plan itself refers to the incentive as a "cash bonus," the Court will use the term bonus rather than commission.

*2 With the sale of Availability Solutions to SunGard impending, Comdisco agreed to extend the plan--which by its terms was set to expire on September 1, 2001--until the November 15, 2001 closing of the sale. Comdisco set February 15, 2002 as the payment date for any bonuses that might be owed with respect to this extension period. Because workers in the Availability Solutions Division would no longer be Comdisco employees on February 15, the acquisition agreement between Comdisco and SunGard obligated Comdisco to pay any bonuses due as a result of the plan's extension.

On November 15, 2001, appellants became SunGard employees. On December 1, 2001--the second scheduled payment date for the plan's original period--Comdisco paid bonuses to appellants for the period ending September 1, 2001. On or about December 20, 2001, SunGard terminated appellants' employment. On February 15, 2002--the scheduled payment date for the extension period--Comdisco paid bonuses to those former Comdisco employees who had participated in the plan's extension and who remained in SunGard's employ on that day. Appellants were not among this group. Because they were no longer employed by SunGard on the February 15 payment date, Comdisco deemed appellants not to have met the plan's requirement that a participant be employed on the payment date in order to receive a bonus.

Appellants maintain that they are entitled to bonuses for the extension period, and on June 13, 2002, they filed applications in the bankruptcy court for payment of the bonuses as an administrative expense. They state in their applications that Comdisco agreed to extend the plan and to pay bonuses "under the Plan" for the extension period. R. 16 (Application for Allowance of Post-Pet. Compensation as Administrative Expense ¶¶ 6, 7). Comdisco's failure to tender the bonuses, they claim, violated the Illinois Wage Payment and Collection Act (IWPCA), 820 ILCS 115/1-115/15. They also maintain that principles of estoppel require Comdisco to pay the bonuses.

The bankruptcy court denied the applications. In an oral ruling, the court stated that appellants had "not earned the plan payments and had no contractual right to them." R. 135 (Tr. of Aug. 20, 2002 Proceedings). Appellants did not earn the bonuses because under the plan "employment on [the payment] date is [a] condition precedent to receiving the payment." Id. 134. Because SunGard had terminated their employment before the February 15 payment date, the court ruled that the former employees "weren't eligible to receive such payments since they weren't employed on the date of the payment ." Id. 135.

The court rejected appellants' argument that a contract was formed by Comdisco's promise to extend the plan and appellants' continued employment. The court found the plan's "no vested rights" provision, which is "located directly above the signature line and is conspicuous and noticeable," to be an enforceable disclaimer under Illinois law. Id. It reasoned that "since the plan specifically states that it should not be construed as a contract between a participant and Comdisco, ... there is no contractual right to those bonuses." Id. The court consequently found no violation of the IWPCA, which "does not confer any rights to recovery in the absence of contractual right." Id.

*3 The court likewise disposed of the former employees' promissory estoppel and equitable estoppel arguments: because "the language of the plan is clear ... the employees could not have justifiably or reasonably relied on any oral statements that contradicted that language." Id. at 136. Moreover, the court also found "no evidence of any kind of any oral agreement superseding the [plan]," and "no showing of any ... bad faith conduct." Id. at 136-37.

The former employees have appealed the bankruptcy court's denial of their applications. For the reasons stated below, the Court affirms the bankruptcy court's decision.

## DISCUSSION

In reviewing a decision by the bankruptcy court, the district court applies the same standards of review that govern other appeals in the federal system. We defer to the bankruptcy court's findings of fact, reviewing them under the "clearly

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.2d
(Cite as: 2003 WL 685645, *3 (N.D.Ill.))

erroneous" standard. In re Frain, 230 F.3d 1014, 1017 (7 th Cir.2000). Conclusions of law are reviewed de novo. Shelby County State Bank v. Van Diest Supply Co., 303 F.3d 832, 835 (7 th Cir.2002). Appellants bear the burden of proving their entitlement to an administrative expense by a preponderance of the evidence. In re Sheridan, 187 B.R. 611 (N.D.Ill.1995).

Appellants maintain that Comdisco is contractually obligated to pay them bonuses for the extension period. They further claim that by breaching this obligation, Comdisco has violated the IWPCA. The IWPCA provides for the timely payment of a terminated employee's full final compensation: "[e]very employer shall pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee." 820 ILCS 115/5. The IWPCA defines "final compensation" as "wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties." Id. 115/2 (emphasis added).

The IWPCA, then, merely requires "that the employer honor his contract"; it does not confer rights to compensation in the absence of a contract. Nat'l Metalcrafters v. McNeil, 784 F.2d 817, 824 (7th Cir.1986). Unless appellants can establish that Comdisco is under a contractual obligation to pay the bonuses, the IWPCA has no application to this case.

Appellants maintain that they are contractually entitled to bonuses under two theories: the plan itself gave rise to a contract, and a separate promise gave rise to a contract. The existence of a contract is a question of law that we review de novo. Barefield v. Vill. of Winnetka, 81 F.3d 404, 709 (7th Cir.1996); Echo, Inc. v. Whitson Co., Inc., 121 F.3d 1099, 1102 (7th Cir.1997) ("Under Illinois law, when the basic facts are not in dispute, the existence of a contract is a question of law." (citing Cottingham v. Nat'l Mut. Church Ins. Co., 290 Ill. 26, 124 N.E. 822 (Ill.1919))). Failing a contractual obligation, appellants maintain that Comdisco is estopped from denying appellants the bonuses.

## A. Claim Based on the Plan

*4 Appellants argue that the plan's "no vested rights" provision does not bar their claim for bonuses under the plan. They maintain that this disclaimer is insufficiently conspicuous to be enforced under Illinois law. The bankruptcy court rejected this argument, finding that the provision complied with Illinois law.

Appellants' unstated assumption is that the plan itself gave rise to a binding contract. Under Illinois law, a statement of employment policy may give rise to an enforceable contract if three conditions are met:

(1) the language of the statement sets forth a promise in terms clear enough to cause a reasonable employee to believe that an offer has been made; (2) the statement is distributed to the employee, so that the employee is aware of its contents and reasonably construes it to be an offer; and (3) the employee accepts the offer by commencing or continuing to work after reading the statement.

Tatom v. Ameritech Corp., 305 F.3d 737, 742 (7th Cir.2002) (citing Duldulao v. Saint Mary of Nazareth Hosp. Ctr., 115 Ill.2d 482, 490, 505 N.E.2d 314, 318 (Ill.1987)). An effective disclaimer can prevent a policy statement from giving rise to a contract by impeding any reasonable belief that an offer has been made. See Tatom, 305 F.3d at 743 (holding that an "express disclaimer foreclose[d] any reasonable expectation that [the employee] had been promised a bonus.")

The disclaimer at issue here states:

No Vested Rights: No employee shall have any vested interest in the Incentive Plan prior to any payment by Comdisco. This document is only designed to communicate the basic provisions of the Plan and should not be construed as a contract between a participant and Comdisco. This Plan will be interpreted under Illinois law, without regard to its conflicts of law rules.

R. 21. This provision resembles the one at issue in Tatom v. Ameritech Corp., supra, which the Seventh Circuit found "expressly disavow[ed] any notion that a bonus had been promised." Tatom, 305 F.3d at 743. There, the provision appeared on the last page of a nine page compensation brochure, was of the same typeface as the rest of the document, and appeared under the heading "Notice." It stated that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.2d
(Cite as: 2003 WL 685645, *4 (N.D.Ill.))

Page  6

the brochure

> is a statement of [the employer's] intentions and
> does not constitute a guarantee that any particular
> amount of compensation will be paid. It does not
> create a contractual relationship or any
> contractually enforceable rights between [the
> employer] and the employee.

Id. (quoting the compensation plan). The Seventh
Circuit found that this provision doomed the
employee's contractual claim because it "did not
give rise to a reasonable belief" that he would
receive a bonus. [FN3] Id. at 744.   Appellants'
claim likewise fails.   The "no vested rights"
provision states in similarly plain language that the
document only communicates the plan's provisions
and that the plan should not be considered a
contract.

> FN3.  Appellants incorrectly argue that Tatom is
> inapposite. They claim that the reason the court
> upheld the bonus's denial is that the plaintiff quit his
> job to work for the defendant's competitor, "an act
> that specifically precluded payment under his
> agreement." Appellants' Reply Br. at 10. The court
> did not, however, reach the question whether the
> employer improperly withheld the bonus based on
> plaintiff's joining a competitor.  Having found the
> disclaimer to doom contract formation, the court
> concluded that it did not need to consider this
> additional question. Tatom, 305 F.3d at 744.

*5 Appellants argue that the "no vested rights"
provision is unenforceable because it is
insufficiently conspicuous to satisfy Illinois law.
The cases they cite, however, militate in favor of
finding the provision at issue here enforceable. The
disclaimer in Hicks v. Methodist Medical Center,
229 Ill.App.3d 610, 593 N.E .2d 119 (1992), was
found to be insufficiently conspicuous because it
was located on the thirty-eighth page of a thirty-nine
page employee handbook, appeared under the
obscure heading "Revisions," and was not "in any
way prominently displayed." Id. at 614, 593 N.E.2d
at 121. The disclaimer in Long v. Tazewell/Pelkin
Consolidated Communications Center, 215
Ill.App.3d 134, 574 N.E.2d 1191 (1991), was even
more obscure. Not only was the disclaimer "not set
out separate and apart[;] ... it was in effect hidden
within the text describing the [employee's] duties."
Id. at 140, 574 N.E.2d at 1193-94. It was "not
unequivocal" and did not specifically state that the
employer would not be bound by the handbook's

provisions. Id., 574 N.E.2d at 1194.

By contrast, the "no vested rights" provision in
this case clearly and unequivocally states that the
plan is not a contract and that an employee has no
vested interest in a bonus until its payment. Far
from being hidden in a long employee manual, the
provision is located on the second page of a two-
page document under an unambiguous heading
which itself disavows the existence of vested rights.
It is comprised of three sentences and is located
directly above the signature line on which the
employee avers that he has read the plan and agrees
to its terms and conditions. It is also adequately set
apart; the words "No Vested Rights" are bold and
underlined.

Appellants argue that the provision is nonetheless
"confusing" because its third sentence is a choice of
law provision and that "[u]pon reading the
paragraph, any reasonable person would be misled
to conclude that even though the particular
document might not contain enforceable rights,
somewhere there existed a more detailed and
complete Plan document that did confer enforceable
rights." Appellants' Br. at 13. These arguments lack
merit. The provision's language is very clear on its
face, and nothing in it would lead a reasonable
person to assume that a different document confers
enforceable rights. The presence of a single sentence
at the end of the provision establishing Illinois law
as the law of choice does not undermine its clarity.
We therefore agree with the bankruptcy court's
ruling that the provision was conspicuous,
enforceable, and a bar to the formation of a binding
contract in this case.

Appellants make the additional argument that
under Illinois law they cannot be forced to forfeit
their bonuses for failing to be employed on the
payment date.  In support of this argument they rely
on Camillo v. Wal-Mart Stores, Inc., 221
Ill.App.3d 614, 582 N .E.2d 729 (1991), in which
the Illinois Appellate Court held that the plaintiff
was entitled to a pro rata share of his bonus under
the IWPCA.  In Camillo, the benefit program
provided that "assistant managers are paid a bonus
each year ... [and] must be on the payroll or
actively working on January 31, or they will forfeit
their bonus." Id. at 617, 582 N.E.2d at 731
(quoting the benefit program). By firing the plaintiff
on December 31, the employer made it impossible

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.2d
(Cite as: 2003 WL 685645, *5 (N.D.Ill.))

for him to fulfill the requirement of employment on January 31. Under these circumstances, the court found that the employee had earned a pro rata share of his bonus.

**\*6** Three important differences distinguish Camillo from the instant case. See Tatom v. Ameritech Corp., No. 99 C 683, 2000 WL 1648931, at \*8-9 (N.D.Ill. Sept. 28, 2000), aff'd, 305 F.3d 737 (7th Cir.2002). First, the plan here contains no such unequivocal statement that employees are paid bonuses each year. Second, the plan in Camillo did not contain, or at least the court did not consider, a disclaimer preventing the emergence of a contractual right. And third, in Camillo, it was the defendant that rendered the employee's compliance with the requirement impossible by firing him before the vesting date. Here, Comdisco was in no way involved with appellants' inability to meet the employment requirement since it was SunGard, not Comdisco, that terminated their employment.

B. Claim of Superseding Promise

Appellants contend that a "new agreement" also supports their contractual claim. They allege that Comdisco promised to pay them commissions for the extension period "regardless of their employment status." Appellants' Reply Br. at 9. According to appellants, this "new offer," coupled with appellants' acceptance by remaining on the job, gave rise to a binding contract. As noted by the bankruptcy judge, there is no direct evidence that Comdisco made such a promise. According to appellants, the fact that an arrangement other than the plan itself was in effect for the extension period is manifest in the fact that the plan, which by its terms expired on September 30, 2001, does not cover the extension period. One essential term of the arrangement is, therefore, outside the four corners of the plan document. Even assuming, however, that a new agreement governs the payment of the bonuses, for appellants to succeed in establishing a contractual right they would have to establish that the new agreement deviated from the plan's plain language in two other essential ways--by excluding the requirement that a participant be employed on the payment date and also excluding the disclaimer that the Court has already found prevents the formation of a contract.

Appellants submit that the plan, by its terms, requires employment by Comdisco on the payment date but is silent with regard to employment by SunGard. As evidence that this requirement was suspended, appellants point out that all parties knew appellants would no longer be employed by Comdisco on the February 15 payment date. Appellants' argument that given this state of affairs, some modification had to be in effect for the extension period has merit. But it only gets them part of the way. Appellants bear the burden of affirmatively establishing their contractual entitlement; merely pointing out the plan was modified does not establish the content of that modification. It certainly does not establish a promise that bonuses would be paid regardless of employment status and despite the "no vested rights" provision. Appellants provided no evidence that such a promise was made. For this reason, and because there was no evidence that the plan was modified to exclude the "no vested rights" provision, appellants failed to meet their burden of establishing a contractual right to the bonuses. We therefore affirm the bankruptcy court's conclusion that no superseding promise gave rise to a contractual obligation to pay bonuses and that absent a contractual breach, there was no violation of the IWPCA.

C. Claims of Estoppel

**\*7** Appellants allege that Comdisco is estopped from denying its obligation to pay them bonuses. To succeed on a promissory estoppel claim, appellants must prove that they relied on "an unambiguous promise" made by Comdisco. Quake Constr. Co. v. Am. Airlines, Inc ., 141 Ill.2d 281, 310, 565 N.E.2d 990, 1004 (1990). Whether such a promise was made is a question of fact that we review for clear error. R.S. Bennett & Co., Inc. v. Econ. Mech. Indus., Inc., 606 F.2d 182, 186 (7th Cir.1979). As noted above, the record contains no evidence that Comdisco made any promise other than to extend the plan and to pay commissions pursuant to the plan. There is certainly no evidence that Comdisco made an "unambiguous promise" to suspend the employment requirement. Given this lack of evidence, the bankruptcy court did not clearly err in denying appellants' promissory estoppel claim, and we therefore affirm its decision.

To prove a claim of equitable estoppel, appellants

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.2d
(Cite as: 2003 WL 685645, *7 (N.D.Ill.))

Page  8

must demonstrate that they relied on a misrepresentation by Comdisco. Black v. TIC Inv. Corp., 900 F.2d 112, 115 (7th Cir.1990). "Whether facts proven are sufficient to constitute an estoppel is a question of law," which we review de novo. Jennings Water, Inc. v. City of North Vernon, Ind, 895 F.2d 311, 316 (7th Cir.1989). Appellants argue that because the Availability Solutions sale was impending when the promise to extend the plan was made, Comdisco is estopped from asserting the requirement that a participant "continue to be employed by the Debtor on the payment date." Appellants' Br. at 23. But that is not Comdisco's position; it paid bonuses to its former employees who were employed by SunGard on that date. As discussed above, appellants have presented no evidence that the plan's requirement of employment as of the payment date was suspended entirely. They may have misunderstood Comdisco's intentions, but they have presented no evidence that Comdisco misrepresented its intention of requiring a participant to be employed in the Availability Solutions Division.

On a related note, appellants allege that Comdisco has not enforced the employment requirement in all cases. They claim that on December 1, 2001--the second payment date for the plan's original period--Comdisco paid bonuses to former employees who had been terminated before September 30, 2001--and who therefore never became SunGard employees--although they failed to meet the employment requirement on the payment date. Appellants' Br. at 8-9. Appellants allege that this different treatment amounts to favoritism and discrimination, but it is unclear, and appellants have not shown, how this allegation advances their claims. Although evidence of non-enforcement could support an estoppel argument, appellants neither allege nor provide evidence that they relied on the non-enforcement of the plan's employment requirement.

For these reasons, we affirm the bankruptcy court's rejection of appellants' equitable estoppel argument.

D. Request for Hearing

*8 Appellants ask the Court, in the event we do not find that the bankruptcy court wrongfully denied their applications, to remand the case for an

evidentiary hearing so that they may introduce evidence on their claims. They claim that "[i]f there are factual disputes, Appellants are entitled to an evidentiary hearing." Appellants' Br. at 23. Although we affirm the bankruptcy court's decision in its entirety, we nevertheless address this request in order to make clear why appellants are not entitled to a new opportunity to prove their claims.

Appellants advance two excuses for the absence in the record of an evidentiary basis for their claims. First, they state that they "were never given an opportunity" to present evidence in support of their claims. Appellants' Reply Br. at 8. Yet there is absolutely no indication anywhere in the record that the bankruptcy judge foreclosed appellants' ability to bolster their claims with documentary evidence such as affidavits or written promises that bonuses would be paid regardless of a participant's employment status. No such evidence was submitted.

Second, appellants maintain that they were not required to present evidence "because the Debtor immediately conceded that the Applications for compensation were factually accurate." Appellants' Reply Br. at 8. They maintain that Comdisco's concession in open court that "there's no dispute on the underlying factual issues" relieved appellants of their burden of marshaling evidence in support of their claims. R. 86 (Tr. of July 15, 2002 Proceedings). Appellants have misunderstood the import of Comdisco's statement. Comdisco's concession referred only to the factual allegations contained in the applications, which, on the date the statement was made, were the only submissions appellants had filed. In the applications, claimants state that Comdisco assured its employees that it would "continue to pay commissions under the Plan," "to extend the Plan to cover the [extension] period," and to "pay commissions under the Plan for the period through November 15, 2001." R. 15-16 (Application for Allowance of Post-Pet. Compensation as Administrative Expense ¶¶ 4, 6, 7, 9) (emphasis added). The applications do not allege that Comdisco promised to pay bonuses regardless of a participant's employment status. The only implication of Comdisco's concession, therefore, is that it promised to extend the plan and to make payments pursuant to the plan, promises Comdisco contends it has kept. In sum, appellants were not relieved of the burden of presenting the bankruptcy

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.2d
(Cite as: 2003 WL 685645, *8 (N.D.Ill.))

court with evidence supporting their claims. Their request that we remand the case to afford them the opportunity to do so now is denied.

## CONCLUSION

For the reasons stated above, the Court affirms the decision of the United States Bankruptcy Court.

2003 WL 685645 (N.D.Ill.), 30 Employee Benefits Cas. 1615

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.                                                  **Page  19**
(Cite as: 1993 WL 534494 (D.N.J.))

Only the Westlaw citation is currently available.

United States District Court, D. New Jersey.

In re TRUMP TAJ MAHAL ASSOCIATES,
Trump Taj Mahal, Inc., The Trump Taj Mahal
Corporation, and Trump Taj Mahal Funding,
Inc., Debtors.
TRUMP TAJ MAHAL ASSOCIATES,
Plaintiffs-Appellees,
v.
Helen O'HARA and Eugene O'Hara Defendants-
Appellants,
and
Ginan ALIBRAHAM, Rashid Alibraham,
Cynthia Smith, Ann Jordan, Marilyn Kunkel,
Robert W. Matthews, Louis J. Picariello,
Cynthia Picariello Rita Newman,
Madelyn Tolerico, Louise Mc Ree and Earl
McRee, Defendants.

Civ. A. No. 93-3571 (JEI) Adv. No. 93-2056.

Dec. 13, 1993.

Schwartz, Tobia & Stanziale, P.C. by Martin L.
Borosko, Montclair, NJ, for plaintiffs-appellees.

Carmen R. Faia, P.C. by Carmen R. Faia,
Pleasantville, NJ, for defendants-appellants Helen
O'Hara and Eugene O'Hara.

MEMORANDUM OPINION AND ORDER
AFFIRMING OPINION AND ORDER OF
BANKRUPTCY COURT

IRENAS, District Judge.

*1 On July 16, 1991, Trump Taj Mahal
Associates, Trump Taj Mahal, Inc., Trump Taj
Mahal Corporation, and Trump Taj Mahal Funding,
Inc. (collectively, the "Taj" or the "debtor") filed
petitions under Chapter 11 of the Bankruptcy Code,
11 U.S.C. §§ 101 et seq.   Thereafter, pursuant to
an order dated July 17, 1991, the bankruptcy court
established August 23, 1991, as the deadline for
filing proofs of claim against the debtor (the "bar
date") and allowed notice of the bar date by
publication in several local and national newspapers.

This case comes before the Court on appeal from a
decision of Bankruptcy Judge Rosemary

Gambardella enjoining a group of personal injury
claimants, including the appellants, from filing
proofs of claim after the bar date had passed.
Applying the "known or reasonably ascertainable"
standard set forth in Tulsa Professional Collection
Services v. Pope, 485 U.S. 478 (1988), Judge
Gambardella concluded that appellants' claims
resulting from a slip and fall incident at the Trump
Taj Mahal were "speculative and conjectural," and
that publication notice of the bar date was sufficient
to satisfy due process requirements.

We find that the Bankruptcy Court did not commit
an abuse of discretion in finding that appellants'
claims against the Taj were speculative and
conjectural, where appellants had filed a prepetition
incident report but failed to respond to a letter from
debtor's claim adjuster mailed ten months before the
bar date.     The order of the bankruptcy court
enjoining the appellants from filing a proof of claim
will be affirmed.

I. BACKGROUND

A. Factual Background

The facts of this case are detailed in the opinion
accompanying Judge Gambardella's order, In re
Trump Taj Mahal Associates, 156 B.R. 928
(Bankr.D.N.J.1993).      On August 23, 1990,
appellant Helen O'Hara was allegedly injured in a
"slip and fall" incident at the Trump Taj Mahal.
She and her husband, appellant Eugene O'Hara,
filed a report of the incident with a security guard or
other Taj representative that same day.

On October 12, 1990, Jay Baver, a Claims
Adjuster for the Taj, sent a letter to Mrs. O'Hara in
which he acknowledged receipt of the accident
report and advised her that the Taj was "willing to
consider paying your out-of-pocket medical bills
associated with this matter as well as additional
compensation for distress."    Letter from Jay Baver
to Helen O'Hara dated Oct. 12, 1990.    Baver
requested that Mrs. O'Hara forward to him copies
of all medical bills, as well as a doctor's evaluation
of her injury.    The O'Haras apparently failed to
reply to this letter. [FN1]

B. Procedural History

The debtor petitioned for bankruptcy under

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1993 WL 534494, *1 (D.N.J.))

Page 20

Chapter 11 of the Bankruptcy Code on July 16, 1991.    By Order dated July 17, 1991, Judge Gambardella (1) established August 23, 1991, as the bar date for filing proofs of claim, [FN2] and (2) allowed notice of the bar date by publication in the New York Times, the Wall Street Journal, the Newark Star-Ledger, the Atlantic City Press, and the Philadelphia Inquirer.    In addition to publication notice, the debtor was required to give actual notice by mail to known creditors.

On August 21, 1992, almost one year to the day after the bar date had passed, the O'Haras filed a complaint in the Superior Court of New Jersey, Law Division--Atlantic County, seeking damages as a result of the injuries allegedly suffered by Mrs. O'Hara at the Taj Mahal.    On October 7, 1992, appellants' counsel was advised by Nicholas F. Moles, Senior Vice President of Law at the Taj, that since appellants had not filed a proof of claim before the bar date, "further proceedings in this matter are barred by the provisions of the United States Bankruptcy Code."    Letter from Nicholas F. Moles to Carmen Faia dated Oct. 5, 1992.    Appellants continued with the litigation, and requested copies of the bankruptcy pleadings thus far submitted so that Mrs. O'Hara could file a proof of claim.

*2 Debtor filed a "Second Order to Show Cause Why Defendants Should not be Enjoined from Prosecuting an Action against Debtors Barred by 11 U.S.C. § 362, the Restraining Order Dated July 17, 1991, the Order of Confirmation Dated August 28, 1991 and 11 U.S.C. § 524(a)(3)" ("Second Order to Show Cause") against appellants and other personal injury claimants who had instituted actions against the Taj after the bar date had passed.    On April 4, 1992, Judge Gambardella delivered an oral opinion in which she (1) granted the debtor's Second Order to Show Cause, (2) declared null and void any "complaints concerning prepetition debts filed against the Debtor in the present case after the onset of the automatic stay," 156 B.R. at 935, (3) enjoined the defendants from prosecuting the subject law suits against the debtor, and (4) found that the defendant's actions were for prepetition claims subject to the automatic stay provisions of § 524(a)(3).

A second hearing was held to discuss the "excusable neglect" [FN3] claims of defendants O'Hara and Jordan in light of the Supreme Court

decision in Pioneer Investment Serv. Co. v. Brunswick Assoc., 113 S.Ct. 1489 (1993).    On July 1, 1993, Judge Gambardella issued a written opinion in which she found that the defendants had failed to establish excusable neglect.    On July 14, 1993, an order was issued permanently enjoining Helen O'Hara and Eugene O'Hara, among others, from pursuing their cause of action.

Appellants filed a Notice of Appeal from the order on August 5, 1993.    The issues designated for appeal addressed whether (1) the O'Haras could properly be considered "unknown" claimants;    (2) publication notice of the bar date was adequate to provide due process to the O'Haras; (3) the Bankruptcy Court correctly held that the O'Haras' failure to file a claim did not constitute excusable neglect;    and (4) the Bankruptcy Court acted within its discretion in denying the O'Haras request to enlarge the time within which to file a proof of claim.

II. LEGAL DISCUSSION

A. Standard of Review

The decision to permit or deny an untimely proof of claim lies within the sound discretion of the bankruptcy court, and the court's decision will only be disturbed upon a showing of an abuse of that discretion.    In re Vertientes, Ltd., 845 F.2d 57, 59 (3d Cir.1988).    Reviewing courts should give wide deference to a determination whether a claimant in bankruptcy constitutes a known creditor deserving of actual notice.    In the Matter of Chicago, M. St. P. & P. RR. Co., 974 F.2d 775, 788 (7th Cir.1992).    Assuming that a bankruptcy court has correctly applied proper legal precepts, and that the court's basic and inferred factual findings are not clearly erroneous, [FN4] the bankruptcy court's ultimate determination should be affirmed absent an abuse of discretion. In re Dykes, No. 93-7235, slip op. at 2 (3d Cir. Nov. 30, 1993); Meridian Bank v. Alten, 958 F.2d 1226, 1230 n. 2 (3d Cir.1992); In re Sharon Steel Corp., 871 F.2d 1217, 1222 (3d Cir.1989);    see also Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 102-03 (3d Cir.1981).

B. Notice Requirements under the Due Process Clause

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1993 WL 534494, *3 (D.N.J.))

Page 21

**\*3** Appellants contend that their submission of an accident report to the Taj transformed them into "known creditors" entitled to actual notice of the August 23, 1991, bar date and that the failure of the Taj to provide them with such notice rendered their failure to timely file a proof of claim excusable neglect. Appellees respond that the Taj receives thousands of such reports each year, the vast majority of which do not proceed to litigation. Particularly where the putative plaintiff has failed to respond to offers of compensation, the Taj argues that the existence of a claim is too speculative to merit actual notice.

Due process requires notice that is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950). However, "impracticable and extended searched are not required in the name of due process." Id. at 316-19. Whether a particular method of notice is reasonably calculated to reach interested parties depends upon the particular circumstances of each case. Tulsa Professional Collection Services, Inc. v. Pope, 485 U.S. 478, 484 (1988).

Bankruptcy law divides creditors into two groups when determining the proper notice to be given of bar dates: known and unknown creditors. The due process standard set forth in Mullane requires that the debtor's known creditors be given actual notice of the bankruptcy proceedings and relevant bar dates. City of New York v. New York, N.H. & H.R. Co., 344 U.S. 293, 296 (1953). Unknown creditors, however, are merely entitled to constructive notice of the pendency of a bankruptcy proceeding and of relevant bar dates. Mullane, 339 U.S. at 314; In re GAC Corp., 681 F.2d 1295, 1300 (11th Cir.1982). The first task for the bankruptcy court, then, is to determine whether the Taj had knowledge of the appellants' claims.

Unknown creditors are "those whose identities or claims are not reasonably ascertainable and those creditors who hold only conceivable, conjectural or speculative claims." In re Thomson McKinnon Sec., Inc., 130 B.R. 717, 720 (Bankr.S.D.N.Y.1991) (citing In re Charter Crude Oil Co., 125 B.R. 650, 655 (M.D.Fla.1991)) (emphasis added); see also Pope, 485 U.S. at 490

("Nor is everyone who may conceivably have a claim properly considered a creditor entitled to actual notice.... [I]t is reasonable to dispense with actual notice to those with mere 'conjectural' claims."); In re GAC Corp., 681 F.2d at 1300 (11th Cir.1982); In re Hunt, 146 B.R. 178 (Bankr.N.D.Texas 1992). Debtors are not required to search out every conceivable or possible creditor. It is enough if the debtor has made reasonably diligent efforts to uncover the identities and claims of any creditors.

Courts in other districts, reviewing factual situations similar to that of the instant case, have found the claims alleged to be speculative and conjectural. [FN5] In re L.F. Rothschild Holdings, Inc., No. 92-1129, 1992 WL 200834 (S.D.N.Y. Aug. 3, 1992), appellant John Barry had been the head of the debtor firm's investment banking division until he resigned in 1989. After his departure, Barry continued to contact executives at the firm, hoping to resolve a dispute over his 1988 bonus. The debtor filed a voluntary Chapter 11 petition in early 1991, and the bankruptcy court established May 1, 1991, as the bar date. Barry did not receive actual notice of the bar date, and sought permission to file a late proof of claim. The district court found that Barry's negotiations with the firm failed to constitute "a dispute ... of which LFR should have been aware." 1992 WL 200834 at \*4. It concluded:

**\*4** [I]t is undisputed that after his resignation in September 1989, Barry gave no notice to LFR that he had any claim against LFR until more than two years later in November 1991.... Barry does not attempt to give any explanation why, despite his failure to notify LFR of his claim during the two-year period, LFR should nevertheless have known that he had not abandoned any claims he may have had. Failure to remind LFR of the size and existence of his claim in his letter of resignation or to pursue it at any time thereafter seems inconsistent with status as a known creditor as opposed to a conceivable, or conjectural creditor.

Id.; see also In re Flanigan's Enterprises, Inc., 77 B.R. 963 (Bankr.S.D.Fla.1987) (refusing to allow insurance company that had prior contractual relationship with debtor to file late proof of claim, where claimant had delayed in informing debtor of claim).

Similarly, in In re Charter Company, 125 B.R.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1993 WL 534494, *4 (D.N.J.))

650 (M.D.Fla.1991), the court found that a dispute between the debtor and one of its oil suppliers was insufficient to render the supplier a "known creditor." Pemex had entered into a sales contract for the sale of oil to the debtor. However, the parties fell into a dispute over the effective date of a price reduction established by Pemex. The parties attempted to reconcile their differences, and the debtor believed the dispute was resolved when Pemex took no further action for several years.

The bankruptcy court held that Pemex was a known creditor entitled to formal, actual notice of the bar date. The district court reversed this determination, finding that Pemex's delinquency in pursuing any disputes it might have had against the debtor rendered it an unknown creditor for the purposes of determining the appropriate standard of notice:

> Even assuming Charter knew there was a possibility of a claim by Pemex, Charter was not required to give actual notice to creditors with merely conceivable, conjectural or speculative claims.... Also, if Charter reasonably believed, or could have believed, that Pemex had abandoned its claim, then even Charter's actual or constructive knowledge of a remote possibility of a claim by Pemex would not raise Pemex to the level of a known creditor deserving of actual notice of the bar date.

125 B.R. at 656 (citing Mennonite Bd. of Missions v. Adams, 462 U.S. 791 (1983)); see also Mullane, 339 U.S. at 316 (noting that publication notice is sufficient for those creditors whom the debtor can reasonably assume to have abandoned their property interest).

In the instant case, appellants filed an incident report with the Taj in August of 1990 but refrained from further communication until August of 1992, when they filed suit in state court. Significantly, appellants failed to respond to a letter from a Taj Claims Adjuster, submitted to them ten months prior to the bar date, that offered to compensate them for medical and related expenses, as well as pain and suffering. There was nothing in the appellants' conduct that distinguished their case from the many thousands of claims received each year by the Taj that do not progress beyond the filing of an incident report. We cannot say that the bankruptcy judge erred in finding the appellants' claims to be speculative and conjectural. [FN6]

## C. Excusable Neglect

*5 In the alternative, appellants argued that their failure to timely file proofs of claim is the result of excusable neglect, and that the bankruptcy court should have allowed them to file late pursuant to Rule 9006(b). The Third Circuit has held that Rule 9006(b) and Rule 3003(c)(3) are to be read in conjunction, and that the bankruptcy court may allow the filing of an untimely proof of claim only where the claimant's failure to timely file was due to excusable neglect. In re Vertientes, Ltd., 845 F.2d 57 (3d Cir.1988).

The Supreme Court recently clarified the meaning of "excusable neglect" as the term is used in Rule 9006(b)(1). The Court found that "by empowering the court to accept late filings 'where the failure to act was the result of excusable neglect,' Rule 9006(b)(1), Congress plainly contemplated that the court would be permitted, where appropriate, to accept late filings cause by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control." Pioneer Investment Serv. Co. v. Brunswick Assoc. Ltd. Partnership, 113 S.Ct. 1489, 1495 (1993). The determination of whether neglect is excusable

> is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission. These include ... the danger of prejudice to the debtor, the length of the delay and its impact on the judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.

113 S.Ct. at 1498. The burden of proving "excusable neglect" is on the creditor seeking to extend the bar date. In re Nutri*Bevco, 117 B.R. 771, 781 (Bankr.S.D.N.Y.1990).

In the case at bar, the bankruptcy court found that (1) the Taj would be prejudiced should the untimely claims be allowed, in that the claims would "deny the Debtor the 'fresh start' to which it is entitled," 156 B.R. at 937; (2) the impact of the delay upon the proceedings was significant; (3) appellants' inaction was the source of the delay; and (4) the defendants acted in good faith. In addition, the court noted that the appellants had received adequate notice of the bar date and that the bar date order was not ambiguous. Based on these findings, Judge Gambardella found that the appellants had failed to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.
(Cite as: 1993 WL 534494, *5 (D.N.J.))

Page  23

establish excusable neglect.

The O'Haras cannot claim excusable neglect based on the alleged insufficiency of publication notice, when their own conduct made them unknown creditors entitled only to publication notice. [FN7] The bankruptcy court properly considered and applied the relevant standard for the O'Haras's failure to file their proofs of claim in a timely manner.    Given that its findings of fact were not clearly erroneous and its refusal to excuse appellants' dilatory conduct was not an abuse of discretion, the bankruptcy court's order enjoining appellants from filing proofs of claim is affirmed.

For the reasons set forth above,

*6 IT IS on this 13th day of December, 1993,

ORDERED that the order of the bankruptcy court enjoining appellants from filing proofs of claim after expiration of the bar date be, and hereby is, AFFIRMED.

FN1. It appears that the first communication from the appellants to the Taj after the filing of the incident report was the service of the summons and complaint in August of 1992.

FN2. Rule 3003(c)(3) of the Rules of Bankruptcy Procedure allows the bankruptcy court to "fix and for cause shown [to] extend the time within which proofs of claim or interest may be filed." Bankr.R. 3003(c)(3).

FN3. Rule 9006(b) allows the Court to extend the period for filing proofs of claim "on motion made after the expiration of the specified period ... where the failure to act was the result of excusable neglect." Bankr.R. 9006(b)(2).

FN4. The Third Circuit distinguishes among three types of facts: basic facts, inferred factual conclusions, and ultimate facts. "Basic facts are the historical and narrative events elicited from the evidence.... Inferred factual conclusions are drawn from basic facts.... No legal precept is implicated in drawing permissible factual inferences." Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 102 (3d Cir.1981).    Findings of these two types of facts are subject to the clearly erroneous standard.    Ultimate facts are expressed in the

language of a standard of law.    Id.    When reviewing an ultimate fact, the Court applies a mixed standard of review, "accept[ing] the trial court's findings of historical or narrative facts unless they are clearly erroneous, but exercis[ing] a plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts." In re Sharon Steel Corp., 871 F.2d 1217, 1223 (3d Cir.1989) (quoting Universal Minerals, 669 F.2d at 103).

FN5. We find this case to be somewhat different from the line of cases involving "truly unknown" claimants, such as employees who develop occupational injuries subsequent to the company's insolvency.    See, e.g., In re Charter Company (Ziegler), 113 B.R. 725 (M.D.Fl.1990) (discharging wrongful death claims made by claimants who were not aware of claims prior to the bar date);    In re Chicago, Rock Island, and Pac. R.R. Co., 90 B.R. 329 (N.D.Ill.1987).

FN6. However, we emphasize that if the debtor had petitioned for bankruptcy shortly after the appellants filed their incident report, we would not find the appellants' claims to be speculative.

FN7. We leave for another day the issue of whether excusable neglect can ever be a viable defense in cases where the claimant is only entitled to publication notice.    Pioneer involved a situation in which the claimant had received actual notice of the bar date, but had nonetheless failed to file a proof of claim.    It is more considerably more difficult to apply the excusable neglect standard in cases involving publication notice.    Claims whose holders are entitled only to publication notice can be classified in one of two ways.    The first relates to the nature of the claim and comprises those claims which, because of causational or attributional indeterminacies, are not discovered until after the bar date has passed.    The most common example of this category is a claim for occupational exposure (e.g., asbestos), where the medical condition arises years after the exposure or where the cause of the condition is not known to the claimant at the time of the bar date.    The second category includes cases in which the conduct of the claimant has rendered an otherwise known claim speculative, such as where a claimant fails to pursue or make known her claim for a protracted period.    The instant case is an example of this category.    Recognizing

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.                                                    **Page  24**
**(Cite as: 1993 WL 534494, \*6 (D.N.J.))**

> excusable neglect claims based on the failure of the
> claimant to read the published notices would be
> problematic in either of these two categories.    In
> the former, recognizing claims that arise many
> years after the bankruptcy proceeding would
> subvert the very purpose of the bar date, namely, to
> confer finality upon the proceedings.     Similarly,
> allowing claimants whose very conduct has made
> the claim speculative to file late proofs of claim
> would reward lack of diligence.    In both cases,
> permitting parties to file late proofs of claim would
> tend to render publication notice meaningless.

1993 WL 534494 (D.N.J.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.
(Cite as: 1993 WL 436026 (E.D.Pa.))

Page 16

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.

In re Ok Cha NAM, Debtor.
Young Yun KIM
v.
Ok Cha NAM.

Bankruptcy No. 92-169625.
Adv. No. 93-0121.
Civ. A. No. 93-3952.

Oct. 25, 1993.

Michael D. Power, Mannino, Walsh & Griffith,
P.C., Philadelphia, PA, for debtor.

Ok Cha Nam, pro se.

Gerald J. McConeghy, Rendine & McConeghy,
Philadelphia, PA, for plaintiff.

Young Yun Kim, pro se.

Arthur P. Liebersohn, Philadelphia, PA, trustee.

Frederic Baker, Asst. U.S. Trustee, Philadelphia,
PA, trustee.

MEMORANDUM

CAHN, Chief Judge.

*1 Before this court is an appeal from a final order
of the bankruptcy court granting a discharge to a
Chapter 7 debtor, Ok Cha Nam. [FN1] The
appellant, creditor Young Yun Kim, alleges that the
bankruptcy court's decision entering judgment in
favor of the debtor was clearly erroneous.

Bankruptcy Rule 8013 dictates that this court
adhere to the "clearly erroneous" standard when
reviewing factual findings of a bankruptcy court.
Bankruptcy Rule 8013; [FN2] In re Columbia Gas
Sys., Inc., 997 F.2d 1039, 1059 (3d Cir.1993); In
re Continental Airlines, et al., 150 B.R. 334, 336
(D.Del.1993); Frymire v. Painewebber, Inc., 107
B.R. 506, 509 (E.D.Pa.1989). Legal conclusions
of the bankruptcy court are subject to plenary review
by the district court and are considered de novo on

appeal. Brown v. Pennsylvania State Employees
Credit Union, 851 F.2d 81, 84 (3d Cir.1988). The
court is unable to apply this standard to the case at
issue, however, because the bankruptcy court made
no specific findings of fact or conclusions of law.
Accordingly, this case is remanded to the
bankruptcy court to make explicit findings of fact
and conclusions of law. [FN3]

The appellant argued in bankruptcy court that the
debtor should not be granted a discharge. An
objection to a discharge is considered an adversary
proceeding under Bankruptcy Rule 7001. [FN4] In
such proceedings, Bankruptcy Rule 7052,
incorporating Rule 52 of the Federal Rules of Civil
Procedure, requires the bankruptcy judge to "find
the facts specially and state separately its
conclusions of law thereon." Fed.R.Civ.P. 52. See
generally In re James M. Morrissey, 717 F.2d 100,
103 (3d Cir.1983) ("We are confident that the
district court will instruct the bankruptcy court, on
remand, to more fully explain its findings of fact,
and to support them with adequate references to the
evidence and a discussion of the applicable legal
precepts.... [T]he bankruptcy rules command no
less."); In re Watson, 456 F.Supp. 432, 436
(S.D.Ga.1978) ("Where the findings of fact upon
which the judgment was granted are phrased in
broad conclusory terms ... the case must be
remanded for detailed findings.") (citations
omitted).

We realize the tremendous caseload facing
bankruptcy judges in this district, and encourage
them to make oral findings of fact and conclusions
of law. However, these findings must be more than
mere discourse with the attorneys following the
hearing. See, e.g., (N.T. 188-199, May 18, 1993).
It is only in this way that the parties who come
before the bankruptcy court can be assured that they
are given reasoned decisions based on the record
presented. An appropriate order follows for further
proceedings consistent with this opinion.

ORDER

AND NOW, this 25th day of October, 1993, upon
consideration of the Brief for Appellant, Brief for
Appellee and all Notes of Testimony from the May
18, 1993 hearing before the Honorable David A.
Scholl, IT IS ORDERED that the case be
REMANDED to the bankruptcy court for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1993 WL 436026, *1 (E.D.Pa.))

proceedings consistent with the opinion filed this
date of October 25, 1993.

　　FN1. See Order of May 19, 1993 (Scholl, J.).

　　FN2. Bankruptcy Rule 8013 provides: "On an
　　appeal the district court or bankruptcy appellate
　　panel may affirm, modify, or reverse a bankruptcy
　　judge's judgment, order or decree or remand with
　　instructions for further proceedings.    Findings of
　　fact, whether based on oral or documentary
　　evidence, shall not be set aside unless clearly
　　erroneous, and due regard shall be given to the
　　opportunity of the bankruptcy court to judge the
　　credibility of the witnesses.".

　　FN3. The court suggests that the bankruptcy judge
　　require the parties to submit proposed findings of
　　fact and conclusions of law.    The bankruptcy court
　　may then adopt its own findings of fact and
　　conclusions of law either orally or in a written
　　memorandum.

　　FN4. Bankruptcy Rule 7001 provides, in relevant
　　part: "An adversary proceeding is governed by the
　　rules of this Part VII.    It is a proceeding ... (4) to
　　object to or revoke a discharge...."

　　1993 WL 436026 (E.D.Pa.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

Not Reported in B.R.
(Cite as: 1996 WL 673169 (Bankr.N.D.Ohio))

Only the Westlaw citation is currently available.

United States Bankruptcy Court, N.D. Ohio.

**In re Sharon Y. GORDON, Debtor.**

**Bankruptcy No. 94-12934.**

Nov. 15, 1996.

Alexander Jurczenko, Cleveland, OH, for Debtor.

Phyllis A. Ulrich, Carlisle, McNellie & Rini Co.,
O.P.A., Cleveland, OH, for Mortgagee.

MEMORANDUM OF OPINION

DAVID F. SNOW, Bankruptcy Judge

**\*1** This is the second of two chapter 13 cases the
Debtor has filed to prevent a sheriff's sale of her
residence pursuant to a foreclosure judgment
obtained by her mortgagee Federal Home Loan
Mortgage Corp. ("FHLMC"). The Debtor filed her
first case, number 93-13616, on July 23, 1993. A
plan was confirmed in that case by an order entered
on November 30, 1993, but the case was dismissed
on April 19, 1994, because of the Debtor's failure
to fund her plan. She filed the current case on July
12, 1994. In this case the Debtor objected,
apparently for the first time, to FHLMC's mortgage
claim. The dispute over FHLMC's mortgage
continued over several confirmation hearings and
pretrials, and no plan has been confirmed in the
case. No creditor other than FHLMC has filed a
proof of claim in this case.

At a pretrial on December 12, 1995, counsel
advised that the mortgage dispute might be settled
on the basis of a written proposal made by the
Debtor. According to that proposal the interest rate
on the mortgage would be reduced to nine percent,
certain costs would be capitalized and added to the
mortgage, the chapter 13 case would be dismissed,
and FHLMC's foreclosure judgment on the Debtor's
residence would be vacated. Counsel for FHLMC
advised that her client had not authorized her to
agree to the settlement. The Court scheduled a
final pretrial on the mortgage dispute for January
16, 1996, and ordered that persons with settlement
authority for FHLMC be present at that hearing.

On January 15, 1996, counsel for the Debtor and
for FHLMC called my courtroom deputy and told
her that they had settled the matter and that the
pending pretrial should therefore be canceled. By
letter of February 16, 1996, counsel for FHLMC
sent documentation to Debtor's counsel embodying
the terms of the agreed settlement. From that date
until July 22, 1996, counsel for FHLMC pressed
Debtor's counsel for execution of the settlement
documents. My courtroom deputy and law clerk
had several phone conversations with counsel
concerning the status of the documentation. During
that time Debtor's counsel initially indicated that he
was having difficulty getting his client into his
office to sign the necessary documents. Later, he
indicated that he wanted to make a small change in
the documentation before returning it to FHLMC's
counsel. However, there was never any indication
that FHLMC's documentation did not accurately
embody the agreed settlement. On July 22, 1996,
FHLMC mailed to Debtor and her counsel a motion
to enforce the settlement agreement or in the
alternative to dismiss Debtor's case with a 180-day
bar against refiling (the "Motion to Compel").
August 2 was set as the hearing date on the motion.

At the August 2 hearing neither the Debtor nor
her counsel appeared. My courtroom deputy called
Debtor's counsel's office to attempt to locate him
but was advised by his secretary that he was
unreachable because he was in trial in another court.
After reviewing the motion and based on the
Debtor's unexplained five-month failure to
document the settlement, I advised that the Court
would enter an order allowing the Debtor 30 days to
execute the settlement documents and providing that
if she failed to do so her case would be dismissed
with a 180-day sanction against refiling. That
order was entered by the Court on August 9, 1996
(the "August 9 Order"). On August 14, 1996,
FHLMC filed a motion with the Court requesting
that Debtor's attorney be sanctioned for his failure
to execute the settlement agreed to on January 15,
1996 and his failure to appear at the August 2
hearing (the "Sanctions Motion"). The Sanctions
Motion was set for hearing on September 6, 1996.

**\*2** Prior to September 6, 1996, Debtor did not
respond to the Motion to Compel, the August 9
Order, or the Sanctions Motion. At the September
6 hearing Debtor's counsel raised for the first time
questions concerning the adequacy of the notice of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in B.R.
(Cite as: 1996 WL 673169, *2 (Bankr.N.D.Ohio))

the August 2 hearing. He argued that the notice was defective because it was wrongly addressed and because it offered the Debtor less than 20 days notice of the hearing in violation of the Fed.R.Bankr.P. 2002(a)(3) and (4). He also said that he had not received notice of the Motion to Compel before the August 2 hearing. At the time of the September 6 hearing, the 30 days allowed the Debtor in the August 9 Order to execute the settlement documents had three more days to run and it was unclear what the Debtor would do. The Court did not rule on the Sanctions Motion at the September 6 hearing.

The Debtor elected not to implement the settlement and on September 9, 1996, she filed a motion for reconsideration of the August 9 Order (the "Motion for Reconsideration"). On September 10th FHLMC filed a notice of dismissal of the case with sanctions pursuant to the August 9 Order. The Court, however, treated the notice of dismissal of the case with sanctions and set it and Debtor's Motion for Reconsideration for hearing on October 24, 1996. At the October 24 hearing Debtor's counsel reiterated the arguments he made at the September 6 hearing that Debtor was entitled to relief from the August 9 Order under F.R.Civ.P. 60(b)(4), which is made applicable to this proceeding by F.R.Bankr.P. 9024, because of the alleged defects in that notice.

The notice of the Motion to Compel was mailed on July 22 for a hearing on August 2, 1996, providing 11 days notice under F.R.Bankr.P. 9006(d). Debtor asserts that she was entitled to 20 days notice under Rule 2002(a)(3) and (5) which relate to hearings on approval of a compromise or a settlement and motions to dismiss. However, neither section governs FHLMC's Motion to Compel.

The settlement had been agreed to by the Debtor and FHLMC. No creditor other than FHLMC has filed a proof of claim or played an active role in the case. The chapter 13 standing trustee received this and other notices but declined to appear. Rule 2002(a)(3) is designed to afford parties in interest an opportunity to object to a settlement reached by parties to a dispute. It would make little sense to provide an opportunity for notice and a hearing to parties who have already agreed to a settlement. Rule 2002(a)(5), by its terms, does not apply to

dismissal of chapter 13 cases. Dismissal was a term of the settlement agreed to by the parties. Debtor suggests no other provision which prescribes the length of notice for FHLMC's Motion to Enforce Settlement. Therefore FHLMC is correct in its assertion that Rule 9006(d) was applicable to Debtor's Motion to Compel. Rule 9006(d) provides for at least five days notice. FHLMC's notice clearly complied with this requirement.

*3 Debtor argues, however, that the notice was defective because it was addressed to Debtor's counsel at the street address of his office building but did not include the number of his suite in that building. F.R.Civ.P. 5, made applicable to this proceeding by F.R.Bankr.P. 7005, requires that notices to an attorney be mailed to the attorney's "last known address." Neither party cited any authority on whether this requirement is met where the notice shows the correct street address of the building in which the attorney's office is located but omits his floor and office number.

The street address uniquely identified counsel's office building; the post office delivered the notice to that building and it was received by Debtor's counsel. Office building operators and their business and professional tenants, such as lawyers, typically make arrangements to identify the tenants' locations in the building, such as by signs in the lobby listing tenants. There is nothing in the record which suggests that a suite number is required by the post office or was necessary for the notice to reach Debtor's counsel. Counsel's address as shown on the notice was accurate and reasonably sufficient to assure that the notice would be delivered to counsel, and it was. Therefore, that address qualifies as counsel's last known address for purposes of Rule 7005. If, as counsel contends, the omission of his suite number delayed his receipt of the notice, any prejudice from that delay can and should be addressed under the excusable neglect standard in Rule 60(b)(4).

Debtor's counsel was in trial in another court on August 2 and had been for a week or more. He said he did not know of the August 2 hearing until after it was over. He said that his receipt of the notice of the Motion to Compel was delayed because it was delivered first to the 20th floor of his building before being directed to his office on the 17th floor. Since his office did not note the date of receipt of

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in B.R.
(Cite as: 1996 WL 673169, *3 (Bankr.N.D.Ohio))

the notice, there is no way to determine with certainty when the notice was actually received. Counsel attempted to buttress the impression that the notice had not been received prior to the August 2 hearing by displaying his appointment book showing his trial but not the August 2 hearing.

Although counsel's story is plausible, it appears more likely that the notice was received by his office prior to the August 2 hearing but neglected. The notice was received by the post office on July 24 and should have been delivered to counsel's office building by July 26 at the latest. This would have left several business days before the August 2 hearing for the letter to be rerouted from the 20th to the 17th floor. My courtroom deputy had called counsel's secretary and advised her that he was late for the August 2 hearing. If the notice of the Motion to Compel had not then been received, I find it extraordinary that counsel would not have fixed the date of its subsequent receipt in order to explain and justify his failure to appear. Counsel's failure to raise the issue until September 6, long after receipt of the notice, the August 9 Order, and the Motion for Sanctions, casts further doubt on his story. These facts, together with counsel's less than pristine record for responding to deadlines, suggest that it is more likely that the notice was ignored because of its arrival shortly prior to the August 2 hearing while counsel was involved in another trial. Even so, counsel's involvement in that trial and his receipt of the notice on the eve of the August 2 hearing would probably have justified postponement of that hearing on the basis of excusable neglect. But a party claiming the benefit of excusable neglect for failure to appear at a hearing cannot simply spring the excuse on the other party and the Court long after the hearing and after the entry of the order based on that hearing of which counsel clearly had notice.

*4 In any event, the point is moot. Debtor had ample notice of the September 6 and October 24 hearings and the opportunity to raise any substantive objections to the August 9 Order. Debtor's counsel indicated in the Motion for Reconsideration that at the September 6 hearing that Debtor disagreed with FHLMC on the amount of the mortgage arrearages. He did not, however, spell out the extent or the significance of this disagreement or explain why in the face of such disagreement Debtor committed to the January settlement or why she waited for five

months after FHLMC sent her the revised mortgage and other settlement documents to raise the issue.

At the September 24 hearing Debtor's counsel denied that he had agreed to the settlement in January or that he had reported that agreement to my courtroom deputy. Counsel was wrong on both points. The Court finds that counsel for the Debtor and FHLMC agreed to the settlement and reported that agreement to my courtroom deputy in a joint phone call on January 15, 1996. Therefore, Debtor's position appears to boil down to the proposition that she is entitled to disregard the January 1996 settlement and the August 9 Order because she has not signed anything. If so, she is wrong.

Debtor has employed the bankruptcy process in two chapter 13 cases to stay foreclosure of her residence. That stay has continued in this case since April 1994 without the benefit of a confirmed plan and for the last five months because of Debtor's own failure to sign the papers to document a settlement she had agreed to. The terms of the settlement were detailed and specific and were proposed and drafted by her counsel. Her counsel's acknowledgment in January that the case had been settled was binding on her. Allowing her to go on with this case, or to file another, prior to foreclosure of the FHLMC mortgage, as her counsel seems to envision, would be grossly unfair to FHLMC and an abuse of the bankruptcy process.

FHLMC has also requested sanctions against Debtor's counsel for willful failure to document the settlement or to attend the August 2 hearing. This motion reflects FHLMC's frustration with Debtor's unjustified delay and FHLMC's attendant legal expenses. The record does not, however, justify a sanction against counsel under Rule 9011 or section 105 of the Bankruptcy Code. Counsel is, however, culpable for assuring the Court that the dispute had been settled but then failing to explain or justify the Debtor's failure to document the settlement. It may be that Debtor failed to execute the settlement documents because she could not or would not perform under the deal her counsel negotiated and that her counsel saw his duty to her to be to delay her loss of her residence as long as possible. Counsel has a history of using delay to advance his client's cause. See In re Greene, 127 B.R. 805 (Bankr.N.D.Ohio 1994); In re Dilley, 125 B.R.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in B.R.
(Cite as: 1996 WL 673169, *4 (Bankr.N.D.Ohio))

Page 14

189 (Bankr.N.D.Ohio 1991).

Counsel is, however, an officer of the Court. The Court must rely on counsel's assurances, including assurances that scheduled proceedings need not go forward because the matter has been settled. Once counsel has given such assurance, his client is bound. If in the process of documenting an agreed settlement some unforeseen problem occurs, counsel has, at a minimum, the responsibility to promptly advise the Court, not remain mute until the other side is forced five months later to file pleadings to enforce the settlement. If, as appears to be counsel's view, his client cannot be bound until she has in fact signed a written document, neither the Court nor other counsel can rely on counsel's agreement to a settlement. I have, therefore, instructed my staff to accept in the future only signed settlement documents in matters involving Debtor's counsel as a basis for mooting a hearing or trial.

*5 The Court's order in conformity with this opinion is attached.

1996 WL 673169 (Bankr.N.D.Ohio)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo