**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

PACIFICORP AND VANCOTT                   :
BAGLEY CORNWALL & MCCARTHY,              :
                                         :        CIVIL ACTION NO. 05-764
                    Appellants,          :
                                         :
                                         :        BANKRUPTCY CASE NO. 01-1139
            v.                           :
                                         :
W.R. GRACE, et al.,                      :
                                         :
                    Appellees.           :

**MEMORANDUM**

BUCKWALTER, S. J.                                           August 16, 2006

            Presently before the Court are Appellants' Brief (Docket No. 9), Appellees' Brief

(Docket No. 12), Appellants' Reply Brief (Docket No. 14), and the Transcript of the Oral

Argument held on January 10, 2006 (Docket No. 16).  For the reasons stated below, this appeal is

denied.

**I. FACTS AND PROCEDURAL HISTORY**[1]

            From 1940 until approximately 1984,[2] W. R. Grace & Co., et al. ("Appellees")

sold unprocessed vermiculite from the Libby Vermiculite Mine ("Libby Mine"), located in

Libby, Montana, to Intermountain Insulation Co. ("Intermountain").  Intermountain processed the

_____

1.   Citations to the Appendix to Appellants' Brief are referred to as "A-X" and citations to the Appendix to Appellees' Brief are referred to as "B-X."

2.   In their brief to this Court, Appellees contend that they shipped vermiculite to Intermountain from 1963 until 1984.  (Appellees' Br. 5.)  However, in their brief to the Bankruptcy Court, Appellees contend that they shipped vermiculite to Intermountain from 1940 until about 1984.  (B-03.)  Appellants contend that Appellees shipped vermiculite to Intermountain from 1940 until 1984.  (Appellants' Br. 5.)

vermiculite at 333 West First Street[3] (the "Site"), which is located on Block 66 in downtown Salt Lake City, Utah.  Intermountain then sold the processed vermiculite under the name "Zonolite."[4]

A significant portion of Block 66, including the Site, is contaminated with toxic amphibole asbestos.  According to the United States Environmental Protection Agency ("EPA"), the Vermiculite Intermountain plant (the "plant")[5] operated between the early 1940s and 1984. (A-54.)  An EPA investigation of the Libby Mine established that, *inter alia*:  the Libby vermiculite contains amphibole asbestos above trace levels; handling and processing Libby vermiculite releases high levels of respirable airborne asbestos fibers; and, disturbance of dust or soil containing the amphibole asbestos from the Libby vermiculite produces high levels of respirable airborne asbestos.  Id.  Further, sampling at the Site found elevated levels of amphibole asbestos in the soil and dust.  Id.

Appellants in this case, PacifiCorp and Van Cott Bagley Cornwall & McCarthy 401(k) Profit Sharing Plan ("Van Cott" or "Van Cott Plan") (collectively referred to as "Appellants"), are the current and prior owners of the Site.  PacifiCorp is a current *and* prior owner of Block 66, which includes the Site.  From 1944 until 1954, PacifiCorp leased the Site to

---

3.  Appellees refer to the Site as "333 W. First Street" (Appellees' Br. 5), while Appellants refer to the Site as "333 West First South."  (Appellants' Br. 4.)

4.  Appellees admit that Intermountain "did hold licenses from Grace's predecessor for a processing technique and the 'Zonolite' name."  (Debtors' Obj. 3 n.2.)  However, Appellees contend that it "never permitted sale of the product under the Grace name."  Id. at 3.
    By contrast, Appellants contend that Grace, through its subsidiary Construction Products Division and its predecessors, entered into an agreement with Vermiculite Intermountain for Vermiculite Intermountain to market the exfoliate under one of several Grace trade names, including the Zonolite brand name.  Appellants further contend that, pursuant to the agreement, Grace agreed to provide technical assistance on the use, manufacture and marketing of the various products.

5.  According to Appellants, Intermountain "is the immediate predecessor company of Vermiculite Intermountain." (Appellants' Br. 4.)

Vermiculite Intermountain.  (A-54.)  While leasing the Site from PacifiCorp, Vermiculite

Intermountain operated a vermiculite exfoliation plant.  According to the EPA, "emissions [from

the plant] containing amphibole asbestos left the plant and contaminated surrounding properties,

which are now part of the Site."  Id.  PacifiCorp sold the property in 1954 and then reacquired it

from Van Cott in 1984.  Van Cott is a prior owner of the Site, having:  purchased a portion of the

Site in 1979;[6] sold a portion of the Site to PacifiCorp, doing business as Utah Power & Light, in

1984; and, sold the remaining portion in 1988 to La Quinta Inns. (A-112 ¶ 4.)

                On April 2, 2001 Appellees filed for bankruptcy under Chapter 11 of Title 11 of

the United States Code.  In their listing of creditors holding unsecured nonpriority claims,

Appellees included a "contingent, disputed, unliquidated" environmental claim for

Intermountain, located at "333 W. First St., Salt Lake City UT."  (A-110.)  Appellees listed the

amount of the claim as "unknown."  Id.

                Appellees claim that notice of commencement of the bankruptcy was served on

Intermountain, Van Cott, and PacifiCorp on April 25, 2001.  With respect to Van Cott, Appellees

admit that notice of the bankruptcy was served to: Van Cott, Bagley, Cornwall & McCarthy (the

"Van Cott Firm"), 50 S. Main St., Salt Lake City Utah, 84145.  Appellants point out that the

service should have been addressed to the Van Cott Plan, not the Van Cott Firm; that the zip

code incorrectly read "84145," when it should have read "84144;" and, that the address did not

include a suite number.  With respect to PacifiCorp, Appellees admit that notice of the

---

6.  In an affidavit, Stephen D. Swindle, a member and president of Van Cott, stated the following with regard to Van Cott's 1979 purchase of the Site: "The previous owner and seller [of the Site] was Utah Lumber Company.  While it owned [the Site], Utah Lumber operated a vermiculite plant through Vermiculite Intermountain."  (A-112 ¶ 3.)

bankruptcy[7] was served to Utah Power & Light, a name "under which PacifiCorp does business." (Appellants' Br. 9.)

On May 16, 2001, shortly after Utah Power & Light received notice of the bankruptcy, it filed a $1,375.58 proof of claim for electric utility service provided to a location unrelated to the Site. (A-106-08.) Utah Power & Light's claim was filed by an employee in Utah Power & Light's Customer Service Division. At that time, Appellants contend that Utah Power & Light's Customer Service Division had no knowledge of the contamination of the Site or Appellees' connection to the vermiculite operations at the Site. Further, Appellants contend that notice of the bankruptcy was not communicated by Utah Power & Light's Customer Service Division to PacifiCorp's environmental personnel.

On June 27, 2001, Appellees filed a Motion for Entry of Case Management Order, Establishment of a Bar Date, Approval of the Proof of Claim Forms and Approval of the Notice Program ("Bar Date Motion"). After filing the Bar Date Motion, Appellees and the Bankruptcy Court worked to create a comprehensive system of publication notice. On April 22, 2002, the Bankruptcy Court entered an order ("Bar Date Order") pursuant to Rule 3003(c)(3) of the Bankruptcy Rules establishing a bar date of March 31, 2003 ("Bar Date") for, in part, unsecured non-asbestos claims. After the Bar Date Order was entered, Debtors published notice of the Bar Date in national publications, including the New York Times and the Wall Street Journal, and local publications, including The Tribune and Desert News.

---

7.   At the bankruptcy court hearing, Appellees stated that this notice was "not related to the [S]ite, but in general." (A-324.)

                On April 26, 2002, notice of the Bar Date was served on Intermountain and Van

Cott.  Again, Van Cott was served at 50 S. Main St., Salt Lake City, Utah 84145, an incorrect

address.  Appellees admit that PacifiCorp was not served notice of the Bar Date.  On March 28,

2003, just three days before the Bar Date, the EPA filed a proof of claim for contamination of the

Site.  Intermountain, Van Cott, and PacifiCorp failed to file any proofs of claim on or before the

Bar Date.

                On June 18, 2004, the EPA notified Van Cott, by letter, that it was investigating

the release of hazardous substances, pollutants or contaminants in or around the Site.  (A-116-

17.)  Pursuant to Section 104 of **CERCLA**, the EPA requested that Van Cott complete an

Information Request.  (A-118-24.)  According to the president of Van Cott, "[p]rior to its receipt

of the EPA letter, the Van Cott Plan had no indication whatsoever of any possible problem with

respect" to the Site.  (A-113 ¶ 5.)  Shortly thereafter, on July 29, 2004, PacifiCorp entered into an

Administrative Order on Consent ("AOC") with the EPA regarding its CERCLA liability for the

Site.  (A-51-77.)  On September 20, 2004, PacifiCorp sent Van Cott a letter advising Van Cott of

its potential CERCLA liability with respect to the site.[8]  (A 125-29.)

                Finally, on January 4, 2005, Appellants filed a Motion for Leave to File Late

Proofs of Claim.  The Motion sought leave from the Bar Date Order so that Van Cott and

PacifiCorp could file late proofs of claim related to environmental clean up costs incurred and to

be incurred to clean up the Site and adjacent property.  The Bankruptcy Court held a hearing on

this Motion on February 28, 2005.

---

8.  Van Cott has not yet incurred cleanup costs or entered into an agreement with the EPA or any other party with respect to the Site.  (A-114.)

5

On September 22, 2005, the Bankruptcy Court denied Appellants' Motion.  The Bankruptcy Court's order states that: "The Court has reviewed the briefs, response briefs, reply brief, all exhibits and considered the arguments of counsel.  The Court agrees with and adopts the reasoning in Debtor's Brief (D.I. 7746) and Response (D.I. 8283).  Excusable neglect has not been established."  The Bankruptcy Court did not make any findings in support of its decision.  This appeal followed.

## II. STANDARD OF REVIEW

This Court must accept the Bankruptcy Court's factual determinations unless those determinations are clearly erroneous.  See Fed. R. Bankr. P. 8013 ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous . . . .").  We review the Bankruptcy Court's legal decisions de novo.  In Re O'Brien Envtl. Energy, Inc., 188 F.3d 116, 122 (3d Cir. 1999).  The Bankruptcy Court's decision to permit or deny a creditor to file a late proof of claim is reviewed for abuse of discretion.  In re Vertientes, Ltd., 845 F.2d 57, 59 (3d Cir. 1988).  The Bankruptcy Court's determination regarding the existence of excusable neglect is also reviewed for abuse of discretion.  Jones v. Chemetron Corp. ("Chemetron II"), 212 F.3d at 205 (citing In re Vertientes, 845 F.2d at 59); In re Orthopedic Bone Screw Prods. Liab. Litig., 246 F.3d 315, 320 (3d Cir. 2001).   "A bankruptcy court abuses its discretion when its ruling is founded on an error of law or a misapplication of the facts."  In re O'Brien, 188 F.3d at 122.

## III. DISCUSSION

### A.  Appellants were Unknown Creditors

6

### 1.  Notice Required to Known and Unknown Creditors under the Due Process Clause

The first issue[9] before this Court is whether Appellants were known creditors or unknown creditors at the time of the Bankruptcy Court's Bar Date Order.[10]  This difference determines whether the Due Process Clause required that Appellees provide Appellants with actual notice or publication notice of the bankruptcy proceedings.

Due process requires notice that is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950).[11]  Bankruptcy law divides creditors into two groups for purposes of notice: known and unknown creditors.  In most cases, known creditors must be provided with actual

---

9.   The Court acknowledges that the parties have stipulated that the Bankruptcy Court's September 22, 2005 Order did not determine the issue of allowability of Appellants' claim against the Debtors.  (Docket No. 8.)  The Court strikes Issue 3 of the Issues Present on Appeal and preserves all rights with respect to that Issue.

10.   The parties disagree about the phrasing of "Issue 1."  Appellants state the issue as follows:
> Whether the court erred in concluding that the Appellants, the current and immediate prior owners of the Vermiculite Intermountain Site in Salt Lake City, Utah ("Site"), were not reasonably ascertainable from public records and therefore were not 'known' creditors constitutionally entitled to actual notice of the bar date for filing claims against the Debtor, W.R. Grace & Co.?

(Appellants' Designation of Record and Statement of Issue Present on Appeal 1.)
> Appellees argue that this issue should be restated as follows: "Whether the Bankruptcy Court erred in concluding that the Late Claimants were unknown creditors and therefore not entitled to actual notice."

(Appellees' Br. 3.)  According to Appellees, the issue on appeal is "not whether the Late Claimants were or were not potential creditors reasonably ascertainable from an investigation of public records."  Id. at 2.  Instead, Appellees contend, the issue is whether Appellants were "unknown creditors and thus not entitled to actual notice of the Bar Date."  Id.
> The Court agrees with Appellants' response that Appellees' restatement of this issue offers a "distinction without a [meaningful] difference [to the outcome of this case].  By concluding that the Appellants were unknown creditors, the Bankruptcy Court concluded that the Appellants were not reasonably ascertainable and therefore not known creditors."  (Appellants' Reply at 1 n.1.)

11.   In Jones v. Chemetron Corp. ("Chemetron I"), 72 F.3d 341, 346 n.1 (3d Cir. 1995), the Third Circuit noted that even though "Mullane involved the notice due beneficiaries on judicial settlement of accounts by the trustee of a common trust fund, subsequent courts have interpreted the case to set the standard for notice required under the Due Process Clause in Chapter 11 bar date cases."

written notice of a debtor's bankruptcy filing and bar claims date, City of New York v. New York, N. H. & H. R. Co., 344 U.S. 293, 296 (1953), while unknown creditors must be provided only with publication notice. Chemetron I, 72 F.3d at 345. Therefore, in this case, as in Chemetron I: "If claimants were 'known' creditors, then due process entitled them to actual notice of the bankruptcy proceedings . . . . If claimants were 'unknown' creditors, however, then notice by publication was sufficient to satisfy the requirements of due process and their claims are barred, absent some other basis for relief." 72 F.3d at 345-46.

The United States Supreme Court has defined a "known" creditor as one whose identity is either known or "reasonably ascertainable by the debtor." Tulsa Prof'l Collection Serv., Inc. v. Pope, 485 U.S. 478, 490 (1988). Conversely, an "unknown" creditor is one whose "interests are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to knowledge [of the debtor]." Mullane, 339 U.S. at 317.

With respect to a debtor's obligation to identify a known creditor, the Third Circuit has explained that:

> A creditor's identity is reasonably ascertainable if that creditor can be identified through reasonably diligent efforts. Reasonable diligence does not require impracticable and extended searches . . . in the name of due process. A debtor does not have a duty to search out each conceivable or possible creditor and urge that person or entity to make a claim against it.

Chemetron I, 72 F.3d at 346-47 (internal citations and quotations omitted). Further, the Chemetron I court stated that the "requisite search [for a known creditor] . . . focuses on the debtor's own books and records. Efforts beyond a careful examination of these documents are

8

*generally* not required." Id. at 347. (emphasis added).  The <u>Chemetron I</u> court pointed out that

"[s]ituations *may* arise when creditors are 'reasonably ascertainable' although not identifiable

through the debtor's books and records."[12] Id. at 347 n.2. (emphasis added).  However, the

<u>Chemetron I</u> decision does not precisely state when such a finding is appropriate: "[w]e need not

address this possibility precisely, because . . . plaintiffs' claims in this case are so speculative that

the identities of the plaintiffs could not be ascertained with 'reasonably diligent efforts.'" 72 F.3d

at 347 n.2.  The <u>Chemetron I</u> court stated that even though some bankruptcy courts have held that

the "reasonably ascertainable" standard requires only an examination of the debtor's books and

records and nothing more, the Third Circuit does not construe the "reasonably ascertainable"

standard "so narrowly."  Id.

## 2.  The Bankruptcy Court's Holding in This Case

In this case, the Bankruptcy Court did not enter findings in support of its

determination that Appellants were unknown creditors.  However, the transcript of the Bankruptcy

Court's hearing on Appellants' Motion for Leave to File Late Proofs of Claim provides some

insight as to that court's reasoning on this issue.  At the hearing, the Bankruptcy Court stated that

---

12.   The Third Circuit cited <u>Tulsa Professional</u> as an example of when a creditor's identity *may* be reasonably ascertainable although not identifiable through the debtor's books and records.  <u>Tulsa Professional</u> involved a provision of Oklahoma's probate law that required claims to be presented to the executor or executrix of an estate within two months of the publication of a notice advising creditors of the commencement of probate proceedings. The issue for the Court was whether this publication notice provision satisfied the Due Process Clause.  485 U.S. at 479.  The late claimant was Tulsa Professional Services, Inc. ("Tulsa Professional"), a subsidiary of the hospital where the decedent was treated prior to his death and the assignee of a claim for expenses connected with that hospital stay.   Tulsa Professional failed to file its claim within two months of the publication notice.
    Even though the decedent's wife was "aware that her husband endured a long stay at [the hospital connected with Tulsa Professional]" the Court held that it was "not clear that this awareness translate[d] into a knowledge" of Tulsa Professional's claim.  Id. at 491.  The Court remanded the case for further proceedings to determine whether Tulsa Professional's identity was known or "reasonably ascertainable" through "reasonably diligent efforts."  Therefore, this case is not a clear example of when a creditor's identity is "reasonably ascertainable" although not identifiable in the debtor's books and records.

Appellants' claim against Appellee was "highly attenuated."  (A-329.)  The Bankruptcy Court

concluded that Appellees had no direct relationship with Appellants, as: (1) Appellees were not

leasing property from Appellants and (2) Appellees were not dealing with Appellants as

customers.[13]  (A-331.)  The Bankruptcy Court described the relationship between Appellants and

Appellees as a "third-party transaction."  (A-331.)  The Bankruptcy Court also expressed concern

about the potential burden on Appellees.  The Bankruptcy Court concluded that if actual notice to

the creditors associated with the Site was required, then the Bankruptcy Court would have to

require actual notice to all creditors associated with every property affected by Appellees' actions.

(A-324.)  Finally, the Bankruptcy Court stated that Appellee was "well on the road toward trying

to get a confirmable plan together" and "permitting late claims would "jeopardize that process."

(A-329.)[14]

### 3.  Appellants' and Appellees' Arguments

Appellants now argue that they were known creditors entitled to actual notice of

the Bar Date.  Appellants claim that Appellees' books and records showed that they contaminated

the Site.  Citing Chemetron I, Appellants contend that Appellees' "specific knowledge of an

environmental claim arising from the [Site] gave rise to the precise situation anticipated by the

Chemetron [I] court – the situation where a creditor is reasonably ascertainable, but not

necessarily identifiable in the debtor's books and records."  (Appellants' Br. 14.)   Appellants

---

13.  The Bankruptcy Court made these comments with respect to PacifiCorp.  However, later in the proceeding, the parties agreed that Van Cott's relationship with Appellees is exactly the same as PacifiCorp's relationship with Appellees in that both PacifiCorp and Van Cott were, or are, owners of the Site.   (A-333.)

14.  In addition, the Bankruptcy Court stated that if Appellant "knew that Intermountain was getting vermiculite from some source other than the property itself, then [they] had a duty to seek that out and determine whether or not it should file a claim."  (A-329.)

point to the following "specific facts" which demonstrate that their claims are not speculative or conjectural: (1) Appellees shipped tons of Libby vermiculite to the Site; (2) Appellees licensed Intermountain to use its patented vermiculite processing techniques and trademarked product names; (3) Appellees received royalty payments on products manufactured and sold by Intermountain; (4) Libby vermiculute contained amphibole asbestos, a toxic substance released during the vermiculite processing operation; and (5) Block 66 in Salt Lake City, on which the Site is located, was contaminated as a result of processing Libby vermiculite and which resulted in Appellees scheduling an environmental claim for Intermountain and the EPA as a result.

Appellees counter that the "reasonably ascertainable" standard only requires that a debtor conduct a reasonable search of their books and records. Appellees contend that they conducted such a search, which did not reveal Appellants' identities as known creditors. Therefore, Appellees claim that they were unaware of Appellants' interests in the Site. According to Appellees, it is undisputed that Appellees: (1) never operated or arranged for the operation of the Site or adjacent land; (2) never owned, leased, or otherwise held any ownership in the Site or adjacent land; and, (3) never owned, leased, or otherwise held any ownership in any business carried on at the Site or adjacent land. Further, Appellees contend that they had no reason to believe that Intermountain was not the owner of the Site. As such, Appellees only had actual knowledge of the claims of Intermountain, its former customer, and the EPA, who notified Appellees that it had a potential claim with respect to the Site. Appellees provided Intermountain and the EPA with actual notice of the Bar Date. Therefore, Appellees contend that this case is not the situation anticipated by Chemetron I, where a creditor is "'reasonably ascertainable,' although not identifiable through the debtor's books and records." 72 F.3d at 347 n.2. In sum, Appellees

argue that they "did not have a duty to conduct any investigation outside their books and records to uncover creditors such as the Late Claimants."  (Appellees' Br. 12.)

### 4.  Analysis

This case turns on the scope of the Third Circuit's decision in <u>Chemetron I</u>.  The Court must determine whether Appellants were "reasonably ascertainable" although not identifiable through Appellees' books and records, as anticipated by the Third Circuit.  More specifically, the Court must determine whether the Third Circuit's interpretation of "reasonable diligence" in <u>Chemetron I</u> required Appellees to conduct a title search of the Site to ascertain the identities of current and prior owners.

The Court will first analyze the facts of <u>Chemetron I</u>.  Then, the Court will discuss "reasonably diligent efforts" as set forth in the Supreme Court's decisions in <u>Mullane</u> and <u>Mennonite</u>.  Next, the Court will examine two bankruptcy cases, cited by Appellees, that involve environmental liability.  The Court will then analyze cases which Appellants claim required debtors to search beyond their books and records.  Finally, the Court will discuss the pertinent facts of this case.

### a.  <u>Chemetron I</u>

In <u>Chemetron I</u>, the debtor, Chemetron Corporation ("Chemetron"), owned and operated a facility that manufactured antimony oxide catalyst through a process that utilized depleted uranium.  72 F.3d at 344.  Chemetron also owned a landfill located near the manufacturing facility.  After Chemetron stopped producing the antimony oxide catalyst, Chemetron demolished a portion of the manufacturing facility and placed a quantity of the rubble from the demolition in the landfill.  It was later discovered that both sites were contaminated with

12

radioactive waste.   The late claimants in <u>Chemetron I</u> were individuals who visited or occupied

two houses near the landfill.  More specifically:

> Only two members of the group actually occupied the properties
> during the period . . . when Chemetron owned the sites.  The other
> members of the group visited the properties periodically, ranging from
> several times per week, to weekly, to monthly, to occasional visits.
> None of the plaintiffs currently resides near either site.  Sixteen of the
> plaintiffs still reside [in the same state].  Five of the plaintiff live [out
> of state].

<u>Id.</u> at 345.  (internal citations and quotes omitted).

The late claimants suggested that a title search of the properties surrounding the

manufacturing plant and the landfill would have identified persons who lived in the area from the

time of Chemetron's operations until commencement of the bankruptcy proceedings.  The Third

Circuit rejected the title search due to "potentially attenuated and certainly ambiguous causal

nexi" and the practical difficulties associated with such a broad notice requirement.[15]  72 F.3d at

347.

With regard to causational difficulties, the <u>Chemetron I</u> court stated that it

remained unclear how large of a geographic area may have been affected by the debtor's actions:

"[t]here is no indication whether a sufficient search would address properties one mile from the

sites or one hundred miles away."  <u>Id.</u> at 347-48.  In addition to the unknown size of the

geographic area affected, the temporal dimension was also unknown due to "lingering

contaminants and slow rates of decay."  <u>Id.</u> at 348.  These problems led the <u>Chemetron I</u> court to

reject the bankruptcy court's holding as unworkable: "we hesitate to thrust the judiciary into a

---

15.   Specifically, the Third Circuit stated it "decline[d] to chart a jurisprudential course through a Scylla of
causational difficulties and a Charybdis of practical concerns."  <u>Id.</u> at 347.

domain where decisions turn on rarely pellucid and often disputed scientific studies, requiring different varieties of technical expertise from case to case." Id.

With regard to practical difficulties, the Chemetron I court noted that even if it did require the debtor to conduct title searches, those searches would not have revealed the identities of the vast majority of late claimants in the case, who were not property owners but guests of those owners. Further, ascertaining and notifying all persons who lived in or may have visited houses in vicinity of the site would have implicated the problems with causation discussed above.

In sum, the Chemetron I court relied on the underlying purpose of bankruptcy law and the protections of the bar date to hold that the late claimants were not "known" creditors entitled to actual notice: "Creditors cannot be required to provide actual notice to anyone who potentially could have been affected by their actions; such a requirement would completely vitiate the important goal of prompt and effectual administration and settlement of debtors' estates." Id. at 348.[16]

### b. Reasonably Diligent Efforts: **Mullane** and **Mennonite**

Two Supreme Court cases shed light on the meaning of "reasonably diligent" efforts: Mullane and Mennonite Board of Missions v. Adams, 462 U.S. 791 (1983). In Mullane, beneficiaries of a common trust fund challenged a New York statute that permitted the trustee to provide the beneficiaries with only publication notice of the trustee's judicial settlement of

---

16. Notably, the Chemetron I court also rejected the bankruptcy court's substitution of a "reasonably foreseeable" standard for the "reasonably ascertainable" standard. "In applying this test, the bankruptcy court found that Chemetron knew or should have known that it was reasonably foreseeable that it could suffer claims from individuals living near the [landfill] . . . ." 72 F.3d at 347. (internal quotes omitted).

The Third Circuit noted that the "reasonably foreseeable" standard was a more "expansive test" than the "reasonably ascertainable" standard and stated that "such a test would place an impossible burden on debtors." Id.

accounts.  The Supreme Court stated that in cases involving  "known present beneficiaries of known place of residence," due process required actual notice.  339 U.S. at 318.  According to the Court, "[w]here the names and post-office addresses of those affected by a proceeding are at hand, the reasons disappear for resort to means less likely than the mails to apprise them of its pendency."  Id.  Notably, the "trustee ha[d] on its books the names and addresses of the income beneficiaries" and the trustee periodically remitted income from the trust to those individuals.  Id.

In Mennonite, a mortgagee of real property challenged an Indiana statute that provided for  notice of a tax sale by publication and posting.  The Court stated that "[w]hen the mortgagee is identified in a mortgage that is publicly recorded, constructive notice by publication must be supplemented by notice mailed to the mortgagee's last known available address, or by personal service."  462 U.S. at 798.  The mortgage on file with the county recorder identified the mortgagee only as "MENNONITE BOARD OF MISSIONS a corporation, of Wayne County, in the State of Ohio."  Id. at 798 n.4.  The Court assumed that the mortgagee's address could have been ascertained by "reasonably diligent efforts," but noted that "extraordinary efforts to discover the identity and whereabouts of a mortgagee whose identity is not in the public record" are not required.  Id.

Appellants contend that the Supreme Court's decisions in Mullane and Mennonite support their argument that, in some cases, "reasonably diligent efforts" can entail a search beyond a debtor's books and records.[17]  First, Appellants argue that Mullane's holding should be extended beyond the specific facts of that case.  As discussed previously, Mullane required actual notice to the beneficiaries of a trust where the names and addresses of those beneficiaries were on

---

17.  Appellants also cite two bankruptcy opinions in support of this argument, which are discussed below.

15

the trustee's books and records.  According to the Court in Mullane, the names and addresses of

the beneficiaries in that case were "at hand."  Appellants claim that the Court's "at hand"

language should be read expansively.  According to Appellants, the situation where a claimant's

identity is on the books and records, as in Mullane, is only one example of when a claimant's

identity is "at hand."  (Appellants' Br. 16.)   In this case, Appellants claim that their identities

were "at hand" because their identities would have been revealed by a title search of the Site.

However, Appellants cite no additional authority for this expansive reading of Mullane.  As such,

this Court declines to read Mullane so broadly.

        Appellants also contend that Mennonite stands for the proposition that "claimants'

names and addresses are 'at hand' if they are easily obtained from public records."  (Appellants'

Br. 16.)  The Court declines to read Mennonite so broadly as well.  In Mennonite, the Supreme

Court emphasized the importance of a mortgagee's legally protected property interest and

narrowly held that "[w]hen the mortgagee is identified in a mortgage that is publicly recorded,

constructive notice by publication must be supplemented . . . ."  462 U.S. at 798.  The Court did

not opine that in all contexts a search of the public records is necessary; Mennonite specifically

addressed the situation where a mortgagee's property interest was about to be nullified by a tax

sale.  Mennonite does not address what efforts a chapter 11 debtor is required to undertake to

determine whether a creditor is "known" or "unknown," which is the issue in this case.

        Further, this Court is guided by the Chemetron I court's statement that the

"reasonably ascertainable" standard requires an analysis of the specific facts of each case.  See 72

F.3d at 346 n.2.  The Court acknowledges that the facts of Mennonite did require the county to

look to the public records to ascertain the identity of the mortgagee *in that case*.  However, this

Court must examine the unique facts of this case to determine whether "reasonable diligence" required such a search.

### c.  Environmental Liability Cases: In re Texaco and In re Bicoastal

Appellees cite In re Texaco, 182 B.R. 937 (Bankr. S.D.N.Y. 1995)[18] and In re Bicoastal, 147 B.R. 807 (Bankr. M.D. Fla. 1992) in support of their argument that Chapter 11 debtors have no duty to search out successors-in-interest for purposes of providing them with actual notice of a claims bar date.  In In re Texaco, for example, the bankruptcy court held that the claimants were unknown creditors where the claimants owned land that was located approximately 9,440 feet from the debtor's contaminated water pits and where the debtor had no reason to believe that the water it contaminated could have migrated two miles underground to the claimant's property.  182 B.R. at 954-55.  In In re Bicoastal, the bankruptcy court held that the claimant was an unknown creditor where that claimant owned property downstream from the property that the debtor owned and the claimant argued that its property was environmentally damaged as a result of the debtor's actions upstream.  147 B.R. at 808.

The Court notes that the present case is not directly analogous to In re Texaco or In re Bicoastal.  In this case, there is only one piece of property at issue, the Site.  Thus, this case does not involve claimants who owned property adjacent to or near property that was directly contaminated by the debtors.  By contrast, the debtors in this case sold contaminants to a company that processed that contaminant on the Site, and the claimants are current and prior owners of that

---

18.    It should be noted that in Chemetron I, the Third Circuit flatly rejected the In re Texaco court's rule that the "reasonably ascertainable" standard requires only an examination of the debtor's books and records, without an analysis of the specific facts of each case, as discussed supra.  72 F.3d at 347 n.2.

property.  In re Texaco and In re Bicoastal do, however, stand for the proposition that in cases

involving environmental liability, a debtor is not obligated to search out every possible party that

could have been affected by its actions.

### d.  Situations in which a Debtor is Obligated to Look Outside its Books and Records

Appellants claim that the following cases support its argument that in some

circumstances, debtors are required to look beyond their books and records to find the identities of

known creditors.  In Waterville Industries, Inc. v. First Hartford Corp., 124 B.R. 411, 413 (Bankr.

D. Me.), the debtor moved for summary judgment, arguing that confirmation of its plan of

reorganization discharged all claims for environmental liability that might arise from pollution

that it caused on its real estate before confirmation.  The debtor failed to schedule any

environmental claims in its bankruptcy petition, even though it had been in negotiations with state

authorities regarding its contamination of the property.  "Not surprisingly, therefore, notice of the

pending reorganization did not go to any potential claimant for such damages either directly or

indirectly."  Id.  The bankruptcy court held that summary judgment on this issue was inappropriate

as the debtor "knew of specific environmental claims and knew of a class of claimants –

subsequent title holders. . . that it could have listed.  Instead, it scheduled no such claims and as a

result no notice was provided."  Id.

The Court finds that Waterville is distinguishable from the present case.  The issue

before the Waterville court was whether a genuine issue of material fact existed as to whether the

debtor's reorganization plan discharged environmental claims against it.  The Waterville court

held that the subsequent title holders were entitled to "*some* notice" of the debtor's bankruptcy

and therefore concluded that summary judgment was inappropriate.  Id. (emphasis in original).

Waterville did not specifically address whether the subsequent owners of the contaminated

property were "known creditors" entitled to actual notice of the bankruptcy, which is the issue

before this Court.

The Court also does not find Argonaut persuasive.  At issue in Argonaut was

whether certain individuals and entities claiming a property right in a leasehold interest held by

the debtor were "known creditors" entitled to actual notice.  Specifically, the claimants were

assignees of fractional interests in promissory notes and deeds of trust which purportedly

encumbered some interest in a piece of real property.  See 154 B.R. at 109-110.  The debtor's

predecessors had "dealt directly" in setting up the initial transaction with the assignor.  Id. at 112.

Further, the bankruptcy court noted that there was "some evidence . . . that [the debtor] knew that

the [assignor's] interest had been further assigned to some other entities [the assignees]."  Id.

These facts, combined with the fact that it would have been easy for the debtors to get the list of

assignees from the assignor and that the assignment was officially recorded, led the court to

conclude that the assignees were known creditors entitled to actual notice.  Id.

The facts of Argonaut are distinguishable from the facts of the present case.  First,

Appellees conducted business with Intermountain and did not have any contact with Appellants,

while in Argonaut the debtor's predecessors and assignors had "dealt directly" with each other.

Second, there is no evidence before the Court indicating that Appellees had knowledge that

Intermountain was not the current owner of the property.  By contrast, in Argonaut, there was

"some evidence" in the record that the debtor knew of the assignments in question.  Finally, the

Court points out that Appellants place too much emphasis on the Argonaut court's reference to the

recordation of the assignment.  The <u>Argonaut</u> court referenced the recordation only after pointing

out the relationship between the debtor and the assignor, the debtor's knowledge of the

assignments, and that the debtor could have gotten a list of the assignees from the assignor.

Contrary to Appellants' argument, <u>Argonaut</u> does not stand for the broad principle that, in every

case, a debtor is obligated to search public records to find the identity of a known creditor.

### e.  Conclusion

In contrast to the cases cited by Appellants, there is at least one case from this

Circuit that expressly rejected a title search:  <u>Chemetron I</u>.  The Court finds that <u>Chemetron I</u>

controls the outcome of this case.  In <u>Chemetron I</u>, the Third Circuit expressly rejected a title

search of the properties surrounding the areas contaminated by the debtors.  As discussed

previously, the Third Circuit held that such a requirement would have implicated difficult

causational issues: what geographic area was affected by the debtor's actions and during what

time period?  The Court notes that the geographic and temporal dimensions found in <u>Chemetron I</u>

are not present in this case.  However, this case brings its own complications.

First, as the Bankruptcy Court pointed out, if the Court holds that "reasonable

diligence" required a title search of the Site, then, Appellees would be required to conduct title

searches for every property affected by the Libby vermiculite.  While the scope of such a search is

finite, unlike the proposed search in <u>Chemetron I</u>, the breadth of such a search is not insignificant.

Appellees licensed thirty-six companies to use its vermiculite exfoliation process and sell Grace-

branded products, and the EPA's proof of claim lists thirty environmental sites, thirteen of which

are vermiculite expansion plants.   Thus, the debtor would be obligated to search for numerous

current and prior owners at numerous sites.

20

Second, like the facts of <u>Chemetron I</u>, the debtor in this case had no direct relationship with the late claimants.[19]   This aspect distinguishes the present case from other cases where actual notice was required.  As noted above, in <u>Mullane</u>, the trustee periodically remitted income from the trust to the income beneficiaries.  Similarly, in <u>Argonaut</u>, the debtor's predecessors dealt directly with the assignor of the claimants' interest.  Such a direct link is not present in this case.  In this respect, the Court concurs with the Bankruptcy Court's statements that the link between Appellees and Appellants is "highly attenuated" and that the relationship was akin to a "third-party transaction."

In addition, the Court finds that, although not directly analogous, <u>In re Texaco</u> and <u>In re Bicoastal</u> lend support to Appellees' argument that, in the context of environmental liability, a debtor is not required to search out all possible parties that may have been affected by its actions.

In sum, the determination of whether a creditor is "known" or "unknown" and consequently entitled to actual notice or publication notice is a fact specific inquiry.  <u>See Argonaut</u>, 164 B.R. at 112.  The Court concludes that the facts of this case do not warrant an expansion of the current case law.  "Reasonable diligence" did not require Appellees to conduct a

---

19.  In this case, Appellees may have had knowledge of potential *claims* against it, but Appellees did not have knowledge of Appellants' *identities*.  Courts in other circuits have held that "in order for a claim to be reasonably ascertainable, the debtor must have in his possession, at the very least, some specific information that reasonably suggests both the claim for which the debtor may be liable and the entity to whom he would be liable."  <u>In the Matter of Crystal Oil Co.</u>, 158 F.3d 291, 297 (5th Cir. 1998).  <u>Cf.</u> <u>In Re Eagle-Picher Indus., Inc.</u>, 278 B.R. 437, 456 (S.D. Ohio 2002) ("[K]nowledge of the existence of a creditor is insufficient to make that creditor a known creditor; it must be shown that the claim was known.").

In the present case, Appellees may have known that all current and prior owners of the Site faced CERCLA liability.  However, Appellees did not know the identities of those current and prior owners.  In this respect, this case is similar to <u>Chemetron I</u>, where Chemetron may have known that individuals residing near the manufacturing plant and landfill may have had claims against it, but Chemetron did not know the identities of those individuals.

title search of the Site to ascertain Appellants' identities, and therefore Appellants were not entitled to actual notice of Appellees' bankruptcy proceedings.

### B.  Excusable Neglect

#### 1.  Bankruptcy Rule 9006(b)(1)

Bankruptcy Rule 9006(b)(1) empowers a bankruptcy court to permit a creditor to file a late claim if the movant's failure to comply with an earlier deadline "was the result of excusable neglect."[20]  See Pioneer Inv. Serv. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 388 (1993).  In Pioneer, the Supreme Court stated that Rule 9006(b)(1) was intended to permit courts "to accept late filings caused by inadvertence, mistake or carelessness, as well as by intervening circumstances beyond the party's control."  Id.   The burden of provision excusable neglect lies with the late claimant.  Chemetron II, 212 F.3d at 205 (citing In re Trump Taj Mahal Assoc., 156 B.R. 928, 936 (Bankr. D.N.J. 1993), aff'd, No. 9303571, 1993 U.S. Dist. LEXIS 17827, at *5 (D.N.J. Dec. 13, 1993)).

---

20.  In Chemetron I, the Third Circuit noted that "it is unsettled whether excusable neglect remains a viable defense for filing a late proof of claim when the claimant is entitled to only publication notice."  72 F.3d at 349 n.3 (internal quotations omitted).  In Taj Mahal, the district court stated that "[i]t is . . . considerably more difficult to apply the excusable neglect standard in cases involving publication notice. . . . Recognizing excusable neglect claims based on the failure to read the published notices would be problematic . . . . [P]ermitting parties to file late proofs of claim would tend to render publication notice meaningless."  1993 WL 534494, at * 6 n.7 (D.N.J. 1993).

        The Court notes that Appellants have not cited, and it is unaware of, any bankruptcy cases permitting an "unknown" creditor entitled only to publication notice to file a late claim based on excusable neglect. Cf. Orthopedic, 246 F.3d at 326-27 (permitting an individual who received only constructive notice to file a registration form seven months after the registration deadline in a class action settlement based on excusable neglect).  By contrast, two cases in this circuit have denied  "unknown" creditors' requests to file late claims based on excusable neglect.  See Chemetron II, 212 F.3d at 205; Taj Mahal, 1993 WL 534494, at *5-6.

        The Court does not address the unsettled nature of the law on this subject, as the Court finds that, even if Rule 9006(b)(1) applies, excusable neglect has not been established.

"The determination whether a party's neglect of a bar date is 'excusable' is essentially an equitable one, in which courts are to take into account all relevant circumstances surrounding a party's failure to file."  Chemetron I, 72 F.3d at 349 (citing Pioneer, 507 U.S. at 389).  Relevant circumstances to be considered by the court include: (1) danger of prejudice to the debtor, (2) the length of delay and its potential impact on judicial proceedings, (3) the reason for the delay, including whether it was within the reasonable control of the movant, and (4) whether the movant acted in good faith.   Pioneer, 507 U.S. at 395.

Recent Third Circuit decisions have emphasized that courts must adequately consider the totality of circumstances presented.  See Orthopedic, 246 F.3d at 320-21; Chemetron I, 72 F.3d at 350.  The Third Circuit has "imposed a duty of explanation on [courts] when they conduct 'excusable neglect' analysis."  In re Cendant Prides Corp. Prides Litig., 233 F.3d 188, 196 (3d Cir. 2000) (citing Chemetron I, 72 F.3d at 350).  For example, in Chemetron I, the Third Circuit held that the bankruptcy court *and* district court below did not adequately consider the totality of the circumstances as required by Pioneer and remanded the case with instructions to "undertake a more comprehensive and thorough determination of whether the totality of the circumstances" supported the late claimants' excusable neglect argument.[21]  Id. at 350.

### 3.  Analysis

#### a.  Adequacy of the Bankruptcy Court's Analysis

---

21.  Specifically, the Third Circuit pointed out that the bankruptcy court failed to make relevant factual findings, including the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, and whether the movant acted in good faith.  Id. at 349-50.  With respect to the district court, the Third Circuit highlighted that it "failed to undertake a comprehensive analysis of how the claimants' late filing would prejudice Chemetron, and also failed to consider the role that Chemetron might have played in contributing to the delay."  Id. at 350.

Appellants argue that under <u>Chemetron I</u>, the Bankruptcy Court abused its discretion by failing to give due regard to its claims of excusable neglect.[22]  The Court acknowledges Appellants' argument.  However, the Court declines to discuss whether the Bankruptcy Court adequately considered Appellants' excusable neglect argument.  Instead, the Court will weigh the factors enumerated by the Supreme Court in <u>Pioneer</u> to determine whether Appellants have established excusable neglect.

### b.  <u>Pioneer</u> factors

### (1) Danger of Prejudice to the Debtor

"[P]rejudice is not an imagined or hypothetical harm; a finding of prejudice should be a conclusion based on facts in evidence."  <u>In re O'Brien</u>, 188 F.3d at 127.  In <u>In re O'Brien</u>, the Third Circuit noted that bankruptcy courts have considered the following factors when examining prejudice:

> [1] the size of the claim with respect to the rest of the estate; [2] whether allowing the late claim would have an adverse impact on the judicial administration of the case; [3] whether the plan was filed or confirmed with knowledge of the existence of the claim; [4] the disruptive effect that the late filing would have on the plan or upon the economic model upon which the plan was based; and [5] whether allowing the claim open the floodgates to other similar claims.

<u>Id.</u> at 126 (citing <u>In re Keene Corp.</u>, 188 B.R. 903, 912-913 (Bankr. S.D.N.Y. 1995)).

---

22.  The Bankruptcy Court did not make factual findings with respect to excusable neglect, and the transcript of the Bankruptcy Court's hearing in this case does not shed much light on the reasoning behind its decision with respect to this issue.

24

Factors two and four overlap with this Court's consideration of the delay's impact on the judicial proceedings, and will be discussed below.  The Court will now examine the other three factors.

With respect to first factor, Appellants argue that its claims are only a small fraction, approximately one percent, of Appellees' total obligations.  (Appellants' Br. 26-27.) This factor weighs in Appellants' favor.

With respect to the third factor, there is no evidence in the record that Appellees had knowledge of the existence of Appellants' claim.  As such, the facts of this case are directly opposite to those of In re O'Brien, where there was no question that the debtor was aware of the late claimant's claim and the amount of that claim and the debtor had planned to pay the claim. The Third Circuit found this factor relevant in determining that no prejudice existed under the excusable neglect analysis.  In re O'Brien, 188 F.3d at 128 (citing Greyhound Lines, Inc. v. Rogers, 62 F.3d 730, 738 (5th Cir. 1995)).  By contrast, in this case, Appellees were not aware of Appellants' claims or the amount of those claims, and Appellees had not planned to pay those claims.  Therefore, unlike the debtor in In re O'Brien, the debtor in this case could arguably be prejudiced by Appellants' claims.

With respect to the fifth factor, Appellees argue that allowing proofs of claim to be filed at this time may open the "flood gates" for similar claims and render Appellees' publication notice meaningless.  (Oral Arg. Tr. 46-47.)  As discussed previously, in response to interrogatories from the EPA, Appellees licensed thirty-six companies to use its vermiculite exfoliation process and sell Grace-branded products.  The EPA's proof of claim lists thirty environmental sites, thirteen of which are vermiculite expansion plants.  While the number of sites affected is known,

25

the number of current and prior owners that may have claims against Appellees is unknown.  The number could be none, as Appellants argue,[23] or it could be many.   The Court acknowledges that, to date, no new creditors have sought to be excused from the Bar Date Order so to as now be entitled to relief on the basis of excusable neglect.  As such, it is difficult to see  how Appellees would be prejudiced if the Court permitted Appellants to file their claims.  See In re O'Brien, 188 F.3d at 128.

### (2)  Length of Delay and its Potential Impact on Judicial Proceedings

The length of delay in this case is approximately one year and eight months: the Bankruptcy Court set a Bar Date of March 31, 2003 and Appellants filed their Motion for Leave to File Late Claims on January 4, 2005.  With respect to the length of the delay, courts have refused to find excusable neglect in cases where the late claimants filed much closer to the bar date than Appellants did in this case.  See, e.g., Taj Mahal, 1993 WL 534494, at *5 (affirming bankruptcy court's determination that the late claimants did not establish excusable neglect where the late claimants filed a complaint almost one year after the bar date passed).  And, in cases where late claimants have established excusable neglect, the delay was far shorter than the length of delay in this case.  See, e.g., Pioneer, 507 U.S. at 384 (late claimants filed twenty days after the bar date); In re O'Brien, 188 F.3d at 130 (late claimants filed two months after the bar date).

In addition to the actual amount of time that passed between the Bar Date and the late filing, the Third Circuit stated that courts should consider the "length of delay in *absolute*

---

23.   Appellants argue that "[t]here is no indication in the record that others have come forward or are primed to come forward on the same st of facts on which the Appellant's premised their Motion to File Late Claims." (Appellants Br. 27.)

terms." In re O'Brien, 188 F.3d at 130 (emphasis added).  In In re O'Brien, for example, the actual delay was only two months (i.e., the claim was filed two months after the Bar Date), but, in that two months, the debtor's Plan became effective.   As such, the actual delay took on "significance mainly because of the intervening occurrence of the effective date of the Plan . . . ." Id.  The Third Circuit held that the delay "should not be held to turn entirely on the urgency created by the debtor's time line.  Such an approach makes the two month delay seem significant, whereas a similar delay [in another case] . . . would be insignificant."  Id.

In this case, the length of delay is one year and eight months, but Appellants did file their claim before the confirmation of Appellees' Plan.  The Court acknowledges that in many cases where excusable neglect arguments are rejected, the late claimants have filed after the confirmation date.  See, e.g., Chemetron II, 212 F.3d at 205 (excusable neglect argument rejected where late claimants filed two years after the confirmation date); Taj Mahal,156 B.R. at 938 (excusable neglect argument rejected where late claimants filed more than one year after the confirmation date).  Nonetheless, as the Bankruptcy Court stated, the delay in this case is not insignificant:  "This debtor is well on the road toward trying to get a confirmable plan together.  Having filed these claims at this point in time will jeopardize that process.  It will certainly change distributions to other creditors within certain classes."[24]  (A-329.)

### (3) Reason for the Delay

---

[24]   The Bankruptcy Court made these statements while the parties were making arguments regarding whether Appellants were known or unknown creditors.  However, the Court points out that the Bankruptcy Court's thoughts are relevant to two of the Pioneer excusable neglect factors: (1) prejudice and (2) the length of delay and its potential impact on the judicial proceedings.

The next factor to be considered under <u>Pioneer</u> is the reason for the delay, including whether it was within the reasonable control of the movant.  At oral argument, Appellants argued that they were unaware of any potential claims they may have had against Appellee until June 2004, when they were contacted by the EPA regarding contamination of the Site.  (Oral Ar. Tr. 23.)  From June 2004 until January 2005, Appellants claim that they "had to go through a process of finding out . . . who were the owners [of the Site], how was [the Site] contaminated, are they in bankruptcy and file the claim . . . ."  <u>Id.</u>

In <u>Chemetron II</u>, the Third Circuit stated that "'ignorance of one's own claim does not constitute excusable neglect.'" 212 F.3d at 205.   Further, unknown creditors entitled to only publication notice cannot blame their ignorance on the fact that they did not receive actual notice: because Appellants did "not read the legal section of the newspaper and did not read the legal section of the newspaper that published the bar date order in this case is not controlling."[25]  <u>Taj Mahal</u>, 156 B.R. at 940.  Consequently, Appellants' argument that they did not know of their claims against Appellees until the EPA contacted them in June 2004 is not persuasive.

Appellants do set forth another argument regarding PacifiCorp.  Appellants argue that Utah Power and Light's Customer Service Division received notice of the commencement of the bankruptcy, but because they did not know of the environmental investigation involving the Site, did not communicate that notice to PacifiCorp's environmental division.  (Oral Arg. Tr. 18-20, 24.)  According to Appellants, this lack of communication constitutes excusable neglect.  Even if the Court were to consider this neglect to be "excusable," however, this reason would only

---

25.   In direct contrast to the bankruptcy court's holding in <u>Taj Mahal</u>, Appellants incorrectly argue: "dumb us, we should have read the paper, we didn't, and under <u>Pioneer</u>, that behavior is excused."  (Oral Arg. Tr. 60.)

remedy PacifiCorp's delay from the Bar Date until June 2004, when it learned of its environmental liability.  After Appellants did learn of their environmental liability, Appellants did not file with the Bankruptcy Court for over six months.  Appellants have not presented the Court with compelling arguments for this delay.   The Court points out that in other cases, late claimants have filed much sooner after claims have come to their attention.  <u>See</u>, <u>e.g.</u>, <u>In re O'Brien</u>, 188 F.3d at 130 (late claimant filed approximately four weeks after it became aware that its claim was waived).

In addition, when considering the reason for the delay, courts must not only examine the conduct of the claimant which contributed to the delay, but should also examine whether the notice given by the debtor contributed to the delay.  <u>In re Orthopedic</u>, 246 F.3d at 328; <u>O'Brien</u>, 188 F.3d at 129.  As will be discussed below, the publication notice given by the debtor was more than adequate and consequently the Court finds that the debtor did not contribute to the delay in this case.

In sum, Appellants have presented no compelling reason for their delay.  According to the Third Circuit, Appellants' ignorance of their own claims prior to June 2004 is no excuse.  <u>See</u> <u>Chemetron II</u>, 212 F.3d at 205.  Further, Appellants have not adequately explained why it took them six months to file with the Bankruptcy Court after they did have knowledge of their claims.  Finally, the Court notes that Appellees did not contribute to Appellants' delay.  Therefore, this factor weighs in favor of Appellees.

### (4) Good Faith

"Given the equitable nature of our inquiry, it is of course true that the movant must demonstrate good faith or otherwise seek the relief of the court with clean hands."  <u>In re</u>

29

Orthopedic, 246 F.3d at 329 (citing Gaudiosi v. Mellon, 269 F.2d 973, 881 (3d Cir. 1959)).  In

this case, the parties agree that Appellants have not acted in bad faith.  (Oral Arg. Tr. 24 & 50.)

This factor weighs in favor of Appellants.

### (5) Adequacy of Notice

In addition to the four factors discussed above, courts also consider the adequacy

of the debtor's notice.  See, e.g, Pioneer, 507 U.S. at 399 (concluding that the "unusual form of

notice employed . . . require[d] a finding that the neglect . . . was, under all the circumstances,

'excusable'"); In re O'Brien, 188 F.3d at 129 (stating that the bankruptcy court should have

considered that the notice of the bar date was buried in the middle of a twelve page document);

Taj Mahal, 1993 WL 534494, at *5 (concluding that excusable neglect was not established where

the late claimants received adequate publication notice of the bar date and the bar date order was

not ambiguous).  As in Taj Mahal, the Court finds that the debtor in this case adequately

published notice of the bar date.   Appellees spent a considerable amount of money publishing the

notice in both national and local publications, and Appellants have not challenged the sufficiency

of the publication notice.  Further, even if Appellants had challenged the sufficiency of Appellees'

publication notice, late claimants "cannot claim excusable neglect based on the alleged

insufficiency of publication notice, when their own conduct made them unknown creditors

entitled only to publication notice."  Taj Mahal, 1993 WL 534494, at *5.  Therefore, this

consideration weighs in favor of Appellees.

### (6) Conclusion

Most significantly, Appellants have not presented the Court with sufficient reasons

for filing their claims after the Bar Date.  It is also important that the publication notice in this

case was clearly adequate, which further supports the Court's finding Appellants have not set forth compelling reasons for the delay.  Weighing in Appellants favor is that: Appellants' claims are arguably minimal in the context of the size of the estate; Appellees have not alleged with specificity that additional creditors will come forward if the Court were to allow Appellants' claims; Appellants filed their late claims before the confirmation date; and, Appellants acted in good faith.  The Court concedes that this case is a close call, with some factors weighing in favor of Appellees and some factors weighing in favor of Appellants.  However, Appellants bear the burden of establishing excusable neglect, and considering the totality of the circumstances, the Court finds that Appellants have not done so in this case.  As such, the Court concurs with the Bankruptcy Court's conclusion in this respect.

### C.  Actual Notice to Van Cott

The final issue for this Court is whether Van Cott received actual notice of the bar date.  Appellees sent notice of the bar date to: VanCott, Bagley, Cornwall & McCarthy, 50 S. Main St., Salt Lake City, Utah 84144.  Appellants point out three problems with this notice: (1) the notice should have been addressed to the firm's 401(k) profit sharing program, and not to the firm itself; (2) the street address did not include a suite number; and (3) the zip code should have been "84145" and not "84144."

If mail is properly addressed, stamped, and mailed, there is a presumption that the notice was received.  In re Longardner & Assoc., 855 F.2d 455, 459 (7th Cir. 1988) (citing Hanger v. United States, 285 U.S. 427, 430 (1932)).  Appellees correctly argue that this presumption is not entirely rebutted, but only weakened when the address does not contain a zip code or there are mistakes in the zip code.  For example, in In re Longardner, the mailing lacked a zip code entirely.

The Seventh Circuit held that "the absence of a zip code on the address . . . [does not] preclude[] a finding that the notice was properly addressed.  855 F.2d at 460.  Further, the court stated that the presumption of delivery was only weakened by the absence of a zip code.  Id.  In In re STN Enter., Inc., 94 B.R. 329, 334 (Bankr. D. Vt. 1988), the bankruptcy court held that there was a presumption of proper delivery even when, as in this case, the last digit of the zip code is incorrect.   Therefore, in this case, the incorrect zip code only weakens the presumption that the notice was received.

With respect to the missing suite number, Appellees correctly point out that bankruptcy courts in the Eastern District of Pennsylvania have held that a missing suite number does not preclude a finding that the notice was properly addressed.  See, e.g., In re Li, 242 B.R. 280, 283 (E.D. Pa. 1999) (stating that where the debtor failed to include the suite number in an address, the "insufficiency of the mailing address [was] doubtful").

In addition, statements from the president of Van Cott that he did not receive actual notice of the bar date do not overcome the presumption that the notice was properly delivered.  "[A creditor's] denial of receipt alone does not rebut the presumption, but merely creates a question of fact."  In re Longardner, 855 F.2d at 459.  By contrast, in In Re Dodd, 82 B.R. 924 (Bankr. N.D. Ill. 1987), the bankruptcy court held that "direct testimony of nonreceipt, particularly in combination with evidence that standardized procedures are used in processing claims, would be sufficient to support a finding that the mailing was not received and thereby rebut the presumption accorded a proper mailing."    In In re Dodd, the standardized procedures involved contacting the company's local office for advice and additional information on the account; forwarding a copy of the notice to the company's legal department in New York; and keeping a

32

record of the notice in the Customer Accounting department.   Despite all of these procedures, the company in In re Dodd had no record of the notice.  This case is distinguishable from In re Dodd in that Van Cott has not alleged any standardized procedures for processing claims and has only attached an affidavit of Van Cott's president.  Therefore, the Court finds that Van Cott did receive actual notice in this case.

**IV. CONCLUSION**

For the reasons stated above, the Court finds that Appellants are unknown creditors entitled to only publication notice, and that Appellants have not established excusable neglect. Further, the Court finds that Van Cott did receive actual notice.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

PACIFICORP AND VANCOTT          :
BAGLEY CONRWALL & MCCARTHY,     :
                                :         CIVIL ACTION NO. 05-764
                    Appellants, :
                                :
                                :    BANKRUPTCY CASE NO. 01-1139
              v.                :
                                :
W.R. GRACE, et al.,             :
                                :
                    Appellees.  :


**ORDER**

AND NOW, this 16th day of August, upon consideration of Appellants' Brief

(Docket No. 9), Appellees' Brief (Docket No. 12), Appellants' Reply Brief (Docket No. 14), and

the Transcript of the Oral Argument held on January 10, 2006 (Docket No. 16), it is hereby

**ORDERED** that this appeal is **DENIED.**  The final opinion and order the Bankruptcy Court,

entered on September 20, 2005, is **AFFIRMED**.

Further, the Court **STRIKES** Issue 3 of the Issues Presented on Appeal (Docket

No. 2) and preserves all rights with respect to that Issue, pursuant to the Stipulation and Motion

for Order Resolving Debtors' Motion to Strike (Docket No. 8).

BY THE COURT:

_____

RONALD L. BUCKWALTER, S. J.


34